UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | 09 MD 2027 (BSJ) |
| | (Consolidated Action) |
| SATYAM COMPUTER SERVICES LTD. SECURITIES LITIGATION | |
| | ECF Case |
| This Document Applies to: All Cases | |

**SUPPLEMENTAL DECLARATION OF SANDEEP PAREKH**

I, SANDEEP PAREKH, declare as follows:

1.     I am a visiting associate professor of law at the Indian Institute of Management, Ahmedabad, India and a former executive director at the Securities and Exchange Board of India ("SEBI") where I served as head of the enforcement and legal affairs departments.  I previously submitted a declaration in this action in support of plaintiffs' opposition to defendants' motions to dismiss on the basis of forum non conveniens (hereinafter "the Declaration"). See Dkt. No. 119. I incorporate the Declaration by reference herein.

2.     It is my understanding that on 22nd March 2010, defendants Maytas Properties, B Rama Raju, Jr. and B. Teja Raju moved to dismiss the Consolidated Class Action Complaint, and expressly cited to and relied upon the Rebuttal Declaration of Justice Aziz Mushabber Ahmadi (hereinafter the "Rebuttal Declaration" and

1

together with his prior declaration, the "Ahmadi Declarations"). Lead Plaintiffs' counsel have asked me to submit this supplemental declaration to address the opinions expressed in Justice Ahmadi's Rebuttal Declaration.

3.  During my experience at SEBI as an enforcement director and otherwise throughout my career as a securities law practitioner, I have not encountered and cannot identify today a single private securities action brought either individually or as a class action in India. It is telling that the Ahmadi Declarations do not cite a single example of a private securities action that has ever been initiated in India. Even more significantly, Justice Ahmadi cannot point to any such action that has been initiated with respect to the Satyam case itself despite the fact that more than a year has elapsed since the fraud was revealed. This is not surprising as such actions are excluded by the SEBI Act and the SCR Act.

4.  Indeed, Justice Ahmadi's assessment of the ability of private litigants to bring securities suits is not just contradicted by case law and statute, it also departs from the position articulated by the Advisory Panel on Financial Regulation and Supervision, a committee of the Reserve Bank of India, India's central bank. The Advisory Panel (whose members include senior policy makers, experts and a senior representative of SEBI) has categorically stated the current law as follows, in advocating for its change:

> 4.3.4 Private Right of Action
> There is no specific provision empowering a private person to seek his or her own remedies for misconduct relating to the securities law. Only SEBI is empowered to take action for a violation of the SEBI Act and Regulations.
>
> A private person can mainly seek remedies such as compensation for deficiency in services provided by an intermediary before a consumer forum as per the Consumer Protection Act, 1986 or for any claim against broker before Arbitrator under bye-laws of a RSE.
>
> However, Section 15Y and 20A of SEBI Act bar the jurisdiction of civil courts in matters which are within the purview of the adjudicating officer, SAT or SEBI. Only SEBI can file a criminal complaint under section 26 for violation of the SEBI Act and regulations.

It is therefore, recommended that private right of action and / or class action suit by investors may be allowed by law.

5.    The authorities cited in Justice Ahmadi's Rebuttal Declaration are either irrelevant or support my position. For instance, the *Bank of Baroda*[1] case does not mention sections 15Y or 20A of the SEBI Act, which bar the jurisdiction of courts where SEBI is empowered to act, let alone address the jurisdiction of civil courts. In fact, the ruling is a key case for the proposition that SEBI has vast remedial powers. For nearly a decade I have used the case in teaching a course titled 'Securities Regulation' to show that SEBI has extensive power over all aspects of securities regulation and enforcement. Similarly, the other case cited in ¶ 11 of the Rebuttal Declaration, *Sterlite*, does not mention sections 15Y or 20A.[2]

6.    Justice Ahmadi's reliance on the Supreme Court of India's decision in *Dhulabhai* is also misplaced. Rebuttal Declaration ¶ 5. That decision recognizes that the jurisdiction of civil courts may be excluded by express provisions of law:[3]

> At the very start we may observe that the jurisdiction of the Civil Courts is all embracing except to the extent it is excluded by an express provision of law or by clear intendment arising from such law. This is the purport of s. 9 of the Code of Civil Procedure.

[See Exhibit 5 of Hunter Declaration]

7.    Thus contrarily, the *Dhulabhai* case supports the view that common law remedies stand excluded where, as here, a statute so excludes them:

> One is where there was a liability existing at common law, and that liability is affirmed by a statute which gives a special and peculiar form of remedy different from the remedy which existed at common law: there, **unless the statute**

---

[1] See Exhibit 3 of the Fraser L. Hunter Declaration of 12th March 2010 [hereafter, the "Hunter Declaration"].

[2] The *Sterlite* case stands for the proposition that monetary penalties cannot be imposed under remedial powers of SEBI. They can of course be imposed under the penal sections of the Act by SEBI. See Exhibit 6 to the Hunter Declaration.

[3] Civil courts could have jurisdiction where the express bar is unconstitutional. There is neither an argument nor a ruling that either S. 15Y or 20A is unconstitutional. Further, as I have submitted in my declaration, the powers of SEBI are extremely wide and there is no area which leaves a vacuum in jurisdiction which can possibly be filled by a civil court.

**contains words which expressly or by necessary implication exclude the common law remedy** the party suing has his election to pursue either that or the statutory remedy.

[Emphasis supplied]

[*Id.* at ¶ 9 of the case]

8. Justice Ahmadi's assertion that the SEBI Act and SCR Act are statutes of limited authority is also contrary to established case law of the Supreme Court of India. In the case of *Clariant v. SEBI*[4] [attached as Exhibit A], the unusually broad powers of the regulator created by the SEBI Act are stated in the following terms:

> The SEBI Act confers a wide jurisdiction upon the Board. Its duties and functions thereunder, run counter to the doctrine of separation of powers. Integration of power by vesting legislative, executive and judicial powers in the same body, in future, may raise several public law concerns as the principle of control of one body over the other was the central theme underlying the doctrine of separation of powers.
>
> …
>
> The Board exercises its legislative power by making regulations, executive power by administering the regulations framed by it and taking action against any entity violating these regulations and judicial power by adjudicating disputes in the implementation thereof. The only check upon exercise of such wide ranging power is that it must comply with the Constitution and the Act.

9. Contrary to Justice Ahmadi's assertion in ¶ 15 of the Rebuttal Declaration, the SEBI statutory framework provides SEBI with authority to obtain compensation for victims of fraud, such as disgorgement of ill gotten gains and restitution. However, SEBI has not initiated these kind of proceedings with regard to the Satyam matter and even if it did, it only has the power to force those who made ill-gotten profits to disgorge. See Declaration of Vikramaditya Khanna, Dkt. No. 120 ("Khanna Declaration"), at n.9.

---

[4] [2004] 54 SCL 519: 122 COMP. CAS. 112 (SC).

10.     As a matter of policy, the SEBI Act reflects the will of the Indian parliament to exclude the jurisdiction of civil courts where SEBI is empowered to act. One of the current whole time members of the SEBI board, M.S. Sahoo, has explained in an article (written previously) the rationale for inserting S. 20A: "This made SEBI's functioning independent of the lower civil courts and allowed quick disposal of cases by SEBI without being hamstrung by stay orders from civil courts." [A copy of the paper is attached as Exhibit B]

11.     Justice Ahmadi's reliance on *Asha Anilkumar Kataria v. Ashokkumar Kevalchand Bafna & ors* (hereinafter *Asha*) does not further the defendants' position, as the case stands for the proposition that where SEBI in fact has no powers in a civil dispute between two persons, civil courts would have jurisdiction. The case states at ¶ 15:

> We have considered in para 10 above, all the provisions creating a bar of jurisdiction against entertainment of an issue by a civil court i.e. Section 20–A and Section 15(Y) of SEBI Act, and Section 22(E) of the S.C. Regulation Act, in the light of provisions relating to powers of the authorities under the respective Acts, i.e. adjudicating officer, Securities Appellate Tribunal and the Board, and found that none of the provisions enable either of these authorities to resolve a dispute regarding non-payment between a client and sub-broker (much less unregistered sub-broker).

*Asha* does not apply to the case at bar because SEBI *does* have the power to investigate and adjudicate the claims in the Satyam case, a fact which Defendants do not dispute. In *Asha*, the Court held that the private claim could proceed because there were no provisions of the SEBI Act, SCR Act or exchange regulations governing the dispute between the plaintiff and the sub-broker. It is indisputable that numerous sections and regulations of the SEBI Act and SCR Act and regulations passed under them were violated by the defendants in this case, leaving no argument that SEBI is not empowered to act. Indeed, SEBI has already invoked its enforcement power in the Satyam fraud. *See* Khanna Declaration at ¶¶ 14-15.

5

12.     Justice Ahmadi incorrectly asserts in ¶ 10 of the Rebuttal Declaration that the SCR Act has no bearing on this litigation as that statute deals with issues such as the functioning of stock exchanges. The SCR Act is one of the key statutes violated in the Satyam fraud[5].

13.     Justice Ahmadi states in ¶ 19 of the Rebuttal Declaration that SEBI can use a fund to support actions brought by investor associations. This assertion, however, is belied by the last two lines of the same paragraph which specifically exclude "proceeding[s] where the board is a party or where the board has initiated any enforcement action." In other words, even though SEBI can fund investor associations, it cannot fund them in cases where SEBI is empowered to take action, and certainly not in cases where SEBI has actually acted. As noted above, SEBI has already exercised its broad powers in connection with the Satyam case. Therefore it is not surprising that, to date, SEBI has not funded any investor associations regarding this matter.

14.     In ¶ 23 of the Rebuttal Declaration, Justice Ahmadi refers to S. 62 of the Companies Act, 1956, which provides shareholders with a direct remedy under Indian law when they suffer a loss by reason of any untrue statement in a prospectus. However, there are no claims in the Satyam fraud arising out of a false prospectus in a public offering.

15.     Similarly, any discussion by Justice Ahmadi on Order I Rule 8 of the Code of Civil Procedure 1908 ("CCP") is moot. As discussed in ¶ 24 of my prior Declaration, Order I Rule 8 of the CCP establishes a "representative action"

---

[5] All violations of disclosure norms, particularly several financial mis-disclosures under the listing agreement are prohibited by the SCR Act. Violations of S. 21 read with 23A and 23E are serious offences inviting penalties of 10 years in prison (under S. 23M) and monetary penalties of up to Rs. 250 million ($5 million). This view is supported by the fact that the investigation initiated by SEBI clearly mentions possible violations of the SCR Act (http://www.sebi.gov.in/cmorder/satyamord.pdf) [A copy of the order initiating investigation by SEBI is attached as Exhibit C].

procedure. However, a representative suit is only a procedural right and cannot grant or create substantive rights.

16. With respect to ¶ 30 of Justice Ahmadi's Rebuttal Declaration, the fraud on the market presumption he relies upon, as reflected in Reg. 2(1)(c)(9), applies only to a SEBI action, not to private actions.

17. Finally, with respect to the Right to Information Act ("RTI"), Justice Ahmadi asserts in ¶ 50 of the Rebuttal Declaration that plaintiffs face certain refusal of any request for information. Justice Ahmadi's position is contrary to case law,[6] which says that refusal can only be for a specific cause. Moreover, as Justice Ahmadi points out, information can be shared "anytime after the investigations are complete" a concession that is difficult to reconcile with his claim that plaintiffs can never obtain information through an RTI request.

18. In sum, the Rebuttal Declaration broadly asserts an entirely conjectural theory of how a private litigant might bring a claim in India for securities fraud, yet fails to identify a single shareholder suit well after a year of India's biggest corporate fraud – or indeed any shareholder suits arising from a securities fraud claim. These speculative theories, moreover, are contrary to all authorities in this area of law and entirely novel to me despite my fifteen years of collective experience as an Indian securities lawyer, securities law professor and enforcement director at SEBI.

---

[6] In *Shri Avtar Singh v. Shri Karan K Sharma* (F.No.CIC/AT/A/2007/00242 dated 28 May 2007), the Central Information Commission holds: "in my view a completed investigation takes the information connected with that investigation outside the ambit of Section 8(1)(h). This Section speaks about "*information which would impede the process of investigation...*" A completed investigation is no more in 'process' and, therefore, cannot be said to be impeded if disclosure of information connected with such investigation is allowed. The CPIO and the AA were in error in concluding that even though the information relates to a concluded investigation, it would still attract the exemption under Section 8(1)(h)." [A copy of the order is attached as Exhibit D]

Respectfully submitted to this Court on the 8th day of April 2010.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

*Sandeep Parekh*

Sandeep Parekh

# EXHIBIT A

2004 INDLAW SC 677 **[SUPREME COURT OF INDIA]**

**Clariant International Limited and Another**
v
**Securities and Exchange Board of India**

[S. B. Sinha](#)

*25 Aug 2004*
**BENCH**
[N. Santosh Hegde](#), [S. B. Sinha](#) & [A. K. Mathur](#)

**COMPARATIVE CITATIONS**
2004 (122) CC 112, 2004 AIR(SC) 4236, 2004 (8) SCC 524, 0 (62) CLA 96, 0 (4) CLJ 52, 0 (5) CLC 1217, 0 (54) SCL 519, 2004 (3) KLT 813, 0 (7) JT 69, 2004 INDLAW SC 677

**CASES REFERRED TO**
Ashok Leyland Limited v State of Tamil Nadu and Another [2004 Indlaw SC 2](#)
South Eastern Coalfields Limited v State of Madhya Pradesh and Others [2003 Indlaw SC 866](#)
Citi Bank N.A. with Canara Bank and Others v Standard Chartered Bank and Others with Citi Bank N.A. and Others [2003 Indlaw SC 831](#)
Dipak Chandra Ruhidas v Chandan Kumar Sarkar [2003 Indlaw SC 590](#)
Secretary, Ministry of Chemicals & Fertilizers, Government of India v Messrs Cipla Limited and Others [2003 Indlaw SC 570](#)
United India Insurance Company Limited and Others v Patricia Jean Mahajan and Others [2002 Indlaw SC 1726](#)
Cellular Operators Association of India and Ors. v Union of India and Ors. [2002 Indlaw SC 1576](#)
West Bengal Electricity Regulatory Commission v Central Excise S.C. Limited Etc [2002 Indlaw SC 1151](#)
Kaushnuma Begum Smt. and Others v New India Assurance Company Limited and Others [2001 Indlaw SC 20418](#)
Executive Engineer, Dhenkanal Minor Irrigation Division, Orissa, Ect. Etc v N. C. Budharaj (Dead) By Lrs. Etc [2001 Indlaw SC 19768](#)
D. P. Varma v R. P. Mishra, Opposite Party [1999 Indlaw SCMAH 14](#)
Municipal Corporation of Delhiv. Sushila Devi Smt. and Others,. (Civil Appeal No. 687 of 1986) With Sushila Devi Smt. and Others v Municipal Corporation of Delhi and Others(Civil Appeal No. 4242 of 1986) [1999 Indlaw SC 1168](#)
State Bank of Patiala v Harbans Singh [1994 Indlaw SC 1941](#)
Delhi Development Authorityv. Messrs Surgical Cooperative Industrial Estate Limited, and Others,. (Civil Appeal Nos. 668-669 of 1988) Surgical Cooperative Industrial Estate Limited v Delhi Development Authority and Others(Slp (C) No. 15673 of 1986) [1993 Indlaw SC 556](#)
Secretary, Irrigation Department, Government of Orissa and Others v G. C. Roy [1991](#)

Indlaw SC 421

Balkrishan Gupta and Others v Swadeshi Polytex Limited and Another 1985 Indlaw SC 442

Narendra Singh v Chhotey Singh and Another 1983 Indlaw SC 467

Dr. Akshaibar Lal and Others v Vice-Chancellor, Banaras Hindu University, and Others 1961 Indlaw SC 200

Messrs. Howrah Trading Company, Limited v Commissioner of Income Tax, Calcutta 1959 Indlaw SC 139

Rai Sahib Ram Jawaya v State of Punjab (And 1955 Indlaw SC 16

Citibank N.A. vs. Standard Chartered Bank etc [2004 (6) SCC 1]

ITW Signode India Ltd. Vs. CCE [2004 (3) SCC 48]

DDA and Others vs. Joginder S. Monga and Others [2004 (2) SCC 297]

H.S. Ahammed Hussain and Another vs. Irfan Ahammed and Another [2002 (6) SCC 52]

Regional Provident Fund Commissioner vs. Shiv Kumar Joshi 2000 (1) SCC 98

Kruger and Others vs. Commonwealth of Australia [1997 (146) Australian Law Reports 126]

Narendra Singh Vs. Chhotey Singh and Another 1983 (4) SCC 131

Ashok Leyland Ltd. Vs. State of Tamil Nadu []

## THIS JUDGMENT WAS FOLLOWED IN 21 CASE(S) ⊛

## ACTS REFERRED

Securities and Exchange Board of India Act, 1992[s. 14A, s. 14A(7), s. 2(2), s. 4(3), s. 4(1)(b), s. 4(1)(a), s. 5(1), s. 5(2), s. 11B, s. 14(2), s. 15M(2), s. 15Z, s. 18(5), s. 24]

Unit Trust of India Act, 1963

Unit Trust of India (Transfer of Undertaking and Repeal) Act, 2002[s. 7]

Companies Act, 1956[s. 41]

Securities Contracts (Regulation) Act, 1956

Depositories Act, 1996

Code of Civil Procedure, 1908[s. 34(1), s. 34(2)]

Indian Companies Act, 1913

Motor Vehicles Act, 1988

Planning and Compensation Act, 1991

Corporate Law Economic Reform Programme Act, 1999

Corporation Act, 2001

Telecom Regulatory Authority of India Act, 1997

Electricity Act, 2003

## RULES REFERRED

Securities and Exchange Board of India (Substantial Acquisition of Shares and Takeovers) Regulations, 1997 [reg. 10, reg. 12, reg. 21, reg. 21(6), reg. 22(12), reg. 44, reg. 44(i), reg. 45]

## CASE NO

Appeal (Civil) 3183 of 2003

**EDITOR'S NOTE**

**Securities Exchange Board of India - Securities and Exchange Board of India Act, 1992 - Securities Contracts (Regulation) Act, 1956, reg. 44 - Arrangement as to transferring of shares of 'target company' – Acquirer as per arrangement acquired 50.1% shares/voting rights and control in the target company – Complaint received as to that arrangement had been made without any public announcement thus the provisions of the Regulations had been violated - Upon an inquiry made in this behalf, the Board came to the conclusion that the acquirer had actually acquired the control over the target company on 21.11.1997 – Order by Board awarding interest at a certain rate for delay involved in making payment to the shareholders who tendered the shares in the public offer required to be made in terms of the Regulations – Whether exercise of right by Board proper? - By reason of reg. 44, as substituted in 2002, the discretionary jurisdiction of the Board is curtailed - Could award interest by way of damages but by reason of Regulation 2002, its power is limited to grant interest to compensate the shareholders for the loss suffered by them arising out of the delay in making the public offer by reason of Regulation 44, as substituted in 2002, the discretionary jurisdiction of the Board is curtailed - Power is limited to grant interest to compensate the shareholders for the loss suffered by them arising out of the delay in making the public offer – Directions issued - Appeals Disposed Of.**

**KEYWORDS**

Articles Of Association, Fixed Deposit, Condition Precedent, Beneficial Owner, Equity Share Capital, Civil Procedure Code, Code of Civil Procedure, CPC

**JUDGMENT TEXT**

The Judgment was delivered by : HON'BLE JUSTICE S. B. SINHA

Hon'ble Justice S.B. Sinha

These appeals under Section 15Z of the Securities and Exchange Board of India Act, 1992 (for short, 'the said Act) arise out of a judgment and order dated 21.02.2003 passed by the Securities Appellate Tribunal, Mumbai (for short, 'the Tribunal') in Appeal No.114 of 2002.

BACKGROUND FACTS :

Colour Chem Ltd. is a target company. Its shares are listed on the Bombay Stock Exchange and National Stock Exchange. Appellant No.1 (**Clariant**) in Civil Appeal No.3183 of 2003 is a Swiss company being subsidiary of another Swiss company, **Clariant** AG. Hoechst is a German company whereas Ebito Chemiebeteiligungen AG (Ebito) is a Swiss company. In Ebito **Clariant** held 49% and Hoechest 51% shares. An agreement was entered into by and between Hoechst and **Clariant** pursuant whereto and in furtherance whereof German Specialty Chemicals business was transferred to the latter by transferring 583708 equity shares of Rs.100/- each of the target company. On or about 21.11.1997, with a view to give effect to the said agreement, **Clariant** sought for an exemption from compliance of the requirements of making open offer to the shareholders of the target company in terms of the provisions of the Securities and Exchange Board of

India (Substantial Acquisition of Shares and Takeovers) Regulations, 1997 (for short, the Regulations). Such exemption, however, was not granted. Hoechst in the aforementioned situation decided to sell off the shares held by it in the target company to Ebito, a company which was floated on 19.5.2000 as a special purpose vehicle. Actual transfer took place on 13.10.2000. Ebito by reason of the aforementioned transfer became a 100% subsidiary of **Clariant**.

