**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

IN RE SATYAM COMPUTER SERVICES
LIMITED SECURITIES LITIGATION,

This Document Applies to:
1:10-cv-02877 (BSJ)

_____

:
:
:
:
:
:
:
:
:

1:09-md-2027 (BSJ)

ECF Case

**OMNIBUS MEMORANDUM OF LAW**
**OF ABERDEEN CLAIMS ADMINISTRATION, INC.,**
**IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**
**ABERDEEN'S SECOND AMENDED COMPLAINT**

Keith R. Dutill
William E. Mahoney, Jr.
Neal R. Troum
Heather Tashman Fritts
Joseph T. Kelleher
Stradley, Ronon, Stevens & Young, LLP
2600 One Commerce Square
Philadelphia, PA 19103-7098
(215) 564-8000
(215) 564-8120 (facsimile)

Attorneys for Plaintiff, Aberdeen Claims
Administration, Inc., Trustee for Aberdeen Claims
Trust and Aberdeen Claims Trust II

**TABLE OF CONTENTS**

I.    Introduction ................................................................................................1

II.   Factual Background ....................................................................................4

    A.    India's Enron ......................................................................................4
    B.    The Fraud ...........................................................................................5
    C.    The Auditors' Involvement ................................................................6
    D.    The Maytas Connection .....................................................................8
    E.    The Aberdeen Losses .........................................................................9

III.  Standard of Review .....................................................................................9

IV.   Argument ...................................................................................................10

    A.    Dismissal for Forum Non Conveniens Is Not Appropriate .............10

        1.    This Case Belongs in the United States ................................11
        2.    India Is Not an Adequate Alternative Forum ........................12
        3.    The Balance of Interests Favors Aberdeen's Choice of Forum ...............15
        4.    Choice of Law Does Not Warrant Forum Non Conveniens
             Dismissal .............................................................................17

    B.    Aberdeen Has Standing .....................................................................17
    C.    Aberdeen Has Asserted Viable § 10(b) Claims against Satyam and PwC
        India ..................................................................................................25

        1.    The Bank Confirmations .......................................................27
        2.    The Size of the Fraud ...........................................................29
        3.    Multiple Red Flags and GAAP Noncompliance ...................30
        4.    The Excessive Audit Fees .....................................................31

    D.    PwCIL Is Derivatively Liable for the Wrongdoing of PwC India ......32
    E.    PwC Pvt. Ltd., Lovelock & Lewes, and Price Waterhouse Are One Entity .........39
    F.    Aberdeen Has Stated § 20(a) Claims against PwCIL, PwC US, and the
        Maytas Defendants ...........................................................................41

        1.    PwCIL's § 20(a) Liability .....................................................42
        2.    PwC US' § 20(a) Liability ....................................................44
        3.    The Maytas Defendants' § 20(a) Liability ............................49

    G.    All of Aberdeen's Losses Remain Compensable after Morrison ..........51
    H.    Aberdeen's State Law Claims Are Viable .........................................53

        1.    SLUSA Does Not Preempt Aberdeen's State Law Claims ..........53
        2.    Supplemental Jurisdiction Exists for the Common Law Claims ...........55
        3.    Aberdeen Has Stated Claims for Fraud, Negligence, and Negligent
             Misrepresentation ................................................................56

    I.    The Maytas Defendants' Service Arguments Are Meritless ..............64
    J.    This Court Has Personal Jurisdiction over the Maytas Defendants ........67

V.    Conclusion ................................................................................................68

## TABLE OF AUTHORITIES

<u>**CASES**</u>

<u>Allstate Life Ins. Co. v. Linter Group Ltd.</u>,
  994 F.2d 996 (2d Cir. 1993)..................................................................................17

<u>Alten v. Atl. Fin. Fed.</u>,
  805 F. Supp. 5 (E.D. Pa. 1992) .............................................................................63

<u>Althaus ex rel. Althaus v. Cohen</u>,
  756 A.2d 1166 (Pa. 2000)......................................................................................59

<u>Anwar v. Fairfield Greenwich Ltd.</u>,
  728 F. Supp. 2d 372 (S.D.N.Y. 2010)..............................................................38, 62

<u>Armstrong v. Sears</u>,
  33 F.3d 182 (2d Cir. 1994)....................................................................................66

<u>Ashcroft v. Iqbal</u>,
  129 S.Ct. 1937 (2009).....................................................................................10, 38

<u>Bell Atl. Corp. v. Twombly</u>,
  550 U.S. 544 (2007)......................................................................................Passim

<u>Bergeron v. Philip Morris, Inc.</u>,
  100 F. Supp. 2d 164 (E.D.N.Y. 2000) ..................................................................24

<u>Bilt-Rite Contractors, Inc. v. The Architectural Studio</u>,
  866 A.2d 270 (Pa. 2005) ...............................................................................Passim

<u>Blue Chip Stamps v. Manor Drug Stores</u>,
  421 U.S. 723 (1975) .........................................................................................21-23

<u>Bomar v. Keyes</u>,
  162 F.2d 136 (2d Cir. 1947)..................................................................................67

<u>Bouriez v. Carnegie Mellon Univ.</u>,
  No. 02-cv-2104, 2010 WL 1416845 (W.D. Pa. Apr. 6, 2010) .........................57, 58

<u>Boykin v. Arthur Andersen & Co.</u>,
  639 So.2d 504 (Ala. 1994)....................................................................................64

<u>Burks v. Griffith</u>,
  100 F.R.D. 491 (N.D.N.Y. 1984) ..........................................................................67

<u>Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.</u>,
  511 U.S. 164 (1994)..............................................................................................38

Ceramicas Industriales, S.A. v. Metro. Life Ins. Co.,
No. 08 Civ. 5114, 2009 WL 331262 (S.D.N.Y. Feb. 11, 2009) .........................................9-10

Citiline Holdings, Inc. v. IStar Fin., Inc.,
701 F. Supp. 2d 506 (S.D.N.Y. 2010)....................................................................................43

Congregation of the Passion v. Touche Ross & Co.,
636 N.E.2d 503 (Ill. 1994)................................................................................................58-59

Cromer Fin. Ltd. v. Berger,
Nos. 00 Civ. 2284 (DLC), 00 Civ. 2498 (DLC), 2002 WL 826847 (S.D.N.Y. May 2,
2002) ......................................................................................................................................37

Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
395 F.3d 25 (2d Cir. 2005).....................................................................................................53

De George v. Am. Airlines, Inc.,
No. 08 Civ. 2103, 2009 WL 1868016 (2d Cir. June 30, 2009) ..............................................39

Delicata v. Bowen,
116 F.R.D. 564 (S.D.N.Y. 1987) ...........................................................................................67

DiRienzo v. Philip Servs. Corp.,
294 F.3d 21 (2d Cir. 2002).......................................................................................... 13, 16-17

Dobyns v. Trauter,
552 F. Supp. 2d 1150 (W.D. Wash. 2008)..............................................................................23

Dornberger v. Metro. Life Ins. Co.,
961 F. Supp. 506 (S.D.N.Y. 1997) .........................................................................................17

Dura Pharms., Inc. v. Broudo,
544 U.S. 336 (2005)................................................................................................................26

Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.,
595 F. Supp. 2d 1253 (M.D. Fla. 2009)..................................................................................32

Engle v. Matrix Golf & Hospitality Phila., LLC,
Civil Action No. 08-5831, 2009 WL 880680 (E.D. Pa. March 31, 2009)...............................40

Fletcher-Harlee Corp. v. Szymanski,
936 A.2d 87 (Pa. Super. 2007)..........................................................................................39, 40

Forcier v. Cardello,
173 B.R. 973 (D.R.I. 1994)...............................................................................................64, 65

Freudenberg v. E*Trade Fin. Corp.,
712 F. Supp. 2d 171 (S.D.N.Y. 2010).....................................................................................26

Gleason v. McBride,
    869 F.2d 688 (2d Cir. 1989)........................................................................67

Guenther v. Cooper Life Sciences, Inc.,
    759 F. Supp. 1437 (N.D. Cal. 1990) ....................................................62, 64

Gulf Oil Corp. v. Gilbert,
    330 U.S. 501 (1947)............................................................................12, 13

Hall v. The Children's Place Retail Stores, Inc.,
    580 F. Supp. 2d 212 (S.D.N.Y. 2008)........................................................41

Hinds County, Miss. v. Wachovia Bank N.A.,
    708 F. Supp. 2d 348 (S.D.N.Y. 2010)..................................................39, 57

In re Bear Stearns Cos., Inc. Sec., Derivative, and ERISA Litig.,
    No. 08 MDL 1963, 2011 WL 223540 (S.D.N.Y. Jan. 19, 2011)....................... 60-61

In re Blech Sec. Litig.,
    No. 94-cv-7969, 2002 WL 31356498 (S.D.N.Y. Oct. 17, 2002)............................51

In re Bristol Myers Squibb Co. Sec. Litig.,
    586 F. Supp. 2d 148 (S.D.N.Y. 2008)........................................................41

In re Chambers Dev. Sec. Litig.,
    848 F. Supp. 602 (W.D. Pa. 1994)................................................. 63-64

In re CIT Group Inc. Sec. Litig.,
    No. 08-cv-6613 (BSJ), 2010 WL 2365846 (S.D.N.Y. June 10, 2010) ...................41

In re Complete Mgmt. Inc. Sec. Litig.,
    153 F. Supp. 2d 314 (S.D.N.Y. 2001)........................................................31

In re Computer Personalities Sys., Inc., No. 01-14231DWS, ADV. 03-0220, 2003 WL
    22844863 (Bankr. E.D. Pa. Nov. 18, 2003) ........................................... 58-59

In re Herley Indus. Inc. Sec. Litig.,
    No. 06-2596, 2009 WL 3169888 (E.D. Pa. Sept. 30, 2009) ...................................21

In re Imax Sec. Litig.,
    587 F. Supp. 2d 471 (S.D.N.Y. 2008)........................................................31

In re Intelligent Elecs., Inc. Sec. Litig.,
    Nos. 95-7663, 95-7712, 1996 WL 304852 (E.D. Pa. June 6, 1996)...........60, 62, 63

In re Kingate Mgmt. Ltd. Litig.,
    No. 09 Civ. 5386(DAB), 2011 WL 1362106 (S.D.N.Y. March 30, 2011) ............53

In re Leslie Fay Cos., Inc. Sec. Litig.,
   918 F. Supp. 749 (S.D.N.Y. 1996) ...................................................................50

In re Livent, Inc. Sec. Litig.,
   78 F. Supp. 2d 194 (S.D.N.Y. 1999) ..............................................................29

In re Morgan Stanley Info. Fund Sec. Litig.,
   592 F.3d 347 (2d Cir. 2010) ..........................................................................28

In re Parmalat Sec. Litig.,
   375 F. Supp. 2d 278 (S.D.N.Y. 2005)...................................................... Passim

In re Parmalat Sec. Litig.,
   474 F. Supp. 2d 547 (S.D.N.Y. 2007)............................................................38

In re Parmalat Sec. Litig.,
   497 F. Supp. 2d 526 (S.D.N.Y. 2007)......................................................41, 51

In re Parmalat Sec. Litig.,
   640 F. Supp. 2d 243 (S.D.N.Y. 2009)............................................................43

In re Regal Commc'ns Corp. Sec. Litig.,
   No. 94-179, 1996 WL 411654 (July 17, 1996)...............................................63

In re S. African Apartheid Litig.,
   643 F. Supp. 2d 423 (S.D.N.Y. 2009)............................................................65

In re Scottish Re Group Sec. Litig.,
   524 F. Supp. 2d 370 (S.D.N.Y. 2007)...................................................... Passim

In re Sterling Foster & Co., Inc., Sec. Litig.,
   222 F. Supp. 2d 216 (E.D.N.Y. 2002) ...................................................... 55-56

In re Take-Two Interactive Sec. Litig.,
   551 F. Supp. 2d 247 (S.D.N.Y. 2008)............................................................41

In re Vivendi Universal, S.A. Sec. Litig.,
   605 F. Supp. 2d 570 (S.D.N.Y. 2009)..................................................... 20-21, 44

In re Vivendi Universal, S.A. Sec. Litig.,
   No. 02-cv-05572, 2011 WL 590915 (S.D.N.Y. Feb. 17, 2011) ............................49

In re Westinghouse Sec. Litig.,
   832 F. Supp. 948 (W.D. Pa. 1993)................................................................63

In re WorldCom, Inc. Sec. Litig.,
   294 F. Supp. 2d 392 (S.D.N.Y. 2003)......................................................41, 51

Iragorri v. United Techs. Corp.,
    274 F.3d 65 (2d Cir. 2001)........................................................................................16

IUE AFL-CIO Pension Funs v. Herrmann,
    9 F.3d 1049 (2d Cir. 1993)........................................................................................56

Katz v. Image Innovations Holdings, Inc.,
    542 F. Supp. 2d 269 (S.D.N.Y. 2008)......................................................................29

Lujan v. Defenders of Wildlife,
    504 U.S. 555 (1992)..................................................................................................18

Lumax Indus. v. Aultman,
    669 A.2d 893 (Pa. 1995)...........................................................................................39

Manu Int'l, S.A. v. Avon Prods. Inc.,
    641 F.2d 62 (2d Cir. 1981).................................................................................. 23-24

McKibben v. Credit Lyonnais,
    No. 98-3358, 1999 WL 604883 (S.D.N.Y. Aug. 10, 1999)......................................67

Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit,
    547 U.S. 71 (2006)..............................................................................................54, 55

Morrison v. Nat'l Australia Bank Ltd.,
    130 S.Ct. 2869 (2010)........................................................................................Passim

New York State Elec. & Gas Corp. v. Westinghouse Elec. Corp.,
    564 A.2d 919 (Pa. Super. 1989)................................................................................58

Norex Petroleum Ltd. v. Access Indus., Inc.,
    416 F.3d 146 (2d Cir. 2005)......................................................................................13

Nossen v. Hoy,
    750 F. Supp. 740 (E.D. Va. 1990) ............................................................................24

Nuevo Mundo Holdings v. PricewaterhouseCoopers LLP,
    No. 03 Civ. 0613 GBD, 2004 WL 112948 (S.D.N.Y. Jan. 22, 2004) ............... 37-38

Ocasio v. Fashion Institute of Tech.,
    86 F. Supp. 2d 371 (S.D.N.Y. 2000).........................................................................66

Paraschos v. YBM Magnex Int'l, Inc.,
    No. CIV A 98-6444, 2000 WL 325945 (E.D. Pa. March 29, 2000)........................63

Peregrin Myanmar Ltd. v. Segal,
    89 F.3d 41 (2d Cir. 1996)..........................................................................................17

Pina v. Henkel Corp.,
    No. 07-4048, 2008 WL 819901 (E.D. Pa. March 26, 2008)....................................................40

Promisel v. First Am. Artificial Flowers, Inc.,
    943 F.2d 251 (2d Cir. 1991)...........................................................................................55

Riley v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
    292 F.3d 1334 (11th Cir. 2002) ..............................................................................53, 55

Ring v. AXA Fin., Inc.,
    483 F.3d 95 (2d Cir. 2007)......................................................................................... 53-54

Robert Wooler Co. v. Fidelity Bank,
    479 A.2d 1027 (Pa. Super. 1984)...........................................................................63

Salahuddin v. Harris,
    657 F. Supp. 369 (S.D.N.Y. 1987) .........................................................................67

Santos v. State Farm Fire & Cas. Co.,
    902 F.2d 1092 (2d Cir. 1990).......................................................................... 66-67

Schexnider v. McDermott Int'l, Inc.,
    817 F.2d 1159 (5th Cir. 1987) .................................................................................23

Shanahan v. Vallat,
    No. 03 Civ. 3496 (MBM), 2004 WL 2937805 (S.D.N.Y. Dec. 19, 2004) ............................56

Sharp v. Coopers & Lybrand,
    457 F. Supp. 879 (E.D. Pa. 1978) ..........................................................................64

Simpson v. Specialty Retail Concepts, Inc.,
    908 F. Supp. 323 (M.D.N.C. 1995) .........................................................................64

Smith v. Ayers,
    977 F.2d 946 (5th Cir. 1992) ............................................................................ 21-22

Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
    332 F.3d 116 (2d Cir. 2003).....................................................................................55

Sprint Communications Co., L.P. v. APCC Servs., Inc.,
    554 U.S. 269 (2008)........................................................................................... Passim

Steed Fin. LDC v. Laser Advisors, Inc.,
    258 F. Supp. 2d 272 (S.D.N.Y. 2003)......................................................................41

Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd.,
    No. 01 Civ. 11814, 2003 WL 21058090 (S.D.N.Y. May 15, 2003).......................................33

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
　　551 U.S. 308 (2007)..................................................................................26, 32, 48

*The Village at Camelback Prop. Owners Ass'n, Inc. v. Carr,*
　　538 A.2d 528 (Pa. Super. 1988)............................................................... 39-40

*Tommy L. Griffin Plumbing & Heating Co. v. Jordan, Jones & Goulding, Inc.,*
　　463 S.E.2d 85 (S.C. 1995) ...................................................................................58

*United States v. Jack Cozza, Inc.,*
　　106 F.R.D. 264 (S.D.N.Y. 1985) .......................................................................68

*United Mine Workers v. Gibbs,*
　　383 U.S. 715 (1966)....................................................................................... 55-56

*United Nat'l Ret. Fund v. Ariela, Inc.,*
　　643 F. Supp. 2d 328 (S.D.N.Y. 2008)..............................................................65

*United States v. Arthur Young & Co.,*
　　465 U.S. 805 (1984)..................................................................................60, 61

*Valley Juice Ltd., Inc. v. Evian Waters of France, Inc.,*
　　87 F.3d 604 (2d Cir. 1996)...........................................................................39, 57

*W.R. Huff Asset Management Co., LLC v. Deloitte & Touche LLP,*
　　549 F.3d 100 (2d Cir. 2008)................................................................................20

*Wiwa v. Royal Dutch Petroleum Co.,*
　　226 F.3d 88 (2d Cir. 2000)........................................................................... 12-13

*Wright v. Ernst & Young, LLP,*
　　152 F.3d 169 (2d Cir. 1998)..............................................................................38

*Yellowave Corp. v. Mana,*
　　No. 00-2267, 2000 WL 1508249 (S.D.N.Y. Oct. 11, 2000)...................................66

**RULES**

Fed. R. Civ. P. 4 .................................................................................................65

**STATUTES**

15 U.S.C. § 78bb.................................................................................................53

15 U.S.C. § 77r...................................................................................................54

15 U.S.C. § 77dj.................................................................................................54

15 U.S.C. § 77c...................................................................................................54

28 U.S.C. § 1331 ..........................................................................................................56

28 U.S.C. § 1367 ..........................................................................................................56

28 U.S.C. § 1407 ..........................................................................................................40

N.Y. Gen. Bus. § 352 ...................................................................................................51

**OTHER AUTHORITIES**

Restatement (Second) of Torts  § 552 (1977) ........................................................60, 62

## I.    <u>Introduction</u>

Defendants recognize the scope of what is at issue.[1]  "India's Enron."  A "massive, multi-year fraud," involving "multi-faceted deceit."  "[T]he largest securities fraud in India's modern history," with "over a billion dollars of apparently now-confessed fraud."[2]  Indeed, with over $4 billion in market capitalization lost following a public confession by Satyam's chairman and founder, it is difficult to overstate the magnitude of the Satyam disaster.  In its downfall, Satyam took with it millions of innocent investors, among them the twenty investors ("the Investors") whose claims are brought by Plaintiff Aberdeen Claims Administration, Inc. ("Aberdeen").  Aberdeen brings this action to recover for the tens of millions of dollars the Investors lost due to the Satyam fraud.

