UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

| | |
|---|---|
| IN RE SATYAM COMPUTER SERVICES LIMITED SECURITIES LITIGATION. | : : : : 09 MD 2027 (BSJ) : : (Consolidated Action) : : |
| This document applies to: 10 Civ. 2877 (BSJ) | |

------------------------------------------------------------X


# REPLY MEMORANDUM OF PRICEWATERHOUSECOOPERS INTERNATIONAL LIMITED IN SUPPORT OF ITS MOTION TO DISMISS THE SECOND AMENDED COMPLAINT OF ABERDEEN CLAIMS ADMINISTRATION, INC.


MAYER BROWN LLP
1675 Broadway
New York, New York 10019
(212) 506-2500

MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
(312) 782-0600

Dated: July 18, 2011

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

ARGUMENT ........................................................................................................................... 2

I.    Aberdeen Has Failed to State A Claim Against PwCIL Based On Agency ........................ 2

    A.    The Supreme Court's Decision in *Janus* Precludes Aberdeen's Claim That PwCIL Is Primarily Liable Under Section 10(b) For Statements Made By Price Waterhouse That Were Not Attributed To PwCIL ........................ 2

    B.    Aberdeen Has Failed To State A Claim Based On Agency Principles ................... 6

        1.    Aberdeen Has Failed To Allege An Actual Agency Claim ......................... 6

        2.    Aberdeen Has Failed To Allege An Apparent Agency Claim .................. 10

II.    Aberdeen Has Failed To State A Control Person Claim Against PwCIL ........................ 13

CONCLUSION ..................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Allen v. Greenville Hotel Partners, Inc.*,
    409 F. Supp. 2d 672 (D.S.C. 2006) ....................................................................................7

*Anwar v. Fairfield Greenwich, Ltd.*,
    728 F.Supp.2d 372 (S.D.N.Y. 2010) ................................................................................7, 8

*Ashcroft v. Iqbal*,
    129 S. Ct. 1937 (2009) .....................................................................................................10

*In re Asia Pulp & Paper Sec. Litig.*,
    293 F. Supp. 2d 391 (S.D.N.Y. 2003) ..............................................................................14

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007) ...............................................................................................13

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) .........................................................................................................10

*Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994) ........................................................................................................2, 5

*In re CIT Group Inc. Sec. Litig.*,
    2010 U.S. Dist. LEXIS 57467 (S.D.N.Y. June 10, 2010) ..........................................13, 14

*Citiline Holdings, Inc. v. iStar Fin., Inc.*,
    701 F.Supp.2d 506 (S.D.N.Y. 2010) ..........................................................................14, 15

*Cromer Fin. Ltd. v. Berger*,
    2002 WL 826847 (S.D.N.Y. Mar. 2, 2002) ......................................................................9

*E.& J. Gallo Winery v. Encana Energy Servs., Inc.*
    2008 U.S. Dist. LEXIS 46927 (E.D. Cal. May 23, 2008) ..................................................7

*Janus Capital Group, Inc. v. First Derivative Traders*,
    180 L.Ed.2d 166 (June 13, 2011) ...................................................................................1-5

*In re Lernout & Hauspie Sec. Litig.*,
    230 F. Supp. 2d 152 (D. Mass. 2002)..............................................................................11

*Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP*,
  2004 WL 112948 (S.D.N.Y. Jan. 22, 2004) ...................................................................... 6

*In re Parmalat Sec. Litig.*,
  375 F. Supp. 2d 278 (S.D.N.Y. 2005) ............................................................................... 9

*In re Parmalat Secs. Litig.*,
  474 F.Supp.2d 547 (S.D.N.Y. 2007) ................................................................................. 5

*In re Parmalat Sec. Litig.*,
  497 F.Supp.2d 526 (S.D.N.Y. 2007) ............................................................................... 13

*In re Royal Ahold N. V. Sec. & ERISA Litig.*,
  2004 WL 2955934 (D. Md. Dec. 21, 2004) .................................................................... 12

*In re Royal Dutch/Shell Transport Sec. Litig.*,
  380 F.Supp.2d 509 (D.N.J. 2005) ................................................................................... 12

*Spagnola v. Chubb Corp.*,
  264 F.R.D. 76 (S.D.N.Y. 2010) ........................................................................................ 7

*Star Energy Corp. v. RSM Top-Audit*,
  2008 WL 5110919 (S.D.N.Y. 2008) ................................................................. 7, 8, 9, 12

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.*,
  552 U.S. 148 (2008) ......................................................................................................... 2