A complaint was received by the Securities and Exchange Board of India (for short, 'the Board') to the effect that as by reason of the aforementioned arrangement as 50.1% shares/voting rights and control in the target company had been made without any public announcement, the provisions of the Regulations had been violated. Upon an inquiry made in this behalf, the Board came to the conclusion that the acquirer had actually acquired the control over the target company on 21.11.1997. By reason of an order dated 16.10.2002, the Board directed :

*"13.1 In view of the findings made above, in exercise of the powers conferred upon me under sub-section (3) of Section 4 read with Section 11B SEBI Act 1992 read with regulations 44 and 45 of the said Regulations, I hereby direct the Acquirer to make public announcement as required under Chapter III of the said Regulations in terms of regulations 10 & 12 taking 21.11.97 as the reference date for calculation of offer price. The public announcement shall be made within 45 days of passing of this order.*

*13.2 Further, in terms of sub regulation (12) of regulation 22, the payment of consideration to the shareholders of the Target company has to be made within 30 days of the closure of the offer. The maximum time period provided in the said Regulations for completing the offer formalities in respect of an open offer, is 120 days from the date of public announcement. The public announcement in the instant case ought to have been made taking 21.11.97 as a reference date and thus the entire offer process would have been completed latest by 21.3.98. Since no public announcement for acquisition of shares of the Target company has been made, which has adversely affected interest of shareholders of Target Company, it would be just and equitable to direct the Acquirer to pay interest @15% per annum on the offer price, the Acquirer is hereby accordingly directed to pay interest @15% per annum to the shareholders for the loss of interest caused to the shareholders from 22.3.98 till the date of actual payment of consideration for the shares to be tendered in the offer directed to be made by the Acquirer." ***

An appeal was preferred thereagainst by the acquirer wherein the primal question raised was the rate of interest for the delay involved in making payment to the shareholders who tendered the shares in the public offer required to be made in terms of the Regulations.

It is not in dispute that the value of the share as on 24.2.1998 was Rs.220/-; on 22.10.2002 Rs.213/- and on the date of public announcement i.e. on 7.4.2003 the value of the share was Rs.209/- , Rs.233/- Rs.203/- and Rs.220/-, whereas the offer price was Rs.318/-.

The submissions of the acquirer before the Tribunal were that (i) the rate of interest is on

the higher side; (ii) the dividends having been paid in the meantime, the same should be set off from the amount of payable interest; and (iii) the interest is payable only to those shareholders who held shares on the triggering date, namely, 24.2.1998.

IMPUGNED JUDGMENT :

The Tribunal by its impugned judgment while rejecting the first two contentions raised on behalf of the acquirer accepted the third, holding :

*"(i) Those persons who were holding shares of the target company on 24.2.1998 and continue to be shareholders on the closure day of public offer to be made in terms of the directions given by the Respondent vide the impugned order alone shall be eligible to receive interest in case the shares which they were holding on 24.2.1998 are tendered in response to public offer made in terms of the impugned order, and accepted by the Appellants.*

*(ii) The interest payable by the Appellants shall be at the rate of 15% as directed by the Respondent in its order dated 16.10.2002.*

*(iii) The dividend paid by the target company to its shareholders not required to be deducted from the interest payable to the shareholders by the Appellants."* *

The acquirer has preferred Civil Appeal No.3183 of 2003, whereas the Board has filed Civil Appeal No.3701 of 2003 against the said judgment. Civil Appeal Nos. D3952 of 2004 and 3872 of 2003 have been filed by the Administrator of the Specified Undertaking of the Unit Trust of India and by one Umeshkuamr G. Mehta respectively.

SUBMISSIONS

Mr. R.F. Nariman, and Mr. D.A. Dave, learned Senior Counsel appearing on behalf of the appellants, would submit that the intent and purport of Regulation 44 of the Regulations, being to compensate the shareholders for the loss suffered by them, the rate of interest payable to the shareholders would vary from case to case. The guidelines in this regard having been provided for in the statute, Mr. Nariman would submit, grant of 9% interest should be held to be just and proper in view the fact that the investment was to be made for a long period, i.e., for about five years. In support of the said contention, the learned counsel placed reliance on Kaushnuma Begum (Smt.) and Others vs. New India Assurance Co. Ltd. and Others [ 2001 Indlaw SC 20418], H.S. Ahammed Hussain and Another vs. Irfan Ahammed and Another [ 2002 (6) SCC 52], United India Insurance Co. Ltd. and Others vs. Patricia Jean Mahajan and Others [ 2002 Indlaw SC 1726] and DDA and Others vs. Joginder S. Monga and Others [ 2004 (2) SCC 297].

It was further submitted that those shareholders who had purchased the shares later than the date fixed by the SEBI were not entitled to receive any compensation by way of interest as they were not the shareholders on the said date having regard to the fact that their names did not appear in the register of the company. As regard the findings of the

Board that the amount of dividend paid to the shareholders would not be set off against the amount of interest, it was argued that having regard to the fact that actual date of transfer had been fixed on 22.3.1998, by reason of a fiction created, a person must be deemed to be a shareholder as on that date and having regard to the fact that interest was being paid to the shareholders at the offer price from the said date till the actual payment is made, the amount received by the shareholders by way of dividend is liable to be adjusted from the amount to be paid by way of interest. Our attention has further been drawn to the fact that pursuant to the order of this Court dated 28.4.2003 a sum of Rs.111.50 crores had been deposited and invested in a nationalized bank.

Mr. Kirit Rawal, learned Senior Counsel appearing on behalf of the Board, would, on the other hand, contend that while fixing the rate of interest, the Board, being an expert body, exercises a discretionary jurisdiction and, thus, the Tribunal and this Court should not interfere therewith. The learned counsel would argue that the rate of interest fixed at 15% p.a. cannot be said to be arbitrary and in support thereof reliance has been placed on Delhi Development Authority vs. M/s Surgical Cooperative Industrial Estate Ltd. and Others [ 1993 Indlaw SC 556]. Mr. Rawal would contend that from a bare perusal of Regulation 44(i) of the Regulations, it would appear that all those shareholders who had opted to sell their shares pursuant to the public offer are entitled to the payment of interest and, thus, the finding of the Tribunal in this regard is bad in law.

It was submitted that Regulation 44 must be read with Section 11B of the Act so as to put a proper and effective meaning thereto in terms whereof the Board is entitled to issue any direction including those which are specified therein..

As regard the direction issued by the Tribunal to the effect that only those shareholders who were on the roll of the company and continued to be so on the date of public offer alone are entitled to interest, Mr. Rawal would contend that by reason of such construction of Regulation 44, the free transferability of the shares which is the basic feature of the security market would be interfered with.

Mr K.K. Rai, learned counsel appearing on behalf of the Appellant in Civil Appeal No. 3872 of 2003, would, inter alia, contend that transaction being commercial in nature, interest at the rate of 15% cannot be said to be on a high side. Reliance in support of the said contention has been placed on State Bank of Patiala and Another vs. Harbans Singh [ 1994 Indlaw SC 1941] and Regional Provident Fund Commissioner vs. Shiv Kumar Joshi [ 1999 Indlaw SCMAH 14].

It was contended that as shares were traded on speculation, it may not be possible to identify the shareholders who as per direction of the Tribunal would be entitled to interest as the shares by such time might have changed many hands. Furthermore, the process being a complex one, Regulation 44 should be read in such a manner which may be effectually worked out.

Mr. Shrish Kr. Misra, learned counsel appearing on behalf of the Administrator of the Specified Undertaking of the Unit Trust of India in Civil Appeal No.D3952 of 2004

would submit that the appellants therein should be held to be entitled to grant of interest despite the fact that it was not a shareholder as on 11.3.1998 as would appear from the following :

A. That the Unit Trust of India was a statutory corporation under the Unit Trust of India Act, 1963 and was/ is the shareholders of the Target company and as on 24-2-1998 holding 1123800 shares.

B. That Unit Trust of India Act, 1963 has been repealed by the Act of the Parliament i.e. Unit Trust of India (Transfer of Undertaking and Repeal) Act, 2002.

C. That the said Act provides for transfer and vesting of Undertaking (excluding Specified Undertaking) of Unit Trust of India to a Specified Company (being UTI Trustee Company Pvt. Ltd.) to be formed and registered under the Companies Act 1956 as well as for transfer and vesting of Specified Undertaking of Unit Trust of India in the Administrator appointed by the Central Government in the terms of section 7 of Unit Trust of India (Transfer of Undertaking and Repeal) Act, 2002.

D. That as per section 4(1) (b) of the said Act the Specified undertaking of the erstwhile Unit Trust of India being all business, assets, liabilities and properties set out in Schedule-I of the said Act stood transferred to the vested in the "Administrator of the Specified Undertaking of the Unit Trust of India" on and with effect from the appointed day viz. 1-2-2003. That by virtue of section 4(1)(a) of the said Act, the Undertaking (excluding the Specified Undertaking) of the erstwhile Unit Trust of India being all business, assets, liabilities and properties set out in schedule II of the said Act stood transferred to and vested in the "UTI Trustee Company Pvt. Ltd" on and with effect from the appointed day viz. 1-2-2003.

E. That the 1123800 shares (considering face value of Rs. 10/- each) purchased by the erstwhile Unit Trust of India were/are from the amount which relates to Schedule I & II to the said Act. Therefore, the shares purchased by the erstwhile Unit Trust of India of M/s. Colour Chem Ltd. stands transferred to and vested in the 'Administrator of the Specified Undertakings of the Unit Trust of India' and the 'Specified Company' i.e. UTI Trustee Company Pvt. Ltd. by virtue of the said Act.

F. That out of 1123800 shares the amount invested for 501100 (considering face value of Rs.10/- each as on 24- 2-1998) shares is from the schemes which come under schedule I of the said Act, as such the "Administrator of the Specified Undertaking of the Unit Trust of India" is the successor in holder of 501100 shares..

G. That the amount invested by the erstwhile Unit Trust of India for the balance 622700 (considering face value of Rs.10/- each as on 24-2-1998) shares was from the schemes which come under the Schedule II of the said Act, as such the "UTI Trustee Company Pvt. Ltd." is the successor in holder of those 622700 shares.

H. That as per Section 5(1) of the said Act all the assets and liabilities including lands,

buildings, vehicles, cash balances, deposits, foreign currencies, disclosed and undisclosed reserves, reserves fund, special reserve fund, benevolent reserve fund, any other fund stock, investments, shares, bonds, debentures, security, powers authorities privileges benefits of the erstwhile Unit Trust of India vest in "Administrator of the Specified undertaking of the Unit Trust of India" and "UTI Trustee Company Pvt. Ltd."

I. That as per section 5(2) of the said Act "All contracts, deeds bonds guarantees, power of attorney other instruments (including all units issued and unit schemes formulated by the Trust and working arrangements) subsisting immediately before the appointed day and affecting the Trust shall cease to have effect or to be enforceable against the Trust and shall be in full force and effect against or in favour of the specified company (UTI Trustee Company Pvt. Ltd.) or the Administrator (Administrator of the Specified Undertaking of the Unit Trust of India) as the case may be, in which the undertaking or specified undertaking has vested by virtue of the said Act and enforceable as fully and effectually as if instead of the Unit Trust of India, the specified company (UTI Trustee Company Pvt. Ltd) or the Administrator (Administrator of the Specified undertaking of the Unit Trust of India) had been named therein or had been a party thereto.

The Relevant Statutory Provisions: The Securities and Exchange Board of India Act, 1992 was enacted to provide for the establishment of a Board to protect the interests of investors in securities and to promote the development of, and to regulate, the securities market and for matter connected therewith or incidental thereto. Section 11 of the Act provides that inter alia the duty of the Board is to protect the interest of investors in securities and to promote the development of, and to regulate the securities market, by such measures as it thinks fit, which would include in regulation of substantial acquisition of shares and take-over of companies. Section 11B empowers the Board to issue directions, inter alia, in the interest of investors, or orderly development of securities market. Regulation 44 of the 1997 Regulations reads thus :

*"44. Directions by the Board. The Board may, in the interests of the securities market, without prejudice to its right to initiate action including criminal prosecution under section 24 of the Act give such directions as it deems fit including :*

*(a) directing the person concerned not to further deal in securities;*

*(b) prohibiting the person concerned from disposing of any of the securities acquired in violation of these Regulations;*

*(c) directing the person concerned to sell the shares acquired in violation of the provisions of these Regulations;*

*(d) taking action against the person concerned". ***

In terms of the said regulation, there was no express power to issue any direction as regard grant of interest.

Regulation 44 of 1997 Regulations was substituted in the year 2002 with effect from 9.9.2002, the relevant portion of which reads thus :

*"44. Directions by the Board. Without prejudice to its right to initiate action under Chapter VIA and section 24 of the Act, the Board may, in the interest of securities market or for protection of interest of investors, issue such directions as it deems fit including: - (i) directing the person concerned, who has failed to make a public offer or delayed the making of a public offer in terms of these Regulations, to pay to the shareholders, whose shares have been accepted in the public offer made after the delay, the consideration amount along with interest at the rate not less than the applicable rate of interest payable by banks on fixed deposits." ***

As the impugned order of the Tribunal had been passed on 21.2.2003, it is not disputed that Regulation 44 as amended in 2002 shall be attracted in the instant case.

'Shareholder' has neither been defined in the Act nor in the Regulations; whereas 'shares' has been defined to mean shares in the share capital of a company carrying voting rights and includes any security which would entitle the holder to receive shares with voting rights but shall not include preference shares..

In terms of sub-section (2) of Section 2 of the said Act, the words and expressions used and not defined in the Act but defined in the Securities Contracts (Regulation) Act, 1956 (42 of 1956) or the Depositors Act, 1996 (22 of 1996) shall have the meanings respectively assigned to them in that Act.

Clause (2) of Regulation 2 provides that all other expressions unless defined therein shall have the same meaning as have been assigned to them under the Act or the Securities Contracts (Regulation) Act, 1956 , or the Companies Act, 1956

*"41. (1) The subscribers of the memorandum of a company shall be deemed to have agreed to become members of the company, and on its registration, shall be entered as members in its register of members.*

*(2) Every other person who agrees in writing to become a member of a company and whose name is entered in its register of members, shall be a member of the company." ***

Rate of interest :

Section 11 of the Act provides that it shall be the duty of the Board to protect the interest of investors in securities. Regulation 44 of 1997, however, empowered the Board to issue directions only in the interest of the securities market. The expression "in the interest of the investors" did not occur therein. Regulation 44 of 2002 Regulations, thus, confers a wider power upon the Board. The said power is without prejudice to its right to initiate action under Chapter VIA and Section 24 of the Act which deals with offences . Regulation 44 of 2002 Regulations, furthermore, empowers the Board to issue directions both in the interest of the securities market as well as for protection of interest of

investors. Such directions may be issued in its discretion. It, however, in its discretion may or may not issue such directions. Regulation 44 (i) of Regulations, therefore, confers a power upon the Board to issue directions also in the interest of the investors which would include a direction to pay interest.

A direction in terms of Regulation 44 which was in the interest of securities market indisputably would have caused civil or evil consequences on the defaulters. Clause (i) of Regulation 44, however, does not provide for any penal consequence. It provides for only a civil consequence. By reason of the said provision, the power of the Board to issue directions is sought to be restricted to pay the amount consideration together with interest at the rate not less than the interest payable by banks on fixed deposits. Both the Board and the Tribunal have proceeded on the basis that the interest is to be paid with a view to recompense the shareholders and not by way of penalty or damages. Such a direction, therefore, was for the purpose of protecting the interest of investors and not "in the interest of the securities market". The transactions in the market are not thereby affected one way or the other. The Board, as noticed hereinbefore, has a discretion in the matter and, thus, it may or may not issue such a direction. The shareholders do not have any say in the matter. As a necessary concomitant, they have no legal right.

The Board further having a discretionary jurisdiction must exercise the same strictly in accordance with law and judiciously. Such discretion must be a sound exercise in law. The discretionary jurisdiction, it is well- known, although may be of wide amplitude as the expression "as it deems fit" has been used but in view of the fact that civil consequence would ensue by reason thereof, the same must be exercised fairly and bona fide. The discretion so exercised is subject to appeal as also judicial review, and, thus, must also answer the test of reasonableness.

In Kruger and Others vs. Commonwealth of Australia, reported in 1997 (146) Australian Law Reports, page 126, it is stated :

Moreover, when a discretionary power is statutorily conferred on a repository, the power must be exercised reasonably, for the legislature is taken to intend that the discretion be so exercised. Reasonableness can be determined only by reference to the community standards at the time of the exercise of the discretion and that must be taken to be the legislative intention."

The discretionary jurisdiction has to be exercised keeping in view the purpose for which it is conferred, the object sought to be achieved and the reasons for granting such wide discretion. [(See Narendra Singh Vs. Chhotey Singh and Another, 1983 Indlaw SC 467]

A discretionary jurisdiction, furthermore, must be exercised within the four-corners of the statute. [See Dr. Akshaibar Lal and Others Vs. The Vice-Chancellor, Banaras Hindu University and Others, 1961 Indlaw SC 200 and also para 9-022 of De Smith, Woolf and Jowell's Judicial Review of Administrative Action, 5th Edition, page 445]

Interest can be awarded in terms of an agreement or statutory provisions. It can also be

awarded by reason of usage or trade having the force of law or on equitable considerations. Interest cannot be awarded by way of damages except in cases where money due is wrongfully withheld and there are equitable grounds therefor, for which a written demand is mandatory.

In absence of any agreement or statutory provision or a merchantile usage, interest payable can be only at the market rate. Such interest is payable upon establishment of totality of circumstances justifying exercise of such equitable jurisdiction. [See Municipal Corporation of Delhi vs. Sushila Devi (Smt.) and Others  1999 Indlaw SC 1168 Para 16].

In Executive Engineer, Dhenkanal, Minor Irrigation Division, Orissa and Others vs. N.C. Budharaj (Deceased) by Lrs. And Others [  2001 Indlaw SC 19768], Raju, J. speaking for the majority held that a person deprived of the use of money to which he is legitimately entitled has a right to be compensated for the deprivation by whatever name it may be called, namely, interest, compensation or damages.

In Black's Law Dictionary, the word 'compensation' has been defined as under : *"money given to compensate loss or injury".* *

In a given case where the liability arises during pendency of a litigation, doctrine of restitution can be invoked. In South Eastern Coalfields Ltd. vs. State of M.P. and Others [  2003 Indlaw SC 866], it was observed :

*In law, the term "restitution" is used in three senses (i) return or restoration of some specific thing to its rightful owner or status; (ii) compensation for benefits derived from a wrong done to another; and (iii) compensation or reparation for the loss caused to another (See Black's Law Dictionary, 7th Edn., p. 1315). The Law of Contracts by John D. Calamari & Joseph M. Perillo has been quoted by Black to say that "restitution" is an ambiguous term, sometimes referring to the disgorging of something which has been taken and at times referring to compensation for injury done:*

*"Often, the result under either meaning of the term would be the same. Unjust impoverishment as well as unjust enrichment is a ground for restitution. If the defendant is guilty of a non-tortious misrepresentation, the measure of recovery is not rigid but, as in other cases of restitution, such factors as relative fault, the agreed- upon risks, and the fairness of alternative risk allocations not agreed upon and not attributable to the fault of either party need to be weighed." *

When a bench-mark is fixed by a statute, the question as to whether a discretion has been judicially or properly exercised or not will have to be determined in the context of the facts of the particular case. [See Irrigation Department vs. G.C. Roy,  1991 Indlaw SC 421]. When a bench-mark is fixed or the court grants interest at the agreed rate, it may not be necessary to give reasons but where interest is granted at a higher or lessor rate, some reasons are required to be assigned.

**By reason of Regulation 44, as substituted in 2002, the discretionary jurisdiction of**

**the Board is curtailed. It in terms of Regulations 1997 could award interest by way of damages but by reason of Regulation 2002, its power is limited to grant interest to compensate the shareholders for the loss suffered by them arising out of the delay in making the public offer. The courts of law can take judicial notice of both inflation as also fall in bank rate of interest. The bank rate of interest both for commercial purpose and other purposes had been the subject-matter of statutory provisions as also the judge-made laws. #** Even in cases of victims of motor vehicles accidents, he courts have upon taking note of the fall in the rate of interest held that 9% interest to be reasonable. [See Kaushnuma Begum (supra), and H.S. Ahammed Hussain (supra) and Patricia Jean Mahajan (supra)]

The statutory changes brought about must be noticed by the court keeping in view the fact that the nature of jurisdiction by the Board has been changed. The mischief rule also in this case should be applied. Furthermore while construing such provisions, the courts must take into consideration the provisions of the law as had been interpreted by courts prior thereto.

By way of an example we may notice that the proviso appended to sub-sections (1) and (2) of Section 34 of Code of Civil Procedure provides for the grant of rate at which moneys are lent or advanced by nationalized banks in relation to commercial transactions.

In DDA vs. M/s Surgical Cooperative Industrial Estate Ltd. and Others [ 1993 Indlaw SC 556] whereupon Mr. Rawal has placed reliance, 15% interest was directed to be paid only in favour of those members who had already been allotted plots and made some payments, on a suggestion made by the court, as would appear from the following :

*At the rate of 15% interest the amount would be considerably less yet we suggested to the learned counsel for these members to ascertain from their clients if they would be willing to purchase the plots at 50% of the price realised in the last auction. They conveyed their willingness to pay that price i.e. 50% of Rs. 10, 756 per square metre. Mr. Arun Jaitley, the learned counsel for the Delhi Development Authority submitted that although he had no instructions from his clients in the matter his clients would abide by any just, reasonable and fair order that this Court would make in the facts and circumstances of the case."* *

The said decision, therefore, has no application to the fact of the present matter.