As set forth in Aberdeen's Second Amended Complaint ("SAC"), and as summarized below, this fraud transpired over years, through phony invoices, ghost employees, a rigged computer system, and the active participation of those both inside and outside Satyam.  Satyam cooked the books and created cash and assets out of thin air.  Its auditors enabled the fraud.  Its phony financials were incorporated into filings with the SEC and relied upon by

---

[1] Defendants have filed eleven briefs in support of the various pending motions to dismiss the SAC.  The following briefs are referenced herein as follows:  Maytas Properties Defendants' Memorandum of Law in Support of Motion to Dismiss for <u>Forum Non Conveniens</u> [Dkt. 282] ("Maytas FNC Brief"); Maytas Properties Defendants' Memorandum of Law in Support of Motion to Dismiss Pursuant to Rule 12(b)(6) [Dkt. 284] ("Maytas Brief"); PwC India's Memorandum of Law in Support of Motion to Dismiss SAC [Dkt. 303] ("PwC India Brief"); PwC India's Memorandum of Law in Support of Motion to Dismiss for <u>Forum Non Conveniens</u> [Dkt. 305] ("PwC India FNC Brief"); PwC US' Memorandum of Law in Support of Motion to Dismiss SAC [Dkt. 308] ("PwC US Brief"); PwCIL's Memorandum of Law in Support of Motion to Dismiss SAC [Dkt. 314] ("PwCIL Brief"); and Satyam's Memorandum of Law in Support of Motion to Dismiss SAC [Dkt. 316] ("Satyam Brief").  Maytas Properties, along with Defendants Rama Raju Jr. and Teja Raju, and Maytas Infra, each filed separate briefs.  Maytas Properties' briefing is virtually identical to that of Maytas Infra, word for word.  For convenience, Aberdeen cites herein to the Maytas Properties briefs.

[2] Only Satyam Computer Services Limited ("Satyam") has the temerity to characterize the fraud as mere "financial irregularities."  (Satyam Brief at 3.)

securities investors.  When the true numbers came to light, the price of Satyam securities plummeted.[3]

Satyam's auditor, PwC India,[4] claims it played no part in the Satyam fraud, insisting on what amounts to an astonishing level of incompetence in failing to detect a billion dollar fraud committed on its watch and under its nose.[5]  Yet two of PwC India's principals have been indicted for their role in the fraud and face criminal trial.  Any suggestion that a fraud of this magnitude could be pulled off and then extended year after year without the active assistance (or willful blindness) of the auditors responsible for ensuring the accuracy of Satyam's financials cannot be taken seriously.  There is no dispute that PwC India had in its possession documents demonstrating that Satyam's financials were fraudulent.  Whether PwC India pocketed its exponentially-higher-than-market compensation from Satyam with a knowing wink, or recklessly failed to perform the most basic elements of its job as Satyam's statutory auditor, PwC India's liability for the securities fraud at issue is plain.

PwC India was not the only PricewaterhouseCoopers entity with a hand in the Satyam audits.  PwC India was under constant supervision by, and was required to follow the dictates of, the entity atop the PwC organization, PricewaterhouseCoopers International Limited ("PwCIL").  PwCIL boasts to the world of its integrated global network and the high quality

---

[3]  When the news of the Satyam fraud broke, the price of Satyam common stock dropped more than 77%, and the price of Satyam American Depository Receipts ("ADRs") fell more than 87% before the New York Stock Exchange ("NYSE") halted trading.  (SAC ¶¶ 301-02.)

[4]  PwC India is comprised of Price Waterhouse, Lovelock & Lewes, and PricewaterhouseCoopers Private Limited ("PwC Pvt. Ltd.").  PwC Pvt. Ltd. seeks to distance itself from Price Waterhouse and Lovelock & Lewes to avoid liability.  As discussed below, this argument fails.

[5]  PwC India claims that "[i]t is inconsistent to argue that Satyam concealed its scheme from investors but that Satyam's auditors knew all along about the scheme."  (PwC India Brief at 1.)  There is no inconsistency.  Either Satyam's auditors were in on the fraud, or they were so reckless in conducting Satyam's audits that they ignored the obvious.  Either way, they bear liability for the fraud.

standards to which it holds its member firms, which it audits regularly for compliance with the standards it promulgates.  PwCIL in fact audited PwC India numerous times during the course of the commission of the fraud, and its supervisory involvement with PwC India's daily affairs was significant.  Though PwCIL now claims little connection with PwC India in the wake of fraud, agency is not a switch that a principal can turn "on" to sell its wares and then "off" to shield its assets.  The lines of agency connecting PwCIL and its Indian member firm are well established, and PwCIL bears liability for the Satyam fraud just as its agent does, PwC India.

PricewaterhouseCoopers LLP ("PwC US"), the United States PwC entity, also played an integral role in assisting PwC India in the filing of Satyam's financials.  Indeed, the fraudulent SEC filings on which the Investors and others relied in deciding to purchase Satyam securities could never have been filed without the assistance and complicity of PwC US.  PwC US' active and ongoing participation in the audits that perpetuated the Satyam fraud is obvious from the email exchanges detailed in the SAC.  It is also evident that Satyam's U.S. auditor did nothing more than its Indian counterpart in response to the many red flags it observed.

Finally, Maytas Properties and Maytas Infra Limited (collectively, along with their principals Teja Ramu and Rama Raju Jr., the "Maytas Defendants") were likewise integral to the Satyam fraud.  Indeed, the Maytas Defendants were almost the singular beneficiaries of the benefits of the fraud.  Among other things, the Maytas Defendants funneled millions of dollars from Satyam in an effort to hide the fraud, playing a vital role in a fraud whose primary attribute was the disgorgement of Satyam's real assets in favor of those created out of thin air.

Aberdeen brings the following claims against the following Defendants: [6]

---

[6]  In addition to Defendants Satyam, PwC India, PwCIL, PwC US, and the Maytas Defendants, Aberdeen has also brought suit against five individuals who have not appeared in this action – three Satyam principals (Ramalinga Raju, Rama Raju, and S. Vadlamai) and two PwC India principals (S. Gopalakrishnan and S. Talluri) – all of whom

| Claim | Defendants |
|---|---|
| § 10(b) (15 U.S.C. § 78j(b)) | Satyam, PwC India, and PwCIL |
| § 20(a) (15 U.S.C. § 78t(a)) | The Maytas Defendants (for control of Satyam), PwCIL (for control of PwC India), and PwC US (for control of PwC India) |
| Negligence | All Defendants |
| Negligent Misrepresentation | All Defendants |
| Fraud | Satyam, the Maytas Defendants, PwCIL, and PwC India |

Defendants amass an array of arguments seeking to exculpate themselves from the Satyam debacle, all of which, to one degree or another, invite this Court to call into question the facts in Aberdeen's SAC.  The Court should decline this invitation.  None of the arguments advanced by the moving Defendants can withstand scrutiny, and all of Defendants' motions to dismiss should be denied.

## II.   Factual Background

### A.   India's Enron

On January 7, 2009, the world learned that global IT outsourcing giant Satyam was at the center of a massive fraud.  (SAC ¶¶ 289-92.)  The fraud was disclosed by its chief architect, Satyam's chairman and founder, B. Ramalinga Raju, in a public, written confession. (Id.)  Chairman Raju's confession revealed that the halcyon picture painted in the financial statements contained in Satyam's filings with the SEC was a sham, intentionally fabricated to deceive Satyam's investors.  (Id.)  Years of robust revenue growth and huge amounts of cash-on-hand reported in Satyam's SEC filings were nothing more than lies, created and concealed through thousands of forged invoices and contracts, phony bank statements, falsified account

---

are incarcerated in India on account of the Satyam fraud.  As they have not appeared or moved to dismiss, the claims against them are not discussed in this memorandum.

books, and manipulated financial statements.  (Id. ¶¶ 266-72.)  When news of the fraud broke,

the value of Satyam securities plummeted, and investors who had purchased Satyam ADRs on

the NYSE, and Satyam common stock on the Bombay Stock Exchange and the National Stock

Exchange in India, lost billions.  (Id. ¶¶ 4, 303.)

      **B.**    **The Fraud**

      Satyam Chairman Raju, in league with his brother, Satyam CEO B. Rama Raju,

and Satyam CFO Srinivas Vadlamani, created over 7,000 phony invoices for services that were

never provided, forged documents representing payment for this fictitious work, and recorded

these non-existent payments as revenue.  (Id. ¶¶ 267-72.)  Rama Raju and Vadlamani fabricated

fake bank deposit receipts, bank statements, and confirmations to create a paper trail to cover up

the fraud.  (Id. ¶ 272.)  Ramalinga Raju and his confederates thus created a self-perpetuating lie:

false revenues became false bank balances, which accrued false interest.  (Id. ¶¶ 121-23.)  The

fraud snowballed for years.

      From 2004 through 2008, Satyam repeatedly and intentionally misstated its

financial performance in the company's Form 20-F and Form 6-K filings with the SEC.  (Id. ¶¶

119-248.)  In the SAC, Aberdeen chronicles line by line and dollar by dollar the precise

misstatements in each SEC filing comprising the fraud that is the subject of this lawsuit.  (Id.)

The figures are staggering.  Finally, in its September 30, 2010, Form 6-K, Satyam acknowledged

the fraud.  (Id. ¶ 243.)  It admitted to the SEC and the world that the financial irregularities in

Satyam's prior audited financial statements arose from (1) "recognition of fictitious revenue and

interest income, which ultimately resulted in creation of fictitious case and bank balances and

receivables"; and (2) "real transactions (movements into and out of the bank accounts) [that]

were omitted from the accounting records of the Company."  (Id. ¶ 246.)

Satyam repeatedly overstated its revenues from sales in its public filings to the tune of $5 million to $130 million each and every quarter over the course of the fraud.  (Id. ¶ 121.)  Indeed, in its September 30, 2010, Form 6-K, Satyam admitted that from April 1, 2002, through September 30, 2008, it had reported "[f]ictious revenue aggregating Rs. 53,528 Million [roughly $1.2 billion USD]."  (Id. ¶ 247.)  Likewise, year after year, Satyam dramatically inflated its cash and bank balances in its regulatory submissions, with discrepancies of more than $1 billion.  (Id.¶ 122.)  Satyam's falsely inflated financials, included in its SEC filings, had the intended effect of deceiving the investing public, the Investors among them, into purchasing Satyam securities.

C.     **The Auditors' Involvement**

Complicit in the fraud was Satyam's auditor, PwC India.  (Id. ¶¶ 249-65.)  PwC India turned a blind eye to the fraud, repeatedly certifying Satyam's grossly distorted financial statements, while collecting exorbitant, above-market fees.  (Id. ¶ 249.)  PwC India repeatedly failed to comply with Generally Accepted Accounting Principles ("GAAP"), and it ignored multiple red flags that should have put it on notice of the fraud.  (Id. ¶¶ 255-64.)  Indeed, PwC India completely disregarded bank account confirmations in its possession that revealed the enormous gaps between the figures Satyam was reporting in its public filings and the actual balances in Satyam's accounts.  (Id. ¶ 258-59.)  In other words, with both the real and falsified financial information in hand, PwC India certified the false data, knowing that that information would be publicly disclosed in Satyam's SEC filings.  (Id.)

PwC India, comprised of alter ego entities Price Waterhouse, PwC Pvt. Ltd., and Lovelock & Lewes, audited Satyam's financials from 2001 through 2008.  (Id. ¶ 71.)  PwC India prepared and certified Satyam's financial statements and issued unqualified opinions regarding those financials.  (Id.)  These financial statements and unqualified opinions were incorporated

into Satyam's SEC filings.  (Id.)  PwC India partners Gopalakrishnan and Talluri were the two partners most closely involved in the Satyam audits and signed Satyam's financial statements on behalf of "Price Waterhouse."[7]  (Id. ¶ 72.)  Both have been indicted and face criminal prosecution in India for their participation in the Satyam fraud.  (Id. ¶ 295.)

PwC India is the Indian member firm of the PricewaterhouseCoopers global entity, PwCIL, a transnational, member-based company headquartered in the United Kingdom. (Id. ¶ 44.)  On PwCIL's website (http://www.pwc.com/gx), PwC India's offices are referred to as "PwC's Office Locations in India."  (Id. ¶¶ 75-76.)  PwCIL controls its member firms, including PwC India, through a formal governance structure.  (Id. ¶ 51.)  PwCIL imposes policies, procedures, and practices standards, with which its members must comply.  (Id. ¶¶ 49, 54-56, 62-63.)  PwCIL rigorously polices its members' compliance with these standards, requiring annual compliance confirmation and conducting "Assurance" audits of each member firm at least once every three years.  (Id. ¶¶ 56-61.)

In addition to its general control over PwC India, PwCIL actively exerted control over PwC India in connection with the Satyam engagement both during and after the fraud.  (Id. ¶¶ 81-90.)  On multiple occasions, for example, PwCIL Global Risk Partner Steven Derrick took charge, directing the Satyam audit team in connection with responding to inquiries by the Public Company Accounting Oversight Board ("PCAOB")[8] and preparing Satyam's SEC filings.  (Id. ¶ 81.)  Following Ramalinga Raju's dramatic confession, PwCIL swiftly reacted to the fraud, with

---

[7]  The PwC India partners who signed Satyam's financial statements did not do so on behalf of "PricewaterhouseCoopers Private Limited" or "Lovelock & Lewes," instead electing a generic "Price Waterhouse" moniker.

[8]  The PCAOB is a not-for-profit corporation created by Congress through the Sarbanes-Oxley Act of 2002.  The PCAOB oversees the audits of public companies for the purpose of protecting investors.  (See http://pcaobus.org/About/Pages/default.aspx.)

Sam DiPiazza (Chairman of PwCIL) immediately travelling to India to suspend Gopalakrishnan and Talluri (principals in PwC India).  (Id. ¶ 84.)  Since the disclosure of the fraud, PwCIL has repeatedly acknowledged its responsibility for the botched Satyam audits.  (Id. ¶¶ 85-90.)  For example, Mr. DiPiazza's successor, Dennis Nally, admitted:  "It is unfortunate that Satyam happened under our watch."  (Id. ¶ 90.)  He also promised that "we're doing everything, and we have done a number of things in India to ensure that this would not happen again."  (Id. ¶ 89.)

PwC US, the United States arm of PwCIL, was intimately involved in the Satyam audits.  (Id. ¶¶ 93, 97-108.)  PwC US, including its wholly-owned business unit PwC Global Capital Markets Group ("PwC GCMG"), actively participated in the preparation, review, and approval of Satyam's SEC filings.  (Id. ¶¶ 97-108.)  PwC US personnel in the United States and elsewhere worked hand-in-hand with PwC India to prepare Satyam's 20-F filings.  (Id. ¶¶ 100-104.)  PwC US repeatedly instructed PwC India regarding PwC's global policies, and reminded PwC India, when needed, of PwC "[f]irm policy."  (Id. ¶ 107.)  Moreover, PwC US was responsible for providing final clearance for every one of Satyam's fraudulent SEC submissions. (Id. ¶¶ 105-106.)  Notably, in connection with preparing, reviewing, and ultimately approving Satyam's 20-F filings, PwC US observed multiple red flags relating to the very misrepresentations at the heart of the fraud, including dramatic increases in cash accounts, revenue, accounts receivable, and net income.  (Id. ¶ 262.)  PwC US nevertheless turned a blind eye.  (Id. ¶ 264.)

  D.     **The Maytas Connection**

The Maytas Defendants played vital roles in the fraud.  (Id. ¶¶ 112-16, 273-88.) The Maytas Defendants used their significant holdings in Satyam stock and their familial influence to control Satyam, causing it to engage in various sham transactions, including acquisitions of vast tracts of land in India.  (Id. ¶¶ 273-76.)  These sham transactions served to

cover up the Satyam fraud and to funnel millions of dollars in ill-gotten gains to the Maytas Defendants.  (Id. ¶¶ 273, 276.)  Moreover, the Maytas Defendants used their control over Satyam to pilfer the "salaries" of more than 10,000 non-existent "ghost" employees included in Satyam's books (as a means of covering up the massive Satyam fraud).  (Id. ¶ 288.)  "Maytas," of course, is "Satyam" spelled backwards.  (Id. ¶ 110.)  As their names suggest, the relationship between Satyam and the Maytas Defendants was a close one.

### E. The Aberdeen Losses

Among the investors who fell victim to the Satyam fraud are the twenty Investors who assigned their claims, lock, stock and barrel, to trusts for which Aberdeen is trustee.  (Id. ¶ 15.)  Aberdeen and the Investors have close ties to the United States and, in particular, to the Eastern District of Pennsylvania, where this suit was filed and where it will be tried.  Aberdeen itself is located in Philadelphia.  (Id. ¶ 25.)  Fourteen of the twenty Investors reside in the United States, seven in Philadelphia.  (Id. ¶ 31.)  Each of the remaining six foreign Investors purchased Satyam ADRs in the United States on the NYSE.  (Cf. id. ¶ 30.)  Each of the Investors employed an Aberdeen-affiliated investment advisor who purchased or oversaw the purchase of Satyam securities on behalf of the Investor.  (Id. ¶ 32.)  A majority of the Investors – fourteen of twenty – used the same investment advisor, also located in Philadelphia.  (Id. ¶ 33.)  The Investors collectively purchased 687,800 ADRs and more than six million shares of Satyam common stock on the Indian exchanges.  (Id. ¶ 28.)  This translates into losses in excess of $68 million as a result of the Satyam fraud, losses for which Aberdeen seeks remedy in this case.  (Id. ¶ 29.)

## III. Standard of Review

In reviewing a motion to dismiss under Rule 12(b)(6), the court "accepts as true all well-pleaded factual allegations in the Complaint and views them in the light most favorable to Plaintiff."  Ceramicas Industriales, S.A. v. Metro. Life Ins. Co., No. 08 Civ. 5114, 2009 WL

331262, at \*2 (S.D.N.Y. Feb. 11, 2009) (Jones, J.) (internal citations and alteration omitted).

"[T]he office of a motion to dismiss is merely to assess the legal feasibility of a complaint, not to

assay the weight of the evidence which might be offered in support thereof." Id. (internal

citations omitted).  In determining a 12(b)(6) motion, the question for the court "is not whether a

plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support

the claims." Id. (internal citation omitted).  To survive a motion to dismiss, a plaintiff need only

set forth "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on

its face.'" Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly,

550 U.S. 544, 570 (2007)).  The complaint must contain "enough fact to raise a reasonable

expectation that discovery will reveal evidence" of the challenged claim. Twombly, 550 U.S. at

556.

IV.   **Argument**

   A.   **Dismissal for Forum Non Conveniens Is Not Appropriate**

      Only the Indian-resident Defendants (Satyam, the Maytas Defendants, and PwC

India) seek dismissal on grounds of forum non conveniens.  Neither PwCIL nor PwC US argues

that this case belongs in India.  There are two possible explanations for this division.  Either PwC

US and PwCIL question whether the other Defendants' forum non conveniens argument has

merit, or PwC US and PwCIL are unwilling to submit to the jurisdiction of the Indian courts

(demonstrating that India is not an adequate alternative forum.)[9]  Either way, it is plain that

dismissal on grounds of forum non conveniens is not warranted.

---

[9]  Neither PwC US nor PwCIL has indicated in its briefing that it will agree to litigate in India, unlike the Maytas
Defendants and PwC India.

1.        **This Case Belongs in the United States**

Satyam, the Maytas Defendants, and PwC India ask this Court to disregard Aberdeen's choice to litigate in its home forum, the district with the closest ties to Aberdeen and the Investors.  They seek to deny Aberdeen access to a United States court despite the fact that Aberdeen's losses arose from a fraud perpetrated through falsified financial statements filed with the SEC and prepared, reviewed, and approved by a U.S. entity in the United States.  And they ask the Court to force victims of a fraud purposefully exported to the United States to send their claims to India.  Deference to Aberdeen's choice of forum, in addition to the myriad facts tying this fraud and the resulting loss to the Aberdeen Investors to the United States, demonstrate that this case belongs right where it is – in the United States.