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
  250 F.3d 87 (2d Cir. 2001) .............................................................................................. 5

*Teachers' Ret. Sys. of LA v. A.C.L.N. Ltd.*,
  2003 WL 21058090 (S.D.N.Y. May 15, 2003) .............................................................. 11

*Triplett v. Soleil Group, Inc.*,
  664 F. Supp. 2d 645 (D.S.C. 2009) ................................................................................ 11

*Wendy Hong Wu v. Dunkin' Donuts, Inc.*,
  105 F. Supp. 2d 83 (E.D.N.Y. 2000) ................................................................................ 7

*Yung v. Lee*,
  2002 WL 31008970 (S.D.N.Y. Sept. 5, 2002), *aff'd*,
  160 Fed. Appx. 37 (2d Cir. 2005) ................................................................................... 15

**INTRODUCTION**

It is undisputed that the audit opinions at issue in this case were signed by an Indian audit firm (Price Waterhouse), in its own name and without any indication that it was speaking on behalf of the international membership organization to which it belongs (PwCIL). Although Aberdeen insists that Price Waterhouse should be deemed to have audited Satyam's financial statements as PwCIL's agent, it does not allege that Price Waterhouse and PwCIL ever agreed to such an arrangement, nor does it identify any statements that PwCIL ever made that supposedly led Aberdeen's investors to believe that an agency arrangement existed. For the reasons outlined in Part II below, Aberdeen's allegations are woefully insufficient to state a claim based on either an actual or apparent agency theory. That requires dismissal of Aberdeen's Section 10(b) and state law claims against PwCIL.[1] Aberdeen's Section 10(b) claim against PwCIL fails for an even more fundamental reason: regardless of the merits of its agency claim, under the Supreme Court's recent decision in *Janus Capital Group, Inc. v. First Derivative Traders*, 180 L.Ed.2d 166 (June 13, 2011), PwCIL cannot be liable under Section 10(b) because it did not make the statements that Aberdeen challenges, nor were those statements attributed to it. *See* Part I below.

That leaves only Aberdeen's control person claim under Section 20(a) against PwCIL. That claim fails because Aberdeen has not come close to alleging particularized facts giving rise to a strong inference that PwCIL culpably participated in Price Waterhouse's alleged misconduct and because Aberdeen has failed to allege a plausible basis for concluding that PwCIL controlled Price Waterhouse's conduct of the Satyam audit. *See* Part III, below.

---

[1] Those claims also fail for a variety of other reasons described in the Indian member firms' briefs.

1

# ARGUMENT

I. **Aberdeen Has Failed To State A Claim Against PwCIL Based On Agency.**

  A. **The Supreme Court's Decision in *Janus* Precludes Aberdeen's Claim That PwCIL Is Primarily Liable Under Section 10(b) For Statements Made By Price Waterhouse That Were Not Attributed To PwCIL.**

Under the Supreme Court's decisions in *Central Bank* and *Stoneridge*, only the person who actually ***makes*** an alleged misstatement can be held primarily liable under Section 10(b); primary liability cannot be based upon a defendant's participation in the creation of the alleged misstatement unless the statement is ***attributed*** to that defendant. *See* PwCIL Opening Br. [Ct. Doc. # 108] at 17-18. If there were any doubt about these basic principles, *Janus* eliminated it.

The issue in *Janus* was whether a mutual fund adviser (Janus Capital Management LLC or JCM) could be held primarily liable under Section 10(b) for alleged misstatements made in prospectuses issued by the Janus Investment Fund, which was one of a number of mutual funds created by JCM's parent. The plaintiff alleged that JCM had participated in drafting and disseminating the prospectus, and the district court concluded that it was reasonable to infer that investors would understand that the adviser had played an important role in the creation of those documents. Nevertheless, the Court held that JCM could not be sued under Section 10(b) because the Fund alone was the maker of the alleged misstatements statements and nothing in the prospectuses attributed any statements to JCM.

In reaching that conclusion, the Court drew a bright line between the person or entity who makes the statement and a person who merely contributes to or in some way influences what is said. Only the maker of the statement can be held liable under Section 10(b). "For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." 180 L.Ed.2d at 175.