**We also do not agree with the contention that the payment of interest for delay in making the public offer is a commercial transaction. #**

While determining the cases of commercial transaction also, fall in rate of interest has been taken note of by this Court in Citibank N.A. etc. vs. Standard Chartered Bank and Others etc. [ 2003 Indlaw SC 831, Para 62] and Citibank N.A. vs. Standard Chartered Bank etc [ 2004 (6) SCC 1, para 54].

It is at this stage relevant to note that the rate of interest at the rate of 15% as directed by the Board has been affirmed by the Tribunal stating:

Even on applying the said test, it does not appear to me that the 15% interest directed to be paid to the shareholders as compensation for the delay involved in making the payment in the Appellants' case is unjust. In this context it is to be noted that the payment was to be made, in case the offer had been made according to the provisions of the Takeover Regulations, by 22.3.1998 and the amount to be so paid remains unpaid till date.

**Therefore, in my view the interest rate applicable should be that rate which was prevailing on 22.3.1998 and not the one prevailing on the date of the impugned order. According to the information furnished by the Appellants the rate of interest payable on deposits for a period of 3 years and above by nationalized banks was around 12% at that point of time. In this context one should not fail to note that the interest is directed to be paid to the shareholders to compensate the loss. Had the shareholder received the money on due date, in the normal course what return he would have received by effectively investing that money has to be taken into consideration. The amount was due on 22.3.1998. The then existing rate of 12%, if calculated on quarterly rest basis, at the end of 2002 works out to more than 15% and therefore, even if the interest is worked out in relation to the rate of interest payable on deposit by nationalized banks, the rate of interest payable by the Appellants fixed at 15% p.a. by the Respondent in the instant case cannot be considered unjust, and the same is also not contrary to the view held by the Hon'ble Supreme Court in Kaushnuma Begum's case or against the provisions of regulation 44(i)." #**

The observation of the Tribunal was on a wrong premise as the rate of interest in a case of fixed deposit in a nationalized bank was not to be calculated on quarterly rest basis. Furthermore, the bank rate of interest which was prevailing in 1998 had also fallen down.

The rate of interest at the relevant time as was payable by Syndicate Bank, a nationalized bank, is as under :

"FIXED DEPOSIT INTEREST RATES FOR THREE YEARS AND ABOVE FROM SYNDICATE BANK

| Sl.No. | From | To | Percentage |
|---|---|---|---|
| 1. | 02.07.1996 | 30.04.1997 | 13% |
| 2. | 01.05.1997 | 31.08.1997 | 12% |
| 3. | 01.09.1997 | 31.10.1997 | 11% |
| 4. | 01.11.1997 | 21.12.1997 | 10% |
| 5. | 22.12.1997 | 14.01.1998 | 11% |
| 6. | 15.01.1998 | 21.01.1998 | 11.5% |

| | | | |
|------|------------|------------|--------|
| 7. | 09.02.1998 | 11.10.1998 | 12% |
| 8. | 12.10.1998 | 14.03.1999 | 11.5% |
| 9. | 15.03.1999 | 04.04.1999 | 11.25% |
| 10. | 05.04.1999 | 30.04.1999 | 11% |
| 11 | 01.05.1999 | 22.08.1999 | 10.5% |
| 12. | 23.08.1999 | 11.11.1999 | 10.25% |
| 13. | 12.11.1999 | 09.04.2000 | 9.75% |
| 14. | 10.04.2000 | 31.08.2000 | 9% |
| 15. | 01.09.2000 | 15.10.2000 | 9.5% |
| 16. | 16.10.2000 | 31.12.2000 | 10% |
| 17. | 01.01.2001 | 11.02.2001 | 9.75% |
| 18. | 12.02.2001 | 14.03.2001 | 10% |
| 19. | 15.03.2001 | 09.07.2001 | 9.5% |
| 20. | 10.07.2001 | 14.09.2001 | 9.25% |
| 21. | 15.09.2001 | 15.12.2001 | 8.75% |
| 22. | 16.12.2001 | 20.01.2002 | 8.50% |
| 23. | 21.01.2002 | 07.04.2002 | 8.25% |
| 24. | 08.04.2002 | 06.08.2002 | 7.75% |
| 25. | 07.08.2002 | 27.10.2002 | 7.50% |

While awarding interest, it is required to bear in mind that interest would be payable on the maximum price of the share which was Rs.318/- and not on Rs.220/- which was not the prevailing price in 1998, as a result whereof not only a shareholder would be getting a higher price but would also be getting interest thereupon.

So far as the contention regarding the applicability of dynamics of the market or its being a volatile one is concerned, the same, in our opinion, has nothing to do with rate of interest inasmuch both the Board and the Tribunal proceeded on the basis that the shareholders are to be compensated by way of interest for delayed payment. In that view of the matter, the relevance of rate of interest payable for the period it is payable and the persons who are entitled to be compensated were required to be determined. **Rate of interest should be a reasonable one as the same became payable for the delay in making the payment, subject of course to the statutory provision contained in the Regulations. As noticed hereinbefore, the discretion of the Board vis-a-vis the Tribunal had been curtailed. There is a change even in relation to the nature of discretion of the Board. The Board and the Tribunal , thus, failed to apply the correct principles of law in determining the rate of interest payable in this case. #**

To whom interest is payable:

It is not in dispute that the acquirer contravened Regulation 12 while acquiring the control of the target company. Regulation 14(3) provides that a public announcement referred to in Regulation 12 is required to be made by the merchant banker not later than four working days after any such change or changes are decided to be made as would result in the acquisition of control over the target company by the acquirer. Clause 4 of Regulation 15 provides that the offer under these Regulations shall be deemed to have been made on the date on which the public announcement appeared in any of the newspapers referred to in clause (1). The announcement of offer in terms of Regulation 16(xi) is to contain that date by which individual letters of offer would be posted to each of the shareholders. Regulation 20 provides for the minimum offer price. In terms of clause (1) of Regulation 21, the public offer is required to be made by the acquirer to the shareholders of the target company to acquire from them an aggregate minimum 20% of the voting capital of the company.

The Board arrived at an inference that the acquirer had acquired the control of the target company as the special vehicle company on 19.5.2000. The liability of the acquirer to pay interest should be judged in the aforementioned context.

Shareholder :

To become a shareholder, a person has to fulfill two conditions, namely, he must agree in writing to become a member of a company and whose name should be entered in its register of members. The members holding equity share capital of company and whose names are entered as beneficial owner in the records of the depository shall be deemed to be the members of the concerned company.

In Palmer's Company Law, 23rd Edn. at page 154, para 12-07, it is stated :

*12-07 Subscribers as members The subscribers of the memorandum are deemed to have agreed to become members of the company, and on its registration shall be entered as members in its register of members (1948 Act, s. 26(1))." ***

It is further stated :

*49.04. Other members In the case of members other than the subscribers to the memorandum two essential conditions have to be satisfied to constitute a person a member:*

*(1) an agreement to become a member; and*

*(2) entry on the register.*

*These two conditions are cumulative: unless they are both satisfied, the person in question has not acquired the status of member.*

*Thus, an agreement to become a member alone does not create the status of membership; it is a condition precedent to the acquisition of such status that the shareholder's name should be entered on the register. Conversely, the company is not entitled to place a person's name on the register without his having agreed to become a member; a person improperly registered without his assent is not bound thereby and may have his name removed from the register." ***

In M/s Howrah Trading Co., Ltd. vs. The Commissioner of Income Tax, Calcutta [ 1959 Indlaw SC 139], the law is stated thus :

*"The question that falls for consideration is whether the meaning given to the expression "shareholder" used in section 18(5) of the Act by these cases is correct. No valid reason exists why "shareholder" as used in section 18(5) should mean a person other than the one denoted by the same expression in the Indian Companies Act, 1913. In In re Wala Wynaad Indian Gold Mining Company Chitty, J., observed :*

*"I use now myself the term which is common in the courts, 'a shareholder', that means the holder of the shares. It is the common term used, and only means the person who holds the shares by having his name on the register." ***

[See also Balkrishan Gupta and Others vs. Swadeshi Polytex Ltd. and Another [ 1985 Indlaw SC 442]]

The rights of a shareholder are purely contractual and would be such which are granted to him by Company's Memorandum or Articles of Association together with the statutory rights conferred on him by the Companies Act.

**A shareholder having regard to the direction issued by the Tribunal must be one who was a shareholder on the triggering date. #** Purpose and object of creating a legal fiction is well-known. Once a fiction is created upon imagining a certain state of affairs, the imagination cannot be permitted to be boggled when it comes to the inevitable corollaries thereof. [See Dipak Chandra Ruhidas vs. Chandan Kumar Sarkar [ 2003 Indlaw SC 590]], ITW Signode India Ltd. Vs. CCE, [ 2004 (3) SCC 48], and Ashok Leyland Ltd. Vs. State of Tamil Nadu, 2004 Indlaw SC 2].

Directions by the Board are required to be issued for the purpose of protecting the interest of the investors which would imply that such protection be extended to the persons who are entitled thereto and not any other shareholder who would get the same by windfall. The shareholders contemplated under clause (i) of Regulation 44 must be those shareholders whose shares have been accepted upon public announcement of offer and who have suffered loss owing to blockage of amount by not being able to sell the shares held by them. The object of the said provision is to protect the interest of such shareholders who had suffered a loss for delay in making the public announcement and, thus, may have to be compensated. The very fact that the bench-mark as regard the rate of interest has been fixed is also a pointer to the fact that the interest is to be paid to such investors who had suffered some loss.

While compensating a person, the court should see that he is not unjustly enriched. Interest is directed to be paid on the default of the acquirer occasioning loss suffered by an investor of his money. The question of paying interest by way of compensation to persons who had not suffered any loss, thus, would not arise.

**Interest was, therefore, payable only to such persons who were shareholders of target company as on the triggering date. #**

Deposits made by the Appellants in this Court Effect :

It is not in dispute that the appellants pursuant to an order of this Court dated 28th April, 2003 have deposited a sum of Rs.111.50 crores which has been calculated on the following basis :

| 1. | Total paid-up capital of Colour-Chem Ltd. (By number of shares) | 11, 650, 000 |
|---|---|---|
| 2. | No. of shares to be acquired through open offer | 2, 330, 000 |
| 3. | Estimated number of shares available for offer having eligibility for interest as per SAT Order (as of 25.4.2003) | 3, 724, 224 |
| 4. | Ratio of acceptance as per Regulation 21(6) | 40% |
| 5. | No. of shares likely to be acquired as per Regulation 21(6) from the lot eligible for Interest | 1, 489, 690 |
| 6. | Balance to be acquired from the lot of shares not eligible for interest | 840, 310 |
| 7. | Total price consideration @ Rs.318/- per share | 740, 940, 000 |
| 8. | Total interest payable in respect of shares at Sl. No.5 above As per the Open Offer - @ 15% p.a. for the period 22.3.1998 to 21.6.2003 (1918 days) Rs.250.65/share) | Rs.373, 390, 799 |
| TOTAL AMOUNT TO BE DEPOSITED AS PER SUPREME COURT ORDER OF 28TH APRIL, 2003 | Rs.1, 114, 330, 799 | |
| | ROUNDED OFF TO | Rs.111.50 crores |

The estimated number of shares available as per order of the Tribunal as on 25.4.2003

would be about 60% of the total shareholders, who would be benefited.

We have hereinbefore noticed that the offer price of Rs. 318/- per equity share would be payable as on 24.2.1998 although the market price thereof at the relevant time was only Rs.220/-.

We may notice the difference on monetary terms on the amount payable to the investors on public announcement of offer, as would appear from the following chart :

| TOTAL PAID-UP CAPITAL OF COLOUR-CHEM LTD. | 1, 16, 50, 000 EQUITY SHARES |
|---|---|
| FACE VALUE | RUPEES 10/- EACH |
| OPEN OFFER PRICE | RUPEES 318/- PER SHARE |
| NO.OF SHARES TO BE ACQUIRED IN THE OPEN OFFER | 20% OF THE PAID-UP CAPITAL 23.30 LAKHS SHARES |
| TOTAL CONSIDERATION | RUPEES 7409.40 LAKHS |

| Interest Rate per Annum | Period 24.2.1998 to 20.6.2003 | Interest per Share (Rs.) |
|---|---|---|
| A | B | C |
| 15% | 5916.35 | 253.92 |
| 14% | 5521.93 | 237.00 |
| 13% | 5127.51 | 220.07 |
| 12% | 4733.08 | 203.14 |
| 11% | 4338.66 | 186.21 |
| 10% | 3944.24 | 169.28 |
| 9% | 3549.81 | 152.35 |
| 8% | 3155.39 | 135.42 |

The difference of amount calculated on the basis of interest at the rate of 10% and 15% would be about Rs.85 per equity share. If shareholders are to be compensated owing to the act of delay on the part of the acquirer in making the public announcement, in a case of this nature, an attempt should be made to strike a delicate balance. The bank rate of interest payable by the nationalized banks on a fixed deposit for the period from 1998 to 2003 was around 9%. This fact has been accepted by the Tribunal. It has also been accepted by the Tribunal that the decisions of this Court relating to rate of interest payable by nationalized banks on fixed deposits and on the compensation amount fixed under the Motor Vehicles Act would be 9% p.a. The Tribunal has applied the said test but, as discussed hereinbefore, committed two apparent errors, namely, it did not think fit to calculate the mean of the rate of interest payable by the banks and; it thought that quarterly rests is payable on the deposits made by an investor in a bank. Quarterly rests

are only payable in commercial transactions when a bank grants loans.

When any criteria is fixed by a statute or by a policy, an attempt should be made by the authority making the delegated legislation to follow the policy formulation broadly and substantially and in conformity thereof. [See Secretary, Ministry of Chemicals & Fertilizers, Government of India vs. Cipla Ltd. and Others  2003 Indlaw SC 570 - Para 4.1]

**The rate of interest fixed by the Board and the Tribunal, thus, in our opinion, was not correct. #**

Effect of Board being an expert body:

The modern sociological condition as also the needs of the time have necessitated growth of administrative law and administrative tribunal. Executive functions of the State calls for exercise of discretion. The executive also, thus, performs quasi judicial and quasi legislative functions and, in this view of the matter, the administrative adjudication has become an indispensable part of the modern state activity.

Administrative Tribunals may be called a specialized court of law, although it does not fulfil the criteria of a law court as is ordinarily understood inasmuch as it cannot like an ordinary court of law entertain suits on various matters, including the matter relating to the vires of legislation. However, such a Tribunal like ordinary law courts are bound by the rules of evidence and procedure as laid down under the law and are required to determine the lis brought before it strictly in accordance with the law.

O. Hood Phillips in his 'Constitutional and Administrative Law', Eight Edition, at page 686 under the Chapter "Tribunals" has stated as follows :-

*These are independent statutory tribunals whose function is judicial. The tribunals are so varied in composition, method of appointment, functions and procedure, and in their relation to Ministers on the one hand and the ordinary courts on the other, that a satisfactory formal classification is impossible." *

Reasons for creating special tribunals, according to the learned author, are:

(i) Expert knowledge

(ii) Cheapness

(iii) Speed

(iv) Flexibility

(v) Informality

At para 30-021 at page 692 of the said treatise, it is stated :

*Appeals from tribunals.*

*A party to proceedings before most statutory tribunals, who is dissatisfied with the tribunal's decision on a point of law, may either appeal to the High Court or require the tribunal to state a case for the opinion of the High Court. Appeal lies by leave of the High Court or of the Court of Appeal to the Court of Appeal, and thence to the House of Lords (section 11)." ***

In 'Environmental Enforcement: The Need for a Specialist Court' by Robert Carnwath published in (1992) Journal of Planning and Environment Law at page 799, the requirements of having an environment court in place of the ordinary courts were highlighted. The author had submitted a report known as "Enforcing Planning Control" and on referring thereto, it was noticed:

*Most of the report's substantive recommendations for reform of the planning enforcement system were adopted by the Government and incorporated in the Planning and Compensation Act 1991. There was no formal response to the suggestions for a unified court system. This was hardly surprising, since reform of the court system is not within the remit of the Department of the Environment.*

*Last year, however, the idea was given a new impetus from an unexpected quarter. Sir Harry Woolf gave his Garner lecture to U.K.E.L.A. on the theme "Are the Judiciary Environmentally Myopic?" He commented on the problems of increasing specialization in environmental law; and on the difficulty of the Courts, in their present form, moving beyond their traditional role of detached "Wednesbury" review. He went on to discuss the benefits of:*

*"having a Tribunal with a general responsibility for overseeing and enforcing the safeguards provided for the protection of the environment. The tribunal could be granted a wider discretion to determine its procedure so that it was able to bring to bear its specialist experience of environmental issues in the most effective way."*

*A key feature of this Tribunal would be flexibility. Possible innovations would be the involvement of expertise from other professions (architects, surveyors, etc.); "multi-disciplined adjudicating panels"; broad discretion over rights of appearance; power to instruct independent counsel on behalf of the Tribunal or members of the public; resources for direct investigation by the Tribunal itself; and incorporation into the Tribunal of the existing inspectorate to deal with "cases of a lesser dimension." ***

The Board is indisputably an expert body. But when it exercises its quasi judicial functions; its decisions are subject to appeal. The Appellate Tribunal is also an expert Tribunal. Only such persons who have the requisite qualifications are to be appointed as members thereof as would appear from Sub-section 2 of Section 15M of the said Act which reads thus:-

*"15.M Qualification for appointment as Presiding Officer or Member of the Securities Appellate Tribunal.*

*(2) A person shall not be qualified for appointment as Member of a Securities Appellate Tribunal unless he is a person of ability, integrity and standing who has shown capacity in dealing with problems relating to securities market and has qualification and experience of corporate law, securities laws, finance, economics or accountancy:*

*Provided that a member of the Board or any person holding a post at senior management level equivalent to Executive Director in the Board shall not be appointed as Presiding Officer or Member of a Securities Appellate Tribunal during his service or tenure as such with the Board or within two years from the date on which he ceases to hold office as such in the Board." * *

The conflict of jurisdiction between an expert tribunal vis-a-vis the courts in the context of the doctrine of separation of powers poses a problem even in other countries. [For a detailed discussion see the Article 'Powers of the Takeovers Panel and their Effect upon ASIC and the Court' by Barbara Mescher [ 2002 (76) Australian Law Journal, p.119].

In Australia, the takeover Panel has also a function of identifying and notifying the third parties who are affected by a decision. Takeover panel created under the Corporate Law Economic Reform Programme Act, 1999, as amended by the Corporation Act, 2001, is also an expert panel.

Throughout the world, specialized adjudicators are performing numerous roles. There are diverse specialized tribunals in America as also in the Commonwealth countries. In certain States, statutes have been enacted authorizing appeals to the Administrative Division which jurisdiction used to be exercised by the High Court alone. The appeals range from questions of law to selected questions of fact, to full rehearing of all issues. [See Stephen Legomsky's 'Specialized Justice].

Had the intention of the Parliament been to limit the jurisdiction of the Tribunal, it could say so explicitly as it has been done in terms of Section 15Z of the Act whereby the jurisdiction of this Court to hear the appeal is limited to the question of law.

The jurisdiction of the appellate authority under the Act is not in any way fettered by the statute and, thus, it exercises all the jurisdiction as that of the Board. It can exercise its discretionary jurisdiction in the same manner as the Board.

The SEBI Act confers a wide jurisdiction upon the Board. Its duties and functions thereunder, run counter to the doctrine of separation of powers. Integration of power by vesting legislative, executive and judicial powers in the same body, in future, may raise a several public law concerns as the principle of control of one body over the other was the central theme underlying the doctrine of separation of powers.

Our Constitution although does not incorporate the doctrine of separation of powers in its full rigour but it does make horizontal division of powers between the Legislature, Executive and Judiciary. [See Rai Sahib Ram Jawaya Kapur and Others Vs. The State of Punjab, 1955 Indlaw SC 16].

The Board exercises its legislative power by making regulations, executive power by administering the regulations framed by it and taking action against any entity violating these regulations and judicial power by adjudicating disputes in the implementation thereof. The only check upon exercise of such wide ranging power is that it must comply with the Constitution and the Act. In that view of the matter, where an expert Tribunal has been constituted, the scrutiny at its end must be held to be of wide import. The Tribunal, another expert body, must, thus, be allowed to exercise its own jurisdiction conferred on it by the statute without any limitation.

In Cellular Operators Association of India and Others vs. Union of India and Others [ 2002 Indlaw SC 1576], this Court observed :"TDSAT was required to exercise its jurisdiction in terms of Section 14A of the Act. TDSAT itself is an expert body and its jurisdiction is wide having regard to sub- section (7) of Section 14A thereof. Its jurisdiction extends to examining the legality, propriety or correctness of a direction/order or decision of the authority in terms of sub-section (2) of Section 14 as also the dispute made in an application under sub-section (1) thereof. The approach of the learned TDSAT, being on the premise that its jurisdiction is limited or akin to the power of judicial review is, therefore, wholly unsustainable. The extent of jurisdiction of a court or a Tribunal depends upon the relevant statute. TDSAT is a creature of a statute. Its jurisdiction is also conferred by a statute. The purpose of creation of TDSAT has expressly been stated by the Parliament in the Amending Act of 2000. TDSAT, thus, failed to take into consideration the amplitude of its jurisdiction and thus misdirected itself in law".