Defendants mistakenly insist that "nearly all actions" relating to this fraud took place entirely in India.  (PwC India FNC Brief at 2.)[10]  Not so.  PwC US – a Delaware entity with its principal place of business in New York City – was actively involved in the preparation of the fraudulent SEC filings that lie at the center of this case.[11]  (SAC ¶¶ 97-108.)  The fact of the U.S. filings is key to the deception and resulting injury for which Aberdeen seeks recompense herein.  Quarter after quarter, year after year, Satyam and its auditors filed false financial statements with the United States SEC that overstated assets by hundreds of millions of dollars.  The fraud may

---

[10]  See also Maytas FNC Brief at 3 ("almost all of the alleged acts and/or omissions occurred in India"); Satyam Brief at 3 (Aberdeen's SAC "details an alleged fraud that occurred entirely within India.").

[11]  The allegation that the addition of PwC US as a Defendant herein was some type of eleventh-hour ploy to stave off forum non conveniens dismissal, (PwC India FNC Brief at 1), part of a "new theory" of the case concocted by Aberdeen, (PwC US Brief at 1), is intentionally misleading.  As Defendants know, it is only when Satyam voluntarily disclosed to Aberdeen documents demonstrating PwC US' involvement in the fraud that Aberdeen sought to amend to include PwC US as a Defendant.  Aberdeen moved to file its SAC soon after receiving these documents.  For Defendants to characterize the timing of PwC US' addition to this suit as a tactic on Aberdeen's part, a "last minute" "manufacture[d] connection[] to the United States" that is "transparent and unavailing," (PwC India FNC Brief at 15; PwC US Brief at 1) – especially when they know better – is pure chutzpah.

have been conceived and put into place in India, but it was repeatedly exported to the United States through the portal of the SEC for the consumption and deception of investors.

PwC India spins the numbers to claim that the losses for which Aberdeen seeks recovery relate to "6,212,639 shares of common stock and 687,800 ADRs" in the U.S.  (PwC India FNC Brief at 1 n.1.)  However, the losses sustained by Investors residing in the United States come to over $58.7 million, while the losses sustained by Investors residing outside the United States (all of whom bought their shares on a U.S. exchange) are $10.5 million.  Losses of United States resident Investors predominate Aberdeen's claims.[12]

The core facts of this case are not in dispute, and their connection to the United States is paramount.  Defendants perpetrated the fraud against the Investors through falsified filings with the SEC.  (SAC ¶¶ 119-248.)  PwC US played a central role in the review and approval of those same statements.  (Id. ¶¶ 97-108.)  The Aberdeen Investors – three quarters of whom reside in the United States – relied, through their investment advisors, upon the misstatements in those SEC filings in deciding to purchase and hold Satyam securities.  (Id. ¶¶ 31, 35.)  The intentional and repeated overstating of Satyam's assets by $1 billion in public filings with the SEC, in which a U.S. entity was involved, for consumption by U.S. investors, is sufficient to tie Aberdeen's claims to the United States.

### 2. India Is Not an Adequate Alternative Forum

The forum non conveniens doctrine permits a court to dismiss a properly-venued action in the rare situation where the plaintiff's choice of forum is used to "vex," "harass," or "oppress."  Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508 (1947); see also Wiwa v. Royal Dutch

---

[12]  As demonstrated below, Aberdeen's state law claims arising from the sale and purchase of Indian common stock are not foreclosed by the Supreme Court's decision in Morrison v. National Australia Bank Ltd., 130 S.Ct. 2869 (2010).  There is no dispute that Morrison has no effect on securities claims arising under state law.

Petroleum Co., 226 F.3d 88, 100 (2d Cir. 2000).  There is no argument to be made – and Defendants advance none – that Aberdeen chose its forum for any such reason.  The <u>forum non conveniens</u> analysis asks:  (1) Is the proposed alternative forum adequate?  (2) If so, how do the private and public interest factors, as they relate to litigating in the competing fora, and with due deference to the plaintiff's choice of forum, come out?  <u>See Wiwa</u>, 226 F.3d at 100; <u>see also</u> <u>DiRienzo v. Philip Servs. Corp.</u>, 294 F.3d 21, 29-31 (2d Cir. 2002).  "[U]nless the balance is <u>strongly</u> in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." <u>Gilbert</u>, 330 U.S. at 508 (emphasis added).  Under this analysis, Aberdeen's choice of forum should not be disturbed.

An action may only be dismissed on grounds of <u>forum non conveniens</u> where the movant can prove that an adequate alternative forum is available.  <u>See Norex Petroleum Ltd. v. Access Indus., Inc.</u>, 416 F.3d 146, 157 (2d Cir. 2005).  "If the movant fails to carry this burden, the <u>forum non conveniens</u> motion must be denied regardless of the degree of deference accorded plaintiff's forum choice."  <u>Id.</u>  Defendants cannot carry this burden.  As ably demonstrated by Class Plaintiffs, India lacks the substantive law, procedural mechanisms, and efficiency to allow Aberdeen to have its day in court.  Among other things:

- Indian courts cannot entertain private suits such as Aberdeen's where, as here, SEBI is acting upon those matters;

- efforts to bring private suits such as Aberdeen's in India have already been unsuccessful; and

- India does not recognize the fraud-on-the-market theory to demonstrate reliance in fraud actions.[13]

---

[13] <u>See</u> Class Plaintiffs' Memorandum of Law in Opposition to Motions to Dismiss First Amended Consolidated Class Action Complaint [Dkt. 321] ("Class Plaintiffs' Opp."), at 39-43.

Contrary to what Defendants suggest, it is no secret that "the wheels of justice move at an agonising pace in India."  (Veenu Sandhu, Stalked by the Law, Business Standard, May 28, 2011, available at http://www.business-standard.com/india/news/stalked-bylaw/436976/.)  To say that the Indian court system moves at a glacial pace is, as commonly observed, no overstatement.[14]  Contrary to what PwC India asserted in its prior (moot) briefing (which it may repeat in its reply brief here), claims of delay in the Indian legal system are anything but "hyperbolic."[15]  (PwC India's Reply Memorandum in Support of Motion to Dismiss

_____

[14] See, e.g., Veenu Sandhu, Stalked by the Law, Business Standard, May 28, 2011, available at http://www.business-standard.com/india/news/stalked-bylaw/436976/ ("The wheels of justice move at an agonising pace in India."); Rosalind Dixon & Eric A. Posne, The Limits of Constitutional Convergence, 11 Chi. J. Int'l L. 399, 419 (2011) ("the [Indian] judicial system is slow and corrupt"); Stuart D. Levi, Outsourcing: A Practical Guide to Law and Business § 9:2.6[C][3] (2011) ("The Indian judicial system is often slow and back-logged . . . ."); Talat Ansari, Doing Deals in Emerging Markets: BRIC & Beyond 2010, PLI Order No. 25546, at 59 (2010) ("One of the biggest challenges foreign companies will face while litigating in India is the problem of delay."); Kirtee Kapoor & Sushma Sharma, The Indopalooza Effect and Some Observations on Effective Strategies for Deal Making in India, PLI Order No. 25546, at 70 (2010) ("[The] Indian legal system is clogged with a back-log of about 31.28 million cases, and it reportedly takes an average of 15 years for a case to be finally decided after all appeals have been exhausted."); Indian PM Plea on Justice Backlog, BBC News, Aug. 17, 2009, available at http://news.bbc.co.uk/2/hi/south_asia/8204607.stm (referencing "[t]he large backlog of court cases in India"); Renu Angal, Delhi Justice's 466-Year Backlog, BBC News, Feb. 11, 2009, available at http://news.bbc.co.uk/2/hi/south_ asia/7883750.stm ("One of the reasons for the delays [in the Indian legal system] is the lack of a full bench."); Associated Press, Report: India Court 466 Years Behind Schedule, MSNBC, Feb. 2, 2009, available at http://www.msnbc.msn.com/id/29164027/ns/ world_news-south_and_central_asia/t/report-india-court-years-behind-schedule ("India – a country of 11 billion people – has approximately 11 judges for every million people compared with roughly 110 per million in the United States."); Afra Afsharipour, Corporate Governance Convergence: Lessons from the Indian Experience, 29 Nw. J. Int'l L. & Bus. 335, 359 (2009) (the Indian "judicial process involves countless delays"); Adam Feibelman, Consumer Bankruptcy as Development Policy, 39 Seton Hall L. Rev. 63, 98 (2009) ("There is strong evidence that . . . India's judicial system in general[] is extremely slow and rather unpredictable."); Sahil Kanuga & Shafaq Uraizee Sapre, Appointment of an Arbitrator—A Dispute in Itself!, 14 No. 2 IBA Arb. News 36, 38 (2009) (referencing "the infamous delays prevalent in the Indian judicial system"); Manoj Pillai, IP Enforcement in India, PLI Order No. 18730, at 249 (2009) ("Delay in legal proceedings in India is a complex issue."); Manmohan Singh, Prime Minister of India, Address at the Conference of Chief Ministers & Chief Justices of High Courts (Apr. 19, 2008), available at http://www.pmindia.nic.in/speech/content.asp?id=669 ("We must work together to bring an end to this era of delayed justice.  For, justice delayed can often mean justice denied.").  These sources are attached as Exhibit A to the Declaration of Joseph T. Kelleher, Esquire ("Kelleher Decl.").

[15] Despite this, PwC India trumpets the efficiency of the Indian courts by pointing out that the criminal trials of the Satyam fraudsters are now "underway."  (PwC India FNC Brief at 9 n.8; see also Maytas FNC Brief at 4 ("The Indian Government has taken a proactive position with respect to this alleged securities fraud.").)  That such proceedings are "underway" two and half years after the disclosure of India's Enron is not the picture of expediency.  This further demonstrates that PwC India's assertion in its prior round of briefing – one year ago – that "[t]he Indian government has demonstrated its commitment to expedited judicial resolution of the Satyam scandal by establishing fast-track criminal courts to try Satyam's chief executives" is unsupportable.  (Prior PwC India FNC Reply Brief at

First Amended Complaint for <u>Forum Non Conveniens</u> [Dkt. 222] ("Prior PwC India FNC Reply Brief") at 4.)  For these reasons, in addition to those set forth in the Class Plaintiffs' opposition brief,[16] incorporated herein by reference, India is not an adequate forum.

### 3.     The Balance of Interests Favors Aberdeen's Choice of Forum

Again, the Class Plaintiffs have submitted extensive briefing on the balancing of the private interest and public interest factors in the <u>forum non conveniens context</u>.  (Class Plaintiffs' Opp. at 44-49.)  They have shown that the balancing of the relevant factors leads to the conclusion that this securities fraud case should proceed in the United States.  Aberdeen addresses only the additional factors, unique to Aberdeen, that further weigh in favor of permitting Aberdeen to pursue its claims in its home district.  Aberdeen's interest in pursuing its claims in its home forum and the United States' compelling public interest in protecting United States investors and its national securities exchanges outweigh Defendants' preference for litigating in India.

PwC India concedes, as its must, that the <u>forum non conveniens</u> analysis begins with "a strong presumption in favor of the plaintiff's choice of forum," and that "[d]eference is due where a plaintiff files suit in his home forum."  (PwC India FNC Brief at 10.)  That presumption applies with full force to Aberdeen.  PwC India nonetheless insists that Aberdeen's decision to file suit in its home forum was motivated by "forum-shopping," more "litigation strategy than convenience."  (<u>Id.</u> at 11, 12; <u>see also</u> Maytas FNC Brief at 8.)  PwC India is wrong, and it is entirely without basis in ascribing nefarious motivations to a plaintiff that merely

---

11.)  Whatever assurances Defendants purport to give <u>now</u> as to how quickly things move in the Indian legal system are highly questionable in light of the inaccuracy of their past predictions.

[16]  Class Plaintiffs' Opp. at 39-44.

wishes to pursue its claims in the district where it resides, where its case began, and where that case will be tried.

As discussed above, Aberdeen and the Investors who assigned their claims to Aberdeen have significant ties to the United States and to Aberdeen's chosen forum, the Eastern District of Pennsylvania.  Aberdeen is a U.S. corporation located in Philadelphia.  (SAC ¶ 25.) Fourteen of the twenty Investors who assigned their claims to Aberdeen reside in the United States, seven in Philadelphia.  (Id. ¶ 31.)  Each of the remaining six foreign Investors purchased Satyam ADRs in the United States on the NYSE.  (Cf. id. ¶ 30.)  The majority of the Investors – 70% – employed the same investment advisor, located in Philadelphia.  (Id. ¶ 33.)  These undisputed facts point to the United States (and, more specifically, the Eastern District of Pennsylvania) as the proper forum to litigate Aberdeen's claims.  Only if Aberdeen had chosen a forum other than the Eastern District of Pennsylvania could there be any credible allegation of forum-shopping.  In light of the ties that exist, accusations that Aberdeen is guilty of forum-shopping are baseless, and the interest of the U.S. in resolving this dispute is hardly "hypothetical and attenuated."  (Maytas FNC Brief at 19.)

It is well established that a plaintiff's choice of forum is entitled to great deference where the choice was made for legitimate reasons.  See, e.g., Iragorri v. United Techs. Corp., 274 F.3d 65, 73 (2d Cir. 2001).  Here, it was.  United States investors and investors in securities purchased on a United States securities exchange have filed suit to recover losses sustained as a result of a fraud perpetrated through falsified SEC filings prepared in part by the U.S. arm of the PricewaterhouseCoopers organization.  That points to the United States as the proper forum.  As recognized by the Court in DiRienzo, for Aberdeen to ask a United States

court to enforce United States securities laws is reason enough to litigate in a federal court.  294

F.3d at 28 (citing <u>Allstate Life Ins. Co. v. Linter Group Ltd.</u>, 994 F.2d 996, 1002 (2d Cir. 1993)).

### 4.    <u>Choice of Law Does Not Warrant Forum Non Conveniens Dismissal</u>

PwC India throws in a final, make-weight argument that potential choice-of-law

issues warrant <u>forum non conveniens</u> dismissal.  (PwC India FNC Brief at 22.)  The mere

prospect of choice-of-law questions and the potential need for the Court to apply foreign law do

not justify overriding the presumption in favor of Aberdeen's choice of forum, however.  <u>See</u>

<u>Peregrin Myanmar Ltd. v. Segal</u>, 89 F.3d 41, 47 (2d Cir. 1996) ("[E]ven if this case raises

complicated choice of law questions and requires the exclusive application of foreign law . . . the

need to apply foreign law is not alone sufficient to dismiss under the doctrine of <u>forum non

conveniens</u>."); <u>see also</u> <u>Dornberger v. Metro. Life Ins. Co.</u>, 961 F. Supp. 506, 531 (S.D.N.Y.

1997) (same).  The mere fact that a United States court may need to conduct a choice-of-law

analysis and potentially apply foreign law to some of Aberdeen's claims does not and cannot

overcome the private and public interests that favor permitting Aberdeen to litigate its claims in

the forum of its choice.  Defendants' request for <u>forum non conveniens</u> dismissal should be

denied.

### B.    <u>Aberdeen Has Standing</u>

Satyam argues that, because the Investors assigned their claims to two trusts of

which Plaintiff Aberdeen is trustee, Aberdeen lacks standing and is not a proper plaintiff to

pursue its claims herein.  Based on the 2008 decision of the Supreme Court in <u>Sprint

Communications Co., L.P. v. APCC Servs., Inc.</u>, 554 U.S. 269 (2008), Satyam is mistaken.  It is

inexplicable that Satyam would seek dismissal of Aberdeen's claims on standing grounds

without even mentioning <u>Sprint</u>, particularly where Aberdeen brought <u>Sprint</u> to Satyam's and the

Court's attention in the prior round of briefing.  Instead, Satyam merely copies and pastes the text from its prior round of briefing.

In <u>Sprint</u>, the Supreme Court considered claims asserted by "aggregators," billing and collection firms to whom payphone operators had assigned claims that those operators had against long distance carriers.  <u>Id.</u> at 272.  The carriers had failed to compensate the operators for certain so-called "dial-around" calls, and the operators chose to assign their claims to aggregators to pursue in court instead of pursuing them individually.  <u>Id.</u>  When the aggregators then brought suit to recover for the losses of approximately 1,400 payphone operators, defendant Sprint moved to dismiss on the ground that the aggregators lacked standing.  <u>Id.</u>  Sprint argued that the aggregators lacked standing because "it was the payphone operators (who are not plaintiffs), not the aggregators (who are plaintiffs) who were 'injured in fact' and . . . it is the payphone operators, not the aggregators, whose injuries a legal victory will truly 'redress.'"  <u>Id.</u> at 274.  The Supreme Court rejected Sprint's standing challenge and held that the assignee aggregators had standing and were proper plaintiffs.

The Court began its analysis by readily acknowledging that Sprint's standing challenge focused on "the most basic doctrinal principles:  Article III, Sec. 2 of the Constitution."  <u>Id.</u> at 273.  Article III restricts judicial power to the resolution of bona fide cases or controversies, and this "case-or-controversy requirement is satisfied only where a plaintiff has standing."  <u>Id.</u>  In order to meet the Article III standing mandate, a plaintiff must demonstrate injury in fact, causation, and redressability, the "irreducible constitutional minimum[s]."  <u>Id.</u> at 273-74 (quoting <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992)).

The manner in which the payphone operators' rights to sue had been assigned (which, as discussed below, is identical to the manner in which the Investors' rights to sue were

assigned) was central to the Court's holding that the assignments were proper and the aggregators had standing.  Each operator signed an Assignment and Power of Attorney in which the operator "assigns, transfers and sets over to [the aggregator] for purposes of collection all [of their] rights, title and interest" in their claims.  Id. at 272.  Since the operators met the unyielding requirements of Article III and assigned all of their rights to the aggregators, the aggregators rightly acquired standing:  "It is, of course, true that that aggregators did not originally suffer any injury caused by the long-distance carriers; the payphone operators did.  But the payphone operators assigned their claims to the aggregators lock, stock, and barrel."  Id. at 286.

Once assigned, the operators' injuries became the aggregators' injuries, and all of the facts surrounding those injuries and the specific means by which they occurred were transferred to the aggregators.  "Here, the aggregators are suing based on injuries originally suffered by third parties.  But the payphone operators assigned to the aggregators all 'rights, title and interest' in claims based on those injuries.  Thus, in the litigation before us, the aggregators assert what are, due to that transfer, legal rights of their own.  The aggregators, in other words, are asserting first-party, not third-party, legal rights."  Id. at 290 (emphasis in original).[17]

Sprint is dispositive of Satyam's standing challenge in this case.  The Investors bought Satyam securities in reliance on fraudulent financial statements filed with the SEC and

---

[17] Chief Justice Roberts sharply criticized the expansive and all-inclusive sweep of the majority opinion in Sprint in his dissenting opinion, joined by Justices Scalia, Thomas, and Alito:

> The undeniable consequence of today's decision is that a plaintiff need no longer demonstrate a personal stake in the outcome of the litigation. Instead, the majority has replaced the personal stake requirement with a completely impersonal one. The right to sue is now the exact opposite of a personal claim – it is a marketable commodity. By severing the right to recover from the right to prosecute a claim, the Court empowers anyone to bring suit on any claim, whether it be the first assignee, the second, the third, or so on.