2

In deciding whether a person qualifies as the maker of a statement, attribution is key: "in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by — and only by — the party to whom it is attributed." *Id.*

Applying these principles to the facts alleged in *Janus*, the Court concluded that the Section 10(b) claim against JCM had been properly dismissed and that plaintiff was limited to pursuing only a control person claim against JCM under Section 20(a). The Court noted that the Fund alone had the statutory obligation to file its prospectuses with the SEC and that the prospectuses themselves identified the Fund as the speaker. There was nothing "on the face of the prospectuses [to] indicate that any statements therein came from JCM rather than Janus Investment Fund — a legally independent entity with its own board of trustees." *Id*. at 177-78. For the same reason, the Court rejected the argument that JCM should be deemed to have been speaking indirectly through the Fund: "none of the statements in the prospectuses were attributed, explicitly or implicitly, to JCM. Without attribution, there is no indication that Janus Fund was quoting or otherwise repeating a statement originally 'made' by JCM." *Id*. at 178 n.11. The Court observed that "[m]ore may be required to find that a person or entity made a statement indirectly, but attribution is necessary." *Id*.

The Court also rejected the argument that an investment adviser should always be deemed to be speaking when a mutual fund issues a prospectus because of the "'well-recognized and uniquely close relationship between a mutual fund and its investment adviser,'" which gives advisers "significant influence over their client funds." *Id*. at 176-77. Under the Court's opinion, the fact that the market may have believed that the adviser played a significant role in drafting the prospectuses was irrelevant. What was important was that the adviser and the Fund "remain legally separate entities" and that only the Fund actually spoke to investors. *Id*. at 177. The

3

Court "decline[d] [the plaintiff's] invitation to disregard the corporate form" by allowing the plaintiff to pursue a Section 10(b) claim against the adviser for statements made by the Fund. *Id*. It also declined plaintiff's invitation to make advisers automatically responsible for any statements made in Fund prospectuses. The Court explained that "[a]ny reapportionment of liability in the securities industry in light of the close relationship between advisers and mutual funds is properly the responsibility of Congress and not the courts" and would violate the "narrow scope" the courts must give the private right of action under Section 10(b). *Id*. at 177, 176.

Finally, the Court explained that the judiciary should not stretch to hold a person or entity who was not a speaker primarily liable in light of Congress' decision to create "control person" liability in Section 20(a):

> Congress also has established liability in §20(a) for '[e]very person who, directly or indirectly, controls any person liable' for violations of the securities laws. 15 U.S.C.A. §78t(a). [Plaintiff's] theory of liability based on a relationship of influence resembles the liability imposed by Congress for control. To adopt [plaintiff's] theory would read into Rule 10b-5 a theory of liability similar to — but broader in application than — what Congress has already expressly created elsewhere. We decline to do so.

*Id*. at 177 (internal citation & footnote omitted).

*Janus* plainly requires dismissal of Aberdeen's Section 10(b) claim against PwCIL. As in *Janus*, it is undisputed that Price Waterhouse and PwCIL are separate legal entities,[2] that Price Waterhouse had the legal obligation, as the auditor, to sign the audit opinions, and that it did so in its own name. Nothing in the Satyam audit opinions attributes any statement to PwCIL, nor

---

[2] Aberdeen has alleged that the Indian member firms are alter egos of each other (SAC ¶ 70), but it makes no such allegation with respect to PwCIL and its Indian member firms. Furthermore, Aberdeen's agency theory necessarily presumes that PwCIL and the Indian audit firm are separate and that one was acting as the agent of the other.

4

do the opinions suggest that Price Waterhouse was acting on behalf of PwCIL.[3]  Aberdeen asserts that Price Waterhouse and PwCIL were closely related, that PwCIL had the ability to influence and control Price Waterhouse's audit work, and that unidentified investors may have believed that PwCIL was involved in or even controlled the audit.  But under *Janus*, allegations that PwCIL influenced or controlled Price Waterhouse behind the scenes, without making any statement itself, are insufficient to state a claim under Section 10(b), as are allegations that investors believed the speaker (Price Waterhouse) was acting on behalf of PwCIL.

As the Court observed in *Janus*, any other result would create a new and much broader cause of action for influencing or controlling the speaker that would supplant the remedy that Congress expressly provided in Section 20(a). 180 L.Ed.2d at 175.  That is certainly true here.  Aberdeen seeks to hold PwCIL vicariously liable under Section 10(b) for statements that Price Waterhouse made, without having to prove a crucial element of a Section 20(a) claim in this Circuit — that PwCIL was a "culpable participant" in Price Waterhouse's alleged misconduct.  Under *Janus*, such a claim fails as a matter of law.[4]

---

[3] *Janus* strongly suggests that Abderdeen cannot pursue **both** the Indian audit firm and PwCIL under Section 10(b). The Court observed that "[o]ne who prepares or publishes a statement on behalf of another is not its maker."  180 L.Ed.2d at 175.  If Price Waterhouse had been speaking on behalf of PwCIL as its agent, Aberdeen would therefore not be able to sue Price Waterhouse under Section 10(b). And because Aberdeen alleges that PwCIL controlled Price Waterhouse, rather than the other way around, it could not sue Price Waterhouse under a control person theory either.  Thus, Aberdeen's agency theory would lead to the absurd conclusion that the audit firm that issued the opinion could not be sued at all under the federal securities laws.