The court noticed the celebrated book on "Judicial Review of Administrative Law" by H.W.R. Wade and C.F. Forsyth and held :

*"The rule as regard deference to expert bodies applies only in respect of a reviewing court and not to an expert tribunal. It may not be the function of a court exercising power of judicial review to act as a super-model as has been stated in Administrative Law by Bernard Schwartz, 3rd edition in para 10.1 at page 625; but the same would not be a case where an expert tribunal has been constituted only with a view to determine the correctness of an order passed by another expert body. The remedy under Section 14 of the Act is not a supervisory one. TDSAT's jurisdiction is not akin to a court issuing a writ of certiorari. The tribunal although is not a court, it has all the trappings of a Court. Its functions are judicial. *

In 'Jurisdiction and Illegality' by Amnon Rubinstein a judicial power in contrast to the reviewing power is stated thus:

*A judicial power, on the other hand, denotes a process in which ascertainable legal rules*

*are applied and which, therefore, is subject to an objectively correct solution. But that, as will be seen, does not mean that the repository of such a power is under an enforceable duty to arrive at that solution. The legal rules applied are capable of various interpretations and the repository of power, using his own reasoning faculties, may deviate from that solution which the law regards as the objectively correct one."*

*The regulatory bodies exercise wide jurisdiction. They lay down the law. They may prosecute. They may punish. Intrinsically, they act like an internal audit. They may fix the price, they may fix the area of operation and so on and so forth. While doing so, they may, as in the present case, interfere with the existing rights of the licensees". ***

In West Bengal Electricity Regulatory Commission vs. CESC Ltd. [ 2002 Indlaw SC 1151], a Bench of this Court, (in which one of us Santosh Hegde, J. was a member), observed :

*"From s.4 of the 1998 Act, we notice that the Central Electricity Regulatory Commission which has a judicial member as also a number of other members having varied qualifications, is better equipped to appreciate the technical and factual questions involved in the appeals arising from the orders of the Commission. Without meaning any disrespect to the judges of the High Court, we think neither the High Court nor the Supreme Court would in reality be appropriate appellate forums in dealing with this type of factual and technical matters. Therefore, we recommend that the appellate power against an order of the state commission under the 1998 Act should be conferred either on the Central Electricity Regulatory Commission or on a similar body. We notice that under the Telecom Regulatory Authority of India Act 1997 in chapter IV, a similar provision is made for an appeal to a special appellate tribunal and thereafter a further appeal to the Supreme Court on questions of law only. We think a similar appellate provisions may be considered to make the relief of appeal more effective." ***

The provisions of the 1992 Act and the Regulations framed thereunder squarely apply to the observations made by this Court in West Bengal Electricity Regulation Commission (supra).

We may furthermore notice that in Part XI of the Electricity Act, 2003, an expert appellate tribunal for electricity in the light of the observations made by this Court has been constituted.

Dividend: Effect of

**In view of our findings aforementioned, we are of the opinion that while calculating the amount of interest, the amount of dividend paid to the shareholders should be excluded. The shareholders who by reason of default on the part of acquirer have been deprived of interest payable on the difference of the offer price and market price would be entitled to interest as direction to pay interest being not penal in nature, they cannot make double gains. The Tribunal, in our opinion, has committed an error in holding that the dividend being a participatory benefit**

**available to a shareholder and being distinct from interest, the same should not be taken into consideration. #**

The regulation fixes a benchmark as regard rate of interest. If any amount has been received by the shareholders by keeping the shares till a public offer was made, the amounts so received by him by way of dividend should be set off. We would reiterate that the shareholders did not have any right to get interest and in effect and substance they were only to be compensated for the loss of interest and nothing more. On the same analogy, if they had received some gains by holding the shares fairly for a long period of five years, the amount of dividend cannot be permitted to be retained by them. The amount of dividend should, thus, be adjusted towards the interest payable to them.

Conclusion:

**We, therefore, direct, having regard to the peculiar facts and circumstances of the case, that the interest of justice would be sub-served, if the rate of interest is directed to be paid at 10% per annum from March 1998 till 2003.**

**The interest at the rate of 10% per annum is directed in stead and place of normal 9% having regard to the fact that the Appellants themselves in their Memorandum of Appeal filed before the Tribunal had contended that the Board should have granted interest at the rate of 10% per annum instead of 15%.**

**If any dividend was paid during the said period, the same shall be adjusted with the amount of interest.**

**The appellants had deposited a total amount of 111.50 crores which sums have been invested. The interest accruing thereupon shall enure to the benefit of those shareholders who were entitled to the payment of interest for the period during which the said amount remained invested in terms of the order of this Court..**

**We uphold that part of the decision of the Tribunal whereby it was held that those persons who were the shareholders till 24.2.1998 and continued to be shareholders on the closure day of public offer alone would be entitled to interest.**

**The case of the Administrator of the Specified Undertaking of the Unit Trust of India, however, stands on a different footing. The facts of the matter, as noticed hereinbefore, clearly go to show that in effect and substance, the Appellants are the successors of the U.T.I. They being the statutory beneficiary, are entitled to interest irrespective of the fact that it came into being after 1998.**

**For the reasons aforementioned, Civil Appeal Nos.3183 of 2003, filed by the Acquirer and D3952 of 2004 filed by the Administrator of the Specified Undertaking of the Unit Trust of India, are allowed; whereas Civil Appeal No.3701 of 2003 filed by SEBI and Civil Appeal No. 3872 of 2003 filed by Umeshkumar G. Mehta are dismissed. No costs.**

# EXHIBIT B

# HISTORICAL PERSPECTIVE OF SECURITIES LAWS

M S SAHOO*

The two exclusive legislations that governed the securities market till early 1992 were the Capital Issues (Control) Act, 1947 (CICA) and the Securities Contracts (Regulation) Act, 1956 (SCRA). The CICA had its origin during the war in 1943 when the objective was to channel resources to support the war effort. Control of capital issues was introduced through the Defence of India Rules in May 1943 under the Defence of India Act, 1939. The control was retained after the war with some modifications as means of controlling the raising of capital by companies and to ensure that national resources were channeled into proper lines, i.e., for desirable purposes to serve goals and priorities of the government, and to protect the interests of investors. The relevant provisions in the Defence of India Rules were replaced by the Capital Issues (Continuance of Control) Act in April 1947. This Act was made permanent in 1956 and enacted as the Capital Issues (Control) Act, 1947. Under the Act, the Controller of Capital Issues was set up which granted approval for issue of securities and also determined the amount, type and price of the issue. This Act was, however, repealed in 1992 as a part of liberalization process to allow the companies to approach the market directly provided they issue securities in compliance with prescribed guidelines relating to disclosure and investor protection.

Though the stock exchanges were in operation, there was no legislation for their regulation till the Bombay Securities Contracts Control Act was enacted in 1925. This was, however, deficient in many respects. Under the constitution which came into force on January 26, 1950, stock exchanges and forward markets came under the exclusive authority of the Central Government. The Government appointed the A. D. Gorwala Committee in 1951 to formulate a legislation for the regulation of the stock exchanges and of contracts in securities. Following the recommendations of the Committee, the SCRA was enacted in 1956 to provide for direct and indirect control of virtually all aspects of securities trading and the running of stock exchanges and to prevent undesirable transactions in securities. It has undergone several modifications since its enactment and even today an amendment is awaiting approval of the Parliament. It gives Central Government regulatory jurisdiction over (a) stock exchanges through a process of recognition and continued supervision, (b) contracts in securities, and (c) listing of securities on stock exchanges. As a condition of recognition, a stock exchange complies with conditions prescribed by Central Government. Organised trading activity in securities is permitted on recognised stock exchanges.

The authorities have been quite sensitive to requirements of the development of securities market, so much so that the last decade (1992-2003) witnessed nine special legislative interventions, including two new enactments, namely the Securities and Exchange Board of India (SEBI) Act, 1992 and the Depositories Act, 1996. The SCRA, the SEBI Act and the Depositories Act were amended six, five and three times respectively during the same period. The developmental need was so urgent at times, that the last decade witnessed five ordinances relating to securities laws. Besides, a number of other legislations (the Income Tax Act, the Companies Act, the Indian Stamps Act, the Bankers' Book Evidence Act, the Benami Transactions (Prohibition) Act etc.) having bearing on securities markets have been amended in the recent past to complement amendments in securities laws.

The legal reforms began with the enactment of the SEBI Act, 1992, which established SEBI with statutory responsibilities to (i) protect the interest of investors in securities, (ii) promote the development of the securities market, and (iii) regulate the securities market. This was followed by repeal of the Capital Issues (Control) Act, 1947 in 1992 which paved way for market determined allocation of resources. Then followed the Securities Laws (Amendment) Act in

1995, which extended SEBI's jurisdiction over corporates in the issuance of capital and transfer of securities, in addition to all intermediaries and persons associated with securities market. It empowered SEBI to appoint adjudicating officers to adjudicate wide range of violations and impose monetary penalties

---

* FCS, Chief General Manager, SEBI. The explanation and understanding provided in this paper are of the author and not necessarily of his employer.

and provided for establishment of Securities Appellate Tribunals (SATs) to hear appeals against the orders of the adjudicating officers. Then followed the Depositories Act in 1996 to provide for the establishment of depositories in securities with the objective of ensuring free transferability of securities with speed, accuracy and security. It made securities of public limited companies freely transferable subject to certain exceptions; dematerialised the securities in the depository mode; and provided for maintenance of ownership records in a book entry form. The Depositories Related Laws (Amendment) Act, 1997 amended various legislations to facilitate dematerialization of securities. The Securities Laws (Amendment) Act, 1999 was enacted to provide a legal framework for trading of derivatives of securities and units of CIS. The Securities Laws (Second Amendment) Act, 1999 was enacted to empower SAT to deal with appeals against orders of SEBI under the Depositories Act and the SEBI Act, and against refusal of stock exchanges to list securities under the SCRA. The next intervention is the SEBI (Amendment) Act, 2002 which enhanced powers of SEBI substantially in respect of inspection, investigation and enforcement. The latest and the ninth legislative intervention namely the Securities Laws (Amendment) Bill, 2003 introduced in the monsoon session of the Parliament to amend the SCRA to provide for demutualisation of stock exchanges is awaiting approval. The approval to this bill is a matter of time as it is a money bill. This paper explains the provisions in these nine legislative interventions in a historical perspective.

## A. Repeal of Capital Issues (Control) Act, 1957

It is believed that a liberalised securities market helps promote economic growth. The more liberalised a securities market is, the better is its impact on economic growth. Interventions in the securities market were originally designed to help governments expropriate much of the seigniorage and control and direct the flow of funds for favoured uses. These helped governments to tap savings on a low or even no-cost basis. Besides government used to allocate funds from the securities market to competing enterprises and decide the terms of allocation. The result was channelisation of resources to favoured uses rather than sound projects. In such circumstances accumulation of capital per se meant little, where rate of return on some investments were negative while extremely remunerative investment opportunities were foregone. This kept the average rate of return from investment lower than it would otherwise have been and, given the cost of savings, the resulting investment was less than optimum.

The implication of the above regime is illustrated in Figure 1. The vertical axis represents cost of capital and rate of return on investment and the horizontal axis represents the amount of capital raised from the securities market. With intervention, the demand for investment is represented by DdD, which indicates lower average rate of return corresponding to sub-optimal resource allocation. As the level of investment increases to OD, the maximum permitted by the authorities, the average rate of return decreases as relatively less remunerative investments are approved. SS represents the supply of capital. This results in an investment of K. If, however, intervention is withdrawn, rate of return will go up causing a shift in demand for investment schedule to $D_1D_1$, which will be down ward sloping through out. This would result in higher

investment and consequently income. This would shift supply schedule of capital to $S^1S^1$. The investment would further increase to K* and rate of return would improve to r*. Rate of return improves because removal of intervention rations out low yielding investments. As the cost of capital goes up, the entrepreneurs are likely to switch to less capital-intensive technologies. Such technologies may not only raise the average productivity of capital, but also represent appropriate technology provided by relative availability and cost of labour and capital in the economy. Letting rate of return be determined by the market mechanism would reduce or even eliminate the costs involved in credit rationing arrangements and thereby enhance the efficiency of the economy as a whole.

The allocation of resources by government, rather than by market, contributed to shrinkage of the securities market. When subject to effective expropriation through suppressed return on investment, people naturally seek a proper reward elsewhere, either through capital flight, through a retreat to underground or through the hoarding of goods. People keep their savings out of the markets. The underground sector allocates the resources, but relatively inefficiently.

As a part of the liberalisation process, the CICA was repealed by an Ordinance on May 29, 1992 paving way for market determined allocation of resources. With this the office of Controller of Capital Issues was abolished and the cost of rationing the resources was saved. The Act earlier required a firm wishing to issue securities to obtain prior approval from the government, which also determined the amount, type and price of the issue. Now the eligible firms comply with the specified requirements and access the market to raise as much resources and at such terms as the market can bear. In the issues made through book building, the investors have freedom to subscribe for the securities at the prices they consider appropriate.



**Figure 1: Effect of liberalisation of Securities Market**

*B. Enactment of the SEBI Act, 1992*

Liberalisation does not mean scrapping of all codes and statutes. It rather means replacement of one set by another set of more liberal code / statute, which influence or prescribe the way the

private sector agents should carry out their activities. In the context of securities market, the regulations are necessary for the following reasons:

(i) The correction of identified market imperfections and failures. There are many potential market imperfections in securities market such as inadequate information, asymmetric information, difficulty in ascertaining the quality of contracts at the point of purchase, imprecise definitions of products and contracts, under-investment in information, agency costs and principal agent problems. In a regulation free environment, these imperfections impose costs on investors in securities. A high degree of information disclosure is required to make investors effective in the market place. If the regulation requires the issuer or intermediaries to provide necessary information, this adds cost to them but reduces cost on consumers.

(ii) Substantial economies of scale to be derived from collective regulation and supervision of issuers and intermediaries. As investment contracts are long-term in nature and often involve a fiduciary role in a principal-agent relationship, there is need for continuous monitoring. In the absence of regulation and supervision by a specialist agency, which offers certain minimum standards, investors are required to spend time, effort and resources in investigating and monitoring issuers and intermediaries. This entails two types of costs: (a) substantial duplication and hence excessive social costs as all investors are duplicating the same process, (b) the loss of economies of scale that are derived through a specialist regulator/supervisor acquiring expertise and establishing effective authorization and monitoring system. In the absence of such an agency, an occasional investor would find investigation and monitoring excessive and free-rider problem are likely to arise.

(iii) Signaling minimum standards of quality enhances confidence in markets. With a known asymmetric information problem, risk averse investors may exit the market altogether. In its extreme form the market breaks down completely as potential investors know there are high and low quality products but they cannot distinguish them ex ante, while the issuers can make the distinction but are unable or unwilling to communicate the distinction with credibility. When investors know there are low quality products in the market, good issuers and their products may become tarnished by the generalized reputation of poor products and suppliers. In such a case, the regulator is to set minimum standards and thereby remove the bad products from the market.

With these objectives, it was considered necessary to create a statutory agency, which would ensure fair play in the market, develop fair market practices, prescribe and monitor conduct of issuers and intermediaries so that the securities market enables efficient allocation of resources. The enactment of the SEBI Act, 1992 was an attempt in this direction.

Constitution : The Act established a Board, called Securities and Exchange Board of India (SEBI), to protect the interests of investors in securities and to promote the development of and to regulate the securities market. It prescribed that the Board would consist of a Chairman, one member each from amongst the officials of the finance ministry, the law ministry and the RBI and two other members. In order to avoid conflict of interest, it was provided that a member shall be removed from office if he is appointed as a director of a company.

Functions :  In addition to its general responsibility, it was assigned the following specific responsibilities:

(a)  regulating the business in stock exchanges and any other securities markets,

(b) registering and regulating the working of stock brokers, sub-brokers, share transfer agents, bankers to an issue, trustee of trust deeds, registrars to an issue, merchant bankers, underwriters, portfolio mangers, investment advisors and such other intermediaries,

(c) registering and regulating working of CIS, including mutual funds,

(d) promoting and regulating self regulatory organizations (SROs),

(e) prohibiting fraudulent and unfair trade practices relating to securities market,

(f) promoting investor education and training of intermediaries,

(g) prohibiting insider trading in securities,

(h) regulating substantial acquisition of shares and takeover of companies,

(i) calling for information from, undertaking inspection, conducting inquiries and audits of the stock exchanges, intermediaries and SROs,

(j) performing such functions and exercising such powers under the SCRA as may be delegated by the Central Government, (This was done in the interest of integrated regulation. Then all the powers under the SCRA were exercisable by Central Government. Until SEBI stabilizes, it was considered desirable that important powers are not transferred from Central Government, but delegated to SEBI.)

(k) levying fees or other charges for carrying the above purposes,

(l) conducting research for the above purposes and

(m) performing such other functions as may be prescribed.

The Board was empowered to delegate any of its powers and functions under the Act (except powers to make regulations) to any member, officer of the Board or any other person.

Autonomy and Accountability : The Central Government being accountable to Parliament, the SEBI Act granted powers of last resort to Central Government. It obligated SEBI, in exercise of its powers and performance of its functions, to be bound by the directions of the Central Government on questions of policy. Whether a question is one of policy or not shall be decided by the Central Government. Further, the Central Government was empowered to supersede the Board for a period not exceeding six months if it is of the opinion that the Board is unable to discharge the functions and the duties under the Act on account of grave emergency, or the Board has persistently defaulted in complying with any directions issued by the Central Government under the Act and as a result of such default the financial position or the administration of the Board has deteriorated, or the circumstances exist which render it necessary in the public interest to do so. The Board was obligated to furnish to the Central Government such returns and statements and such particulars in regard to any proposed or existing programme for the promotion and development of the securities market, as the Central Government may, from time to time, require. The Board was also obligated to submit to Central Government a report in the prescribed form giving a true and full account of its activities, policy and programmes during the previous year within 60 days (increased to 90 days by 1995 amendment) of the end of each financial year. A copy of this report shall be laid before each house of parliament. While the Act empowered Central Government to make rules for carrying out the purposes of the Act, it empowered SEBI to make regulations, with the previous approval of Central Government, consistent with the Act and the rules, to carry out the purposes of the Act. In order to ensure accountability, it was provided that all the rules and regulations made under the Act shall be laid before each house of parliament. It was also provided that any person aggrieved by an order of the Board under the Act may prefer an appeal to the Central Government. The Act empowered Central Government to exempt, in public interest, any person or class of persons dealing in securities from the requirements of registration.

In the interest of autonomy of SEBI, it was empowered to levy fees or other charges for carrying on the purposes of the Act. This power to levy fees has been upheld by the Supreme Court in the matter of *BSE Brokers' Forum and others* v. *SEBI and Others*.

It was provided that no court shall take cognisance of any offence punishable under the Act or any rules or regulations made thereunder except on a complaint made by the Board with the approval of Central Government. It was further provided that no suit, prosecution or other legal proceedings shall lie against central government or any officer of the Central Government or any member, officer or other employee of the Board for anything which is in good faith done or intended to be done under this Act or the rules or regulations made thereunder.

Amendments in SCRA :  All the powers under the SCRA were exercised by Central Government. The SEBI Act, however, created a Board to regulate the securities market. In the interest of integrated regulation of securities market, it was felt that only one agency (SEBI) as far as possible, should regulate the securities market. In order to do so, the SEBI Act transferred some of the powers of the Central Government under the SCRA to SEBI and empowered Central Government to delegate other powers, except power to make rules, under the SCRA to SEBI. In exercise of this power, Central Government has delegated almost all the powers under the SCRA by notifications issued in 1992 and 1994. All the powers under the Securities Contracts (Regulation) Rules, 1957 have also been transferred to SEBI in 1996.

Trading of government securities was not subject to any regulatory framework as these were not 'securities' under the SCRA. In order to develop the market for government securities, the definition of 'securities' was amended to include government securities within its ambit so that the whole regulatory framework applicable to trading of securities could apply to trading government securities also. Further, in order to avoid frequent amendments, which is time consuming, the SCRA was amended to empower Central Government to declare any other similar instrument to be securities.

*C.  Securities Laws (Amendment) Act, 1995*

In the light of experience gained with the working of the SEBI Act, 1992, it was considered desirable to expand the jurisdiction of SEBI, enhance its autonomy and empower it to take a variety of punitive actions in case of violations of the Act.

Composition of Board: As mentioned earlier, the SEBI Act made it obligatory for the central government to remove a member from the Board if he was appointed as a director of any company.  This was presumably to ensure that a person would not be able to do justice to his roles as member of Board and as a member of board of directors of a company simultaneously. His interests as member of Board might clash with that of a director of a company. SEBI, being a quasi-judicial body, the members of the Board were not just expected to be impartial, they should also appear impartial.  This was precluding the appointment of people with adequate knowledge and experience in the area of securities market to Board as many of them were also involved with corporate management in various capacities.  The amendment Act deleted the provision relating to disqualification of a member of Board on his being appointed as a director of a company from the statute.  It inserted a new provision to make it obligatory for a member of Board, who is director of any company and who has any direct or indirect pecuniary interest in any matter coming up for consideration at a meeting of the Board, to disclose the nature of interest and refrain from participating in the deliberations or decisions of the Board with respect to that matter.  Now the government can appoint people of eminence with experience in matters relating to securities market to Board.  This was expected to improve the decision making potential of SEBI and enable Board to lead and guide more effectively the team of professionals working for SEBI.