Id. at 301 (Roberts, C.J., dissenting) (emphasis added).

sold those securities at enormous losses in the wake of Chairman Raju's public confession. (SAC ¶¶ 15, 29, 35.)  They then assigned their claims "lock, stock and barrel" to Aberdeen in a manner identical in both form and substance to the assignment at issue in Sprint.  (Id. ¶ 16.) That assignment is specifically described in the Amended Complaint:

> Each Investor has, by means of an Assignment of Claims and Power of Attorney, assigned, transferred, and set over to Aberdeen Claims Trust or Aberdeen Claims Trust II, for purposes of collection, all rights, title, and interest of the Investor in the Investor's claims, demands, and causes of action relating to the common stock and/or ADRs of Satyam; and has appointed Aberdeen Claims Trust or Aberdeen Claims Trust II as its true and lawful attorney in fact.

(Id.)  Just like the aggregators in Sprint, Aberdeen has standing to pursue all of the claims in this action.

Sprint has been applied in this Circuit to claims asserted under § 10(b) of the Exchange Act.  In W.R. Huff Asset Management Co., LLC v. Deloitte & Touche LLP, 549 F.3d 100, 103-04 (2d Cir. 2008), an investment advisor brought an action on behalf of its clients alleging violations of § 10(b) and Rule 10b-5.  While the case was pending before the Second Circuit, the Supreme Court issued its decision in Sprint, holding that "an assignee who holds legal title to an injured party's claim has constitutional standing to pursue that claim, even if the assignee has agreed to remit all proceeds from the litigation to the assignor."  Id. at 105. Recognizing that an assignee of a securities fraud claim would have standing under the Sprint doctrine, the Second Circuit noted that the investment advisor seeking to assert the claims of its clients in Huff had not obtained an assignment of claims and was instead relying on a mere power of attorney.  Id. at 108-09.  The court concluded that the investment advisor lacked standing, but only because the power of attorney, unlike an assignment, did not transfer ownership of the claims.  Id.  W.R. Huff does not stand alone.  See also In re Vivendi Universal,

S.A. Sec. Litig., 605 F. Supp. 2d 570, 576 (S.D.N.Y. 2009) ("Should the evidence show that
plaintiffs own the claims [§ 10(b), among others] by virtue of an assignment, there would be
little doubt that they have standing.") (emphasis in original); In re Herley Indus. Inc. Sec. Litig.,
No. 06-2596, 2009 WL 3169888, at *6, 14 (E.D. Pa. Sept. 30, 2009) (holding based on Sprint
that assignee of § 10(b) claims has standing, and allowing assignee to proceed as class plaintiff
even though assignee "did not have standing at time of its appointment but has since cured its
standing infirmity with a valid assignment").  No court has held that § 10(b) claims are somehow
exempt from the Supreme Court's decision in Sprint, and Satyam points to none.

       Satyam's challenge to Aberdeen's standing as an assignee inexplicably ignores
Sprint.  In fact, every case Satyam cites in support of its standing challenge pre-dates Sprint.
Satyam relies on Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723 (1975), and the 1992
decision of the Fifth Circuit in Smith v. Ayers, 977 F.2d 946 (5th Cir. 1992).  Satyam's reliance
on Blue Chip is misplaced.  The holding in Blue Chip, however Satyam chooses to characterize
it, does not displace the holding in the Sprint decision.  Instead,  Blue Chip addressed the claims
of a class of plaintiffs composed of those who had "failed to purchase the offered" securities.
421 U.S. at 727 (emphasis added).  The damages sought in Blue Chip were "damages
representing the lost opportunity to purchase" the securities, id., and the Blue Chip Court was
thus presented with a § 10(b) claim with "no actual purchase or sale of securities" by anyone, id.
at 735.  Assignment was not at issue in Blue Chip, and the Court never considered the standing
issue now raised by Satyam.

       Smith is no help to Satyam either.  It is a Fifth Circuit case decided sixteen years
before Sprint and expressly limited to its facts.  Smith found that an assignee seeking to prolong
a "strike or nuisance suit" lacked standing in light of the policy considerations underlying the

Blue Chip decision.  977 F.2d at 950.  The court even noted that "[w]e need not resolve and reserve for another day whether under other circumstances some Rule 10b-5 claims may be expressly assigned."  Id. at 951.  The unique class claim before the Smith Court was one being "used as a weapon in [Plaintiff's] arsenal rather than a device for the protection of all shareholders."  Id. at 950.  The Court observed that the putative plaintiff's "personal antagonisms are a major motivation behind this lawsuit" and that, as a result, "this action bears all the hallmarks of a strike or nuisance suit, the very actions which the Blue Chip Stamps decision seeks to reduce or eliminate."  Id.  Satyam does not contend and cannot contend that the unique "strike suit" nature of the plaintiff's claims in Smith that drove the Court to its limited holding are present here.  Instead, Satyam cites Smith for the much broader notion that § 10(b) claims are not assignable under any circumstance.[18]  The Smith Court went out of its way to make it clear that it was not so holding.  Id. at 951.  Satyam's reliance on Smith is as inexplicable as its failure to address Sprint.

Satyam insists that Aberdeen is a "trustee of two trusts to which twenty Investors have assigned their claims."  (Satyam Brief at 14.)  But that's precisely the point.  Under Sprint, the use of such a vehicle to aggregate individual claims is expressly sanctioned.  Satyam's accusation that Aberdeen seeks to "circumvent federal class action requirements," (id. at 15), similarly comes to naught.  Sprint addresses and disposes of this same argument, noting that the

---

[18]  Satyam seems to suggest, without any authority, that the "purchaser or seller" requirement of § 10(b) and the history of strict compliance with that requirement are so fundamental that it should render § 10(b) claims incapable of assignment under any circumstance.  That was precisely the argument the dissent made in Sprint with respect to the most fundamental of all requirements – constitutional standing:  "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies," and "[w]e have always insisted on strict compliance with the jurisdictional standing requirement."  Sprint, 554 U.S. at 299 (Roberts, C.J., dissenting).  The majority did not diminish the importance of the requirement; it simply held that a stranger to the transaction could acquire by assignment the rights necessary to meet the requirement.  Id. at 286 ("It is, of course, true that the aggregators did not originally suffer any injury caused by the long distance carriers; the payphone operators did.  But the payphone operators assigned their claims to the aggregators lock, stock and barrel.").

Court could not "understand how 'circumvention' of Rule 23 could constitute a basis for denying standing." 554 U.S. at 290-91; <u>see also</u> <u>id.</u> ("Because the federal system permits aggregation by other means, we do not think that the payphone operators should be denied standing simply because they chose one aggregation method over another.").[19]

Just as PwC India throws in a last-ditch choice-of-law argument when arguing for <u>forum non conveniens</u> dismissal, so too does Satyam with respect to its standing argument.[20] Satyam claims that "the selection of a single common law to apply to [Aberdeen's] common law claims will be exceedingly difficult, if not impossible," and will "create[] insuperable questions of choice of law." (Satyam Brief at 18, 19.) Questions will certainly arise as to which law will apply to Aberdeen's common law claims. But such questions will merely require the Court to engage in a choice-of-law analysis; they do not <u>preclude</u> the possibility of such analysis. Indeed, courts throughout the country engage in choice-of-law analyses as a matter of course and routinely apply the laws of other jurisdictions where appropriate. <u>Schexnider v. McDermott Int'l, Inc.</u>, 817 F.2d 1159, 1164 (5th Cir. 1987) (federal courts "must guard against an excessive reluctance to undertake the task of deciding foreign law, a chore federal courts must often perform"); <u>Manu Int'l, S.A. v. Avon Prods., Inc.</u>, 641 F.2d 62, 68 (2d Cir. 1981) ("foreign law

---

[19] <u>Dobyns v. Trauter</u>, 552 F. Supp. 2d 1150 (W.D. Wash. 2008), on which Satyam also relies, provides no support for its challenge to the Aberdeen assignment. First, <u>Dobyns</u> is a decision that pre-dates <u>Sprint</u> and thus was not informed by the principles set forth in <u>Sprint</u>. Second, <u>Dobyns</u> is a product of the <u>Blue Chip</u> decision and finds its footing in the same policy considerations, none of which applies here. <u>See</u> <u>id.</u> at 1153-54 (noting the policy considerations on which <u>Blue Chip</u> relied). <u>Dobyns</u> presented a strikingly <u>Blue Chip</u>-like set of facts, including multiple suits seeking the same relief, a "suspicious[ly]" timed assignment of claims, claims asserted only to cause "nuisance," and "hazy" liability issues that invited "self-serving testimony." <u>Id.</u> at 1155-56. Not surprisingly, the <u>Dobyns</u> court's holding – "that the evidentiary problems associated with this case are of the type that the Supreme Court sought to avoid in <u>Blue Chip</u>" – has no applicability to the facts presently before this Court. <u>See</u> <u>id.</u> at 1156. Even absent <u>Sprint</u>, <u>Dobyns</u> would have no more applicability to this case than <u>Blue Chip</u> does.

[20] While PwC India and PwC US adopt Satyam's standing argument as relates to <u>Blue Chip</u>, (PwC India Brief at 7 n.3; PwC US Brief at 7 n.5), they carefully avoid incorporating that portion of Satyam's standing argument as relates to choice of law.

. . . is not alone enough to push the balance of convenience strongly in favor of [the]

defendant[s]" in the <u>forum non conveniens</u> context).

     Further, Satyam's insistence that a choice-of-law analysis must be performed

<u>now</u>, considering only the averments in the pleadings and without the benefit of discovery, is

unsound.  Indeed, Satyam's choice-of-law concern appears to arise from the fact that "the

Complaint does not give sufficient information to determine what law should apply," and thus it

must "glean" what it can from Aberdeen's pleading.  (<u>Id.</u> at 19.)  Satyam provides no support,

however, for the proposition that all the facts needed to perform a choice of law analysis need to

be pleaded.  Regardless, choice of law issues can be addressed by this Court if and when they

become necessary.  <u>See</u> <u>Bergeron v. Philip Morris, Inc.</u>, 100 F. Supp. 2d 164 (E.D.N.Y. 2000)

(permitting additional discovery to resolve choice of law issue); <u>Nossen v. Hoy</u>, 750 F. Supp.

740, 743 (E.D. Va. 1990) (noting that, at the motion to dismiss stage, "this Court will proceed

without directly addressing the choice of law question.  If the subsequent development of this

case requires assessment of the choice of law question, the Court will address the issue at that

appropriate time.").

     Satyam's choice-of-law argument is especially puzzling where it affirmatively

states that "it is likely that Indian law should apply to the claims of the Indian Stock Purchasers."

(Satyam Brief at 19.)  But as to the purchasers of United States securities, according to Satyam,

"it is virtually impossible to determine with certainty which jurisdiction's law should apply."

(<u>Id.</u>)  It is hardly impossible.  It is no more impossible to determine which law applies to

transactions involving United States securities than it is in relation to transactions involving

foreign securities.  There is also no legal authority for the proposition that the need to perform a

choice-of-law analysis can defeat a plaintiff's standing (just as there was none mandating <u>forum non conveniens</u> dismissal).  Aberdeen has standing to pursue its claims.

### C.   Aberdeen Has Asserted Viable § 10(b) Claims against Satyam and PwC India

Aberdeen asserts direct § 10(b) claims against Satyam and PwC India.[21]  Neither of these claims is subject to dismissal.  Satyam does not challenge the merits of the § 10(b) claim against it.[22]  PwC India, in turn, argues only that Aberdeen has not adequately pleaded scienter in connection with its 10(b) claim.  PwC India is wrong.

Aberdeen's allegations demonstrating PwC India's scienter are many.  From at least 2001 through 2008, PwC India was charged with auditing Satyam's financials.  (SAC ¶ 71.)  During this time, Satyam repeatedly and dramatically overstated its revenues and assets in its financial statements and public filings.  (<u>Id.</u> ¶¶ 119-248.)  The SAC contains detailed allegations demonstrating how PwC India turned a blind eye to the billion dollar fraud, all the while reaping exorbitant, above-market fees.  (<u>Id.</u> ¶¶ 73-74, 249-65.)  Time after time, PwC India gave its blessing to Satyam's financial statements without confirming the data contained therein, without reacting to obvious red flags, and without adhering to GAAP.  (<u>Id.</u> ¶¶ 249-65.)  PwC India partners S. Gopalakrishnan and Srinival Talluri, both of whom have been indicted and face criminal trials in India for their participation in the Satyam fraud, intentionally or recklessly ignored bank confirmations <u>in their possession</u> that demonstrated the vast divergence between the financial information publicly disclosed by Satyam and the true figures.  (<u>Id.</u> ¶¶ 258-59.)

---

[21]  In addition to direct § 10(b) claims against PwC India and Satyam, Aberdeen also asserts that PwCIL is derivatively liable for the wrongdoing of its agent, PwC India, and thus bears liability for PwC India's § 10(b) and common law violations, as discussed below.

[22]  Satyam does not challenge any of the claims against it on the merits.  The only defenses Satyam raises in its motion to dismiss relate to <u>forum non conveniens</u>, standing, and <u>Morrison</u>.

Despite all this, incredibly, PwC India contends that Aberdeen has not sufficiently pleaded scienter.

To adequately plead a § 10(b) violation, the plaintiff must plead, among other things,[23] facts giving rise to a "strong inference" of scienter.  See 15 U.S.C. § 78u-4(b)(2).  The inference of scienter need not be "of the smoking gun genre," or "even the most plausible of competing inferences."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007).Instead, the inference of scienter need only be "at least as compelling as any opposing inference."  Id. at 324.  In other words, "the tie goes to the plaintiff."  Freudenberg v. E*Trade Fin. Corp., 712 F. Supp. 2d 171, 196 (S.D.N.Y. 2010).  Here, the detailed allegations in the SAC, viewed as a whole, go well beyond the requirements of Tellabs.

PwC India employs an impermissible "divide and conquer" strategy in its attempt to defeat the § 10(b) claim against it, examining each allegation relating to scienter in isolation and concluding that that allegation, standing alone, does not give rise to a strong inference of scienter.  Such compartmentalization directly contravenes the Tellabs mandate that courts must determine "whether all the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." 551 U.S. at 323 (emphasis in original).  Julius Caesar may have famously observed in his divide-and-conquer approach to warfare that "gallia est omnis divisa in partes tres";[24] but Aberdeen's

---

[23]  The elements for a claim under § 10(b) are:

> (1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as transaction causation; (5) economic loss; and (6) loss causation, i.e., a causal connection between the misrepresentation and the loss.

Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005) (internal citations and quotations omitted).

[24]  "All France is divided into three parts."

allegations supporting an inference of scienter on the part of PwC India must be considered as a whole and in their entirety.  Viewing those allegations as a whole, there is no credible argument that Aberdeen has failed to adequately plead that PwC India was at least reckless in auditing Satyam's financials.

1.      **The Bank Confirmations**

PwC India suggests that Aberdeen's § 10(b) claim against PwC India fails because the allegations of the SAC give rise to a stronger inference that PwC India was duped by Satyam than that PwC India was complicit in the fraud.  (PwC India Brief at 7.)  Not so. Ramalinga Raju may have gone to great lengths to hide the massive Satyam fraud from the investing public.  However, PwC India had possession of at least one key piece of information hidden from the investing public – the bank confirmations that revealed that Satyam's reported numbers were fraudulent.  PwC India can hardly claim it was bamboozled by Satyam when PwC India closed its eyes to the very bank confirmations that demonstrated conclusively that the client it was auditing had overstated its assets by hundreds of millions (and ultimately billions) of dollars.

PwC India urges the Court to disregard Aberdeen's allegations regarding the bank confirmations because the SAC does not state who prepared the bank confirmations, when they were prepared, where they were located, or what variance existed between them and the misstated figures in Satyam's financial statements.  (PwC India Brief at 9-10.)  The Court should reject this invitation to ignore the uncontested forest (i.e., the bank confirmations that would have revealed the fraud were in PwC India's hands) for the irrelevant trees (i.e., whether the bank statements were stored in a drawer or a filing cabinet; which banks prepared which confirmation; how many bank statements there were; etc.).  PwC India's argument would require application of a new and extraordinarily high pleadings standard.  This new standard would

foreclose a plaintiff from asserting a securities fraud claim against an auditor unless the plaintiff

has unfettered access to the auditor's working files prior to taking discovery, an absurd

proposition.  What is clear from Aberdeen's allegations is that PwC India possessed multiple

bank confirmations that contradicted the financial information Satyam provided to PwC India;

PwC India disregarded these bank confirmations; and PwC India certified Satyam's falsified

financial statements nonetheless.  (SAC ¶¶ 258-59.)  These allegations alone demonstrate

recklessness (or worse) sufficient to support a finding of scienter at the motion to dismiss stage.

On April 5, 2011, after the filing of the SAC, the SEC initiated public

administrative proceedings against PwC India.  In the Order instituting the proceedings, the SEC

provided examples of the disparities between the real bank confirmations PwC India received

from Satyam's banks and the fictitious confirmations furnished by Satyam.  The numbers are

astonishing:

| Period Ending | Bank | Confirmations PwC India Received Directly from Bank (in $ USD) | Confirmations PwC India Received from Satyam (in $ USD) | Cash Variance |
|---|---|---|---|---|
| 9/30/08 | BNP Paribas | $1,860,280 | $100,753,498 | $98,893,218 |
| 9/30/08 | HSBC | No balance identified | $172,000,153 | -- |
| 6/30/08 | BNP Paribas | $1,919,404 | $109,014,675 | $107,095,271 |
| 3/31/08 | Citibank | $330,172 | $152,923,538 | $152,593,366 |
| 3/31/08 | HDFC | No balance identified | $175,952,024 | -- |
| 3/31/07 | BNP Paribas | $11,192,807 | $108,584,687 | $97,391,880 |
| 3/31/06 | BNP Paribas | $13,082,509 | $96,830,036 | $83,747,527 |
| 3/31/06 | HSBC | No balance identified | $53,282,374 | -- |

(See Order, attached as Exhibit B to Kelleher Decl. ¶ 29.)[25]  These examples demonstrate that the

gaps between the real and fake bank confirmations were anything but trivial, each representing

tens of millions dollars, and, in some cases, in excess of one hundred million dollars.

---

[25]  The Court can take judicial notice of the SEC's Order.  See In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 355 n.5 (2d Cir. 2010) (taking judicial notice of the contents of SEC enforcement filings as "matters of public record").

Instead of investigating the glaring discrepancies between Satyam's reported cash holdings and the figures reflected in the bank confirmations in PwC India's possession – that is, instead of doing its job – PwC India simply looked the other way, like a radiologist concluding that a bone is not broken without so much as a glance at the x-ray.  Such conduct is so deficient, so contrary to any reasonable standard of what a competent auditor is required to do, that PwC India's "audits" effectively amounted to no audits at all.  This gives rise to a strong inference of scienter.  In re Scottish Re Group Sec. Litig., 524 F. Supp. 2d 370, 385 (S.D.N.Y. 2007) (facts demonstrating that auditor's "accounting practices were so deficient that the audit amounted to no audit at all" are sufficient to plead scienter on the part of the auditor).

### 2.     The Size of the Fraud

Satyam repeatedly overstated its revenues and assets over the course of eight years, publicly reporting more than $1 billion in fictitious bank balances.  The breathtaking size of the Satyam fraud also supports a finding of scienter.  See Katz v. Image Innovations Holdings, Inc., 542 F. Supp. 2d 269, 273 (S.D.N.Y. 2008) (finding that the magnitude of the fraud was circumstantial evidence of scienter); In re Scottish Re, 524 F. Supp. 2d at 394 ("large, $112 million 'surprise' valuation that allegedly wiped out a year's worth of the Company's earnings also provides some circumstantial evidence of scienter"); In re Livent, Inc. Sec. Litig., 78 F. Supp. 2d 194, 217 (S.D.N.Y. 1999) ("Common sense suggests that, all other things being equal, more opportunities should exist to discover a larger fraud than a smaller fraud.").  Despite the astounding magnitude and duration of the fraud, PwC India, handsomely compensated to audit Satyam's financials, failed to find anything amiss.  Put simply, Satyam could not have sustained an eight-year, $1 billion fraud, absent PwC India's willful blindness or complicity.