[4] In response to PwCIL's *Central Bank* argument, Aberdeen relied (at 38 n.28) on *In re Parmalat Secs. Litig.*, 474 F.Supp.2d 547, 551 (S.D.N.Y. 2007), which held that *Central Bank* did not preclude a plaintiff from suing Grant Thornton International under Section 10(b) for audit opinions issued by its Italian member firm. The reasoning in *Parmalat* has been superseded by *Janus*.  In any event, it is unpersuasive.  *Parmalat* relied on a Second Circuit decision that arose out of a very different context — where a company invoked *Central Bank* in an attempt to avoid primary liability for misstatements made by one of its own employees while acting on behalf of the corporation. *See Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001).  In *Suez Equity*, there was never any question but that the employee was speaking on behalf of his employer and therefore the corporation in fact "made" the statement.  As the Court pointed out, "[a] corporation can only act through its employees and agents." *Id*.  Here, by contrast, there was no indication that the member firm was acting as the agent of the organization to which it belonged and thus no basis for treating that organization as "making" the alleged misstatement.

5

### B.     Aberdeen Has Failed To State A Claim Based On Agency Principles.

In any event, all of Aberdeen's vicarious liability claims against PwCIL (including its state law claims) should be dismissed because Aberdeen has not pleaded a plausible agency theory. Remarkably, nowhere in its response does Aberdeen even discuss, let alone show that it has satisfied, the elements it must plead and prove to state a claim against PwCIL under an agency theory.  Indeed, Aberdeen still does not even bother to explain whether it is proceeding under a theory of actual or apparent agency.  Instead, Aberdeen tries to persuade the Court that it has stated a claim by grossly exaggerating its own allegations in the vain hope that its rhetoric will obscure its failure to allege *facts* to support its assertion that Price Waterhouse audited Satyam's financial statements as PwCIL's actual or apparent agent.

#### 1.     Aberdeen Has Failed To Allege An Actual Agency Claim.

Aberdeen does not dispute that, to plead an actual agency claim, it must allege three elements: "(1) the manifestation by the principal that the agent shall act for him; (2) the agent's acceptance of the undertaking; and (3) an understanding between the parties that the principal is to be in control of the undertaking." *Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP*, 2004 WL 112948, at *4 (S.D.N.Y. Jan. 22, 2004).  Yet Aberdeen does not even argue (1) that PwCIL ever authorized Price Waterhouse to act for it in auditing Satyam or (2) that Price Waterhouse ever accepted such an undertaking. This alone means that any actual agency claim must be dismissed — without even considering whether Aberdeen has pleaded facts sufficient to show that the Satyam audits were performed under PwCIL's control.  *See* PwCIL Opening Br. at 9-10.

Aberdeen's "control" argument also fails as a matter of law. Aberdeen relies heavily on its allegations of "general" control — that is, that PwCIL's promulgation and monitoring of

quality standards and the use of a common name and brand is sufficient to demonstrate that PwCIL controls *all* of its member firms. A "plethora" of cases, which Aberdeen largely ignores, rejects this approach. *See Anwar v. Fairfield Greenwich, Ltd.*, 728 F.Supp.2d 372, 459 (S.D.N.Y. 2010); PwCIL Opening Br. at 10-13. Those cases hold that, to state a claim based on an actual agency theory, plaintiffs must be able to plead facts showing that the umbrella association exercised "specific" control over the audit at issue. *Id*. That means Aberdeen would have to plead facts from which the Court could "infer sufficient involvement by the [alleged] principal in the preparation of the audits at issue" to show that PwCIL controlled the Satyam audit. 728 F.Supp.2d at 460. *See also Star Energy Corp. v. RSM Top-Audit*, 2008 WL 5110919, at *3 (S.D.N.Y. 2008) (the "central element necessary to sustain a claim of vicarious liability" was "that RSM International was in control of RSM Top Audit in its business dealings with Star Energy").[5] That is a burden that Aberdeen has not met.