Jurisdiction of SEBI: The jurisdiction of SEBI was enlarged to register and regulate a few more intermediaries and other persons associated with the securities market. The amendment Act empowered SEBI to register and regulate the working of the intermediaries like depositories, custodians for securities and also certain other persons associated with the securities market like foreign institutional investors, credit rating agencies, venture capital funds etc. SEBI was also given blanket authority to regulate other intermediaries or persons, not named specifically in the statute, by specifying them through a notification. This obviated the need for amending SEBI Act every now and then to deal with a particular type of intermediary or a person associated with the securities market that may emerge in future.

Before the amendment Act, SEBI was being perceived as ineffective and toothless in protecting the interest of investors. This was essentially because SEBI did not have any power to control or regulate the issuers of securities. The SEBI Act listed all kinds of intermediaries to be registered and regulated by SEBI, but excluded the issuer of securities. As a result, SEBI could not directly regulate the issuers (Companies) on matters relating to issue and transfer of securities. In the absence of clear statutory mandate to SEBI to regulate issuers of securities which are governed by the Companies Act, 1956, SEBI was not able to compel the issuers to make adequate disclosures. It was rather directing its efforts only at the lead managers and merchant bankers who are intermediaries and signatories to prospectus requiring them to make adequate disclosures. Even this was being challenged in courts of law, as this was perceived beyond the jurisdiction of SEBI. This debilitating infirmity was done away with by the amendment Act which incorporated section 11A to SEBI's regulatory powers over corporates in the issuance of capital, transfer of securities and other related matters. SEBI can now specify by regulations the matters to be disclosed and the standards of disclosure required for the protection of investors in respect of issues made by bodies corporate.

Monetary Penalties : The SEBI Act originally provided for penalty of suspension and cancellation of a certificate of registration of an intermediary. Such suspension/cancellation led to cessation of business and affected innocent third parties, often adversely, who were dealing with the intermediary. Besides there were many persons other than intermediaries associated with the securities market on whom the penalty of suspension/cancellation had no bearing. In order to tackle this, the amendment Act provided for monetary penalties as an alternative mechanism to deal with capital market violations.

SEBI was empowered to adjudicate a wide range of violations and impose monetary penalties on any intermediary or other participants in the securities market. The amendment Act listed out a wide range of violations along with maximum penalties leviable. It provided for a highest penalty of Rs.10 lakh and the violations listed were failure to submit any document, information or furnish any return, failure to maintain required books of accounts or records, carrying on any CIS without registration, failure to enter into agreement with clients, insider trading, failure to redress the grievances of investors, failure to issue contract notes, charging excessive brokerage by brokers, failure to disclose substantial acquisition of shares and take-overs, etc. The amendment Act provided for three types of monetary penalties viz., - (a) a lump sum penalty for a specific violation of the Act, (b) a penalty for every day during which the violation continued, and (c) a multiple of the amount involved in the violation. The amount of penalty was determined, subject to the ceiling, by the adjudicating officer who would be guided by the factors including amount of disproportionate gain or unfair advantage wherever quantifiable made as a result of the default, the amount of loss caused to an investor or any group of investors as a result of default, and the repetitive nature of the default. It amended section 24 to provide that non-payment of penalty would be an offence punishable with fine or imprisonment under the Act.

The adjudicating officer is required to be appointed by SEBI. He shall not be an officer below the rank of a division chief of SEBI. He will hold an enquiry after giving a person reasonable opportunity of being heard for the purpose of determining if any violation has taken place and imposing penalty. To ensure fair enquiry and penalty, it was provided that appeal against the orders of adjudicating officers would lie to the SAT, which was also constituted by the amendment Act.

While the suspension or cancellation of registration continued to be regulated by regulations framed by SEBI and the appeal from the orders of the Board suspending or canceling a registration would lie to Central Government, the amendment Act provided that the monetary penalties would be imposed only in cases of violations listed in the Act by an adjudicating officer as per the Rules prescribed by the Central Government. Appeals from the orders of an adjudicating officer can be preferred to the SAT. The appeals against the orders of SAT can be preferred to the High Court.

Empowerment : The amendment Act inserted section 11B to empower SEBI to issue directions to all intermediaries and other persons associated with the securities market (i) in the interest of investors, (ii) in the interest of orderly development of the securities market, (iii) to prevent the affairs of any intermediary including a mutual fund from being conducted in a manner detrimental to the interest of investors or of the securities market, or (iv) to secure the proper management of any such entity. The Act also empowered SEBI to call for and furnish to any agency such information as necessary for efficient discharge of its functions. It vested SEBI with powers of a civil court under the Code of Civil Procedure, 1908 in respect of the following: (i) summon and enforce attendance of person and examine them on oath, (ii) inspect any books, register and other documents, (iii) discover and enforce production of books of accounts and other documents. These helped SEBI considerably to carry out investigations, conduct inquires and inspections and levy fines against the erring intermediaries, issuers of securities and other persons associated with the securities market. SEBI was also empowered to call for information and conduct enquiries, audits and inspection of mutual funds, and other persons associated with the securities market, in addition to stock exchanges, self regulatory organizations and intermediaries provided earlier.

Autonomy of SEBI: The autonomy of SEBI was reinforced by the following provisions: (i) SEBI was vested with the powers of a civil court; (ii) Section 20A barred the jurisdiction of civil court in respect of actions or orders passed by SEBI. One can, however, prefer an appeal to the Central Government against the orders of SEBI and the jurisdiction of the High Court was not barred. This made SEBI's functioning independent of the lower civil courts and allowed quick disposal of cases by SEBI without being hamstrung by stay orders from civil courts; (iii) Section 23 was amended to extend the immunity from suit, prosecution or other legal proceedings to SEBI or any of its members, officers or employees in respect of action taken in good faith; (iv) Section 26 was amended to permit SEBI to file complaints in Courts under section 24 in respect of offences under the SEBI Act without previous sanction of the Central Government which was mandatory then even for filing routine prosecutions; (v) By amendment to section 28, the power of last resort of the Central Government to exempt any person or class of persons dealing with securities market from the requirement of registration with SEBI was withdrawn; (vi) Sections 29 and 30 were amended to amended to provide that the conditions for grant of registration would be determined by Regulations and not by Rules; (vii) Section 30 was amended to provide that the SEBI can notify regulations without approval of the Central Government. These enabled SEBI to respond speedily to changing market conditions and enhanced its autonomy.

SEBI was armed with better weapons to regulate various participants in the securities market. The amendment Act provided that henceforth the conditions of registration shall be determined

by Regulations and not under Rules as used to be before the amendment. The enactment of Rules under the Act is the prerogative of the Central Government and is a very time consuming process in contrast to Regulations which required only prior approval of Central Government. By this amendment, the requirement of prior approval was dispensed and the regulation making was brought within the exclusive domain of SEBI. This enabled SEBI to expeditiously notify and modify regulations to keep pace with rapidly changing market conditions, facilitate maintenance of market discipline, prudence and transparency and thereby strike on time.

Securities Appellate Tribunal : An efficient and effective system of regulation calls not only for firmness, but also for fairness. The amendment Act provided for establishment of one or more SATs to hear the appeals from the orders of the adjudicating officers. Anybody not satisfied with the orders of the SAT can prefer an appeal to the High Court. This ensured fairness in the process of adjudication.

Amendments in SCRA: The amendment Act also amended SCRA. In the last few years there has been substantial improvements in the functioning of the securities market. However there were inadequate advanced risk management tools. In order to provide such tools and to deepen and strengthen the cash market, a need was felt for trading of derivatives like futures and options. But it was not possible in view of prohibitions in the SCRA. Its preamble stated that the Act was to prevent undesirable transactions in securities by regulating business of dealing therein, by prohibiting options, etc. Section 20 of the Act explicitly prohibited all options in securities. Section 16 of the Act empowered Central Government to prohibit by notification any type of transaction in any security. In exercise of this power, government by its notification in 1969 prohibited all forward trading in securities. Introduction of trading in derivatives required withdrawal of these prohibitions. The amendment Act withdrew the prohibitions by repealing section 20 of the SCRA and amending its preamble.

Traditionally the operations of the stock exchanges were limited to the area earmarked at the time of its recognition. This prevented an exchange from expanding its operations beyond the area, though it was considered desirable to introduce competition among the exchanges and technology permitted such expansion. The SCRA was amended to allow an exchange to establish additional trading floor outside its area of operation with approval of SEBI.

The SCRA, before the amendment, provided that SEBI could compel a company to list its securities on any stock exchange. Such coercion from authorities was not considered desirable in the liberalised market environment. This provision was removed from the SCRA.

The exchanges enter into listing agreements with the listed companies. The agreement casts a lot of obligations on the listed companies in the interest of investors. However, this agreement was not having any statutory backing. As a result, in cases of non-compliance with listing agreement, the exchanges used to suspend / withdraw trading of the security, which was not in the interest of investors. In order to provide statutory backing to listing agreement, which is being increasingly used to improve corporate governance, it was prescribed that where securities were listed on the application of any person, such person shall comply with the conditions of listing with the stock exchange.

The rules made under the SCRA used to be published before formal notification. Though this practice helped to consult the regulated and the public on the proposed rules, it was time consuming and the regulated could derive regulatory arbitrage before the new rule came to effect. The Amendment Act did away with the requirement of previous publication.

*D.  The Depositories Act, 1996*

The system of transfer of ownership of securities prevailing till mid 1990s was grossly inefficient as every transfer was required to be accomplished by the physical movement of paper securities to the issuer for registration and the ownership was evidenced by the endorsement on the security certificate.  The process of transfer in many cases took much longer time than two months stipulated in the Companies Act, 1956 or the SCRA.  A significant proportion of transactions ended up as ' bad delivery' due to faulty compliance of paper work, mismatch of signatures on transfer deeds with the specimen records of the issuer or for other procedural reasons.  Theft, forgery, mutilation of certificates and other irregularities were rampant.  The inherent right of the issuer to refuse the transfer of a security added to the misery of the investors.  The cumbersome paraphernalia associated with the transfer of securities under section 108 of the Companies Act, 1956, along with huge paper work, printing of stationary, safe custody of securities, transportation and dispatch added to the cost of servicing paper securities, delay in settlement and restricted liquidity in securities and made investor grievance redressal time consuming and at times intractable.  All these problems had not surfaced overnight but these were compounded by burgeoning trade volumes in secondary market and increasing dependence on securities market for financing trade and industry.  This underscored the need for streamlining the transfer of ownership of securities which was sought to be accomplished by the Depositories Act, 1996.  The Act provides a legal basis for establishment of depositories in securities with the objective of ensuring free transferability of securities with speed, accuracy and security by (a) making the securities of public limited companies freely transferable; (b) dematerializing the securities in the depository mode; and (c) providing for maintenance of ownership records in a book entry form.

Legal Basis : The Depositories Act, 1996, read with section 12 of the SEBI Act, 1992, provides a legal basis for establishment of multiple depositories and entrusts them with responsibility of maintaining ownership records of securities and effecting transfer of securities through book entry only.  The depositories render, through participants, any service connected with recording of:

(a)  allotment of securities; and

(b)  transfer of ownership of securities.

By fiction of law under section 10 of the Depositories Act, the depository is deemed to be registered owner of securities with the limited purpose of effecting transfer of ownership of security.  In respect of securities held in a depository, the name of the depository appears in the records of the issuer as registered owner of securities.  The depository has right to effect the transfer of securities and shall not have any other right associated with them. The owners of the securities become beneficial owners on the records of the depository in respect of the securities held in a depository.  The beneficial owner has all the rights and liabilities associated with the securities.  The depositories holding the securities maintain ownership records in the name of the each participant.  Each such participant, as an agent of the depository, in turn, maintains ownership records of every beneficial owner in book entry form.  The depository and participants have a principal and agent relationship and their relations are governed by the bye-laws of the depository and the agreement between them.

Both the depository and participant need to be registered with SEBI under section 12 of the SEBI Act, 1992, and are regulated by SEBI.  Only a company formed and registered under the Companies Act, 1956 can be registered as a depository.  However, before commencing business, the depository registered with SEBI has to obtain a certificate of commencement of business from SEBI.  Such certificate is issued by SEBI on being fully satisfied that the depository has adequate systems and safeguards to ensure against manipulation of records and transactions.  SEBI is

empowered to suspend or cancel the certificate of registration of a depository as well as of the participants after giving a reasonable opportunity of hearing.

The ownership records of securities maintained by depositories/participants, whether maintained in the form of books or machine readable form, shall be accepted as prima facie evidence in legal proceedings. The depository is treated as if it were a bank under the Bankers' Books of Evidence Act, 1891.

The depository services shall be available in respect of the securities as may be specified by SEBI. The type of securities and the eligibility criteria for admission to the depository mode shall be determined by SEBI regulations. This provides the flexibility to SEBI, for example, to admit certain instruments like units of mutual funds and prohibit admission of certain securities like shares of private limited companies from depository mode.

Free Transferability of Securities : The securities of all public companies have been made freely transferable. The Act took away the companies' right to use discretion in effecting transfer of securities by deleting section 22A from the SCRA and by inserting section 111A in the Companies Act, 1956. These provisions, read with section 7 of the Depositories Act make the transfer of securities in any company, whether listed or not, other than a private company and a deemed public company, free and automatic. That is, once the agreed consideration is paid and the purchase transaction is settled, the buyer is automatically entitled to all the rights associated with the security. As soon as the intimation regarding delivery of security against the payment of cash (delivery v. payment) is received, the transfer will be effected by the depository or company and the transferee will enjoy all the rights and obligations associated with the security immediately. If the securities are in the depository mode, depository would effect the transfer on the basis of intimation (contract notes or some other suitable evidence) from the participants. If the securities are outside the depository mode, the company would effect the transfer on receipt of the transfer deed. For the securities in the depository mode, no transfer deed is required and other procedural requirements under section 108 of the Companies Act were dispensed with. The transferee in both the modes would be entitled to all the rights including voting rights and obligations associated with security.

However, if it is felt that the transfer of a security is in contravention of any of the provisions of the SEBI Act, 1992 or Regulations made thereunder or Sick Industrial Companies (Special Provisions) Act (SICA), 1985, the company, depository, participant, investor or SEBI can make an application to the Company Law Board (CLB) to determine if the alleged contravention has taken place. After enquiry, if the CLB is satisfied of the contravention, it can direct the company/ depository to make rectification in ownership records. In other words, transfer has to be effected immediately even if the transfer is contravention of SEBI Act, 1992 or SICA, 1985, subject to subsequent rectification by the direction of CLB. Pending the completion of enquiry, CLB can suspend voting rights in respect of securities so transferred. The transferee will continue to enjoy economic rights (bonus, dividend, rights etc) which cannot be suspended under any circumstances. During the pendency of the application with CLB, the transferee can transfer the securities and such further transfer will entitle the transferee to the voting rights also unless the voting rights in respect of transferee has also been suspended.

Partial Dematerialisation of Securities : Section 9 of the Depositories Act provides that the securities held by a depository shall be dematerialized and be fungible. The Act envisages dematerialization of securities in the depository mode as against immobilization of securities. The later refers to a situation when the depositories hold securities in physical form side by side with ownership records. In such a case physical movement of securities does not accompany the transfers but securities are in existence in the custody of the depository. What the Act envisages is that ownership of securities shall be reflected through book entry system and this will not

require existence of securities certificates. However, the securities outside the depository would be represented by physical security certificate. Hence, the depository mode envisaged is one of the partial dematerialization, that is, a portion of securities is dematerialized and the other portion remains in physical form.

Supremacy of Investor : The investor has been given the option between holding physical securities as at present or opting for a depository based ownership records. At the time of fresh issue, the issuer is under obligation to give the option to the investors either to seek physical securities under the existing paper based system (non-depository mode) or opt for book entry system of recording ownership (depository mode). The decision on whether or not to hold securities within the depository mode, if in depository mode, which depository or participant, would be entirely with the investor. Such freedom can be exercised either at the time of the initial offer of the security by indicating his choice in the application form or at any subsequent time. He will also have the freedom to switch from depository mode to non-depository mode and vice versa.

At the time of initial offer, if the investor opts to hold a security in the depository mode, the issuer shall be intimate concerned depository the details of allotment of securities and record the depository as registered owner of the securities. On receipt of such information, the depository shall enter in its records the names of allottees as the beneficial owners.

An investor who holds physical securities and seeks to avail the services of a depository will surrender the certificates to the issuer. The issuer on receipt of certificates shall cancel them and substitute in its records the name of the depository as a registered owner in respect of that security and inform the depository accordingly. The depository shall thereafter enter the name of the investor in its records as beneficial owner.

If a beneficial owner or a transferee of securities seeks to opt out of a depository in respect of any security, he shall inform the depository of his intention. The depository in turn shall make appropriate entries in its records and shall inform the issuer. The issuer shall make arrangements for the issue of certificate of securities to the investor.

The depository shall record all transfers made within the depository mode on receipt of intimation from a participant. The type of intimation would be specified by SEBI regulations.

An investor, before availing the services of a depository, shall enter into an agreement with a depository through a participant. The participant is also required to enter into an agreement with the depository to act as the latter's agent. There will also be an agreement between the depository and the issuer of securities. The rights and obligations of depositories, participants, issuers and investors would be governed by the agreement among them, the bye-laws of the depository and the regulations of SEBI.

Amendments in Other Acts : To provide for the smooth operation of the depositories, the Depositories Act amended a few other Acts such as the Indian Stamps Act, 1989, the Companies Act, 1956, the Securities Contracts (Regulation) Act, 1956, the Income-tax Act, 1961, the Benami Transactions (Prohibition) Act, 1988 and the Securities and Exchange Board of India Act, 1992. The major amendments in these Acts are discussed below:

Amendment to the Indian Stamps Act : Section 8A was inserted in the Indian Stamps Act to provide for the following:

(i) At the time of issue of securities, shares or otherwise, the issuer shall pay the Stamp duty on the total amount of the security issued by it, whether through a depository or direct to

investors, even though there will be no physical securities (instrument) which can be stamped (executed).

(ii) Entry into depository involves change of registered ownership as the investor becomes the beneficial owner and the depository becomes the registered owner in respect of the security. As it involves change in registered ownership, it attracts stamp duty under the existing provisions. The new section 8A, however, exempted such change of registered ownership of shares from an investor to a depository from the stamp duty.

(iii) All transactions of securities involving change in registered ownership and/or beneficial ownership of shares within the depository mode shall not attract any stamp duty.

(iv) If an investor opts to exit from the depository and seeks the issue of physical certificate of securities from the issuer, the issue of such certificates shall attract stamp duty as is payable on the issue of duplicate certificates.

(v) All transactions outside the depository mode shall attract stamp duty as at present.

Amendments to the Income Tax Act : Sub-section 2A was inserted in section 45 to provide that the depositories as well as the participants would not be liable to pay any capital gains tax in respect of profits or gains arising from transfer securities held in depositories and transacted from time to time since these securities are held on behalf of the beneficial owners. In other words, inter-se transfer of securities between the participants in the books of a depository as well as between the depositories in the records of an issuer shall not be treated as transfer unless it involves change in beneficial ownership. If it involves any change in the beneficial ownership, only the beneficial owner shall be chargeable to capital gains tax, not the registered owner.

Due to fungible characteristic of the securities, while calculating capital gains tax, the cost of acquisition of securities shall not be determined with reference to cost of acquisition of specific identifiable securities, but be ascertained on the principle of first in first out. That is, the securities acquired first by the beneficial owner would be deemed to have been transferred first irrespective of the intention of the investor. This principle would be applicable only in respect of securities held in a depository.

Amendment to the Companies Act : Section 83 of the Companies Act was deleted. This did away with the mandatory requirement of each company limited by shares to distinguish the shares by distinguishing numbers, in order to introduce the concept of fungibility. The abolition of section 83, however, did not prohibit a company from having distinct numbers, although there was no mandatory requirement to that effect.

Section 108 was amended to provide that the provisions of section 108 shall apply to transfer of securities effected outside the depository mode. The provisions of section 108 shall not apply to transfers of securities effected within the depository mode.

Section 111 was amended to provide that the provisions of section 111 shall apply to a private company and a deemed public company. The new section 111A was inserted to govern the transfer of securities of a public limited company. The shares or debentures and any interest therein of a company were made freely transferable and all the rights and obligations associated with them immediately accrue to the transferee. However, if the transfer violates any of the provisions of the SEBI Act, 1992 or SICA, 1985, the depository, company, participant, investor or SEBI can make an application to the CLB. The CLB, pending completion of enquiry may make an interim order to suspend the voting rights in respect of those securities, and on completion of the enquiry, may direct the company or depository to rectify the register or records if transfer is in violation of the aforesaid provisions. During the pendency of the application with

CLB, the economic rights accrue to the transferee and the transferee has a right to transfer the securities further and such further transferee shall be entitled to voting rights also.