3.      **Multiple Red Flags and GAAP Noncompliance**

The "red flags" Aberdeen describes in detail in the SAC also confirm the strong

inference of scienter – that PwC India's audit opinions were either intentionally fraudulent or

extremely reckless.  (See SAC ¶¶ 260-61.)  For example:  (1) in the span of two years, bank

deposits more than doubled from $403.7 million to $826.7 million; (2) Satyam reported 39%

compounded annual growth rate since 2001; (3) B. Ramalinga Raju, B. Rama Raju, and their

family members created related investment companies through which they funneled their Satyam

shares; (4) the Raju family steadily sold off its Satyam shares over the course of several years,

ultimately selling off over 90% of its holdings leading up to the disclosure of the fraud, despite

the facts that the stock price continued to rise and Satyam appeared healthy and robust to the

investing public; and (5) PwC India observed and reported scores of control deficiencies,

including the fact that Satyam's computer system was subject to manipulation.  (Id. ¶¶ 260-61.)

Any one of these red flags could and should have prompted PwC India to investigate Satyam's

egregiously inflated financials.  PwC India ignored them all.

The SAC also recounts numerous GAAP violations committed by PwC India in

connection with the Satyam audits.  Specifically, PwC India violated GAAP  by:

- failing to provide information useful to investors, creditors, and other users in making rational investment, credit, and similar decisions;

- failing to provide information about the economic resources of Satyam, claims to its resources, and matters that change such resources;

- failing to provide information about how the management of Satyam had discharged its stewardship responsibility to security-holders for the use of enterprise resources entrusted to it;

- failing to provide information about Satyam's financial performance, as used by investors and creditors in order to evaluate whether they are interested in future investment and credit offerings;

- failing to provide reliable and relevant information that represented what it purported to represent;

- failing to provide complete information as would be necessary to validly represent underlying events and conditions; and

- failing to issue conservative statements that adequately considered and reflected uncertainties and risks.

(SAC ¶ 255.)  These repeated violations are additional indicia of scienter on the part of PwC India.  See In re Complete Mgmt. Inc. Sec. Litig., 153 F. Supp. 2d 314, 334 (S.D.N.Y. 2001) (GAAP and GAAS violations "may be one of several 'red flags' that support an inference of scienter").  While PwC India tries to downplay them, it cannot and does not argue that the series of red flags chronicled in the SAC did not take place.

Taken together, PwC India's disregard of numerous red flags and repeated GAAP violations demonstrate that, at the very least, PwC India "refus[ed] to see the obvious, or to investigate the doubtful"; or, for that matter, to question anything that Satyam gave or represented to it.  See In re Imax Sec. Litig., 587 F. Supp. 2d 471, 482 (S.D.N.Y. 2008) (holding that to adequately plead fraud against an auditor, a pleading only need allege that the auditor had "an egregious refusal to see the obvious, or investigate the doubtful"); see also In re Scottish Re, 524 F. Supp. 2d at 385 ("Allegations of 'red flags,' when coupled with allegations of GAAP and GAAS violations, are sufficient to support a strong inference of scienter.") (internal citations omitted).

### 4.    The Excessive Audit Fees

PwC India was motivated to commit fraud, based on the fact that its audit fees were "exorbitant" and well-above-market.  (SAC ¶¶ 73-74, 249.)  After all, a well-heeled accomplice is much more accommodating.  According to India's Central Bureau of Investigation criminal charge sheet, the audit fees paid by Satyam to PwC India "were as much as 667%

greater than those paid by Satyam's peer companies to their auditors."  (Id. ¶ 73.)  That is quite a premium, and it is, at the very least, "circumstantial evidence of scienter."  Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc., 595 F. Supp. 2d 1253, 1275 (M.D. Fla. 2009) (noting an "extraordinary" incentive package provides circumstantial evidence of scienter).  In addition, Gopalakrishnan and Talluri received hundreds of thousands of dollars for additional services provided to Satyam that were not properly reflected in Satyam's accounts.[26]  (SAC  ¶ 73.)

* * *

Aberdeen does not rely simply on the astonishing size and duration of the Satyam fraud to establish PwC India's recklessness.  Nor do Aberdeen's claims rest exclusively on PwC India's disregard of bank confirmations that would have revealed the fraud, or on PwC India's repeated GAAP violations, or on the numerous unheeded red flags, or on PwC India's motive to continue collecting above-market fees.  Instead, Aberdeen relies on all these indicia of scienter, taken together, to plead that, if not intentionally complicit in the Satyam fraud, PwC India was at least reckless in not uncovering the scheme.  See Tellabs, 551 U.S. at 323 (allegations supporting an inference of scienter must viewed together, not in isolation).  Aberdeen has adequately demonstrated PwC India's scienter and has properly pleaded its § 10(b) claim against PwC India.

### D.   PwCIL Is Derivatively Liable for the Wrongdoing of PwC India

PwCIL cannot promote PricewaterhouseCoopers as one firm when it suits its purpose of growing its global accounting and auditing services, and then retreat to the fine print on its website and claim it is a random collection of far-flung satellite entities when one of its

---

[26]  All PwC India has to say about the ridiculously high compensation it received from Satyam is that Aberdeen "provides no context for these numbers" and "does not identify the 'peer companies' to which [PwC India] are purportedly compared."  (PwC India Brief at 14.)  It is unclear what "context" is needed or why "peer companies" need be identified.  PwC India was paid almost seven times what other auditors charged.  That fact speaks for itself and suggests that there was a reason for such outlandish compensation.

member firms commits fraud.  As Class Plaintiffs aptly noted, to accept PwCIL's argument that it is an entity with little connection with PwC India is "to accept the proposition that the financial integrity of Satyam – with worldwide operations, tens of thousands of employees, and a market capitalization that at one time approximated $6.7 billion – was entrusted to a 20-partner accounting office located in the hills outside Hyderabad that just happened to be called 'Price Waterhouse.'"[27]

    PwCIL has built, maintained, controlled, and promoted PricewaterhouseCoopers as a single global firm.  Now that PwC India's conduct in connection with this massive fraud is challenged, PwCIL acts as if it is little more than coincidence that PwCIL and PwC India share "PricewaterhouseCoopers" in their names.  Confronted with the same sophistry from another accounting firm, this Court insisted that "either defendants are engaged in a global fraud by producing promotional materials that are a pack of lies, or defendants are . . . a single, closely intertwined network.  Defendants cannot have it both ways."  Teachers' Ret. Sys. of La. v. A.C.L.N., Ltd., No. 01 Civ. 11814, 2003 WL 21058090, at *1 n.4 (S.D.N.Y. May 15, 2003) (internal quotation marks omitted).  This observation applies with full force here, and PwCIL's "now you see me now you don't" argument, id., should be rejected.

    PwCIL's promotional materials, including the information available on its website (http://www.pwc.com/gx), make clear that PwC India was part of "a single, closely intertwined network."  (SAC ¶¶ 44-64, 75-80.)  That network consists of member firms like PwC India.  PwCIL broadcasts the close relationship of its member firms to the world, the undeniable intent of which is to confirm to existing and prospective clients around the globe that member firms answer to and are controlled by PwCIL.  PwCIL's web-site boasts that "no matter where you're

---

[27] Class Plaintiffs' Memorandum of Law in Opposition to Motions to Dismiss [Dkt. 127] at 5.

located, chances are there's a PwC office near you," and India is listed as one of those office locations.  (SAC ¶ 76.)  PwCIL thus holds itself out as a global organization maintaining similar standards and professional qualifications world-wide.  It strains credulity to assert that where an international organization trumpets its control and direction of virtually every aspect of the accounting and auditing business of its member firms, and openly advertises the global nature of its business, the public will not see PwCIL and PwC India as fundamentally connected.  That is precisely what PwCIL intends.

      The relationship between PwCIL and PwC India could scarcely be closer.  PwCIL controlled PwC India's audits through a complex and sophisticated "governance structure." (SAC ¶ 51.)  Such a structure existed for an obvious reason – control.  For example, PwCIL's Global Board ensured, among other things, the accountability and effective governance of PwC India.  (Id. ¶ 51(a).)  Its Network Leadership Team set standards that PwC India needed to follow.  (Id. ¶ 51(b).)  PwCIL's Strategy Council ensured the alignment of the PwCIL network and its members, including PwC India.  (Id. ¶ 51(c).)  Its Network Executive Team handled service and functional issues relating to the PwCIL network.  (Id. ¶ 51(d).)  The complexity of this sophisticated governance structure is not meaningless, and it cannot be ignored.  It exists to enable PwCIL to control its member firms, to ensure they operate according to PwCIL's standards, and to maintain the integrity of member firms' audits.  Cf. In re Parmalat Sec. Litig., 375 F. Supp. 2d 278, 300 (S.D.N.Y. 2005) (a complex organizational structure and the ability to discipline a putative agent suggests that the putative principal "had the power to direct the policies and practices . . . a defining characteristic of agency").

      To maintain its membership in PwCIL, PwC India was required to comply with PwCIL's standards, rules, and protocols, including compliance with GAAP.  (SAC ¶¶ 54-61, 78-

79.)  Indeed, compliance with GAAP was at the heart of the auditing services that PwC India provided to Satyam, and the very SEC filings relied on by the Investors and their advisors, as certified by PwC India, were performed (or should have been performed) in accordance with GAAP.  (Id. ¶ 254.)  PwCIL also required PwC India to sign an "annual compliance confirmation" relating to, among others things, ethics, business conduct, assurance, data protection, and privacy.  (Id. ¶ 55.)  PwCIL reviewed the partners assigned to specific engagements and made recommendations for improvement.  (Id. ¶ 57.)  Between 2001 and 2008, PwCIL's "Assurance" practice likely conducted as many as seven reviews of PwC India's accounting practices to ensure GAAP compliance.  (Id. ¶¶ 60-61.)  There was hardly an aspect of PwC India's business that PwCIL did not review and control.

       The limited collection of internal PwC email correspondence produced to Aberdeen by Satyam shortly before the filing of the SAC provides further evidence of PwCIL's control over its agent, PwC India.  (SAC ¶ 81.)  For example, when the PCAOB reviewed the Satyam engagement, PwC Global Risk Management Partner Steven Derrick stepped in, directing the appropriate PwC US personnel to assist in coordinating PwC's response and noting, "I am extremely interested, as we all are, in providing the PCAOB a timely and accurate response." (Id.)  Likewise, when a debate arose regarding whether PwC could comply with Satyam's deadline for filing the company's 2008 Form 20-F, Derrick again took charge, instructing the audit team that "PwC needs to ensure that it is satisfied with the final conclusion on this matter while trying to do so within deadlines, but no matter what the deadlines imposed.  Let's ensure we have the organization and plan in place to achieve that and stop with any other debate."  (Id.) And, in the wake of the aborted Maytas acquisitions, PwC India partner Talluri indicated in an email to his PwC India colleagues that he needed to communicate with "global" about the

potential risk-related issues.  (Id.)  These examples show that PwC India sought and took direction from PwCIL, specifically in connection with the Satyam audits.

PwCIL's conduct after the disclosure of the Satyam fraud further demonstrates the principal-agent relationship between PwCIL and PwC India.  Following the fraud, PwCIL Chairman Sam Piazza immediately flew to Mumbai to suspend Gopalakrishnan and Talluri.  (Id. ¶ 84.)  Soon thereafter, DiPiazza publicly acknowledged PwCIL's responsibility for the Satyam audits, stating:  "When you have some participation in the situation, as we did in this case as auditors, it's difficult."  (Id. ¶ 85.)  He further stated, "Our partners were clearly misled."  (Id. ¶ 86.)  DiPiazza's successor, Dennis Nally, likewise engaged in a concerted effort to control the fallout from PwCIL's role in the Satyam fraud, acknowledging the importance of India as "one of our most strategic markets," (id. ¶ 87), and assuring the investing public that "[o]ur job is to make sure we're doing everything, and we have done a number of things in India to ensure that this [i.e., the Satyam fraud] would not happen again."  (Id. ¶ 89.)  PwCIL's Nally admitted that "[i]t is unfortunate that Satyam happened under our watch."  (Id. ¶ 90.)

PwCIL argues that its post-fraud conduct is immaterial to determining whether it bears respondeat superior liability for PwC India's misconduct.  (PwCIL Brief at 14.)  However, both applicable case law and common sense dictate that a principal's actions after its agent has committed a wrongful act can and oftentimes do show that the principal had authority over the agent when the wrongful act was committed.  See In re Parmalat, 375 F. Supp. 2d at 301-02 (principal's "ability to discipline" the agents deemed a "defining characteristic of agency").  Such post-disclosure actions, as argued above, are among the facts demonstrating agency.

PwCIL argues that Aberdeen makes too much of DiPiazza's and Nally's post-fraud public statements, contending that the use of the terms "we" and "our" do not suggest that

PwCIL was involved in the Satyam audits.  (PwCIL Brief. at 14.)  Instead, PwCIL argues that it was merely "embracing" and "defending" PwC India and its partners, as members of the PwC network.  (Id.)  This argument turns the applicable Rule 8(a) pleading standard on its head, asking the Court to draw inferences from the alleged facts in favor of PwCIL.  PwCIL should not be permitted to recast the facts as it would have them interpreted to evade the obvious:  It is for the jury to decide whether the relationship between PwCIL and PwC India, in fact and in the public eye, was one of agency.  Cf. Cromer Fin. Ltd. v. Berger, Nos. 00 Civ. 2284 (DLC), 00 Civ. 2498 (DLC), 2002 WL 826847, at *5 (S.D.N.Y. May 2, 2002) (leaving for trial the issue of whether defendant was principal of the alleged agent at the time the audits were performed).  At this nascent stage of litigation, the Court should reject PwCIL's efforts to disclaim liability for the actions of its agent in this litigation while publicly professing that it is "doing everything . . . to ensure that this would not happen again."  (SAC ¶ 89.)

          The case law on which PwCIL relies does not do the work that PwCIL would have it do.  For example, PwCIL far oversells Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP, No. 03 Civ. 0613 GBD, 2004 WL 112948 (S.D.N.Y. Jan. 22, 2004), as analogous to Aberdeen's agency allegations.  In Nuevo Mundo, the complaint contained only "two allegations" of agency: that one agent/defendant represented that it was "part of and operated under the control of Defendant PwC, the well-known international accounting firm, and that [it] used the same international accounting standards as are used by Defendant PwC"; and that another agent/defendant "represented itself, directly, indirectly or implicitly, as Defendant Andersen, the well-known international accounting firm, to show its ability and experience as auditor."  2004 WL 112948, at *5-6.  The court rejected plaintiffs' allegations as bare conclusions, and explained that regardless, the purported evidence of agency came only from

representations by the agent, which are insufficient to establish agency because an "agent cannot confer authority upon himself or make himself an agent merely by saying that he is one."  Id. at *6.  Aberdeen's detailed and voluminous allegations of PwCIL's principal/agent relationship with PwC India – stemming foremost from PwCIL's representations and actions – stand in stark contrast to Nuevo Mundo, which provides no help to PwCIL here.

        PwCIL further relies on Anwar v. Fairfield Greenwich Ltd., 728 F. Supp. 2d 372 (S.D.N.Y. 2010).  (PwCIL Brief at 10-13.)  In that case, the court dismissed plaintiffs' vicarious liability claims against PwCIL because plaintiffs had failed to plead that PwCIL controlled its member firms in connection with the transaction at issue.  Anwar, 728 F. Supp. 2d at 459.  Here, in contrast, Aberdeen has sufficiently pleaded that PwCIL controlled PwC India in connection with the Satyam audit.  (See SAC ¶¶ 44-64, 75-90.)  Aberdeen need only make out a "plausible" claim of agency.  Twombly, 550 U.S. at 570.  Aberdeen has met this standard.  To the extent PwCIL suggests that Anwar requires more specific allegations than these, such a reading of the decision is inconsistent with the Rule 8(a) standard.[28]

        Aberdeen's allegations with respect to agency between PwCIL and PwC India go well beyond the pleading requirements of Twombly and Iqbal.  It is clear from PwCIL's conduct both during and after the fraud that there is more than a "reasonable expectation that discovery will reveal evidence" of the agency relationship between PwCIL and PwC India.  Twombly, 550 U.S. at 556.  The intentional blurring of the lines between the two entities in the public eye

---

[28]  PwCIL relies on Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164 (1994), and Wright v. Ernst & Young, LLP, 152 F.3d 169 (2d Cir. 1998), to disclaim liability under § 10(b).  (PwCIL Brief at 17-18).  Such reliance is misplaced.  As this Court has recognized, "[t]he issue in Central Bank and Wright . . . was the nature of the conduct that subjects one to [§ 10(b)] liability."  In re Parmalat Sec. Litig., 474 F. Supp. 2d 547, 551 (S.D.N.Y. 2007).  But "[n]either [case] involve[d] the entirely distinct question whether a principal, in consequence of its status, may be held liable on the basis of respondeat superior for a 10b-5 violation committed by its agent."  Id. (emphasis added).  PwCIL's 10(b) liability is predicated on its respondeat relationship with PwC India.  PwCIL's efforts to conflate primary and secondary liability in order to avoid the latter should be rejected.

cannot be overstated.  PwCIL should not be permitted to whitewash the numerous, publicly-available statements that establish the intimate relationship between PwCIL and its Indian member firm.  This Court should reject PwCIL's efforts to disclaim agency with its member firm and hold PwCIL accountable for PwC India's conduct under the doctrine of respondeat superior.

>    **E.**    **PwC Pvt. Ltd., Lovelock & Lewes, and Price Waterhouse Are One Entity**

The relationship between PwCIL and PwC India is not the only source of discord in the PricewaterhouseCoopers family.  PwC Pvt. Ltd. too seeks to distance itself from PwC India, arguing that while Lovelock & Lewes/Price Waterhouse may have committed wrongdoing, PwC Pvt. Ltd. had nothing to do with it.  This is merely another misplaced divide-and-conquer theory.  The facts averred in Aberdeen's SAC, taken together, demonstrate that PwC India is one unitary entity composed of indivisible parts, and PwC Pvt. Ltd. is as much a proper defendant as to the § 10(b) and common law claims set forth by Aberdeen as are its alter egos Lovelock & Lewes and Price Waterhouse.

Alter ego liability may be predicated either upon a showing of fraud or complete control by the dominating corporation that leads to a wrong against a third party.  Pennsylvania law[29] recognizes four general veil-piercing factors: (1) undercapitalization; (2) failure to adhere to corporate formalities; (3) substantial intermingling of corporate and personal affairs; and (4) use of the corporate form to perpetuate fraud.  Fletcher-Harlee Corp. v. Szymanski, 936 A.2d 87, 95 (Pa. Super. 2007); Lumax Indus. v. Aultman, 669 A.2d 893, 895 (Pa. 1995); see also The

---

[29]  It is well-settled that "the transferee Court in a MDL . . . applies the substantive state law of the jurisdiction in which the action was filed."  Hinds County, Miss. v. Wachovia Bank N.A., 708 F. Supp. 2d 348, 366 n.11 (S.D.N.Y. 2010) (citing De George v. Am. Airlines, Inc., No. 08 Civ. 2103, 2009 WL 1868016, at *1 (2d Cir. June 30, 2009)); see also Valley Juice Ltd., Inc. v. Evian Waters of France, Inc., 87 F.3d 604, 607 (2d Cir. 1996) (where a case is transferred from one federal jurisdiction to another at the behest of the defendant, "a transferee court applies the substantive state law, including choice-of-law rules, of the jurisdiction in which the action was filed").  Further, Aberdeen's case will be tried in Pennsylvania, not New York, following the close of discovery.  See 28 U.S.C. § 1407(a) ("Each action so transferred shall be remanded . . . at or before the conclusion of . . . pretrial proceedings to the district from which it was transferred . . . .").