Aberdeen argues that its Second Amended Complaint meets the standard for "specific control" set forth in *Anwar*, claiming that Price Waterhouse was "under constant supervision by" PwCIL, that "[t]here was hardly an aspect of [Price Waterhouse's] business that PwCIL did not

---

[5] The same principle is applied in analogous contexts. Corporate parents are not liable for the alleged misconduct of their subsidiaries simply because the parent strives to improve the corporate brand and has the ability to set and enforce standards for its subsidiaries. *E.& J. Gallo Winery v. Encana Energy Servs., Inc.* 2008 U.S. Dist. LEXIS 46927 at *31 (E.D. Cal. May 23, 2008). Instead, it is only in the rare instance when a parent corporation "move[s] beyond the establishment of general policy and direction for the subsidiary and in effect take[s] over performance of the subsidiary's day-to-day operations in carrying out that policy" that courts will conclude that the subsidiary has become an agent of the parent. *Id.*; *see also Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 88-89 (S.D.N.Y. 2010) ("[a]lthough a parent corporation may be held accountable for the wrongs of its subsidiary under an agency theory, courts have long ago concluded that such a finding is remote"). Similarly, "the quality and operational standards and inspection rights contained in a franchise agreement"—which are designed to protect the trade name and the network of franchised operations—"do not establish a franchisor's control or right of control over the franchisee sufficient to ground a claim for vicarious liability as a general matter." *Allen v. Greenville Hotel Partners, Inc.*, 409 F. Supp. 2d 672, 677 (D.S.C. 2006) (internal quotation and citation omitted); *accord*, *Wendy Hong Wu v. Dunkin' Donuts, Inc.*, 105 F. Supp. 2d 83, 88 (E.D.N.Y. 2000) (requiring licensees or franchisees to comply with quality standards does not create a principal-agent relationship). PwCIL and Price Waterhouse have neither a parent/subsidiary nor a franchisor/franchisee relationship, but the principles adopted in these cases are nevertheless instructive here.

review and control," and that "PwCIL Global Risk Partner Steven Derrick took charge" "on multiple occasions," "directing" the audit team in connection with inquiries by the PCAOB and Satyam's SEC filings. Aberdeen Opp. at 2, 35, 7. In so arguing, Aberdeen grossly exaggerates the factual allegations in its own complaint. The SAC contains no factual allegations suggesting that PwCIL ever supervised Price Waterhouse's daily affairs, let alone that it controlled Price Waterhouse's conduct of the Satyam audit. Instead, Aberdeen tries to transform its allegations of "general" control into a claim of "specific" control by simply *assuming* that PwCIL used its power to promulgate and monitor quality standards to control Price Waterhouse's day-to-day activities. Under *Anwar* and *Star Energy*, that kind of sleight-of-hand fails as a matter of law.

The only link between PwCIL and Price Waterhouse's work for Satyam that Aberdeen alleges in the SAC is provided by Aberdeen's allegations regarding Steven Derrick. But the complaint does *not* allege (as Aberdeen argues in its brief) that PwCIL or Mr. Derrick took control of or directed any aspect of Price Waterhouse's Satyam engagement. Instead, it claims only that Mr. Derrick "was *notified* and *consulted* in connection with the Satyam audits." SAC ¶ 81 (emphasis added). Furthermore, Aberdeen's factual allegations show that the "consultation" was brief and did *not* involve the Satyam audits themselves, the sufficiency of the audit procedures Price Waterhouse was utilizing, or the issuance of Price Waterhouse's opinion. *See* Opening Br. at 5-6, 13-14. That Price Waterhouse may have consulted with PwCIL on discrete issues is unexceptional and does not come close to providing a plausible basis for Aberdeen's claim that PwCIL controlled Price Waterhouse's conduct of the Satyam audit.

Unable to point to any contemporaneous facts showing that PwCIL controlled Price Waterhouse's audit work before the Satyam scandal broke, Aberdeen relies on what happened afterward. Citing one of the *Parmalat* decisions, Aberdeen argues (at 36) that after-the-fact

8

conduct can sometimes provide a basis for inferring that an organization like PwCIL controlled its member firm before any problems surfaced. But, as Judge Chin concluded in *Star Energy*, the fact that a membership organization reacts to the disclosure of a problem and even takes remedial measures provides no basis to infer that the organization was controlling its member firm's conduct at the crucial point in time. 2008 WL 5110919, at *5.[6]

Furthermore, that — after the scandal broke — PwCIL's CEO or Chairman referred to Price Waterhouse's partners as "our" partners, used the word "we" in talking about Price Waterhouse with reporters, or generally expressed regret about the entire Satyam situation does not provide a plausible basis for inferring that PwCIL controlled Price Waterhouse's conduct of the Satyam audit. *See* PwCIL Opening Br. at 6-7, 14-15. Aberdeen argues that the significance of these statements is a question of fact that a jury should consider, citing *Cromer Fin. Ltd. v. Berger*, 2002 WL 826847 (S.D.N.Y. Mar. 2, 2002). But *Cromer* involved a very different, and very unusual situation, where a representative of Deloitte's international umbrella organization had been in charge of the audit plaintiff was challenging and had actually signed the audit opinion in question. There are no remotely comparable facts alleged here.