*E. The Depository Related Laws (Amendment) Act, 1997*

While amending the Depositories Act, 1996, this amendment Act amended the Companies Act, 1956, the Indian Stamp Act, 1899, the State Bank of India Act, 1955, the State Bank of India (Subsidiary Banks) Act, 1959, the Industrial Development Bank of India Act, 1964, the Banking Companies (Acquisition and Transfer of Undertakings) Act, 1970, and the Banking Companies (Acquisition and Transfer of Undertakings) Act, 1980 to facilitate dematerialization of securities. The Act amended the Depositories Act to provide that the provision of the Companies Act relating to securities held in trust shall not apply to a depository in respect of such securities, even though the depository is the registered owner of the securities. It restored section 83 in the Companies Act relating to distinct numbers for securities. However, the securities held in a depository may not have distinct numbers. It amended section 111A to restrict free transferability of securities provided originally in the Depositories Act, 1996. It provided that if a company refuses to register securities within 2 months, the transferee can appeal before the CLB for registration of securities in his favour. It also provided that if the transfer is in violation of any law for the time being in force, the depository, depository participant, company, SEBI or investor may apply to CLB within 2 months for rectification of register or records. It amended the Indian Stamp Act to exempt stamp duty on transfer of beneficial ownership of units of mutual funds dealt with by a depository. (Subsequently the stamp duty was exempted on transfer of beneficial ownership of debt securities.)

*F. Securities Laws (Amendment) Act, 1999*

This Act has inserted provisions relating to derivatives, units of CIS and delegation of powers under the SCRA to RBI.

Derivatives : Despite withdrawal of prohibitions on derivatives by the Securities Laws (Amendment) Act, 1995, the market for derivatives, however, did not take off, as there was no regulatory framework to govern trading of derivatives. SEBI set up a 24 member Committee under the Chairmanship of Dr. L. C. Gupta on 18th November 1996 to develop appropriate regulatory framework for derivatives trading in India. The Committee submitted its report on March 17, 1998 recommending among others, that the derivatives may be declared as securities under section 2(h) (ii)(a) of the SCRA, so that the regulatory framework applicable to trading of securities could govern trading of derivatives also. Section 2 (h) of the SCRA, which provides an inclusive definition of 'securities', empowers Central Government to declare "such other" instruments as "securities". Government, however, did not declare derivatives to be securities, rather amended the SCRA, to explicitly define securities to include derivatives, probably because it's power to declare any instruments as "securities" was limited by the words "such other".

The Securities Contracts (Regulation) Amendment Bill, 1998 was introduced in the Lok Sabha on 4th July 1998 proposing to expand the definition of "securities" to include derivatives within its ambit so that trading in derivatives could be introduced and regulated under the SCRA. The Bill was referred to the Standing Committee on Finance (SCF) on 10th July 1998 for examination and report thereon. The Committee submitted its report on 17th March 1999. The committee was of the opinion that the introduction of derivatives, if implemented with proper safeguards and risk containment measures, will certainly give a fillip to the sagging market, result in enhanced investment activity and instill greater confidence among the investors/participants. The Committee after having examined the Bill and being convinced of the needs and objectives of the Bill approved the same for enactment by Parliament with certain modifications. The Bill, however, lapsed following the dissolution of 12th Lok Sabha. A fresh bill, the Securities Laws

(Amendment) Bill 1999 was introduced in the Lok Sabha on 28th October 1999 incorporating the amendments proposed in the Securities Contracts Regulation (Amendment) Bill, 1998 as well as the modifications suggested by the SCF. This Bill was converted into an Act on 16th December 1999.

The Act inserted clause (aa) in section 2 to define derivatives to include: (a) a security derived from a debt instrument, share, loan whether secured or unsecured, risk instrument or contract for differences or any other form of security, and (b) a contract which derives its value from the prices, or index of prices, of underlying securities.  It also inserted sub-clause (ia) in section 2 (h) to include derivatives within the ambit of securities. Since derivative contracts are generally cash settled, these may be classified as wagers.  The trading in wagers being null and void under section 30 of the Indian Contracts Act 1872, it may be difficult to enforce derivatives contracts.  In order to avoid such legal uncertainties, a new section 18A was inserted to provide that notwithstanding anything contained in any other law for the time being in force, contracts in derivatives shall be legal and valid if such contracts are traded on a recognised stock exchange and settled on its clearing house in accordance with rules and bye-laws of such stock exchange. Section 23 was amended to provide that any body who enters into contract in contravention of section 18A shall be punishable.

By a notification issued on 1st March 2000, Government lifted the three-decade-old prohibition on forward trading in securities by rescinding 1969 notification.  This prohibition was imposed by government in exercise of its powers under section 16 of the SCRA by a notification issued on 27th June 1969 in order to curb certain unhealthy trends that had developed in the securities market at that time and to prevent undesirable speculation.  In the changed financial environment, the relevance of this prohibition had vastly reduced.  Through appropriate amendments in the byelaws of the stock exchanges, carry forward transactions in securities were permitted.  Similarly, periodic amendments to the aforesaid notification were made to permit repo transactions in government securities by authorised intermediaries.  Even though the notification of 1969 was in force, exceptions had been carved out in course of time as market needs changed and some form of forward trading (carry forward/ready forward) was prevalent.

The provisions in the SCRA and the regulatory framework developed thereunder govern the trading in securities.  The amendments of the SCRA to include derivatives within the ambit of "securities" in the SCRA made trading in derivatives possible within the framework of that Act.

Collective Investment Scheme : During mid 1990s, many companies especially plantation companies had been raising capital from investors through schemes, which were in the form of CIS.  Though SEBI is authorised under the SEBI Act, 1992 to register and regulate CIS, there was no suitable regulatory framework to allow an orderly development of market for units/instruments by them.  Since SEBI's jurisdiction is limited to protect the interests of investors in securities, it could not take steps to protect the interests of investors in CIS units which were not securities. In order to allow for this and to strengthen the hands of SEBI to protect interests of investors in plantation companies, the Act amended the definition of "securities" to include within its ambit the units or any other instruments issued by any CIS to the investors in such schemes.  The Act empowered the Central Government to make rules to provide for the requirements, which shall be complied with by CIS for the purpose of getting their units listed on any stock exchange. Such rules have been incorporated in the Securities Contracts (Regulation) Rules.  This is aimed at an orderly development of market for these units while protecting the interest of investors therein.  The Act also inserted a definition of the CIS in the SEBI Act, 1992. The CIS was defined to mean any scheme or arrangement made or offered by any company under which (a) the contributions, or payments made by the investors, by whatever name called, are pooled and utilised solely for the purposes of the scheme or arrangement; (b) the contributions or

payments are made to such scheme or arrangement by the investors with a view to receive profits, income, produce or property whether movable or immovable from such scheme or arrangement; (c) the property, contribution or investment forming part of scheme or arrangement, whether identifiable or not, is managed on behalf of the investors; and (d) the investors do not have day to day control over the management and operation of the scheme or arrangement. The CIS, however, does not include any scheme or arrangement (a) made or offered by a cooperative society, (b) under which deposits are accepted by non banking financial companies, (c) being a contract of insurance, (d) providing for any Scheme, Pension Scheme or the Insurance Scheme framed under the Employees Provident Fund and Miscellaneous Provision Act, 1952, (e) under which deposits are accepted under section 58A of the Companies Act, 1956, (f) under which deposits are accepted by a company declared as Nidhi or mutual benefit society under section 620A of the Companies Act, 1956, (g) falling within the meaning of Chit business as defined in clause (d) of section 2 of the Chit Fund Act, 1982 and (h) under which contributions made are in the nature of subscriptions to a mutual fund.

Delegation of Powers to RBI : The Government had power to delegate regulatory authority to SEBI. To provide additional flexibility, the Act amended section 29A of the SCRA so as to empower the Central Government to delegate powers to RBI also along with SEBI, to enable the former to regulate transactions under the SCRA as may be necessary. Now the Central Government, SEBI, and the RBI depending on their jurisdiction as may be mutually agreed upon can exercise the powers under the Act.

With the repeal of the 1969 notification in 2000, the then prevailing regulatory framework, which governed repo transactions, disappeared. It was, therefore, necessary to work out an arrangement whereby the regulators could regulate such transactions. In pursuance to this and in exercise of its newly acquired power, Central Government issued a notification on 2nd March 2000 delineating the areas of responsibility between RBI and SEBI. In terms of this notification, the powers exercisable by Central Government under section 16 of the SCRA in relation to the contracts in government securities, gold related securities, money market securities and in securities derived from these securities and in relation to ready forward contracts in bonds, debentures, debenture stock, securitised debt and other debt securities shall also be exercised by RBI. Such contracts, if executed on stock exchanges, shall, however, be regulated by (i) the rules and regulations or the byelaws made under the SCRA, or the SEBI Act or the directions issued by SEBI under these Acts, (ii) the provisions contained in the notifications issued by RBI under the SCRA, and (iii) the rules or regulations or directions issued by RBI under the RBI Act, 1934, the Banking Regulations Act, 1949 or the Foreign Exchange Regulation Act, 1973.

RBI and SEBI have also issued consequential notifications on 2nd March 2000 specifying the regulatory framework in their respective areas. In terms of RBI notification, no person can enter into any (a) contract for the sale or purchase of government securities, gold related securities and money market securities other than spot delivery contract or such other contracts traded on a recognised stock exchange as is permissible under the SCRA, rules and byelaws of such stock exchange, and (b) ready forward contracts in bonds, debentures, debentures stock, securities debt, and other debt securities. Ready forward contracts may, however, be entered into by permitted persons in all government securities put through the Subsidiary General Ledger Account held with RBI in accordance with terms and conditions as may be specified by RBI. SEBI by its notification has prohibited all contracts in securities other than such spot delivery contract or contract for cash or hand delivery or special delivery or contract in derivatives as is permissible under the SCRA or the SEBI Act and rules and regulations made thereunder and rules, regulations and byelaws of a recognised stock exchange.

*G. The Securities Laws (Second Amendment) Act, 1999*

The SCRA provided the right of appeal before the Central Government against refusal, omission or failure by a stock exchange to list the securities of any public company. The SEBI Act, 1992 provided for two kinds of appeals. Under section 20 of the Act, any person aggrieved by any order of the SEBI under the Act or rules or regulations made thereunder, may prefer an appeal to the Central Government. Accordingly, the Central Government had notified the SEBI (Appeal to the Central Government) Rules, 1993 and constituted an Appellate Authority for disposal of appeals. Section 15K of the Act provided for establishment of one or more SATs to hear appeals from orders of adjudicating officer of SEBI imposing monetary penalty as per Rules framed by the Central Government. Government has accordingly established a SAT at Mumbai to hear appeals from the orders of adjudicating officers. Under section 23 of the Depositories Act, 1996, any person aggrieved by an order of SEBI under the Depositories Act 1996 or Rules and Regulations made thereunder may prefer an appeal to the Central Government. Accordingly, the Central Government had notified the Depositories (Appeal to the Central Government) Rules, 1998 and constituted an Appellate Authority for disposal of appeals. Thus the Central Government was conferred with powers to dispose of appeals in respect of all matters (except disposal of appeals against the orders of adjudicating officer under the SEBI Act, 1992) under all the three Acts.

In addition, the Central Government was empowered to issue directions to SEBI and make rules under these Acts. It was empowered to approve / amend / make rules / byelaws / regulations of the stock exchanges. Further, Central Government was represented on the management of SEBI as well as of the stock exchanges. The powers of the Central Government to issue directions and to make rules and appoint members of the SEBI as well as all governing bodies of the stock exchanges were perceived as compromising on its appellate powers. The Appellate Authorities appointed by the government under the SEBI Act and the Depositories Act had been receiving and disposing of appeals in accordance with the Rules. However, since government constituted these, their orders were perceived at times as orders of the government. When an order of SEBI was struck down, even on merits, there was a feeling that SEBI's autonomy as the regulator has been compromised. In order to remove such misgivings and impart transparency and impartiality to the process of disposal of appeals and to make the administration of penal provisions in the securities laws by the regulators more accountable and impartial, the Securities Laws (Second Amendment) Act 1999 amended all the three Acts to transfer appellate functions from the Central Government to an independent body, SAT.


The Amendment Act freezed section 22 of the SCRA and inserted a new section 22A to provide for right of appeal before SAT against refusal, omission or failure by a stock exchange to list the securities of any public company within 15 days of such refusal, omission or failure. An obligation was cast on SAT to dispose off appeals as expeditiously as possible, and to endeavour to dispose of finally within six months. Section 23 was amended to provide penalty for failure to comply with orders of SAT. Similar amendments were effected in the SEBI Act, 1992 and the Depositories Act 1996. Section 15K of the SEBI Act was amended to expand jurisdiction of SAT to deal with appeals also under any other law. Section 15T was amended to empower SAT to deal with appeals from any person aggrieved by an order of SEBI as well as of an adjudicating officer under the SEBI Act. Section 20 of the SEBI Act, which provided for appeals to Central Government, was freezed. Section 23 of the Depositories Act, 1996, which provided for appeals to the Central Government, was also freezed. A new section 23A was inserted to provide for appeals to SAT under the Act. Hence, all appeals, namely the appeals against the orders of SEBI under the SEBI Act and the Depositories Act, appeals against the orders of the adjudicating officers under the SEBI Act, and appeals against refusal of stock exchanges to list securities were allowed to be preferred to SAT. It was further provided that any person aggrieved by the order of SAT may prefer appeal to High Court within 60 days.

Provisions were made in all three Acts to provide for appearance of the appellant in person or through one or more chartered accountants or company secretaries or cost accountants or legal practitioners or any of its officers before a SAT.

Central government was empowered to make rules to provide for the form in which an appeal may be filed before the SAT and the fees payable in respect of such appeals. Consequently, the SEBI (Appeal to the Central Government) Rules, 1993 and the Depositories (Appeal to the Central Government) Rules, 1998 were repealed. Government notified on 18th February 2000 three Appeal Rules, Viz. (a) Securities Appellate Tribunal (Procedure) Rules, 2000 under the SEBI Act, 1992, (b) The Depositories (Appeal to Securities Appellate Tribunal) Rules, 2000 under the Depositories Act, 1996, and (c) The Securities Contracts (Regulation) (Appeal to Securities Appellate Tribunal) Rules, 2000 under the SCRA. These rules provide for fees, form and procedure for filing appeal and the process of their disposal by the SAT. The appeals (except appeals against adjudication orders under the SEBI Act) under all three Acts need to be accompanied by a fee of Rs. 5,000/- only. The appeals against the adjudication orders need to be accompanied by a fee of Rs. 500/- if the penalty imposed is less than Rs.10,000/-, Rs.1,200/- if the penalty imposed is more than Rs. 10,000/- but less than Rs. 1,00,000/- and an additional Rs. 1,000/- for every additional one lakh of penalty or fraction thereof.

*H. SEBI (Amendment) Act, 2002*

While responding to a calling attention motion in early March, 2001 by the leader of the opposition on extreme volatility in the stock markets, Finance Minister had proposed legislative changes to further strengthen the provisions in the SEBI Act, 1992 to ensure investor protection. In pursuance to this, the SEBI (Amendment) Act, 2002 was enacted to make provisions to (i) strengthen the Securities Appellate Tribunal (SAT) and the SEBI in terms of organisational structure and institutional capacity, (ii) enhance powers of SEBI substantially, particularly in respect of inspection, investigation and enforcement, and (iii) strengthen penal framework by prescribing a few more offences in the SEBI Act and enhancing the monetary penalties for various offences.

Strengthening Organisations : Before the Amendment Act, 2002, SEBI consisted of a Chairman and five other members to be appointed by the Central Government. Of the five members, three represented Ministry of Finance, Ministry of Law and the RBI. In view of the growing importance of the securities markets in the economy and the responsibilities of the SEBI under the SEBI Act, it was necessary to strengthen it further. The Amendment Act strengthened it by increasing the number of members from five to eight, providing for at least three whole time members and substituting the representation of the Ministry of Law by the Ministry dealing with administration of the Companies Act, 1956. SEBI would now benefit from the expertise of three additional members, full time attention of at least three additional members, and the representation of the Department of Company Affairs whose operations have bearing on the working of the securities market.

The SEBI Act provides for establishment of one or more SATs to hear appeals against the orders of SEBI. Prior to this amendment, the SAT consisted of one person called the Presiding Officer. Since it hears appeals against the orders of SEBI which is a very high powered statutory body and which is strengthened further by this amendment, and in the interests of objectivity and potential work load, it was necessary to strengthen the SAT. The Amendment Act converted the SAT to a three member body consisting of a presiding officer and two other members to be appointed by the Central Government. It enhanced the level of the SAT by prescribing higher eligibility criteria for appointment of the presiding officer and the members. It provided that only a sitting or retired judge of the Supreme Court or a sitting or retired Chief Justice of a High Court would be eligible to be appointed as presiding officer of the SAT and such appointment shall be

made in consultation with the Chief Justice of India or his nominee. The presiding officer will hold the office for a term of five years or until he attains the age of sixty eight years, whichever is earlier. It further provided that a person shall be qualified for appointment as member of the SAT if he is a person of ability, integrity and standing, who has shown capacity in dealing with problems relating to securities market and has qualification and experience of corporate law, securities laws, finance, economics or accountancy. A member of SAT can hold office for a term of five years or until he attains the age of sixty two years, whichever is earlier. A member of SEBI or a senior officer of SEBI at the level Executive Director shall not be eligible to be appointed as a member or Presiding Officer of the SAT during the tenure of his office with the SEBI or within two years from the date on which he ceases to hold such office. This will avoid conflict of interest in the sense that an official of SEBI responsible for a particular order should not uphold the order as a member of the SAT. Any person aggrieved by any decision or order of the SAT can prefer an appeal before the Supreme Court (it was High Court earlier) only on a question of law.

Empowering SEBI : The Amendment Act conferred on SEBI a lot of additional powers to deal with any kind of market misconduct and protect the investors in securities. For example, it can now prevent issue of any offer document if it has any misgivings about the antecedents of promoters / companies concerned. Under the amended provisions, SEBI can now:

(i) call for information and record from any bank or any other authority or board or corporation established or constituted by or under any Central, State or Provincial Act in respect of transactions in securities which are under investigation or enquiry by SEBI;

(ii) conduct inspection of any book or register or other document or record of any listed public company; If, however, the said company is not a registered intermediary, SEBI can inspect only if it has reasonable grounds to believe that such company has been indulging in insider trading or fraudulent and unfair trade practices relating to securities market.

(iii) issue commissions for examination of witnesses or documents while exercising powers to call for information or conduct inspection;

(iv) take any of the following measures in the interest of investors or securities market, either pending investigation or inquiry or on completion of such investigation or inquiry, but after giving an opportunity of hearing -

(a) suspend trading of a security in a recognised stock exchange;

(b) restrain persons from accessing the securities market and prohibit any person associated with securities market from buying, selling or dealing in securities;

(c) suspend any office bearer of a stock exchange or self-regulatory organisation from holding such position;

(d) impound and retain the proceeds or securities in respect of any transaction which is under investigation;

(e) attach for a period not exceeding one month, with the prior approval of a magistrate, one or more bank accounts of any intermediary or any person associated with the securities market in any manner involved in violation of any of the provisions of the Act or rules or regulations made thereunder; and

(f) direct any intermediary or any person associated with the securities market in any manner not to dispose of or alienate an asset forming part of any transaction which is under investigation.

In case of a listed public company, which is not a registered intermediary, the SEBI can exercise its powers of impounding and retaining proceeds or securities, attaching bank accounts or directing non-alienation of assets only if it has reasonable grounds to believe that the company has been indulging in insider trading or fraudulent and unfair trade practices relating to securities market.

(v) prohibit, for the protection of investors, any company from issuing any offer document including a prospectus or advertisement soliciting money from the public for the issue of securities, and specify the conditions subject to which such offer documents can be issued;

(vi) specify the requirements for listing and transfer of securities; and

(vii) pass an order requiring a person to cease and desist from committing or causing a particular violation of any of the provisions of the SEBI Act, or any rules or regulations made thereunder, if it finds, after an enquiry, that such person has violated or likely to violate the said provisions. In case of a listed public company, which is not a registered intermediary, the SEBI can exercise this powers only if it has reasonable grounds to believe that the company has been indulging in insider trading or market manipulation.

In addition, SEBI was armed with powers of investigation. If SEBI has reasonable grounds to believe that the transactions in securities are being dealt in a manner detrimental to the investors or the securities market or any intermediary or any person associated with the securities market has violated any of the provisions of the SEBI Act or the rules or the regulations made or directions issued by SEBI thereunder, it can appoint a person as investigating authority to investigate the affairs of such intermediary or persons associated with the securities market. In order to provide required teeth to the investigating authority, it has been provided that any person failing to produce any document or information to the investigating authority or appear before the investigating authority or sign the notes of examination shall be punishable with imprisonment or with fine or with both. Further, if the investigating authority has reasonable grounds to believe that the books, registers or documents or records of or relating any intermediary or any person associated with securities market in any manner, may be destroyed, mutilated, altered or falsified or secreted, he can obtain an authorisation from a Magistrate to (a) enter the place or places where such books or records are kept, (b) search the place or places and (c) seize the books or records, as considered necessary for investigation. Such authorisation would not be available to investigating authority in case of books or documents of any listed public company, which is not a registered intermediary, unless such company indulges in insider trading or market manipulation. Such search and seizure shall be carried out in accordance with the provisions of the Code of Criminal Procedure, 1973. The investigating authority can keep such record and documents in his custody till the conclusion of the investigation.