Village at Camelback Prop. Owners Ass'n, Inc. v. Carr, 538 A.2d 528, 535 (Pa. Super. 1988). These factors are to be considered in their totality, and none is dispositive.  Fletcher-Harlee, 936 A.2d at 95-96.  The facts in the SAC make clear that PwC Pvt. Ltd., Price Waterhouse, and Lovelock & Lewes operated as a single entity, and thus should be treated as one entity under Pennsylvania law.

   If PwC Pvt. Ltd. really has nothing to do with Lovelock & Lewes, then there are some pretty amazing coincidences.  The same office space (not just in Hyderabad, but in Bangalore, Bhubaneswar, Chennai, Guragon, and Kolkata).  (SAC ¶ 65, 67.)  The same address. The same telephone number.  The same fax number.  (Id.)  The same public moniker ("Price Waterhouse").  (Id. at 68.)  Overlapping leadership.[30]  (Id. ¶ 69.)  PwC Pvt. Ltd., Price Waterhouse, and Lovelock & Lewes use each others' names interchangeably, they hold themselves out to the public as a single, integrated entity, and they act as a unit in connection with providing audit services throughout India, including the Satyam audits.  (Id. ¶ 70.)  These are not coincidences; they are indicia of a single entity, and they show that PwC Pvt. Ltd. was the alter ego of Price Waterhouse and Lovelock & Lewes.  Cf., e.g., Engle v. Matrix Golf & Hospitality Phila., LLC, Civil Action No. 08-5831, 2009 WL 880680, at *4 (E.D. Pa. March 31, 2009) (denying motion to dismiss where plaintiff alleged total overlap in management, employees, officers sufficient to permit inference that, while "structured as many different entities, they are, in fact, intermingled and all controlled by the same source."); Pina v. Henkel Corp., Civil Action No. 07-4048, 2008 WL 819901, *8 (E.D. Pa. March 26, 2008) (denying motion to dismiss where plaintiff alleged that executives from one corporation exerted authority

---

[30]  For example, Ramesh Rajan, who submitted Price Waterhouse's resignation as statutory auditor for Satyam on Satyam's request, was a partner in Lovelock & Lewes and CEO of PwC Pvt. Ltd.  (SAC ¶ 69.)

and control at all management levels over the operations and employees of other corporation, compromising legal distinction between corporations).  Thus, the liability of Price Waterhouse and Lovelock & Lewes can be imputed to PwC Pvt. Ltd.  See In re Parmalat Sec. Litig., 375 F. Supp. 2d 278, 291 (S.D.N.Y. 2005) ("A firm may be liable for the acts of a wrongdoer if the wrongdoer is the other's alter ego.").

## F.   Aberdeen Has Stated § 20(a) Claims against PwCIL, PwC US, and the Maytas Defendants

Aberdeen asserts § 20(a) control liability claims against PwCIL and PwC US (in connection with their control of PwC India) and the Maytas Defendants (in connection with their control of Satyam).  To adequately plead a § 20(a) claim, a plaintiff must allege (1) a primary violation of § 10(b), and (2) direct or indirect control over the violator by the defendant.  See In re Parmalat, 375 F. Supp. at 307 (discussing the requisite elements for a § 20(a) claim).[31]  These allegations are subject to the Rule 8(a) pleading standard.  In re Bristol Myers Squibb Co. Sec. Litig., 586 F. Supp. 2d 148, 169 (S.D.N.Y. 2008); Hall v. The Children's Place Retail Stores, Inc., 580 F. Supp. 2d 212, 235 (S.D.N.Y. 2008); In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d 247, 307 (S.D.N.Y. 2008).  Thus, "a short and plain statement that gives the defendant fair notice that the defendant was a control person and the ground on which it rests its assertion is all that is required."  In re Scottish Re, 524 F. Supp. 2d at 386; see also Twombly, 550 U.S. at

---

[31]  Aberdeen does not ignore the fact that this Court has held that § 20(a) requires a plaintiff to plead "culpable participation," see, e.g., Steed Fin. LDC v. Laser Advisors, Inc., 258 F. Supp. 2d 272, 280 (S.D.N.Y. 2003) (Jones, J.), and that culpable participation must be pleaded with particularity, see In re CIT Group Inc. Sec. Litig., No. 08-cv-6613 (BSJ), 2010 WL 2365846, at *5 (S.D.N.Y. June 10, 2010) (Jones, J.).  However, the language of § 20(a) and the reasoning in cases such as In re Parmalat Sec. Litig., 497 F. Supp. 2d 526, 532 n.42 (S.D.N.Y. 2007) ("This Court repeatedly has held that culpable participation need not be alleged to state a claim under and is not an element of Section 20(a) liability . . . ."), and In re WorldCom, Inc. Sec. Litig., 294 F. Supp. 2d 392, 415 (S.D.N.Y. 2003) ("[P]laintiffs need not meet the PSLRA's heightened pleading standard in alleging a violation of Section 20(a), or separately allege culpable participation."), support the conclusion that culpable participation is not an element of the claim and need not be pleaded with particularity.  As set forth herein, even if the Court disagrees, PwCIL, PwC US, and the Maytas Defendants each culpably participated in the Satyam fraud.

570 (a complaint must contain "enough facts to state a claim that is plausible on its face").

Aberdeen sufficiently pleads these elements as against PwCIL, PwC US, and the Maytas

Defendants.

### 1.    PwCIL's § 20(a) Liability

PwCIL argues that Aberdeen's § 20(a) claim should be dismissed because

Aberdeen fails to adequately plead that PwCIL had control over PwC India or that PwCIL

culpably participated in the fraud.  Both of these arguments fail.[32]

The SAC contains ample facts showing that PwCIL controlled PwC India.

Aberdeen has averred that PwCIL possessed the power to direct or cause the direction of the

management of PwC India.  (SAC ¶ 345.)  Through its complex governance structure, PwCIL

did in fact control the activities of PwC India, and had direct involvement in the operation,

management, policies, and procedures of PwC India.  (Id. ¶¶ 51-52, 78-79.)  PwCIL also

controlled PwC India by requiring it to comply with set standards that PwCIL itself dictated and

set in place; standards relating to management, operations, business conduct, assurance, risk

management, firm governance, data protection, and privacy, among other things.  (Id. ¶¶ 51-63.)

The SAC shows that PwCIL had the power to influence PwC India's conduct in connection with

the Satyam audits.[33]  These allegations make out a plausible claim of control.

_____

[32]  As set forth above, PwC India violated § 10(b); therefore, the first element of the § 20(a) claim against PwCIL, a predicate violation of § 10(b), is met.

[33]  See SAC ¶ 345 ("PwCIL . . . had the ability to prevent the issuance of statements or cause the statements to be corrected."); ¶ 57 ("PwCIL's 'Assurance' practice conducts annual reviews of member firms to ensure compliance [and it reviews] the performance of partners on selected engagements."); ¶ 58 ("PwCIL's Assurance practice also ensures that audit examinations are performed in accordance with GAAP, and that 'financial statements are prepared in conformity with' GAAP."); ¶ 59 ("PwCIL['s Assurance practice] also serves to identify possible causes of existing deficiencies and risk in member firms, and it makes recommendations for improvement."); ¶ 60 ("Each PwCIL member firm is subject to the global Assurance practice at least once every three years."); ¶ 61 ("[P]ursuant to its own protocol, PwCIL conducted at least one, and likely more than one, Assurance practice review of PwC India's audit examinations and GAAP compliance while protracted fraud described therein was ongoing."); ¶ 78 ("PwCIL thus scrutinizes and controls PwC India's operations and performance, including its audit practices."); ¶ 79

But there's more.  The SAC demonstrates that PwCIL exercised control over PwC India in connection with the Satyam audits themselves.  As noted above, Global Risk Management Partner Steven Derrick took charge of the Satyam engagement on multiple occasions, dictating the PwC position on issues relating to Satyam's SEC filings and its interactions with the PCAOB, and directing PwC India personnel (and PwC US personnel) on how to proceed.  (Id. ¶ 81.)  Additionally, and as set forth above, PwCIL's conduct after the disclosure of the fraud supports an inference that PwCIL controlled PwC India in connection with the Satyam audits.  These allegations clearly give rise to a plausible inference that PwC India sought and took direction from – and indeed was controlled by – PwCIL.  Aberdeen, therefore, has sufficiently pleaded control in connection with its § 20(a) claim against PwCIL.[34]  See Citiline Holdings, Inc. v. IStar Fin., Inc., 701 F. Supp. 2d 506, 516-17 (S.D.N.Y. 2010) (finding allegation that the defendant "had the power to influence and exercised the same to cause [the control person] to engage in the conduct complained therein" sufficiently alleged control person liability); In re Scottish Re, 524 F. Supp. 2d at 401 (same).

The SAC shows that PwCIL turned a blind eye to the eight-year, billion dollar Satyam fraud.  The SAC alleges that "PwCIL was provided with or had unlimited access to copies of Satyam reports, press releases, public filings, and other statements in the possession of, or available to, PwC India, that were misleading prior to and/or shortly after these statements were issued, and they had the ability to prevent the issuance or cause the statements to be

---

("PwC India thus provided its audit services to Satyam on the authority of, at the direction of, under the supervision of, and/or for the benefit of PwCIL.").

[34]  PwCIL argues that PwC India could not have been controlled simultaneously by PwCIL and the two incarcerated Indian partners, as Aberdeen has alleged.  (PwCIL Brief at 24.)  This argument lacks foundation, and PwCIL provides no case law in support.  Indeed, courts allow § 20(a) plaintiffs to allege control by multiple defendants. See, e.g., In re Parmalat Sec. Litig., 640 F. Supp. 2d 243, 255 (S.D.N.Y. 2009).

corrected."  (SAC ¶ 346.)  Aberdeen avers that PwCIL was directly involved in the audits in
question.  (Id. ¶¶ 81-90.)  In light of the magnitude and duration of the fraud, together with the
Satyam audit team's repeated GAAP violations and failures to react to numerous red flags that
could and should have revealed the fraud, including bank confirmations revealing Satyam's
gross overstatements of its cash balances, there is no question but that PwCIL, like PwC India,
was at least reckless in not uncovering the fraud.  Aberdeen has adequately alleged PwCIL's
culpable participation and control of PwC India.

### 2.        PwC US' § 20(a) Liability

In seeking dismissal of Aberdeen's § 20(a) claim against it, PwC US relies on
PCAOB Appendix K,[35] arguing that (1) Appendix K somehow insulates PwC US from liability
for the Satyam audits, and (2) Aberdeen impermissibly seeks to pin liability on PwC US by
virtue of its role as the Appendix K reviewer for the Satyam audits.  (PwC US Brief at 8-12.)
Both arguments are unavailing.  The first is irrelevant, and the second does nothing more than
knock down a straw man.  In view of Aberdeen's detailed allegations regarding PwC US'
involvement in preparing, reviewing, and ultimately approving Satyam's SEC filings, PwC US
cannot now hide behind Appendix K.

Appendix K sets forth procedures for a "filing reviewer's" review of SEC filings
prepared by a foreign auditor.  (See Appendix K.)  Appendix K does not (and cannot) immunize
a filing reviewer or any other accountant who has taken part in a fraud.  PwC US can point to no
authority to the contrary.  PwC US focuses on the "limited nature" of an Appendix K review.
But the scope of Appendix K is besides the point.  Aberdeen has alleged that PwC US controlled

---

[35] SECPS § 1000.45, Appendix K, available at http://pcaobus.org/Standards/QC/Pages/SECPS_1000.08_
appendices.aspx#appendix_k.

PwC India in connection with preparing Satyam's fraudulent SEC filings.  In the face of

Aberdeen's detailed allegations showing control for the purposes of § 20(a), PwC US' reliance

on Appendix K is entirely misplaced.[36]

PwC US' active involvement in preparing and directing Satyam's SEC filings, as

detailed in the SAC, cannot be denied.  The SAC contains numerous examples of PwC US

personnel, including members of PwC GCMG (a business unit wholly-owned and operated by

PwC US) collaborating with PwC India and substantively reviewing and commenting on

Satyam's Form 20-F filings:

- In an April 17, 2001, email, Chen Shen (PwC GCMG) provided detailed instructions to the PwC Indian auditors as to "the outstanding procedures that our PwC India team needs to follow up and complete after the clearance of the Satyam confidential filing with the SEC."

- A January 19, 2004, internal email confirmed that Ferraro (PwC GCMG) would be reviewing "Satyam's US GAAP accounts going forward."

- Later that month, and in February 2004, Ferraro emailed his comments and instructions to the audit team regarding changes to Satyam's Form 20-F and Form 6-K filings.

- In discussing whether to amend Satyam's 2004 Form 20-F filing, Richard Fuchs (a PwC US partner and the PwC GCMG Managing Partner) noted in an April 15, 2004, email, "I don't see any other outcome than restatement," and recommended that "the audit committee be informed" of the need to amend.

- Later, in July 2004, again addressing the need to file an amended Form 20-F, Fuchs explained to Gopalakrishnan, "The PwC position has been established based on our view and consultation with US National office."

- An April 22, 2005, email, from Kotwal (PwC GCMG) to Melissa Bledsoe (PwC GCMG) and Ferraro, confirmed, "The changes suggested by you in Form 20-F will be processed in F-3," showing PwC GCMG's involvement

---

[36]  PwC US' insistence that, if it is liable under § 20(a), then every Appendix K reviewer would be subject to § 20(a) liability, (PwC US Brief at 2), is absurd.  PwC US mistakenly believes that Aberdeen seeks to impose liability based on Appendix K.  PwC US' liability, however, arises from its violations of § 20(a).

in substantively reviewing and revising Satyam's April 26, 2005, Form
20-F.

- Similarly, in a March 23, 2006, email, Bledsoe noted that she needed five
  full days to review Satyam's April 28, 2006, Form 20-F.

- In April 2007, Persaud (PwC US), in addressing Satyam's "aggressive"
  timelines, explained to the Satyam audit team, "Going forward we will
  need to address the working practices and perhaps we will need to be
  involved on a quarterly basis if the Company is looking to file their 20-F
  in such a short time frame."

- In an August 7, 2008, email, Talluri sent Persaud a copy of Satyam's
  August 8, 2008, Form 20-F, confirming that the filing incorporated
  Persaud's changes.

(SAC ¶ 104.)

But PwC US did not just perform a pro forma review.  Instead, PwC US had <u>final</u>

<u>say</u> over the Satyam SEC filings.  The Form 20-F filings were not to be submitted until PwC US

gave, in PwC US' own words, its "final clearance":

- Baid (PwC India) acknowledged in a June 29, 2001, email to David Taylor
  (a PwC US partner) that, with respect to Satyam's Form 20-F, "I
  understand and know, before US office review we will not be giving a
  final clearance on the financials."

- A June 29, 2003, email to Gareth Lea (PwC GCMG) and Fuchs (PwC
  GCMG) noted, "We need to give Satyam our clearance to file their 20F
  for the year ended March 31, 2003 by 11 am India time on June 30, 2003.
  Kindly give us your final clearance."

- An October 19, 2004, email reflects Bledsoe's (PwC GCMG) blessing of a
  Satyam regulatory filing:  "At this time, we give our final clearance of this
  document so you can release the report."

- Likewise, in an April 16, 2005, email, with respect to a change to the April
  28, 2005, Form 20-F proposed by Satyam's lawyers, Bledsoe was asked,
  "Please confirm this is acceptable."

- Later that month, the local auditors noted, "Satyam want's [sic] PwC's
  final clearance to file the F-3 on April 25, 2005," and asked Ferraro (PwC
  GCMG) and Bledsoe if they could meet such a tight deadline.

- In an April 27, 2006, email, Ferraro was asked by the local auditors in India to "give us your final clearance so that the client can go ahead and file the Form 20-F."

- Similarly, an April 17, 2007, email, circulated to the audit team, noted the schedule for Satyam's proposed Form 20-F filing and confirmed that the filing would be "available for Peter's [Ferraro] review" in advance of the submission.

(Id. ¶ 105.)

PwC US carefully policed the approval process and demanded that PwC India follow protocol.  (Id. ¶ 106.)  For example, in 2004, Peter Ferraro, a PwC GCMG partner, scolded one of the PwC India auditors:  "I just noted on the SEC website that the Form 20-F of Satyam was filed on June 29, 2004.  Ravi [Kiran Vadlamani, of PwC India] had agreed that I would be able to review the final version before it was filed to ensure that all issues had been addressed.  This did not happen."  He insisted the he "want[ed] to make sure that this does not happen again in the future."  (Id. ¶ 107.)[37]

Further, PwC US itself observed red flags that could and should have revealed the fraud.  (Id. ¶ 262.)  But, like its Indian counterpart, it failed to do anything about it.  For example:

- In reviewing Satyam's financial statements for the year ending March 31, 2004, Ferraro (PwC GCMG) remarked in an email to Kotwal (PwC GCMG), copied to the Satyam audit team, including Gopalakrishnan, "The accounts receivable has increased dramatically from year to year. What is the reason for the increase?  Is the allowance for bad debt appropriate?"

- In an October 15, 2004, email, Bledsoe (PwC GCMG) identified several questions she and Ferraro "came up with" in reviewing Satyam's financials.  She asked, "Did we confirm cash accounts at 09/30/2004 as it is the largest asset the Company has and has dramatically increased in the past quarter?"  She went on to state that "accounts receivable have

---

[37] In the face of these allegations, PwC US again retreats to Appendix K, noting that U.S. firms "usually do not control" their foreign associated firms.  (PwC US Brief at 10.)  However, a motion to dismiss is not governed by what the facts "usually" look like.  Instead, the Court must consider the facts actually alleged.  Aberdeen alleges ample facts showing PwC US' control over PwC India.

dramatically increased" and noted "revenue has increased 44% yet the A/R balance has increased 49%."

- Similarly, in an April 27, 2006, email to Kotwal, copied to Gopalakrishnan, Ferraro stated, "It appears that the company's revenues, net income, accounts receivable and unbilled revenue on contracts have increased substantially during FY 2006, but operating cash flow has actually declined relative to FY 2005.  This is normally a risk indicator that should result in additional revenue recognition and accounts receivable testing procedures as part of the audit."

- Again, in August 2006, Ferraro expressed concerns regarding the accuracy of Satyam's Form 20-F filings.  In an email to Kotwal, copied to the audit team, Ferraro advised that Dennis Neider (a highly-regarded PwC US partner) "is very concerned that the disclosure in Form 20-F appears not to be consistent with the company's actual business practices."  He went on: "The engagement team must be absolutely certain that the responses are accurate and correspond to the audit record and are consistant [sic] with company practices.  Please confirm."

- On April 19, 2007, Ferraro cautioned Kotwal about Satyam's estimates regarding the profitability of its operations, noting that "Satyam has consistently overestimated the revenue/profitability," and directing that "[i]n all the analysis, we should use the minimum case as the company does not have a good history of estimating."

(Id.)