*Iqbal*, *Twombly* and the PSLRA are all designed to ensure that defendants are not subjected to costly and unnecessary discovery based on the mere hope that the plaintiff will be

---

[6] *In re Parmalat Sec. Litig.*, 375 F. Supp. 2d 278, 301-02 (S.D.N.Y. 2005), which Aberdeen cites, focuses on the fact that Grant Thornton International had first suspended the Italian audit partners and then expelled its Italian member firm from the Grant Thornton network after the firm was implicated in a scandal much like Satyam. Judge Kaplan concluded that the fact that GTI was able to discipline a member firm in this way was an indicator of control for purposes of pleading an agency relationship. *Id*. *Parmalat* is factually distinguishable. There is no claim here that PwCIL suspended or expelled Price Waterhouse; as noted in PwCIL's Opening Brief (at 6 n.8), Aberdeen's allegation that PwCIL's CEO suspended the Price Waterhouse partners in charge of the Satyam audit ignores the very newspaper sources that Aberdeen must have been relying upon, which clearly show that it was Price Waterhouse, rather than PwCIL, that suspended those partners. In any event, Judge Kaplan's reliance on after-the-fact events cannot be reconciled with Judge Chin's decision in *Star Energy*, which represents the better and more logical view. That a member firm is subsequently disciplined for engaging in misconduct does not provide any basis for inferring that the membership organization controlled that conduct.

9

able to identify some factual basis for its claims.  In this case, Aberdeen has not offered any plausible factual basis for believing that Price Waterhouse and PwCIL actually agreed and understood that Price Waterhouse would audit Satyam as PwCIL's agent. Indeed, such a claim is utterly implausible: as the very website Aberdeen relies upon explains, the network is structured so that individual member firms, which are independent legal entities composed of locally-licensed professionals, are responsible for conducting audits in their local markets. *See* PwCIL Opening Br. at 5.

### 2. Aberdeen Has Failed To Allege An Apparent Agency Claim.

Much of the rhetoric in Aberdeen's brief suggests that its real theory is not that there was an actual agency created by an agreement between PwCIL and Price Waterhouse, but rather that PwCIL led investors to believe that an agency relationship existed. *See, e.g.*, Aberdeen Opp. at 34 (arguing that PwCIL "holds itself out as a global organization" such that "the public" would view PwCIL and its Indian member firms as "fundamentally connected").  As our opening brief demonstrated (at 15), to state a claim under an apparent agency theory, Aberdeen must show (1) that PwCIL held Price Waterhouse out to investors as its agent and (2) that the investors whose claims Aberdeen is pursuing relied on the fact that Price Waterhouse was PwCIL's agent in purchasing Satyam securities.  Aberdeen has not met either requirement.

Aberdeen appears to argue that the marketing of the "PwC" brand and of the global network of member firms is enough by itself to demonstrate the necessary "holding out."  But, as we argued in our opening brief (at 5, 16), the very website on which Aberdeen relies explains that audits are conducted by locally-owned and operated firms, all of which are separate entities. And case law holds that this kind of "express declaration that each member . . . is a 'separate and independent legal entity'" "precludes any reasonable inference of apparent authority." *In re*

10

*Lernout & Hauspie Sec. Litig.*, 230 F. Supp. 2d 152, 173 n.17 (D. Mass. 2002); *see also Triplett v. Soleil Group, Inc.,* 664 F. Supp. 2d 645, 656-57 (D.S.C. 2009) (franchisor did not "hold out" hotel as a property it owned where, among other things, the franchisor's website and business cards disclosed that some hotels were independently owned by franchisees). Aberdeen ignores this case law and tries to brush off the explanations that appear on the PwC website as "fine print." Aberdeen Opp. at 32. But the "fine print" matters, just as the separate corporate identities of the adviser and the mutual fund mattered in the *Janus* case.