Strengthening Penal Framework : Section 11 of the SEBI Act, 1992 enjoins upon SEBI to take measures to provide for prohibiting insider trading in securities and fraudulent and unfair trade practices relating to securities markets, regulating substantial acquisition of shares and takeover of companies etc. However, these terms were not explained and these activities were not expressly forbidden in the Act. In order to clarify the matter, the Amendment Act added a new chapter, Chapter VA, relating to prohibition of manipulative and deceptive devices, insider trading and substantial acquisition of securities or control and empowered SEBI to regulate these practices by regulations. It now provides that it shall be unlawful for any person, directly or indirectly –

(a) to use or employ any manipulative or deceptive device or contrivance in contravention of regulations in connection with the issue, purchase or sale of any securities listed or proposed to be listed;

(b) to employ any device, scheme or artifice to defraud in connection with issue or dealing in securities which are listed or proposed to be listed;

(c) to engage in any act, practice, course of business which operates or would operate as a fraud or deceit upon any person, in connection with the issue, dealing in securities which are listed or proposed to be listed, in contravention of the provisions of the Act, or the rules or the regulations made thereunder;

(d) to engage in insider trading;

(e) to deal in securities while in possession of material or non-public information or communicate such material or non-public information to any other person, in a manner which is in contravention of the provisions of the Act, or the rules or the regulations made thereunder; and

(f) to acquire control or securities beyond threshold limit of a company, whose securities are listed or proposed to be listed, in contravention of the regulations made under the SEBI Act.

In order to equip SEBI with wherewithal to bring all types of culprits to book to ensure orderly development of market, the Amendment Act prescribed a few more offences along with associated penalties and enhanced penalties for the offences committed under the Act from a maximum of Rs. 5 lakh to a maximum of Rs. 25 crore or three times the amount of profit made out of violation, whichever is higher, and from imprisonment of one year to 10 years. Such enhanced punishment should serve as enough deterrent for the potential violators of law. Table 1 illustrates the scheme of penalties.

All the violations under section 15 shall be adjudicated by an adjudicating officer appointed by SEBI. The Amendment Act, however, provides that all sums realised by way of penalties would be credited to Consolidated Fund of India instead of SEBI. This is probably to avoid conflict of interest that SEBI may impose higher penalty when it needs more funds.

The Amendment Act empowered the SAT and the Courts to compound offences. They can compound any offence under the SEBI Act, not being an offence punishable with imprisonment only, or with imprisonment and also with fine, either before or after the institution of the proceeding.

In order to reduce delays, avoid unnecessary litigation and get cooperation of the accused, Central Government has been empowered to grant immunity, before institution of prosecution, to any person from prosecution for any offence under the SEBI Act or rules or regulations made thereunder or from the imposition of any penalty under the Act with respect to alleged violation. Such immunity can be granted only if SEBI recommends it and the person makes a full and true disclosure in respect of the alleged violation. If any person to whom immunity has been granted does not comply with the conditions on which immunity was granted or had given false evidence, the immunity can be withdrawn and on such withdrawal, the accused would face normal prosecution / penalty.

Any offence punishable under the Act or any rules or regulations made thereunder shall be tried by a 'court of session' instead of 'a metropolitan magistrate or a judicial magistrate of the first class' as provided earlier.

Table 1

Scheme of Penalties under the SEBI (Amendment) Act, 2002

| Section | Violations | Penalty |
|---------|------------|---------|

| Amendment | | Before Amendment | After Amendment |
|---|---|---|---|
| 11C(6) | Failure to produce books, records, etc. or furnish information or appear before the investigating authority or to sign the note of any examination by investigating authority | New provision | Imprisonment for a term which may extend to one year or fine which may extend to Rs. 1 crore or both and a further fine which may extend to Rs. 5 lakh for every day after the first during which the failure or refusal continues |
| 15A(a) | Failure by any person to furnish any document, return or report to SEBI required under the Act or any rules or regulations made there under | Not exceeding Rs.1.5 lakh / Failure | Rs. 1 lakh for each day during which such failure continues or Rs. 1 crore, whichever is less |
| 15A(b) | Failure by any person to file any return or furnish any information, books or other documents within the time specified in the regulations | Not exceeding Rs. 5,000 for each day during which such failure continues | |
| 15A(c) | Failure by any person to maintain books of accounts or records required under the Act or any rules or regulations made thereunder. | Not exceeding Rs. 10,000 for each day during which such failure continues | |
| 15B | Failure by an intermediary to enter into agreement with clients required under the Act | Not exceeding Rs. 5 lakh / Failure | |
| 15C | Failure by an intermediary to redress the grievances of investors after having been called upon by SEBI to do so | Not exceeding Rs. 10,000 / Failure | |
| 15C | Failure by a listed company to redress the grievances of investors after having been called upon by SEBI to do so | New provision | |
| 15D(a) | Sponsoring or carrying on any CIS, including mutual funds, by any person, without obtaining a certificate of registration from SEBI | Not exceeding Rs. 10,000 for each day during which he carries on any such CIS or Rs. 10 lakh, whichever is higher | Rs. 1 lakh for each day during which he sponsors or carries on any such CIS or Rs. 1 crore, whichever is less |
| 15D(b) | Failure by a registered CIS to comply with terms and conditions of registration | Not exceeding Rs. 10,000 for each day during which such failure continues or Rs. 10 lakh, whichever is higher | |

| | | | |
|---|---|---|---|
| 15D(c) | Failure by a registered CIS to apply for listing of its schemes as provided in the regulations | Not exceeding Rs. 5,000 for each day during which such failure continues or Rs. 5 lakh, whichever is higher | |
| 15D(d) | Failure by a registered CIS to despatch unit certificates in the manner provided in the regulations | Not exceeding Rs. 1,000 for each day during which such failure continues | |
| 15D(e) | Failure by a registered CIS to refund application monies within the period specified in the regulations | Not exceeding Rs. 1,000 for each day during which such failure continues | |
| 15D(f) | Failure by a registered CIS to invest money in the manner or within the period specified in the regulations | Not exceeding Rs. 5 lakh / Failure | |
| 15E | Failure by any asset management company of a registered mutual fund to observe rules and regulations | Not exceeding Rs. 5 lakh / Failure | |
| 15F(a) | Failure by a registered stock broker to issue contract notes in the manner specified by the exchange | Not exceeding five times the amount for which the contract note was required to be issued | No change |
| 15F(b) | Failure by a registered stock broker to deliver any security or make payment of the amount due to investor in the manner specified in the regulations | Not exceeding Rs. 5,000 for each day during which such failure continues | Rs. 1 lakh for each day during which such continues or Rs. 1 crore, whichever is less |
| 15F(c) | Charging brokerage in excess of the amount specified in the regulations by a registered stock broker | Not exceeding Rs. 5,000 or five times the amount of brokerage charged in excess of the specified brokerage, whichever is higher | Rs. 1 lakh or five times the amount of brokerage charged in excess of the specified brokerage, whichever is higher |
| 15G | Insider trading | Not exceeding Rs. 5 lakh | Rs. 25 crore or three times the amount of profits trading, whichever is higher |
| 15H | Failure by any person to disclose the | Not exceeding Rs. 5 | Rs. 25 crore or three times |

| Section | Nature of contravention | Existing penalty | Proposed penalty |
|---|---|---|---|
| | aggregate shareholding in the body corporate or make public announcement as required under the Act or rules or regulations | lakh | the amount of made out of such whichever is higher |
| 15H | Failure by any person to make a public offer or make payment of consideration to shareholders who sold their shares pursuant to the letter of offer, as required under the Act or rules or regulations | New provision | |
| 15HA | Indulging in fraudulent and unfair trade practices relating to securities | New provision | Penalty which may extend up to Rs. 1 crore |
| 15HB | Failure to comply with any provision of the Act, the rules or regulations made or directions issued by SEBI thereunder for which no separate penalty has been provided | New provision | |
| 24(1) | Contravenes or attempts to contravene or abets the contravention of the provisions of the Act or of any rules or regulations made thereunder | Imprisonment for a term which may extend to one year, or fine, or both | Imprisonment for a term which may extend to ten years, or fine which may extend to Rs. 25 |
| 24(2) | Failure to pay the penalty imposed by adjudicating officer or to comply with any of his directions or order. | Imprisonment for a term which shall not be less than one month but which may extend to 3 years, or fine which shall not be less than Rs. 2,000 but which may extend to Rs. 10,000, or both | Imprisonment for a term which shall not be less than one month but which may extend to 10 years, or fine which shall not be less than Rs. 25 crore or both |

## I. The Securities Laws (Amendment) Bill, 2003

The Securities Laws (Amendment) Bill, 2003 was introduced in the monsoon session of the Parliament to provide for (a) demutualisation and corporatisation of the stock exchanges, (b) fill up certain identified regulatory gaps such as units of mutual funds, delisting of securities, clearing corporation, protection of client assets etc. for which there were no statutory provisions, and (c) strengthen penal framework. The Bill has been referred to Standing Committee on Finance for Examination.

### Demutualisation of Exchanges

Historically the exchanges were formed as 'mutual' organisations. They are generally "not-for-profit" and tax exempted entities. The trading members who provide broking services, also own, control and manage such exchanges for their common benefit, but do not distribute the profits among themselves. In contrast, in a "demutual" exchange, three separate sets of people own the exchange, manage it and use its services. The exchanges frame and enforce rules, which may not always, further the public interest (interest of investors and society) and the private

interest (interests of trading members) simultaneously. Theoretically, public interest gets precedence in a demutualised exchange while private interest gets precedence in a mutual exchange in formulation and implementation of the rules. As the self (private interest) sometimes gets precedence over regulation (public interest), mutual exchanges do not offer an effective model for self-regulatory organisations. Besides addressing this malaise, the demutualisation offers several advantages. The limitations of a mutual structure has been realised time and again by the exchanges and the regulators. Recent happenings, particularly the 2001 stock market scam, made it clear that failure of the 'mutual' stock exchanges to resolve conflict of interest satisfactorily contributed to undesirable transactions in securities, which the SCRA aims to prevent. In order to address the malaise, the Finance Minister in March 2001 proposed corporatisation of stock exchanges by which ownership, management, and trading membership would be segregated from each other. The Joint Parliamentary Committee on the Stock Market Scam called for expeditious corporatisation and demutualisation of the stock exchanges. The implementation of this proposal, however, required amendments in the SCRA. The Securities Laws (Amendment) Bill, 2003 proposes these amendments.

The SCRA permits different structures for stock exchanges. That is why some exchanges are association of persons, some are company limited by shares, and some others are company limited by guarantee. Since the law permits any form for a stock exchange, it may not be possible to mandate a particular form for all exchanges. Similarly, the SCRA does not prohibit brokers from owning and managing an exchange. It may not, therefore, be possible to mandate a demutualised structure for all exchanges. In order to mandate these, the Bill seeks to amend the SCRA to specify that only a corporate entity can be a stock exchange and the exchange must be demutualised. The process of demutualisation involves segregation ownership, management and trading rights. However, the process of corporatisation would involve offering shares to public, including brokers. It is possible that the brokers subscribe for the shares and in terms of their rights under the Companies Act, get themselves elected to the board of directors. It may so happen that a stock exchange has only broker shareholders in the general body and broker directors in the governing body. Thus, even though an exchange is corporatised, it would not be demutualised, as the same set of people would be owning and managing the exchange and also trading on the exchange. The Bill, therefore, seeks to restrict the participation of broker-shareholders in the general body as well as in the management of the exchange.

The Bill makes it mandatory that all stock exchanges, if not corporatised and demutualised, shall be corporatised and demutualised on and from a date appointed by SEBI. It obligates the exchanges to submit a scheme for corporatisation and demutualization to SEBI for approval. SEBI shall not approve any scheme of demutualization and corporatisation if the issue of shares for a lawful consideration or payment of dividend or provision of trading rights in lieu of membership card of the members of an exchange is proposed out of any reserves or assets of the exchange. If a scheme is approved, it shall be published immediately and shall be binding on all persons and authorities. SEBI may reject a scheme after giving a reasonable opportunity of hearing the concerned exchange and the persons. Any person aggrieved by an order of SEBI can prefer an appeal before SAT.

While approving the scheme, SEBI may, by order, restrict (a) voting rights of the broker shareholders, (b) the rights of shareholders or brokers to appoint the representatives on governing boards, and (c) the maximum number of broker directors on the governing board, which shall not exceed one fourth of the total strength of the governing board. Such order shall be published in the official gazette. Within 12 months of this publication, the concerned stock exchange shall, either by fresh issue of equity shares to the public or in any other manner as may be specified by SEBI, ensure that at least 51% of its equity shares is held by public other than shareholders having trading rights. SEBI may extend this period by another 12 months in public interest.

If an exchange is not corporatised and demutualised or fails to submit a scheme for the same or the scheme is rejected by SEBI, the recognition granted to such exchange shall stand withdrawn.

Regulatory Gaps

In view of so many regulators and so many statues governing securities market, it is quite natural that there are regulatory gaps and overlaps. The Bill seeks to remove a few regulatory gaps.

Units of Mutual Funds : Units of mutual funds (MFs) resemble securities. They represent the interest of the unit holder in the specific scheme just as securities represent the interest of the holder in the issuer. The unit holder has similar rights as a security holder has on the future performance of any underlying asset or group of assets. Special kinds of units (units of assured return schemes), which represent the rights of investors on a fixed income flow over the future years or a fixed maturity value at the end of a specified period, are similar to debentures issued by companies. The units are issued, dematerialised, listed, traded on exchanges in a manner similar to any other security. These are transferred from one holder to another or sold back to the issuer, at pre-specified or market determined values, just like shares, debentures and other securities are. The holders of units and securities have the same need for safety, liquidity and return. Despite such close similarities between units and securities, they are not explicitly treated legally at par. While the trading of securities issued by corporates is governed by SCRA and regulatory framework developed thereunder, while trading of units are not subject to similar regulatory framework. In fact, trading of units is not subject to any regulatory framework. This presents a case of regulatory gap and this is one of the reasons why the secondary market for units has not developed appreciably. The easiest way to develop the market for units of MFs and protect the investors investing in them is to consider the units to be securities so that the regulatory framework applicable to trading of securities would also apply to trading of units and SEBI which has the responsibility to protect the interests of investors in securities, can protect the interest of holders of units of MFs also. Since the jurisdiction of SEBI is limited to securities market and the units of MFs are not explicitly recognised as securities in law, the actions of SEBI in protecting the interests of investors in units of MFs and developing a market for them is being challenged before the courts of law. In an appeal before SAT, an appellant contended that he was not covered by the Rules as he was not dealing in securities, but in units of MFs which are not securities and hence the SEBI had no powers, authority or jurisdiction to conduct any enquiry or impose any penalty on him. While disagreeing with this, the SAT considered the units of MFs to be securities in view of the object and purpose underlying the SEBI Act. This judicial pronouncement needs to be codified in law. The Bill, therefore, proposes to expand the definition of 'securities' to include units or any such instrument issued to the investors under any mutual fund scheme.

Delisting of Securities : Listing and delisting are two sides of the same coin. There is a substantial body of law that governs listing. The Companies Act makes it mandatory for a company issuing shares to public to list its securities on a stock exchange. The SCRA obliges the company to comply with the conditions of listing. It also allows a company to prefer an appeal before Securities Appellate Tribunal if a stock exchange refuses listing. The SCRA prescribe requirements for listing on a stock exchange. It also regulates suspension and withdrawal of trading. So much care and concern about listing. Even there are provisions about suspension of listing in statutes, rules and regulations. Unfortunately, delisting does not find place in any statute, rules or regulations. It was so far being regulated through a circular of SEBI, now by guidelines. Since the delisting is at least as important as listing, it is necessary that both have same level of legal backing.

Since no such statutory provision exists, doubts are raised if delisting is at all permissible under the laws. It is argued in some circles that delisting should not be permitted at all. They argue that it is the intention of legislature, as there are statutes and rules to govern listing, but no statute/rule provides for delisting. It is probably considered that listing is so sacrosanct that once a security is listed, it should not be delisted. An investor subscribes to an issue on the basis of the contents in the prospectus which may state that the security would be listed on stock exchanges. Once he subscribes to the issue, he takes an irreversible decision, as the promises in the prospectus are irreversible. Hence if one considers investors interest to be predominant and sole factor, there should not be any delisting of securities. Another school argues that listing agreement is essentially a contract between a company and an Exchange. Like any contractual relations, it must have also a way to terminate the relationship in certain circumstances. If there is a way to get in, there must be also a way to get out. Should the exchange and the company consider terminating their relationship, after taking care of interest of the affected investors, they should be permitted to do so. In view of pros and cons of delisting, it may not be desirable to put an absolute ban on delisting but it may be regulated. The statute and rules must provide a framework for delisting, as it provides for listing. If it is in the interest of investors, it must be permitted. If it is not in the interest of investors, delisting may be allowed only if investors are adequately protected.

The Bill proposes a framework for voluntary and compulsory delisting. A stock exchange may delist securities, after giving the concerned company an opportunity of hearing, if (a) the company has incurred losses or its networth has been reduced to less than its paid up capital, (b) the securities have not been traded continuously, (c) the company has failed to comply with listing agreement or provisions of any law, (d) the company fails to redress complaints of investors, (e) the company or its promoters or directors indulge in insider trading or unfair trade practices in securities, (f) the promoters or directors or persons in management indulge in malpractices, (g) the addresses of promoters or directors are not known or false, (h) trading in securities has remained suspended for more than six months, and (i) public shareholding has come below the limits specified in the listing agreement. The Bill empowers SEBI to specify additional grounds on which securities may be delisted. A listed company or an aggrieved investor can file an appeal before SAT against the decision of the exchange delisting the securities. The Bill allows a company to delist its securities from an exchange. It can, however, do so only after it has obtained prior approval of the holders of securities by a special resolution passed at a general meeting, given an opportunity to the shareholders to exit at a fair price, and complied with such conditions as may be prescribed by the Exchange or SEBI.

Clearing Corporation : The securities laws do not explicitly recognise existence of clearing corporation. They talk only about trading and not about settlement, which is left to byelaws of the exchanges. The byelaws are supposed to provide for clearing house (not clearing corporation) for settlement of securities transactions. The anonymous order book ushered in by screen based trading system does not allow participants to assess the counter party risk. It is, therefore, necessary that the exchanges use a clearing corporation to provide novation and settlement guarantee.

The Bill inserts a new section to provide that an exchange may, with the approval of SEBI, transfer the duties and functions of a clearing house to a clearing corporation for the purpose of the periodical settlement of contracts and differences thereunder, and the delivery of and payment for securities. SEBI shall approve such transfer if it is in public interest or in the interest of trade. Every clearing corporation must be a company and its byelaws must be approved by SEBI. The various provisions in the SCRA such as grant and withdrawal of recognition, supersession of management, suspension of business etc. applicable to stock exchanges shall, *mutatis mutandis*, apply to clearing corporations.

Client Assets : The intermediaries handle the money and the securities on behalf of clients and hold these in their custody on their behalf. They have generally been advised by SEBI to segregate their assets from those of their clients and not comingle the assets of the clients. At times, the intermediaries like depositories hold the assets as registered owner on behalf of beneficial owners. However, there is a doubt if the assets of the clients can be attached in case of insolvency of the intermediaries. There is no statutory backing to protect the investors in case of insolvency of intermediaries. In order to provide this protection of assets held in trust on behalf of investors, the Bill proposes that an investor can entrust the money or securities to any intermediary (stock broker, sub-broker, share transfer agent, banker to an issue, trustee of trust deed, registrar to an issue, merchant banker, underwriter, portfolio manager, investment adviser, depository, depository participant, custodian of securities, FIIS, credit rating agencies and such other intermediary) to be dealt or held on behalf of and at the instance of the investor. The intermediary shall hold such assets in trust and shall not have any right, title or interest of any nature therein. He shall deal with such assets as directed by the investor and shall be accountable for the same. Such assets shall not form part of assets of the intermediary and no authority can attach or seize such assets. If a broker or sub-broker fails to segregate the assets of the client or clients or uses the assets of a client for self or any other client, he can be penalized by an adjudicating officer up to Rs. 1 crore.

Scheme of Penalty

The securities market is an integral part of the economy. It has the potential to destabilise other sectors. It is, therefore, necessary that the penalty for offences in the securities market is deterrent. The first step in this regard is to make all the offences in the securities market cognisable, as a few offences under the SCRA are. Accordingly the Bill proposes to make all the offences listed in section 23 cognisable.

The penalty prescribed under the SCRA is ridiculously low. Many of the offences under the SCRA attract a penalty of Rs. 1,000, on conviction. For example, non-compliance of listing agreement, which can put investors to untold miseries and make a mockery of corporate governance norms, can be punished upto Rs. 1,000. Listing agreement can be effectively used to discipline a listed company, if its non-compliance invites a deterrent penalty. Accordingly, the Bill proposes increase penalty from Rs. 1,000 to an imprisonment upto 10 years or fine upto Rs. 25 crore or both. The Bill empowers SAT and Courts to compound any offence punishable under the SCRA, not being an offence punishable with imprisonment only, or with imprisonment and also with fine, either before or after institution of any proceeding.

The Bill lists out a wide range of violations along with maximum penalties leviable. It empowers SEBI to appoint an officer not below the rank of a division chief of SEBI to be an adjudicating officer. He will hold an enquiry after giving the person concerned a reasonable opportunity of being heard for the purpose of imposing penalty under sections 23A to 23F. While adjudging the quantum of penalty, the adjudicating officer shall have due regard to amount of disproportionate gain or unfair advantage wherever quantifiable made as a result of the default, the amount of loss caused to an investor or any group of investors as a result of default, the repetitive nature of the default and seriousness of the offence or violation. Table 2 presents the penalties envisaged in the Bill for different violations.