In its brief, PwC US pays short shrift to these red flags, claiming that they are insufficient to establish culpable participation, "a far cry from any 'smoking gun' that could establish culpable participation."  (PwC US Brief at 18.)  However, Tellabs instructs that an inference of scienter need not be "of the smoking gun genre," or "even the most plausible of competing inferences."  551 U.S. at 324.  PwC US further ignores the fact that these red flags relate to the very misrepresentations at the heart of the Satyam fraud – dramatic increases in cash accounts, revenue, accounts receivable, and net income.  (SAC ¶ 263.)  PwC US states that "the best plaintiff can do is confess to not knowing whether [PwC India] responded to [PwC US'] questions."  (PwC US Brief at 18.)  However, the inference to be drawn from the totality of the allegations in the SAC is clear:  PwC US saw something amiss but received no satisfactory

answer to its questions because there was none.  The information in Satyam's SEC filings was bogus.  PwC US saw red flags indicating as much, and it looked the other way.  PwC US controlled PwC India and is equally culpable for closing its eyes to the obvious.

### 3.       The Maytas Defendants' § 20(a) Liability

The Maytas Defendants contend that Aberdeen's § 20(a) claim against them fails because:  (1) there is no primary violation of § 10(b); (2) the Maytas Defendants did not control Satyam; and (3) the Maytas Defendants neither culpably participated in the fraud nor had scienter.  All of these arguments fail.

The Maytas Defendants suggest that Aberdeen has failed to show a primary § 10(b) violation by Satyam in light of Morrison.  As set forth herein, Morrison has absolutely no impact on Aberdeen's § 10(b) ADR claims.  Aberdeen's ADR claims fall squarely within the Morrison Court's pronouncement that "Section 10(b) reaches the use of a manipulative or deceptive devise or contrivance . . . in connection with the purchase or sale of a security listed on an American stock exchange."  130 S.Ct. at 2888 (emphasis added).  ADRs are listed on an American stock exchange.  Indeed, in prior briefing, even the Maytas Defendants' codefendants conceded that Morrison does not affect Aberdeen's ADR claims.[38]  (See Joint Supplemental Memorandum in Further Support of Defendants' Motions to Dismiss the Consolidated Class Action Complaint and the Aberdeen First Amended Complaint [Dkt. 228] at 3 n.6.)  Subsequent to the Morrison decision, courts have acknowledged that the decision does not impact ADR claims.  See, e.g., In re Vivendi Universal, S.A. Sec. Litig., No. 02-cv-05572, 2011 WL 590915, at *7 (S.D.N.Y. Feb. 17, 2011) ("The parties agree that Morrison has no impact on the claims of

---

[38]  Likewise, even now, the defendants who raise or adopt arguments regarding Morrison (Satyam, PwC US, and PwCIL) do not contend that Morrison affects Aberdeen's ADR claims.

ADR purchasers since [Defendant's] ADRs were listed and traded on the NYSE.").  Satyam

itself, in fact, does not contest whether Aberdeen has pleaded a viable § 10(b) claim against it.

Aberdeen has adequately pleaded a primary § 10(b) violation by Satyam.

    The Maytas Defendants further contend that Aberdeen has not adequately pleaded

that the Maytas Defendants controlled Satyam.  However, the SAC contains numerous

allegations indicating that the Maytas Defendants controlled Satyam and were complicit in the

fraud.  For example, Aberdeen alleges that the Maytas Defendants:

- had significant holdings in Satyam's stock, (SAC ¶¶ 112-14);

- used their familial connections and other influence to control Satyam in connection with the Satyam fraud, (id. ¶ 338);

- directed or engaged in various sham transactions, including acquisitions of vast tracts of land in India, in order to cover up the Satyam fraud, (id. ¶¶ 273-76);

- received millions of dollars in ill-gotten gains through the aforementioned sham transactions, as well as through artificially inflated dividends on their Satyam holdings, (id.); and

- pocketed the "salaries" of more than 10,000 non-existent "ghost" employees included in Satyam's books to cover up the fraud, (id. ¶ 288).

    In sum, Satyam entered into numerous transactions in which money was

fraudulently funneled to the Maytas Defendants, thereby benefiting the Maytas Defendants at the

expense of Satyam.  (SAC ¶¶ 273-79).  Satyam can only have entered into such transactions at

the direction and under the control of the Maytas Defendants.  Considering "the total effect of

the various indicia of control in combination," as the Court must, In re Leslie Fay Cos., Inc. Sec.

Litig., 918 F. Supp. 749, 763 (S.D.N.Y. 1996), Aberdeen has pleaded sufficient facts to give rise

to a plausible inference of control.  See In re Scottish Re Group, 524 F. Supp. 2d at 386; see also

Twombly, 550 U.S. at 570.

Finally, the Maytas Defendants argue that Aberdeen has failed to adequately plead that the Maytas Defendants "culpably participated" in the fraud, or that the Maytas Defendants had the requisite scienter.  As set forth above, neither "culpable participation" nor scienter are necessary elements of a § 20(a) claim.  See In re Parmalat, 497 F. Supp. 2d at 532, n.42; In re WorldCom, 294 F. Supp. 2d at 415.  Nonetheless, the SAC contains numerous, particularized allegations from which the Court can infer that the Maytas Defendants were knowing and culpable participants in the Satyam fraud.  The fact that the Maytas Defendants were among the primary beneficiaries of the spoils of the Satyam fraud further supports an inference of culpable participation.  See In re Blech Sec. Litig., No. 94-cv-7969, 2002 WL 31356498, at *21 (S.D.N.Y. Oct. 17, 2002) (receipt of the financial benefits of the fraud demonstrates culpable participation).  Aberdeen has alleged that the Maytas Defendants actively engaged in transactions integral to the fraud and its cover-up and plundered millions of dollars from Satyam in the process.  (See SAC ¶¶ 273-88.)  That is sufficient.

### G.   All of Aberdeen's Losses Remain Compensable after Morrison

Aberdeen has alleged claims relating to two types of Satyam securities transactions:  (1) claims relating to the sale and purchase of ADRs listed on the NYSE, and (2) claims relating to the sale and purchase of common stock listed on Indian exchanges.  Aberdeen seeks recovery on account of Defendants' fraud in connection with these two types of transactions by means of both federal (i.e., §§ 10(a) and 20(b)) and Pennsylvania common law claims (i.e., negligence, negligent representation, and fraud claims).[39]  Thus, Aberdeen's claims fall into four categories:

---

[39]  Because Aberdeen originally filed its complaint in the Eastern District of Pennsylvania, the Martin Act, N.Y. Gen. Bus. § 352 et seq., presents no barrier to Aberdeen's common law claims.  See supra, n.29.

|  | Federal Causes of Action | Common Law Causes of Action |
|---|---|---|
| **Satyam Common Stock** | Potentially affected by <u>Morrison</u> | Unaffected by <u>Morrison</u> |
| **Satyam ADRs** | Unaffected by <u>Morrison</u> | Unaffected by <u>Morrison</u>[40] |

<u>Morrison</u> can affect <u>only one</u> of these four types of claims:  Aberdeen's §§ 10(b) and 20(a) claims arising from transactions in Satyam common stock traded on the Indian exchanges.  Thus, even in the event that the Court concludes that, as a matter of law, federal claims relating to securities traded on a foreign exchange do not survive <u>Morrison</u>, the following classes of Aberdeen's claims remain fully intact:

> (1)   federal ADR claims (Counts I through V of the SAC); and

> (2)   state law Satyam common stock claims (Counts VI through VIII of the SAC).

<u>Morrison</u> does not have, and cannot have, any impact on Aberdeen's state law common stock claims.  <u>Cf.</u> <u>Morrison</u>, 130 S.Ct. at 2884 (section 10(b) punishes "only deceptive conduct 'in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered'").  Indeed, Satyam, PwC US, and PwCIL all but concede that <u>Morrison</u> has no impact on Aberdeen's ADR claims; each seeks dismissal only of the Indian common stock claims under <u>Morrison</u>.  (Satyam Brief at 8 ("The claims of the Indian Stock Purchasers are squarely precluded by <u>Morrison</u> . . . ."); PwC US Brief at 1 n.1 ("PwC US moves to dismiss in light of [<u>Morrison</u>] claims asserted by plaintiff in connection with investors who

---

[40]   Aberdeen does not advance common law claims relating to the purchase and sale of ADRs in light of SLUSA (though its common law claims relating to Satyam common stock are unaffected by SLUSA, as discussed below).

purchased common stock . . . on Indian stock exchanges."); PwCIL Brief at 1 ("under [Morrison], Aberdeen cannot pursue federal securities law claims based on" "purchases of Satyam common stock on Indian stock exchanges").

H.     **Aberdeen's State Law Claims Are Viable**

1.     **SLUSA Does Not Preempt Aberdeen's State Law Claims**

Aberdeen has brought state law claims that the Class Plaintiffs do not and could not bring.  These claims relate to the losses sustained from the purchase and sale of Satyam common stock on the Bombay Stock Exchange and the Indian National Stock Exchange. Defendants argue that these common stock-common law claims are preempted under SLUSA. They are wrong.  Because Satyam common stock is not a "covered security" under SLUSA, Aberdeen's common law-common stock claims are not preempted.

In order for SLUSA preemption to apply to a particular claim,[41] four elements must be shown:  (1) a "covered class action"; (2) based on state law; (3) involving a "covered security"; and (4) allegations of securities fraud.  See Riley v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 292 F.3d 1334, 1342 (11th Cir. 2002).  An essential element of SLUSA preemption is thus that the claim alleged to be preempted relate to "a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security." 15 U.S.C. § 78bb(f)(1)(A) (emphasis added).  Put differently, SLUSA preemption does not apply to a claim where no "covered security" is at issue.  See Ring v. AXA Fin., Inc., 483 F.3d 95, 101-02 (2d

---

[41]  The Second Circuit requires a claim-by-claim analysis as to SLUSA preemption.  In re Kingate Mgmt. Ltd. Litig., No. 09 Civ. 5386(DAB), 2011 WL 1362106, at *6 (S.D.N.Y. March 30, 2011) (citing Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 395 F.3d 25, 47 (2d Cir. 2005), rev'd on other grounds, 547 U.S. 71 (2006)).  PwC India disregards this instruction, and mischaracterizes Kingate by arguing that Aberdeen's ADR claims affect the applicability of SLUSA to Aberdeen's state law claims.  (PwC India Brief at 17-18.)  Such mix-and-match is not permitted.  In Kingate, all securities at issue were "covered."  Id. at *9.  Here, the securities underlying the state law claims – the Satyam common stock – are not "covered."  Kingate does not support PwC India's conflation of Aberdeen's ADR and common stock claims.

Cir. 2007) (holding that state law class action was not preempted under SLUSA because variable life insurance policies at issue were not covered securities).  Because Satyam common stock is not a "covered security," Aberdeen's state law claims relating to the purchase and sale of Satyam common stock are not preempted.

Covered securities are defined, for purposes of SLUSA, as one of four things. See 15 U.S.C. §§ 77r(b)(1) – (4).  There is no question that three of these four definitions do not apply to Satyam common stock.[42]  However, PwC India asks this Court to find that Satyam common stock is a "covered security" under the fourth definition, in that it is "listed, or authorized for listing, on the New York Stock Exchange."  (PwC India Brief at 16 (quoting 15 U.S.C. § 77r(b)(1)(A).)  There is no basis in fact or law for such a finding.  While Satyam ADRs were "listed," "authorized for listing," and in fact traded on the NYSE, Satyam common stock is neither listed nor authorized to be listed on the NYSE.[43]  It for precisely this reason that Satyam ADRs were traded on the NYSE.[44]  Satyam common stock is not a "covered security" under

---

[42]  That is, Satyam common stock (1) is not "issued by an investment company that is registered, or that has filed a registration statement, under the Investment Company Act of 1940," § 77r(b)(2); (2) was not offered or sold to "qualified purchasers, as defined by the [SEC] by rule," § 77r(b)(3); and (3) is not exempt from registration under the '40 Act under §§ 77d(1) or (3), 77d(4), 77c(a), or 77d(2), § 77r(b)(4).

[43]  The circumstances where a security is authorized for listing but not in fact listed are "extremely rare."  See Letter Comment by American Bar Association's Committee on State Regulation of Securities to U.S. Securities and Exchange Commission's Proposed Amendment of Rule 146(b) of Securities Act (Dec. 20, 2006), available at http://www.sec.gov/comments/s7-18-06/s71806-1.pdf (discussing "extremely rare" circumstance where an initial public offering is authorized for listing but ultimately not listed); Covered Securities Pursuant to § 18 of the Securities Act of 1933, 72 Fed. Reg. 20410, 20413 (Apr. 24, 2007) (citing approvingly to letter).  Regardless, whether rare or common, Satyam common stock has never traded on a U.S. exchange, has never been listed on a U.S. exchange, and has never been authorized for listing on a U.S. exchange.

[44]  Upholding Aberdeen's state law claims is moreover consonant with SLUSA's policy objectives.  Congress enacted SLUSA in response to a wave of state court securities fraud class actions, which Congress viewed as an attempt to circumvent the strictures of the PSLRA.  See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71, 82 (2006).  Congress intended SLUSA to prevent lawyers from using state court class actions to circumvent the PSLRA.  It did not intend to limit a litigant's ability to assert legitimate state law claims in the securities fraud context.  Thus, in enacting SLUSA, Congress found that:

> [I]n order to prevent certain State private securities class action lawsuits alleging fraud from being used to frustrate the objectives of the [PSLRA], it is

SLUSA, and Aberdeen's state law claims relating to the purchase and sale of Satyam common stock are not preempted.[45]

### 2. Supplemental Jurisdiction Exists for the Common Law Claims

Defendants' second purported basis for dismissal of Aberdeen's common law claims is that the Court lacks subject matter jurisdiction over these state law causes of action. This argument is baseless.  This Court has federal question jurisdiction under 28 U.S.C. § 1331 over Aberdeen's federal securities law claims, as discussed herein.  With original jurisdiction secure, a district court has "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  That relationship is present here, and it is the beginning and end of the analysis demonstrating that subject matter jurisdiction exists over Aberdeen's state law causes of action.

"A federal court's exercise of pendent jurisdiction over plaintiff's state law claims, while not automatic, is a favored and normal course of action."  Promisel v. First Am. Artificial Flowers, Inc., 943 F.2d 251, 254 (2d Cir. 1991).  Where a plaintiff properly alleges a federal cause of action, and plaintiff's state law claims arise out of the same set of factual

---

appropriate to enact national standards for securities class action lawsuits involving nationally traded securities, while preserving the appropriate enforcement powers of State securities regulators and not changing the current treatment of individual lawsuits.

H.R. Rep. No. 105-803, at 2 (1998) (Conf. Rep.) (emphasis added).  In other words, while "SLUSA was intended to completely preempt the field of certain types of securities class actions," it does not, and should not, "preclude all state enforcement or private causes of action in securities fraud cases."  Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 332 F.3d 116, 123-24 (2d Cir. 2003) (emphasis added).  That rationale applies with full force here.

[45]  Further, were the term "covered securities" read to encompass stock traded on a foreign exchange, questions relating to SLUSA's constitutionality would be implicated.  For example, the Eleventh Circuit upheld SLUSA as constitutional precisely because "SLUSA regulates only national securities markets and expressly deals with claims pertaining to nationally-traded securities."  Riley v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 292 F.3d 1334, 1347 (11th Cir. 2002), overruled on other grounds by Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 88 (2006).

allegations that form the basis of the federal claims, "the Court will retain jurisdiction over the remaining state law claims in the interest of judicial economy." In re Sterling Foster & Co., Inc., Sec. Litig., 222 F. Supp. 2d 216, 283 (E.D.N.Y. 2002) (citing 28 U.S.C. § 1367(a) and United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966) (holding that a federal court has jurisdiction over an entire action, including the state-law claims, where the federal and state claims "derive from a common nucleus of operative fact . . . such that [plaintiff] would ordinarily be expected to try them all in one judicial proceeding")); see also Shanahan v. Vallat, No. 03 Civ. 3496 (MBM), 2004 WL 2937805, at *7 (S.D.N.Y. Dec. 19, 2004) ("Because plaintiffs have sufficiently pleaded at least one federal securities fraud claim, this court retains supplemental jurisdiction over plaintiffs' common law fraud claim."). Aberdeen's state law claims for fraud, negligent misrepresentation, and negligence derive from the same facts and circumstances as Aberdeen's federal securities claims. These facts, set forth in detail throughout the SAC, are the basis for Aberdeen's federal and state law claims. Accordingly, this Court should exercise supplemental jurisdiction over Aberdeen's common law claims.[46]

### 3. Aberdeen Has Stated Claims for Fraud, Negligence, and Negligent Misrepresentation

#### a. Aberdeen's Common Law Fraud Claim Is Viable

PwC India challenges Aberdeen's fraud claim, arguing that Aberdeen has not pleaded scienter or reliance. Just as Aberdeen has properly pleaded scienter with respect to the §

---

[46] The Court further has pendent personal jurisdiction over all Defendants with respect to Aberdeen's common law claims. See IUE AFL-CIO Pension Funs v. Herrmann, 9 F.3d 1049, 1056 (2d Cir. 1993) ("[U]nder the doctrine of pendent personal jurisdiction, where a federal statute authorizes nationwide service of process, and the federal and state claims derive from a common nucleus of operative fact, the district court may assert personal jurisdiction over the parties to the related state law claims even if personal jurisdiction is not otherwise available.") (internal citations and quotations omitted).

10(b) claim against PwC India, scienter exists in the context of Aberdeen's common law fraud claim against PwC India as well.

Aberdeen has also pleaded sufficient facts to demonstrate that PwC India made representations upon which the Investors and/or their advisors justifiably relied.  Aberdeen's SAC contains dozens of paragraphs detailing Price Waterhouse's signed statements certifying the contents of years' worth of 20-F and 6-K statements as "present[ing] fairly, in all material respects, the financial position of [Satyam]." (See, e.g., SAC ¶¶ 124, 128, 147.)  These financial statements and certifications were false and misleading when made because they vastly overstated Satyam's cash balances, revenues, and growth.  (Id. ¶¶ 126, 127, 130, 131, 152, 153.) Aberdeen further alleges that the Investors purchased Satyam securities "in actual reliance on Defendants' material representations as to the financial health of Satyam," and that the Defendants "intended and knew, or should have known, that the Investors and/or their investment advisors would rely on their misrepresentations relating to the purchase and sale of Satyam common stock."  (Id. ¶¶ 317, 368.)  Aberdeen has adequately pleaded reliance in connection with its common law fraud claim.

### b.    The Economic Loss Doctrine Is Inapplicable to the Negligence and Negligent Misrepresentation Claims

Pennsylvania's economic loss doctrine generally precludes recovery for economic loss in a negligence action where the plaintiff has suffered no physical or property damage, "premised on the notion that parties to a contract may protect themselves from negligence or defective products by negotiating the liability terms of the contract."[47]  Bouriez v. Carnegie Mellon Univ., No. 02-cv-2104, 2010 WL 1416845, at *2 (W.D. Pa. Apr. 6, 2010); see also Bilt-

---

[47]  Because Aberdeen filed this action in Pennsylvania, Pennsylvania law applies.  See Hinds County, 708 F. Supp. at 366 n.11; Valley Juice, 87 F.3d at 607.

Rite Contractors, Inc. v. The Architectural Studio, 866 A.2d 270, 285-86 (Pa. 2005).  The

purpose of this doctrine, as adopted in Pennsylvania, is to "maintain[] the separate spheres of the

law of contract and tort."  New York State Elec. & Gas Corp. v. Westinghouse Elec. Corp., 564

A.2d 919, 925 (Pa. Super. 1989).  To that end, the doctrine has been specifically rejected in the

context of negligent misrepresentation claims.  Bilt-Rite, 866 A.2d at 288 (holding that negligent

misrepresentation claim not barred by economic loss doctrine); Bouriez, 2010 WL 1416845, at

*2-3 (W.D. Pa. Apr. 6, 2010) (same).  The economic loss doctrine has no application to

Aberdeen's negligent misrepresentation claim.