Rather than addressing the facts and the relevant law, Aberdeen relies (at 33) on a quote pulled out of context from *Teachers' Ret. Sys. of LA v. A.C.L.N. Ltd.*, 2003 WL 21058090, at *1 n.4 (S.D.N.Y. May 15, 2003), a case that provides no support whatsoever for Aberdeen's position here. The plaintiff there alleged, among other things, that BDO International "represent[ed] to the public that its member firms are its representatives," required its member firms to use the BDO International logo, and knew that member firms actually signed audit opinions in the name "BDO International." *Id.* at *2, 6. Audit clients could choose to retain only a local BDO member firm; when they did so, only that firm would sign the audit opinion. *Id.* at *5. The company whose financial statements were at issue in *Teachers'* had specifically retained BDO International and consistently identified its auditor over a number of years as "BDO International." *Id.* at *2.

There are no comparable allegations here. It is indisputable that the name on the audit opinion is that of the Indian firm and not PwCIL. Satyam never claimed that PwCIL was its auditor, nor did Price Waterhouse purport to sign audit opinions on PwCIL's behalf. Furthermore, although marketing materials describe the global reach of the PwC network of member firms, the materials did not hold the network out as a single legal entity as BDO

11

International allegedly did.  Instead, the most Aberdeen can say is that the PwC member firms described themselves as participating in a single network in which the member firms — all of which are separate legal entities — shared a common brand and common quality standards. Aberdeen Opp. at 33. But it is "well recognized" that members of an international accounting association are not agents or partners of each other simply because they participate in such a global network. *See In re Royal Ahold N. V. Sec. & ERISA Litig.*, 2004 WL 2955934, at *36 n.41 (D. Md. Dec. 21, 2004); *In re Royal Dutch/Shell Transport Sec. Litig.*, 380 F.Supp.2d 509, 571 (D.N.J. 2005) (same); *see also Star Energy*, 2008 WL 5110919, at *4 (that RSM International "'advertises itself as one combined organization'" was irrelevant because "[a] principal-agent relationship cannot be found on such general assertions").[7]

Second, despite twice amending its complaint, Aberdeen has still failed to allege that ***any*** (let alone all) of the sophisticated investors it represents believed that Price Waterhouse was auditing Satyam's financial statements as PwCIL's agent and reasonably relied on that belief in purchasing Satyam securities. The closest Aberdeen comes to addressing the issue of reliance is to quote (at 33) the Class Plaintiffs' argument that Satyam was too big for anyone to believe that it was being audited by a 20-member Indian firm "located in the hills outside Hyderabad that just happened to be called 'Price Waterhouse." But, as the Class Plaintiffs themselves acknowledged, Indian law "prohibit[s] multinational accounting firms from being registered in India as auditors. . . . As a result of this rule, auditing in India is typically conducted by local firms regulated by the Institute of Chartered Accountants of India, which then join networks of larger accounting

---

[7] Aberdeen argues (at 32-33) that PwCIL should not be able to promote the cohesive nature of the PwC network and then, when a member firm is involved in a fraud, "claim that it is a random collection of far-flung satellite entities" and that PwCIL had "little connection" with its Indian member firms.  This is another example of Aberdeen's exaggerated rhetoric.  PwCIL has never denied its relationship to Price Waterhouse or any other member firm.  The issue here, however, is not how "close" the entities are, but rather whether PwCIL led investors to believe that its member firms in general or Price Waterhouse in particular acted as its agents and that PwCIL was in charge of the audits undertaken by those firms.  Aberdeen has not alleged any facts to support such a theory.

12

firms." Class Compl. ¶ 43(a). Furthermore, the audit opinions themselves made it abundantly clear that the auditor was indeed the Indian firm of "Price Waterhouse," which signed the audit opinions at "Secunderabad, India" or "Hyderabad, India." *See* Ex. A to España Decl. [Ct. Doc. # 107]. Under these circumstances, it would not have been reasonable for any investor to assume that PwCIL was the auditor or that Price Waterhouse was somehow acting on its behalf. However, the Court need not address the reasonableness issue because Aberdeen's complaint is devoid of any allegation of reliance, whether reasonable or not. That alone is enough to require dismissal of any apparent agency claim.

## II.     Aberdeen Has Failed To State A Control Person Claim Against PwCIL.

Aberdeen has also failed to allege a control person claim against PwCIL. As this Court held in *In re CIT Group Inc. Sec. Litig.*, 2010 U.S. Dist. LEXIS 57467, at *15 (S.D.N.Y. June 10, 2010), culpable participation is an element of a Section 20(a) claim and "[t]herefore, to withstand a motion to dismiss, a Section 20(a) claim must allege, at a minimum, particularized facts of the controlling person's conscious misbehavior or recklessness."[8] Aberdeen's allegations against PwCIL fall woefully short of meeting this standard.