Table 2

Penalties proposed in the Securities Laws (Amendment) Bill, 2003

| Section | Offence | Penalty |
|---------|---------|---------|
| 23(1) | Various offences | |
| | | Imprisonmen |

| | | t upto 10 years or fine upto Rs. 25 crore or both |
|---|---|---|
| 23A | Failure to furnish information, books etc. or maintain books, records etc. as required under listing agreement or byelaws of an exchange | Rs. 1 lakh for each day during which such failure continues or Rs. 1 crore, whichever is less |
| 23B | Failure to enter into an agreement with client | |
| 23C | Failure to redress the grievances of investors by a broker, sub-broker, a listed or proposed to be listed company, after being called upon to do so by SEBI or Exchange | |
| 23D | Failure by a broker or sub-broker to segregate assets of clients or uses the assets of a client for self or another client | Penalty not exceeding Rs. 1 crore |
| 23E | Failure to comply with listing agreement or delisting norms by a person or company managing CIS or Mutual fund | Penalty not exceeding Rs. 25 crore |
| 23F | Dematerialisation in excess of the listed securities | |
| 23G | Failure or neglect by an Exchange to furnish periodical returns or to comply with any direction of SEBI | |
| 23H | Failure to comply with any provisions of the Act, rules, articles or byelaws of exchange or directions issued by SEBI, for which no separate penalty has been prescribed | Penalty not exceeding Rs. 1 crore |

The Bill provides that non-payment of penalty imposed by an adjudicating officer or non-compliance with any of his orders or directions would be an offence punishable with imprisonment for a term between one month and ten years, or with fine upto Rs. 25 crore or with both. All sums realized by way of penalties shall be credited to Consolidated Fund of India.

To ensure fair enquiry and penalty, the Bill provides that appeal against the orders or decision of SEBI rejecting the scheme of demutualisation submitted by an exchange, of an adjudicating officer imposing monetary penalty or of an Exchange regarding listing or delisting of securities can be preferred before SAT. Any person aggrieved by an order of SAT can prefer an appeal before Supreme Court only on a question of law.

The Bill provides that that no court shall take cognisance of any offence punishable under the Act or any rules made thereunder except on a complaint made by Central / State Government, SEBI, a stock exchange or a person. Any offence punishable under the Act shall be tried by a 'Court of Session' instead of 'a Presidency Magistrate or a Magistrate of the First Class' as provided now.

The amendment Bill inserts section 12A to empower SEBI to issue directions to any stock exchange, clearing corporation, any agency or person providing trading, clearing or settlement facility in respect of securities and to any company whose securities are listed or proposed to be listed on a stock exchange. Such directions can be made only being satisfied after inquiry that it is (i) in the interest of investors or orderly development of securities market, (ii) to prevent the affairs of any exchange, clearing corporation etc. from being conducted in a manner detrimental

to the interest of investors or of the securities market, or (iii) to secure the proper management of any such entity.

Other Amendments

The amendment Bill also proposes the following amendments:

*Derivatives* : It amends the definition of 'derivatives' to include swap, options and hybrid instruments and other contracts for differences. These are not securities as such and not based on underlying securities, but can be traded and regulated under SCRA, if these are considered derivatives and consequently securities. This will help the market for these instruments to develop.

*Spot Transactions* : Market has moved to T+2 rolling settlement in April 2003 and is scheduled to move to T+1 by April 2004. Since T+2 is as good as spot transactions, there is no need to allow spot transactions or exempt them from the regulatory framework. Besides, the spot transactions have been alleged misused for manipulative purposes. It may, therefore, be desirable to regulate spot transactions. The Bill proposes to withdraw the exemption for spot transactions in general. It grants the exemption only in respect specified types of spot transactions from the regulatory framework. It also empowers Central Government to regulate spot transactions, including exempted transactions, in the interest of trade or public interest.

*Depositories Act :* The Bill amends the Depositories Act to provide that any person aggrieved by an order of SAT can prefer an appeal before Supreme Court on a question of law arising out of the order.

Further Reforms

Nine special legislative interventions since 1992 indicate generosity of authorities. This has built up expectations of the market participants. This is a perfect example of more we get, more we ask or expect. The following further changes in law could be considered:

Regulatory Issues

There are several statutes regulating different aspects of the securities market. The four main legislations are: the SEBI Act, 1992, the Companies Act, 1956, the SCRA, 1956, and the Depositories Act, 1996. The larger the number of laws, higher is the scope for inconsistency among them and the possibility of regulatory overlaps and gaps. For example, listing is provided for in the Companies Act, SCRA and SEBI Act, while law does not provide for delisting, clearing corporation etc. as on date.

There are also as many regulators as the number of laws. The responsibility for supervision and development of the securities market is shared by Department of Economic Affairs, Department of Company Affairs, RBI and SEBI. In view of involvement of so many regulators, there is scope for confusion among the regulators and the regulated, regulatory gaps and overlaps, and duplicate and inconsistent regulations. For example, no regulator regulated CIS till it assumed scandalous dimensions when it was explicitly assigned to SEBI. Similarly, there is hesitation among regulators to regulate private placement of securities.

Not only the regulatory jurisdiction among different agencies is blurred, but also there is no statutory provision to provide for regulatory cooperation / sharing information among the domestic regulators and between overseas and domestic regulators. Powers of the regulator to

assist / seek assistance from overseas regulators or to enter into MOUs or other co-operation arrangements with them to deal with cross border misconduct are not explicitly provided in any legislation, though these are also not forbidden.

The protection of the interests of investors requires consolidation of all laws relating to securities market into a single piece of legislation, preferably called the Securities Act which should prevail over general laws. The administration of the Act may assigned to one agency with clearly defined regulatory jurisdiction and accountability. And the agency works in close coordination with other regulators, domestic or foreign.

If a regulator is also a participant in the market, it may not always be possible to avoid conflict of interest. For example, RBI, which is manager of the monetary policy, acts as regulator for government securities market, and also participates in the market simultaneously as manger of government debt, issuer of securities, merchant banker to issue, registrar and transfer agent, clearing and settlement agent, depository for securities, provider of trading platform, and subscriber to securities. The decisions relating to debt management, interest rate and regulation of market should be taken independently to avoid perceived conflict of interest.

The SROs are expected to share the responsibility with the regulator in framing and administering regulations. However, the SROs have not developed appreciably in India. Most of the associations of intermediaries like, AMFI, AMBI do not exactly regulate, though promote the activities of their members. The stock exchanges are SROs in true sense. However, the current ownership and governance structure of many stock exchanges do not seem adequate to deal with conflict of interest objectively. The imminent demutalisation should address this. This requires approval to the Securities Laws (Amendment) Bill, 2003.

While formulating regulations, no conscious effort is made to estimate cost of compliance of regulations and if the benefits from regulation outweigh the costs of regulation. There has also not been any study to estimate the cost of regulation / compliance. In order to prevent over regulation, it is necessary that the regulators are mandated to explicitly take into account the costs of regulation.

There is no provision in law requiring regulator to consult the regulated while formulating regulations. SEBI has, however, recently instituted a consultative process before framing regulations. All major policy / regulatory proposals are evolved through a committee comprising of experts and market participants and are posted on SEBI web site for comments from market participants and public. This needs to be codified.


Penal Provisions

The SEC lets off the offenders who simply pay up without admitting to an offence. This prevents every case being locked up in a Court. Given the number of cases pending in the Indian Courts and intangible nature of securities market offences, SEBI requires similar facilities if the offenders are to be punished on priority. This would help to bring all the co-accused to book or solve difficult cases if one accused provides lead by agreeing to plea bargain in exchange of a linient sentence.

The SEBI Act provides for two alternative types of punishment. They are: (a) suspension or cancellation of certificates of registration to be imposed by SEBI, or (b) monetary penalty to be imposed by an adjudicating officer. These two types of punishments are mutually exclusive. If a violation is assigned to an adjudicating officer for adjudication or monetary penalty is imposed, penalty of suspension or cancellation of certificate of registration can not be imposed and vice-

versa. This happens because SEBI does not have power to impose monetary penalty and the adjudicating officer does not have power to suspend or cancel a certificate of registration. A corollary of this is that mind is made up about the type of punishment to be imposed on the erring party when the alleged violation is referred to an adjudicating officer for adjudication or taken up by SEBI for imposition of suspension or cancellation of registration, that is, at a stage when the nature and gravity of the violation has not been fully ascertained. What would, therefore, be desirable is to authorise the adjudicating officers to try all offences under the SEBI Act, rather all securities laws, and award all types of penalties so that SEBI can concentrate on developmental and regulatory work.

**Investor Protection**

Investors are the backbone of the securities market. Protection of their interest is essential for sustenance of their interest in securities and hence development of market.

The consumer fora provide an expeditious remedy to a consumer who has suffered loss on account of deficiency in goods/services purchased by him. A system ombudsman is working well in the banking and insurance sector. A similar arrangement is called for redressal of investor grievances.

The investor forum as well as other authorities should have power to dispose off the cases summarily and to award compensation to the investor. It is not enough if the culprit is punished. The culprit needs to be punished in an exemplary manner, while investor should have means to recover his loss caused by the culprit. The law should empower the authorities not only to levy penalties, but also award compensation to investor.

The depositors are protected up to Rs. 1 lakh in the event of liquidation/bankruptcy of a bank. This protects innocent depositors and thereby contributes to the stability of the financial system. A similar mechanism may be insituted to compensate an investor up to Rs. 5 lakh if he suffers a loss on account of the failure of the system or mischief by any market participant. An organisation called Securities Investor Protection Corporation operates in the USA to provide similar protection to investors.

A large number of shares in the hands of a large number of shareholders is essential for sustenance of a continuous market for listed securities to provide liquidity to investors and to discover fair prices. To ensure this, a public company seeking listing of its securities on a stock exchange is required to offer at least 10% of securities to public. This framework suffers from following limitations: (i) 10% offer to public is too low to prevent price manipulation. (ii) The public offer is of no consequence unless the public are actually allotted shares. Even allotment has no meaning, unless sizeable number of shares remains in the hands of public to provide a continuous market. The law should speak in terms of allotment to public and public holding. (iii) The units of CIS are securities. But there is a different standard for listing of units of CIS. The same requirement (10% + 20 lakh + Rs. 100 crore or 25%, as the case may be) as applicable to listing of securities, should also apply to listing of units of CIS. The units of MFs are being considered as securities and are being traded like securities on exchanges. The requirement of public holding may apply to units of MFs as well. The investors in securities – shares, units of CIS or units of MFs – have need for same level of protection and hence the conditions of listing for all kinds of securities should be uniform. (iv) There should not be any discrimination between a government company and a non-government company. The powers of the stock exchange to relax this requirement in respect of a government company needs to be withdrawn. The powers of SEBI to relax or waive strict enforcement of listing requirement may also be withdrawn. (v) The words 'public' or 'offer to public' have not been defined. The Rules permit 10% public offer subject to the condition that 60% of the issue is allocated to QIBs. Since QIBs are part of public,

allocating 60% to QIBs would automatically constitute 60% public offer and the retail public would not get any share. Or, if 60% of public offer of 10% is allocated to QIBs, the retail public would be left with just 4%. It is, therefore, necessary to define 'public' and other terms and explicitly exclude allocation to QIBs from the public offer.

To ensure availability of reasonable floating stock on continuous basis, the listing agreement requires a company to maintain the minimum level of non-promoter holding at the level of public shareholding as required at the time of listing. If, however, the non-promoter holding of an listed company as on April 1, 2001 was less than that is required at the time of initial listing, the company was required raise the level of non-public holding to at least 10% within one year. This arrangement prescribes different standards for continued listing for companies listed before April 2001 and for companies listed thereafter. A company listed before April 2001 can have non-promoter holding of at least 10%, if as on April 1, 2001 it had non-promoter holding less than that is required at the time of initial listing. Otherwise it will have non-promoter holding as required at the time of initial listing, which may be 60% if it was listed before 1993. A company listed after April 2001 would maintain a minimum level of non-promoter holding at the level of public holding as required at the time of listing, that is, at 10% plus 20 lakh securities plus Rs. 100 crore or 25%, as the case may be. Thus existing listed and would be listed companies and consequently investors in these companies are treated differently.

Non-promoter holding required at the time of listing is quite vague as it has changed over time. If we follow the listing agreement, the companies listed before 1993 would maintain non-promoter holding at 60%, the companies listed between 1993 and 2001 would maintain at 25% and the companies listed after 2001 would maintain at 10% + 20 lakh + Rs. 100 crore or 25%, as the case may be. If minimum non-promoter holding is prescribed in the interest of investors and investors in all companies are to be treated uniformly, regulation has to be uniform and all companies should be required to maintain non-promoter holding of 10% + 20 lakh + Rs. 100 crore or 25%, as the case may be.

The confidence of the investors can be maintained and enhanced by making provision for professional intermediation services. Industry/SROs/Regulators have made a modest beginning, but not adequate given the dimensions of the market. There must be a formal and adequate arrangement to equip the personnel working with the intermediaries with the skills required to operate in the securities market. Probably an institute like ICSI or ICAI is necessary for securities market.

An investor normally deals in securities through an intermediary, whose acts of omission and commission can cause loss to him. In order for the investor to choose the right intermediary through whom he may transact business, it may be useful to help him in taking informed decision by making details of intermediaries available to him. Even, the intermediaries may be rated and their ratings are disseminated.

The sustenance of investors' interest and confidence in the securities market depends crucially on corporate governance. An investor, however, is generally not equipped to form an idea about the level of corporate governance in a company. As he is helped by credit rating in respect of his investments in debt instruments, he needs to be helped by a summary figure such as corporate governance index in respect of his investments in the concerned company.

# EXHIBIT C

## PROCEEDINGS OF THE WHOLE TIME MEMBER APPOINTING INVESTIGATING AUTHORITY

**WHEREAS:**

The Securities and Exchange Board of India (the Board) is satisfied that it is in the interest of investors and public interest to investigate into the affairs relating to buying, selling or dealing in the shares of Satyam Computer Services Ltd and more particularly to ascertain whether the provisions of the SEBI Act, 1992 and following Rules and Regulations made there under have been violated:

a.  whether there are any circumstances which would render any person guilty of having contravened any of the regulations of the SEBI (Prohibition of Fraudulent and Unfair Trade Practices relating to the Securities Market) Regulations, 2003;

b.  whether any provision of the SEBI (Prohibition of Insider Trading) Regulations, 1992 has been violated by any person;

c.  whether any Merchant Banker is guilty of having contravened the provisions of the SEBI (Merchant Bankers) Rules and Regulations, 1992;

d.  whether any violation of SEBI (Substantial Acquisition of Shares and Takeovers) Regulations, 1997 has taken place;

e.  whether any violation of Securities Contract (Regulations) Act, 1956 and Rules and Notifications made there under has taken place.

The Whole Time Member has therefore, in exercise of the powers conferred upon him under Section 19 of the SEBI Act 1992 read with:

(i)   Regulation 7 of the SEBI (Prohibition of Fraudulent Unfair Trade Practices relating to the Securities Markets) Regulations, 2003;

(ii)  Sub-regulation (1) of Regulation 5 of the SEBI (Prohibition of Insider Trading) Regulations, 1992;

(iii) Sub-regulation (1) of Regulation 29 of the SEBI (Merchant Bankers) Regulations, 1992;

(iv)  Regulation 38 of the SEBI (Substantial Acquisition of Shares and Takeovers) Regulations, 1997.

hereby appoints Shri Sunil Kumar A, General Manager as the Investigating Authority to investigate into the affairs relating to buying, selling or dealing in the shares of Satyam Computer Services Ltd. and submit a report to the Board at the earliest, vide order dated January 7, 2009. The Investigating Authority may seek the assistance of officers of the Board and any other person and these persons shall be bound to render such assistance. The Investigating Authority is also empowered to exercise the powers under Section 11 (3) and 11C of the SEBI Act, 1992 for the purpose of investigation.

SEBI is further satisfied that in the interest of the investors and in public interest / securities market, no notice to the persons to be investigated should be given and therefore it is ordered that in terms of the provisions of the said regulations the above investigation may be conducted without such notice.

It shall be obligatory upon the persons being investigated to extend co-operation and furnish such information and material as may be required by the Investigating Authority in accordance with the Regulations referred herein above.

Dated at Mumbai this 7th day of January 2009.


**P K NAGPAL**
**EXECUTIVE DIRECTOR**
**SECURITIES AND EXCHANGE BOARD OF INDIA**

# EXHIBIT D

**CENTRAL INFORMATION COMMISSION**
.....

| F.No.CIC/AT/A/2007/00242 | & | F.No.CIC/AT/A/2007/00243 |

Dated, the 28th May, 2007.

**Appellants** : **Shri Avtar Singh, 684 Industrial Area-B, Ludhiana, Punjab**

**Shri Darbara Singh, 108-R, Industrial Area-B, Ludhiana, Punjab.**

**Respondents** : **Shri Karan K. Sharma, CPIO, Directorate General of Central Excise Intelligence, West Block-VIII, Wing No.VI, R.K. Puram, New Delhi.**

**Shri V. Sridhar, DGCE Intelligence & Appellate Authority, Directorate General of Central Excise Intelligence, West Block-VIII, Wing No.VI, R.K. Puram, New Delhi.**

These two appeals have been filed by the appellants, Shri Avtar Singh and Shri Darbara Singh against the orders of the Appellate Authority (AA), which were both issued on the same date, viz. 7.12.2006. Although the points for consideration in both these appeals are the same, yet the files requested to be inspected by the appellants pertain to different investigations. In Appeal No.CIC/AT/A/2007/00242, the appellant has requested inspection of File No.DZU/INV/58/2003-p.t II/dated 23.01.06. In Appeal No.CIC/AT/A/2007/00243, inspection of File No.DZU/INV/68/2003/p.t-I dated 07.07.2006 has been requested. The query in both these cases is the same— "Complete investigation files relating to…….."

2.      Both CPIO and the AA had rejected the requests of the appellants on the ground that even though the investigation in both these matters had been completed, files could not be disclosed as they contained sensitive information about the sources of information, depositions of witnesses, the methodology of the investigation and the enquiry, the organizational setup and so on. The AA had also mentioned in his order that the Central Excise Manual very clearly laid down the entitlement of persons, against whom the investigations might have been launched, for documents / records and papers. These had been historically found to be adequate for defending the interest of such persons. The Central Excise Manual laid down the procedure for providing the documents required to mount defence of such persons before a legally constituted authority, follow all canons of natural justice, which leaves little room for injustice or miscarriage of justice. In the AA's view, therefore, there are no substantial grounds to respond positively to the appellant's request for information, i.e. inspection of the investigation files.

3.      Parties were called for a hearing on 9.5.2007. Appellants were called and were absent while the respondents were represented by the CPIO.

4.      The short point which has presented itself for consideration in these two appeals is whether a completed investigation would attract provisions of Section 8(1)(h) of the RTI Act. Besides, there is also this issue regarding such files—even after the completion

of the investigation, containing material sensitive enough to attract the exemption of Section 8(1)(g) of the Act.

5.      in my view a completed investigation takes the information connected with that investigation outside the ambit of Section 8(1)(h).    This Section speaks about "*information which would impede the process of investigation...*." A completed investigation is no more in 'process' and, therefore, cannot be said to be impeded if disclosure of information connected with such investigation is allowed.  The CPIO and the AA were in error in concluding that even though the information relates to a concluded investigation, it would still attract the exemption under Section 8(1)(h). As admitted by the respondents, an investigation is over once the show-cause notice is issued for the recovery of the revenue dues and penalties, if any.   Provisions of Section 8(1)(h) cannot be attracted to this category of information.

6.      However, in this case the CPIO and the Appellate Authority have also taken recourse to the exemption under Section 8(1)(g) to deny the information requested by the appellants.  This Section prohibits disclosure of information "*which would endanger the life or physical safety of any person or identify the source of information or assistance given in confidence for law enforcement and security purposes*".  According to the Appellate Authority, the file connected with the concluded investigation in this case contains several information which would attract the exemption under Section 8(1)(g).

7.      There is merit in this averment.  This file, it is stated to contain statements of witnesses, information about the sources, names of persons who assisted the law-enforcement authority in carrying out its duties, and other sensitive details, which if disclosed, could impair the very process of law enforcement in this as well as in future cases.  I, therefore, uphold the contention of the Appellate Authority and the CPIO that any file containing the above class of information would be barred from disclosure under Section 8(1)(g) of the RTI Act.

8.      I do not want at this stage to go into the matter relating to the issues of natural justice and the relationship of Section 8(1)(j) of the RTI Act to this case.  Suffice it to say that this Commission has not allowed disclosure of information when it has been proved to the satisfaction that such information came within the ambit of Section 8(1)(g) of the Act.  In the present appeal this appears to be the case.

9.      In view of the reasoning stated above, the contentions of the respondents are upheld and, the appeals are rejected.

Sd/-<br>(A.N. TIWARI)<br>INFORMATION COMMISSIONER

Authenticated by –


      Sd/-
( D.C. SINGH )
Under Secretary & Asst. Registrar

Address of parties:

1.   Shri Avtar Singh, 684 Industrial Area-B, Ludhiana, Punjab

2.   Shri Darbara Singh, 108-R, Industrial Area-B, Ludhiana, Punjab.

3.   Shri Karan K. Sharma, CPIO, Directorate General of Central Excise Intelligence, West Block-VIII, Wing No.VI, R.K. Puram, New Delhi.

4.   Shri V. Sridhar, DGCE Intelligence & Appellate Authority, Directorate General of Central Excise Intelligence, West Block-VIII, Wing No.VI, R.K. Puram, New Delhi.