       The economic loss doctrine is similarly inapplicable to Aberdeen's negligence

claims against its auditors.  The Pennsylvania Supreme Court has recognized that "purely

economic loss may be recovered under a variety of tort theories . . . [and] other contexts such as

legal malpractice, accountant malpractice, and architect liability."  Bilt-Rite, 866 A.2d at 288.

Such "accountant malpractice" is at issue here.  Further, "the question of whether the plaintiff

may maintain an action in tort for purely economic loss turns on the determination of the source

of the duty plaintiff claims the defendant owed."  Id. (quoting Tommy L. Griffin Plumbing &

Heating Co. v. Jordan, Jones & Goulding, Inc., 463 S.E.2d 85 (S.C. 1995)).  Whether a tort duty

exists on the part of an accountant toward an investor, however, is not an open question under

Pennsylvania law:

> Accountants have long been held to be members of a skilled
> profession, and liable for their negligent failure to observe
> reasonable professional competence.  This duty to observe
> reasonable professional competence exists independently of any
> contract.  The economic loss doctrine does not bar recovery in tort
> for the breach of a duty that exists independently of a contract.

In re Computer Personalities Sys., Inc., No. 01-14231DWS, ADV. 03-0220, 2003 WL

22844863, at *4 (Bankr. E.D. Pa. Nov. 18, 2003) (emphasis added) (quoting from Congregation

of the Passion v. Touche Ross & Co., 636 N.E.2d 503 (Ill. 1994)); see also Bilt-Rite, 866 A.2d at 288 ("[W]e agree with [the South Carolina Supreme Court] that a plaintiff is not barred from recovering economic losses simply because the action sounds in tort rather than contract law.").

Given this well-established law, the Court should deny PwC India's motion to dismiss Aberdeen's claims for negligence and negligent misrepresentation on account of the economic loss doctrine.

### c.   A Duty to the Investors Exists

In moving to dismiss Aberdeen's negligence claims, PwC India and PwC US suggest that, as a matter of law, they did not owe any duty to the holders of Satyam securities during the years when they signed, certified, and issued materially false and misleading financial statements in unqualified opinions that were incorporated into Satyam's SEC filings and press releases.  This argument fails because the Investors and their investment advisors were within the foreseeable class of plaintiffs to which PwC India and PwC US owed a duty to exercise reasonable care in supplying information (or, stated differently, a duty not to supply false information).

"In determining the existence of a duty of care, it must be remembered that the concept of duty amounts to no more than the sum total of those considerations of policy which led the law to say that the particular plaintiff is entitled to protection from the harm suffered." Bilt-Rite, 866 A.2d at 281 (quoting Althaus ex rel. Althaus v. Cohen, 756 A.2d 1166 (Pa. 2000)). Pennsylvania courts have enunciated several factors to be considered in determining whether a duty of care exists, a determination couched in public policy considerations: "(1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution." Id. at 281.  In addition,

Pennsylvania has adopted § 552 of the <u>Restatement (Second) of Torts</u>, which "sets forth the parameters of a duty owed when one supplies information to others, for one's own pecuniary gain, where one intends or knows that the information will be used by others in the course of their own business activities." <u>Id.</u> at 285-86.

PwC India and PwC US are suppliers of information to others for pecuniary gain, and therefore, under § 552, owed duties to supply correct information to the intended beneficiaries of that information: Satyam's investors, including the Investor assignors. <u>Cf., e.g.</u>, <u>In re Intelligent Elecs., Inc. Sec. Litig.</u>, Nos. 95-7663, 95-7712, 1996 WL 304852, at *4 (E.D. Pa. June 6, 1996) (relying on § 552 in denying motion to dismiss class plaintiffs' negligent misrepresentation claim against Price Waterhouse because "as securities holders, [plaintiffs] were the intended beneficiaries of the accounting information audited by Price Waterhouse"). The purpose behind § 552 "is not radical or revolutionary," but rather reflects "modern business realities" and "merely recognizes that it is reasonable to hold such professionals to a traditional duty of care for foreseeable harm." <u>Bilt-Rite</u>, 866 A.2d at 286.

As Aberdeen has alleged, PwC India and PwC US for years supplied Satyam's investors with audited financial statements containing false and exaggerated revenues, deposits, and earnings. (SAC ¶¶ 119-265.) In exchange for providing fraudulent certifications, Satyam paid its auditors exorbitant, above-market fees that were more than six time greater than those paid by Satyam's peers. (<u>Id.</u> ¶ 73.) It was foreseeable that the financial statements audited by PwC India and PwC US would be relied upon by Satyam's investors, as it is no secret that "[c]orporate financial statements are one of the primary sources of information available to guide the decisions of the investing public." <u>United States v. Arthur Young & Co.</u>, 465 U.S. 805, 810 (1984). Indeed, "[b]y certifying the public reports that collectively depict a corporation's

financial status, the independent auditor assumes a public responsibility transcending any employment relationship with the client." In re Bear Stearns Cos., Inc. Sec., Derivative, and ERISA Litig., No. 08 MDL 1963, 2011 WL 223540, at *73 (S.D.N.Y. Jan. 19, 2011) (quoting Arthur Young, 465 U.S. at 817).

The U.S. Supreme Court has summarized the generally-accepted purpose of certified, audited financial statements:

> In an effort to control the accuracy of the financial data available to investors in the securities markets, various provisions of the federal securities laws require publicly held corporations to file their financial statements with the Securities and Exchange Commission. Commission regulations stipulate that these financial reports must be audited by an independent certified public accountant in accordance with generally accepted auditing standards. By examining the corporation's books and records, the independent auditor determines whether the financial reports of the corporation have been prepared in accordance with generally accepted accounting principles. The auditor then issues an opinion as to whether the financial statements, taken as a whole, fairly present the financial position and operations of the corporation for the relevant period.

Arthur Young, 465 U.S. at 810-11. The importance of those statements to those who rely on them is paramount.

Aberdeen alleges that its assignors' "investment advisors relied on financial statements and related information contained within Satyam's SEC filings in the United States, discussed herein, in making investment decisions respecting Satyam's common stock and/or Satyam ADRs." (SAC ¶ 35.) Aberdeen further alleges that the false and misleading statements were made to deceive the Investors and were included in SEC filings to induce investment in Satyam securities. (Id. ¶ 248.) PwC India and PwC US not only approved of, signed off on, and disseminated these misrepresentations, but did so knowing the Investors and/or their investment advisors would rely on the misrepresentations in purchasing the Satyam securities. (Id. ¶¶ 261-

64, 368, 375, 381).  The Investors lost millions as a result of these misrepresentations.  (Id. ¶ 29.)
That is more than enough.

        Satyam's auditors' attempt to characterize the Investors as an undefined, limitless group misses the mark.[48]  The comments to § 552 make clear that it is sufficient "insofar as the plaintiff's identity is concerned, that the maker supplies the information for repetition to a certain group or class of persons and that the plaintiff proves to be one of them, even though the maker never had heard of him by name when the information was given."  Restatement (Second) of Torts § 552 cmt. h (1977).  See also Anwar v. Fairfield Greenwich Ltd., 728 F. Supp. 2d 372, 433-35 (S.D.N.Y. 2010) (investors in hedge funds could maintain negligence and negligent misrepresentation claims against funds' accountants where allegations supported awareness by accountants that the funds' financial reports were to be used for known investors' and future investors' evaluation of investing in funds); In re Intelligent Elecs., Inc. Sec. Litig., 1996 WL 304852, at *4 (upholding investor plaintiffs' negligent misrepresentation claim against defendant Price Waterhouse because "as securities holders, [plaintiffs] were the intended beneficiaries of the accounting information [of corporation] audited by Price Waterhouse").  PwC India and PwC

―――――――――――――――

[48] Guenther v. Cooper Life Sciences, Inc. offers an instructive discussion about the meaning of the term "limited" in the context of § 552:

> [Auditor] Peat Marwick's contention that potential investors constitute an unlimited class presupposes that the reference to "limited" in section 552 refers to a group's size. The adjective "limited," however, pertains not to size, but to identifiability.  While size is certainly one of the criteria that may be used to limit a group's membership, it is but one of many possible restrictive criteria that can define the contours of a "limited group."  Thus, it is not necessary that a group be restricted by size in order to qualify as "limited" under section 552.  It is enough that providers of information know that their client intends to provide the information for the benefit and guidance of a group of people, and that the information provider understand the parameters that define the third-party group.  Where a group is identifiable, accountants and other information providers are not relieved of liability merely because the group of people whom they intend to influence with their information is too large.

759 F. Supp. 1437, 1443 (N.D. Cal. 1990) (emphasis added).

US signed off on Satyam's audited financial statements that contained false information for at least seven years, during which time Satyam used those statements to solicit and retain investors, including the twenty Investors who assigned their claims to Aberdeen.[49]

       Although Pennsylvania federal district courts are divided on whether public investors constitute a "limited group of persons for whose benefit and guidance [defendants] intend to supply the information," and while Pennsylvania state courts have not had occasion to thoroughly address the issue, there exists ample persuasive authority upon which to conclude that PwC India owed a duty to the Investors under § 552.  Paraschos v. YBM Magnex Int'l, Inc., No. CIV A 98-6444, 2000 WL 325945, at *11 (E.D. Pa. March 29, 2000) (allowing investors' cause of action for negligent misrepresentation to proceed against defendant outside auditors of defendant corporation alleged to have been a money-laundering operation); In re Regal Commc'ns Corp. Sec. Litig., No. 94-179, 1996 WL 411654, at *5 (July 17, 1996) (rejecting privity argument, stating "the plain language of Section 552 allows a claim to be brought against one acting in the course of his business to be brought by members of a class intended to be benefitted the information disclosed"); In re Intelligent Elecs., Inc. Sec. Litig., 1996 WL 304852, at *4 (upholding claim against Price Waterhouse for negligently preparing federally-mandated financial reports that were "clearly intended to provide information to shareholders and other investors");  In re Chambers Dev. Sec. Litig., 848 F. Supp. 602, 626 (W.D. Pa. 1994) (rejecting privity argument, upholding investors' negligent misrepresentation claims against defendant

---

[49]  Pennsylvania does not require strict privity for plaintiffs pursuing negligence-based claims.  See In re Westinghouse Sec. Litig., 832 F. Supp. 948, 987 (W.D. Pa. 1993) (finding privity not required under Pennsylvania law for tort of negligent misrepresentation), aff'd in part, rev'd in part, 90 F.3d 696 (3d Cir. 1996); Alten v. Atl. Fin. Fed., 805 F. Supp. 5, 6-7 (E.D. Pa. 1992) (finding that investors could assert negligent misrepresentation claims against accounting firm even where the investors "had no knowledge of [the accounting firm's] involvement [in preparing financial statements] upon making their investment decision"); accord Robert Wooler Co. v. Fidelity Bank, 479 A.2d 1027 (Pa. Super. 1984) (accounting firm's agreement to perform unaudited services did not relieve it from liability for negligently ignoring suspicious circumstances which would have raised a "red flag" for reasonably skilled and knowledgeable accountants).

auditing firm arising from certifications of accuracy made in offering documents, SEC filings, and annual reports of defendant corporation); see also Sharp v. Coopers & Lybrand, 457 F. Supp. 879, 888 (E.D. Pa. 1978) ("If the certified financial statements (or opinions) are intended to be used and are used, to the knowledge of the accountants, in the sale of securities by the company or someone else to the public, there would seem to be little question that the purchasers are persons entitled to complaint of that breach of duty . . . .")  (quoting R. Jennings & H. Marsh, Securities Regulations: Cases and Materials 1132 (1977)); Simpson v. Specialty Retail Concepts, Inc., 908 F. Supp. 323, 330-32 (M.D.N.C. 1995) (denying summary judgment and holding public investors represented a "limited group" where auditor knew its report would be included in its client's 10-K report to the SEC); Forcier v. Cardello, 173 B.R. 973, 983 (D.R.I. 1994) (denying summary judgment and stating that "[a]s Comment a to § 552 explains, extending an accountant's liability to this foreseeable class 'promotes the important social policy of encouraging the flow of commercial information upon which the operation of the economy rests'"); Guenther v. Cooper Life Sciences, Inc., 759 F. Supp. 1437, 1442-43 (N.D. Cal. 1990) (holding that, under § 552 and Minnesota law, auditor owed a duty to potential investors where auditor was aware of company's intention to distribute the audited report to potential investors); Boykin v. Arthur Andersen & Co., 639 So.2d 504, 510 (Ala. 1994) ("Basic principles of justice require that an accounting firm be held liable for its intentional or negligent dissemination of inaccurate financial reports to specifically foreseen and limited groups of third parties for whose benefit and guidance the accounting firm supplied the information.").

## I.     The Maytas Defendants' Service Arguments Are Meritless

The Maytas Defendants argue that Aberdeen's claims against them must be dismissed for Aberdeen's purported failure to effect service of process upon them in a timely

manner.  This argument misstates the law.  Aberdeen has initiated service via the Hague

Convention,[50] and has thus fulfilled its responsibilities.

   Rule of 4 of the Federal Rules of Civil Procedure specifically provides that no

time limit applies to the service of foreign defendants.  Fed. R. Civ. P. 4(f), (m); see also United

Nat'l Ret. Fund v. Ariela, Inc., 643 F. Supp. 2d 328, 331 (S.D.N.Y. 2008).  Where, as here, the

defendant is located in a foreign state that is a signatory to a treaty or convention concerning

service, service upon that defendant must be effected through the internationally agreed means.

See Fed. R. Civ. P. 4(f).  No one disputes that the United States and India are signatories to the

Hague Convention, or that service via the Hague Convention is the appropriate means for

effecting service of process upon the Maytas Defendants.  Courts recognize that once a plaintiff

initiates service via the Hague Convention, "the timing of service is out of [the] plaintiff's

control," and the plaintiff is not subject to penalty for any delay in effectuating service.  In re S.

African Apartheid Litig., 643 F. Supp. 2d 423, 433 (S.D.N.Y. 2009).  Service via the Hague

Convention has begun, and that is all that is required under the rules.  Indeed, the Maytas

Defendants themselves spell out the steps required for proper service under the Hague

Convention.  (Maytas Properties Brief at 19-20.)  They nowhere claim that Aberdeen failed to

follow any of those steps.

   The Maytas Defendants seek to portray Aberdeen as a dilatory plaintiff who filed

a lawsuit long ago and has since made no attempt to serve the defendants.  To the contrary,

Aberdeen has diligently pursued service upon the Maytas Defendants as follows:

    • Aberdeen filed its Complaint on Friday, November 13, 2009.

---

[50]  Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial
Matters (the "Hague Convention"), Feb. 10, 1969, 20 U.S.T. 361.

- Four days later, on November 17, 2009, Aberdeen sent requests for waiver of service to the Maytas Defendants.

- On December 29, 2009, Aberdeen filed its First Amended Complaint.

- Two weeks later, having received no response from the Maytas Defendants as to its requests for waiver of service, Aberdeen initiated service upon the Maytas Defendants via the Hague Convention.

- On August 18, 2010, having received no response from the Ministry of Law and Justice, Aberdeen followed up with the designated contact persons at the Ministry of Law and Justice via email.

- On June 15, 2011, Aberdeen again followed up with the Ministry of Law and Justice, via letter.[51]

Aberdeen has discharged its obligation to effect service on the Maytas Defendants.

The cases cited by the Maytas Defendants for the proposition that the time to serve has elapsed are patently distinguishable. Yellowave Corp. v. Mana, 00-2267, 2000 WL 1508249, at *2 (S.D.N.Y. Oct. 11, 2000), dealt with service on a foreign defendant where "plaintiff [had] not allege[d] that it made any effort to serve" him. In contrast, there is no dispute that Aberdeen long ago initiated service against the Maytas Defendants under the Hague Convention. Yellowave has no application to the facts of this case. The other cases cited by the Maytas Defendants are equally inapposite. See Ocasio v. Fashion Institute of Tech., 86 F. Supp. 2d 371, 375-76 (S.D.N.Y. 2000) (dismissal for lack of service pursuant on a domestic defendant, not a foreign defendant; international service via Hague Convention not at issue); Armstrong v. Sears, 33 F.3d 182, 188 (2d Cir. 1994) (dismissal for failure of service reversed on appeal; no service on international defendant through Hague Convention at issue); Santos v. State Farm Fire & Cas. Co., 902 F.2d 1092, 1095-96 (2d Cir. 1990) (dismissal for failure of service reversed on appeal due to defendant's waiver of issue; no service on international defendant through Hague

---

[51] See Kelleher Decl. ¶¶ 6-13.

Convention at issue); <u>McKibben v. Credit Lyonnais</u>, No. 98-3358, 1999 WL 604883 (S.D.N.Y. Aug. 10, 1999) (no service on international defendant through Hague Convention at issue); <u>Delicata v. Bowen</u>, 116 F.R.D. 564 (S.D.N.Y. 1987) (same); <u>Burks v. Griffith</u>, 100 F.R.D. 491 (N.D.N.Y. 1984) (same).

The Maytas Defendants also present their service argument under the guise of a statute of limitations defense.  (Maytas Brief at 22.)  None of the cases cited, however, stands for the proposition that a statute of limitations runs on claims where service of the complaint has been properly initiated by means of the Hague Convention.  <u>See</u> <u>Bomar v. Keyes</u>, 162 F.2d 136 (2d Cir. 1947) (no foreign defendant or Hague Convention service at issue; and holding, in fact, that "it is the filing of the complaint which tolls the statute"); <u>Salahuddin v. Harris</u>, 657 F. Supp. 369 (S.D.N.Y. 1987) (same); <u>United States v. Jack Cozza, Inc.</u>, 106 F.R.D. 264 (S.D.N.Y. 1985) (same); <u>Gleason v. McBride</u>, 869 F.2d 688 (2d Cir. 1989) (same).

The Maytas Defendants have neither a colorable statute of limitations defense nor one grounded on allegations of improper service.

**J.       This Court Has Personal Jurisdiction over the Maytas Defendants**

This Court has personal jurisdiction over the Maytas Defendants, each of whom was an active co-conspirator who participated in an elaborate scheme to defraud Satyam investors, including American investors.  As set forth at length in the Class Plaintiffs' opposition brief, (Class Plaintiffs' Opp. at 49-55), the allegations of the Maytas Defendants' conduct in connection with the Satyam fraud satisfy the standard for personal jurisdiction.  Similar allegations are made by Aberdeen as to the Maytas Defendants.  (<u>See</u> SAC ¶¶ 273-88.)[52]

---

[52]  In the event the Court finds Aberdeen's allegations pertaining to the Maytas Defendants' contacts with the United States incomplete in the first instance, Aberdeen respectfully requests limited discovery on the issue of personal jurisdiction for the reasons articulated in the Class Plaintiffs' Opposition.

**V.**      **Conclusion**

For the foregoing reasons, as well as those set forth in the Class Plaintiffs'

briefing, incorporated herein by reference, Aberdeen respectfully requests that the Court deny

Defendants' motions to dismiss in their entirety.

Respectfully submitted,

/s/ Keith R. Dutill
Keith R. Dutill
William E. Mahoney, Jr.
Neal R. Troum
Heather Tashman Fritts
Joseph T. Kelleher
STRADLEY, RONON, STEVENS & YOUNG, LLP
2600 One Commerce Square
Philadelphia, PA 19103-7098
(215) 564-8000
(215) 564-8120(facsimile)

Dated:  June 17, 2011          Attorneys for Plaintiff, Aberdeen Claims
                               Administration, Inc., as Trustee for Aberdeen
                               Claims Trust and Aberdeen Claims Trust II

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 17, 2011, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send notice of electronic filing to all counsel of record.

/s/ Joseph Kelleher
Joseph Kelleher

# 1378460