In support of its claim that it has properly pleaded culpable participation, Aberdeen first quotes its conclusory allegation that PwCIL had "access" to all of Satyam's statements and supposedly had "the ability to prevent the issuance or cause the statements to be corrected." SAC ¶ 346. Then it says (at 44) that PwCIL was "directly involved in the audits in question" and therefore must have been "at least reckless in not uncovering the fraud." For the reasons

---

[8] Aberdeen suggests in a footnote (at 41 n.31) that this Court should reconsider its conclusion that culpable participation is an element of a Section 20(a) claim, despite the fact that the Second Circuit specifically endorsed that position in *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007). The only post-*ATSI* case from this Circuit that Aberdeen is able to cite in support of its argument is *In re Parmalat Sec. Litig.*, 497 F.Supp.2d 526, 532 (S.D.N.Y. 2007), in which Judge Kaplan refused to follow *ATSI* on the ground that the Second Circuit's identification of culpable participation as an element of a Section 20(a) claim was "dictum."

13

outlined above, Aberdeen's allegations do not show that PwCIL was directly involved in the Satyam audits. Nor do they show that PwCIL was aware of, let alone participated in, any claimed wrongdoing by Price Waterhouse. On the contrary, the two emails from Steven Derrick that Aberdeen quotes show that he believed and expected that Price Waterhouse would act properly. *See* SAC ¶ 81 ("I am extremely interested, as we all are, in providing the PCAOB a timely and accurate response") ("PwC needs to ensure that it is satisfied with the final conclusion on this matter while trying to do so within deadlines, but no matter what the deadlines").

Significantly, despite having obtained access to a large number of internal documents, Aberdeen still has not identified a single document that PwCIL allegedly saw that contained information contradicting Satyam's financial statements. Aberdeen's general assertion that PwCIL had access to such information is not enough to meet its burden. As this Court explained in *CIT Group, Inc.*, "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." 2010 U.S. Dist. LEXIS 57467 at *13 (internal quotations and citation omitted). Aberdeen has not even attempted to meet that burden.

Aberdeen also claims that it has alleged a sufficient basis for treating PwCIL as a control person of Price Waterhouse. But the promulgation and monitoring of quality standards, along with the promotion of a common brand, is not enough to establish "control" for purposes of Section 20(a). *See, e.g.*, *In re Asia Pulp & Paper Sec. Litig.*, 293 F. Supp. 2d at 396; PwCIL Opening Br. at 22-23. Aberdeen cites cases, including *Citiline Holdings, Inc. v. iStar Fin., Inc.*, 701 F.Supp.2d 506, 516-17 (S.D.N.Y. 2010), in which courts have held that plaintiffs suing corporate officers or directors had sufficiently alleged control. Aberdeen Opp. at 43. But in those cases the defendants clearly had the ability to control the primary actor because of their

14

positions and the plaintiffs alleged that the officers or directors had actually exercised that power.  *Citiline Holdings*, 701 F.Supp.2d at 516-17.  Here, by contrast, the SAC provides no basis for believing that PwCIL had the power to control the professional judgments Price Waterhouse made during the course of its audit work for Satyam or that it ever attempted to do so.  Thus, Aberdeen has failed to plead the necessary element of control.

## CONCLUSION

For the foregoing reasons, and the reasons set forth in PwCIL's opening brief and in the briefs filed by the Indian member firms, Aberdeen's claims against PwCIL should be dismissed with prejudice.

Aberdeen notes in its Opposition that PwCIL has not joined in the *forum non conveniens* motion filed by its Indian member firms and has not specifically consented to be sued in an Indian court.  PwCIL agrees that this case belongs in India.  But Aberdeen has utterly failed to state a claim against PwCIL, which should therefore be dismissed from the case before there is any ruling on the forum motion.  *See Yung v. Lee*, 2002 WL 31008970 (S.D.N.Y. Sept. 5, 2002), *aff'd*, 160 Fed. Appx. 37 (2d Cir. 2005) (dismissing BDO Seidman from securities fraud action for failure to state a claim and then granting *forum non conveniens* motion filed by the remaining BDO defendants, in favor of a Hong Kong forum).

Dated: July 18, 2011  
New York, New York

Respectfully submitted,

MAYER BROWN LLP

By: /s/ Mauricio A. España  
1675 Broadway  
New York, New York 10019  
(212) 506-2500

15

Stanley J. Parzen
Michele Odorizzi
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
(312) 782-0600

*Counsel for PricewaterhouseCoopers International Limited*

700277586