**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------x
                                        :
In re SATYAM COMPUTER SERVICES LTD.     :        09 MD 2027
SECURITIES LITIGATION                   :          (BSJ)
                                        :
                                        :    **Opinion and Order**
----------------------------------------x

**BARBARA S. JONES**
**UNITED STATES DISTRICT JUDGE**

This case arises out of a massive fraud at Satyam Computer

Services Ltd. ("Satyam" or the "Company"), involving thousands

of forged invoices, business contracts and bank statements, dual

sets of account books, and SEC filings overstating the Company's

assets by a total of more than $1 billion. Before the Court are

motions to dismiss two related complaints. The first is a

consolidated class action against Satyam, certain officers and

outside directors, the Company's outside auditors, and other

entities, alleging violations of sections 10(b) and 20(a) of the

Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§

78j(b) and 78t(a), SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ("Rule

10b-5"), and sections 11, 12(a)(2) and 15 of the Securities Act

of 1933 ("Securities Act"), 15 U.S.C. §§ 77k, 77l(a)(2), and 77o

(the "Class action").[1] The second is an action brought by

---

[1] Three inside directors ("Officer Defendants") are named as the
principal perpetrators of the fraud: Byrraju Ramalinga Raju ("Ramalinga
Raju"), Byrraju Rama Raju ("Rama Raju"), and Vadlamani Srinivas.

Several members of the Company's Audit Committee ("AC Defendants") are
also named in the Class action: Mangalam Srinivasan ("Srinivasan"),
Krishna G. Palepu ("Palepu"), M. Rammohan Rao ("Rao"), T.R. Prasad, and
V.S. Raju.

Aberdeen Claims Administration, Inc., on behalf of investors in

Aberdeen Claims Trust and Aberdeen Claims Trust II, against

Satyam, the Officer Defendants, the PwC Defendants, and the

Maytas Defendants, alleging violations of sections 10(b) and

20(a) of the Exchange Act and Rule 10b-5 and common law claims

for fraud, negligence, and negligent misrepresentation

("Aberdeen action"). The Director Defendants have moved to

dismiss the Exchange Act and Securities Act claims against them

in the First Amended Consolidated Class Action Complaint

("FACC")[2], and the Maytas Defendants have moved to dismiss the

section 20(a) claim asserted against them in the FACC and the

section 20(a) and common law claims asserted against them in

Aberdeen's Second Amended Complaint ("SAC").[3] For the reasons

---

Securities Act violations have been brought against the following
outside directors ("SA Defendants"): Srinivasan, Palepu, Rao, Vinod K.
Dham, and Ram Mynampati.

Various PricewaterhouseCoopers entities ("PwC Defendants") provided
outside auditing services and are named as defendants:
PricewaterhouseCoopers International Ltd., PricewaterhouseCoopers LLP,
Price Waterhouse, PricewaterhouseCoopers Private Ltd., and Lovelock &
Lewes.

The "Maytas Defendants" are two companies owned by the Raju family,
Maytas Infra Ltd. and Maytas Properties, as well as Byrraju Teja Raju
and Byrraju Rama Raju Jr., who are individual insiders in the Maytas
entities and sons of Ramalinga Raju.
[2] On September 13, 2011, this Court entered judgments settling the Class
action as to Satyam and the PwC Defendants and establishing the Settlement
Class. (Dkt. Nos. 363, 364.)
[3] On July 30, 2012, the Court entered a Consent Order approving the exclusion
from the Settlement Class of Aberdeen's ordinary share-related claims. (Dkt.
No. 378.) Aberdeen's ordinary share-related claims against Satyam were
dismissed without prejudice on August 3, 2012. (Dkt. No. 138 in 10-cv-2877.)
Aberdeen's ADS-related claims are part of the Settlement Class.

2

provided below, the motions to dismiss the FACC and the SAC are
GRANTED.

## BACKGROUND[4]

### I. Prior Proceedings

On April 28, 2009, this Court consolidated a group of
actions brought by individuals and institutional investors to
hold accountable the perpetrators of the Satyam fraud. (Dkt.
No. 4.)[5] On May 12, 2009, the Court appointed the Global
Institutional Investors group[6] as Lead Plaintiff of this action
and the law firms of Grant and Eisenhofer P.A., Bernstein
Litowitz Berger & Grossman LLP, Barrow Topaz Kessler & Check
LLP, and Labaton Sucharow LLP, as Lead Counsel for the class.
(Dkt. No. 8.) On July 17, 2009, Lead Plaintiffs filed their
first Consolidated Class Action Complaint against the Company,
the Officer Defendants, the AC Defendants, the SA Defendants,
the PwC Defendants, and the Maytas Defendants. (Dkt. No. 19.)
The parties briefed Defendants' motions to dismiss that
complaint. The Class filed the FACC on February 17, 2011.
(Dkt. No. 253.)

---

[4] The following facts, unless otherwise noted, are taken from the FACC
and are assumed to be true for purposes of this motion. Facts alleged
in the SAC are included where appropriate.
[5] Unless otherwise noted, all docket references are for No. 09-MD-2027
(S.D.N.Y.).
[6] The Global Institutional Investors group was originally comprised of
Mississippi Public Employees' Retirement System, the Mineworkers Pension
Fund, SKAGEN A/S, and Sampension KP Livsforsikring A/S.

Aberdeen filed its initial complaint in the Eastern
District of Pennsylvania on November 13, 2009. (Dkt. No. 1 in
10-cv-2877.) Shortly thereafter, Aberdeen filed its First
Amended Complaint on December 12, 2009. (Dkt. No. 14 in 10-cv-
2877.) The action was transferred to the Southern District of
New York on April 12, 2010. (Dkt. No. 15 in 10-cv-2877.)
Aberdeen filed the SAC on February 18, 2010. (Dkt. No. 254.)

## II.  The Parties

### A. Plaintiffs

#### i. Lead Plaintiffs

Public Employees' Retirement System of Mississippi
("MPERS"), Mineworkers' Pension Scheme ("MPS"), SKAGEN AS
("SKAGEN"), Sampension KP Livsforsikring A/S ("Sampension")
(collectively, "Lead Plaintiffs") represent a class of investors
who (a) purchased or otherwise acquired Satyam ADSs on the New
York Stock Exchange ("NYSE") and/or (b) were investors residing
in the United States who purchased or otherwise acquired Satyam
common stock on the National Stock Exchange of India ("NSE") or
the Bombay Stock Exchange ("BSE") between January 6, 2004, and
January 6, 2009 (the "Class Period") and who were damaged by the
purportedly fraudulent conduct alleged in the FACC.

MPERS manages billions of dollars of assets for the benefit
of more than 75,000 retired public employees of the State of
Mississippi and for the future benefit of more than 250,000

4

current and former public employees. (FACC ¶ 17.) The FACC alleges that MPERS purchased Satyam common stock on Indian stock exchanges during the Class Period at artificially inflated prices and suffered damages as a result of Defendants' alleged fraudulent conduct. (FACC ¶ 17.)

The MPS is a registered pension scheme registered in the United Kingdom which pays income to more than 255,000 members in retirement. (FACC ¶ 18.) SKAGEN is a Norwegian mutual fund manager that handles billions of dollars in assets. (FACC ¶ 19.) Sampension is a Danish pension fund that manages billions of dollars in assets for the benefit of employees in the Hellerup, Denmark local government, as well as employees in the graphical arts industry. (FACC ¶ 20.) The FACC alleges that MPS, SKAGEN, Sampension, and additional named plaintiff IBEW purchased Satyam ADSs on the NYSE during the Class Period at artificially inflated prices and suffered damages as a result of Defendants' allegedly fraudulent conduct. (FACC ¶¶ 18-21.)

### ii. Additional Named Plaintiffs

International Brotherhood of Electrical Workers Local Union #237 ("IBEW") is a New York union pension fund responsible for managing approximately $30 million for the Niagara Falls, New York, electrical workers union. (FACC ¶ 21.)

Brian F. Adams ("Adams") is a former Satyam employee who participated in two of the Company's five employee stock option

5

plans in existence during the Class Period.  (FACC ¶ 22.)  Adams
purports to represent a sub-class all current and former
employees who, during the Class Period, acquired and exercised
options to purchase Satyam ADSs or ordinary shares through one
of Satyam's five employee stock options plans pursuant to the
allegedly false and misleading statements made by Defendants and
who suffered damages as a result of the fraudulent conduct
alleged in the FACC (the "sub-class").  (FACC ¶¶ 23, 342.)

    The relevant employee stock option plans are:

1) Associate Stock Option Plan ("ASOP-Ordinary"):  The plan
   offers options to purchase Satyam ordinary shares and was
   annexed as an exhibit to the Company's May 7, 2001
   Registration Statement.  Securities issued pursuant to
   the ASOP-Ordinary plan were subject to the Form F-3 filed
   by Satyam on February 25, 2005, which was last amended on
   May 9, 2005.  (FACC ¶ 340a.)

2) Associate Stock Option Plan B ("ASOP-B"):  The plan offers
   options to purchase Satyam ordinary shares and was
   annexed to the Company's Form 20-F filed on April 28,
   2006.  Securities issued pursuant to this plan were
   subject to the Form F-3 filed by Satyam on February 25,
   2005, which was last amended on May 9, 2005.  (FACC ¶
   340b.)

6

3) Associate Stock Option Plan ADS ("ASOP-ADS Plan"): The
   plan offers options to purchase Satyam ADSs and was
   attached to the Form 20-F filed on April 28, 2006.
   Securities issued pursuant to this plan were subject to
   the Form F-3 filed by Satyam on February 25, 2005, which
   was last amended on May 9, 2005. (FACC ¶ 340c.)

4) Associate Stock Option Plan-RSUs ADS ("RSU-ADS Plan"):
   This plan offers options to purchase Satyam ADSs and was
   attached to the registration statement filed on January
   12, 2007. (FACC ¶ 340d.)

5) Associate Stock Option Plan-RSUs ("RSU-Ordinary Plan"):
   This plan offers options to purchase Satyam ordinary
   shares and was filed with the Form 20-F on April 30,
   2007. (FACC ¶ 340e.)

The FACC alleges that Adams acquired options under the
ASOP-ADS and RSU-Ordinary plans, but exercised options to
purchase Satyam securities under only the ASOP-ADS plan. (FACC
¶¶ 23, 342.)

### iii. Aberdeen

Aberdeen Claims Administration, Inc. ("Aberdeen") is the
trustee for the Aberdeen Claims Trust and Aberdeen Claims Trust
II ("Trusts"), which are in turn the assignees of the rights of
the various investors in the Trusts to pursue claims in this
action. (SAC ¶¶ 24, 26.) Individuals who invested in the

7

Trusts purchased Satyam common stock on the BSE and/or the NSE, and/or purchased ADSs on the NYSE. (SAC ¶ 27.) Roughly 20 entities comprise this group of investors. (SAC ¶ 28.) In total, Aberdeen seeks recovery for the investors' losses totaling approximately $68 million resulting from the Satyam fraud. (SAC ¶ 29.)

## B. Defendants

### i. Satyam

Satyam is an Indian public company that "provides global IT and business process outsourcing services to clients in numerous industries and throughout the world[.]" (FACC ¶ 24; SAC ¶ 36-38.) During the Class Period, Satyam ordinary shares traded on the NSE and the BSE, and its ADSs were listed on the NYSE until October 2010, when the Company moved its ADS trading to the over-the-counter market. (FACC ¶ 26.) The Company settled the charges brought against it by the SEC, as well as the claims against it in the FACC.

### ii. Officer Defendants

Three former Satyam senior executives have been incarcerated in India since January 2009. (FACC ¶¶ 27-28, 30.) Ramalinga Raju founded the Company and was the Chairman of the Board of Directors (the "Board") throughout the Class Period. (FACC ¶ 27; SAC ¶ 40.) Rama Raju is Ramalinga Raju's younger brother and served as the Company's Managing Director and CEO

8

throughout the Class Period. (FACC ¶ 28; SAC ¶ 41.) Vadlamani
Srinivas ("Srinivas") was Satyam's CFO throughout the Class
Period. (FACC ¶ 30; SAC ¶ 42.) All three Officer Defendants
resigned on January 7, 2009. (FACC ¶¶ 27-28, 30; SAC ¶¶ 40-42.)

### iii. AC Defendants

As noted above, the FACC alleges section 10(b) and Rule
10b-5 violations against the following former directors of
Satyam who each, at some point during the Class Period, served
on the Company's Audit Committee.

Mangalam Srinivasan ("Srinivasan") is an expert in
international financial management and a distinguished fellow at
Harvard University's Kennedy School of Government. (FACC ¶ 50.)
She was a member of the Board from July 1991 until December 25,
2008, and she served on the Audit Committee when the Company
filed its 2004, 2005, 2006, 2007, and 2008 Form 20-Fs. (FACC ¶
50.) Srinivasan is alleged to have signed the January 12, 2007,
Registration Statement (the "2007 Registration Statement").
(FACC ¶ 429.)

Krishna G. Palepu ("Palepu") is a professor of Business
Administration and Senior Associate Dean at Harvard Business
School. (FACC ¶ 51.) He served on the Board from January 2003
until December 29, 2008, and was a member of the Audit Committee
when the Company filed its 2004, 2005, 2006, 2007, and 2008 Form

9

20-Fs.[7]  (FACC ¶ 51.)  Palepu is alleged to have signed the 2007 Registration Statement.  (FACC ¶ 429.)

M. Rammohan Rao ("Rao") was Dean of the Indian School of Business until January 8, 2009, and was a Satyam director from July 29, 2005 until December 29, 2008.  (FACC ¶ 52.)  He served on the Audit Committee when the Company filed its 2006, 2007, and 2008 Form 20-Fs, and became the Chairman of the Audit Committee in July 2007.  (FACC ¶ 52.)  Rao is alleged to have signed the 2007 Registration Statement.  (FACC ¶ 429.)

T.R. Prasad ("Prasad") is a former Cabinet Secretary and Defense Secretary of the Government of India, as well as former Chairman of the Foreign Investment Promotion Board, Secretary of Industrial Policy and Promotion, and member of the Finance Commission of India.  (FACC ¶ 53.)  He served on the Board from April 2007 until January 7, 2009, and was a member of the Audit Committee when the Company filed its 2007 and 2008 Form 20-Fs. (FACC ¶ 53.)

V.S. Raju is a former Director, Dean and Professor of the Indian Institute of Technology.  (FACC ¶ 54.)  He was a Satyam director from April 2007 until January 7, 2009, and was an Audit

---

[7] For purposes of this motion, the Court accepts the FACC's allegations concerning Palepu's service on the Audit Committee. It should be noted that Palepu's reply memorandum indicates that he left the Audit Committee in July 2005. (Palepu Reply Mem. in Support of Dir. Defs.' Mot. to Dismiss FACC, July 6, 2011, 1.)

Committee member when the Company filed its 2007 and 2008 Form 20-Fs. (FACC ¶ 54.)

The FACC alleges that these AC Defendants "were responsible for overseeing the preparation and integrity of the Company's financial statements; the engagement, performance, and compensation of the Company's independent auditors; and the adequacy and effectiveness of the Company's internal accounting and financial controls." (FACC ¶ 55.)

### iv. SA Defendants

Vinod K. Dham ("Dham") was a member of the Board "at all relevant times," and signed the 2007 Registration Statement. (FACC ¶¶ 56, 429.) He resigned from the Board on December 29, 2008. (FACC ¶ 56.)

Ram Mynampati ("Mynampati") was also a member of the Board throughout the Class Period, and he signed the 2007 Registration Statement. (FACC ¶¶ 57, 429.) During his tenure at Satyam, Mynampati was "the public face of the company in the US, particularly for interactions with investors." (FACC ¶ 57.) He resigned as Director and Interim CEO in June 2009. (FACC ¶ 57.)

Dham and Mynampati, along with Srinivasan, Palepu, and Rao, are the subjects of the sub-class's Securities Act claims.

### v. Maytas Defendants

Maytas Infra Ltd. ("Maytas Infra") is a publicly held infrastructure development, construction, and management company

11

located in India. (FACC ¶ 33.) Members of the Raju family, including Ramalinga Raju and his two sons, Teja Raju and Rama Raju Jr., held a significant financial stake in and exercised control of Maytas Infra. (FACC ¶ 33; SAC ¶ 112.) Maytas Infra had significant holdings in Satyam stock during the Class Period. (FACC ¶ 33; SAC ¶ 114.) Teja Raju was Vice Chairman of Maytas Infra during the Class Period. (FACC ¶ 35; SAC ¶ 113.)

Maytas Properties is a real estate development and management company, controlled by members of the Raju family, including Ramalinga Raju, Teja Raju and Rama Raju Jr. (FACC ¶ 34; SAC ¶ 115.) The FACC alleges that cash from the Company was funneled through Maytas Properties for the acquisition of real estate by the Raju family and in furtherance of the Raju brothers' fraudulent scheme. (FACC ¶ 34.) Rama Raju Jr. was Vice Chairman of Maytas Properties during the Class Period. (FACC ¶ 36; SAC ¶ 116.)

Together, the Maytas entities "were essential partners in the fraudulent scheme and recipients of untold sums of money misappropriated from Satyam; they were also among the tools and instrumentalities employed to perpetuate the fraud." (SAC ¶ 9.) Both the FACC and the SAC allege that the Maytas Defendants are liable as control persons under section 20(a) of the Exchange Act for the Company's fraud. (FACC ¶ 37; SAC ¶ 338.)

**III. The Alleged Fraud**

12

## A. Overview of the Officer Defendants' Scheme

Based in large part on the January 7, 2009, written confession of Ramalinga Raju, Plaintiffs allege that the PwC Defendants, Director Defendants, and Maytas Defendants were all either active participants or recklessly complicit in the massive fraudulent scheme perpetrated by the Officer Defendants and the Company. In this letter, Ramalinga Raju reported that as of September 30, 2008, Satyam's balance sheet overstated its assets by over $1 billion, fabricated interest income of $80 million, overstated its receivables by $100 million, and failed to report a debt of $260 million owed by the Company as a result of undisclosed related party loans to the Company. (FACC ¶ 79.) The FACC outlines the means by which the fraud was allegedly perpetrated, supported in large part by the investigation reports of the Indian Central Bureau of Investigation ("CBI") and hundreds of witness statements taken by CBI investigators and obtained by Lead Plaintiffs' counsel. (FACC ¶¶ 68-69.)

As part of the scheme, the Officer Defendants instructed certain Satyam employees to create fake invoices without any corresponding purchase order and to cover up the false invoices by manipulating the programming of the Company's invoice management system. (FACC ¶¶ 89-92). More than 7,000 phony invoices were generated this way, representing more than 10% of all Satyam invoices during the period. (SAC ¶ 268.) Employees

13

who helped the Officer Defendants with this part of the fraud were compensated with stock options without having to go through the proper channels. (FACC ¶¶ 94-95; SAC ¶ 271.) The Officer Defendants maintained two sets of books: one with the inflated figures and one reflecting the true sales figures. (FACC ¶ 96; SAC ¶ 269.) The employees who generated the false invoices reported to Indian authorities that they had also been instructed to destroy evidence of their fraudulent conduct. (SAC ¶ 270.)

In addition, the Officer Defendants recorded "ghost employees" on the books and diverted the salaries for these nonexistent people (as much as $4 million per month) to the Maytas entities through secret accounts maintained by Ramalinga Raju. (FACC ¶ 74; SAC ¶ 288.)

To make it look like the Company had in fact earned the nonexistent proceeds and to cover up the fake salaries, the Officer Defendants forged deposit receipts, bank statements, bank confirmation letters, and letters describing nonexistent fund transfers. (FACC ¶¶ 97-102; SAC ¶ 272.) The perpetrators sought to destroy incriminating evidence of these forgeries during the period of time leading up to Ramalinga Raju's confession. (FACC ¶¶ 103-04; SAC ¶ 272.)

The scheme also involved diverting Satyam funds for the benefit of the Raju family. More specifically, Plaintiffs

14

allege that between 1999 and 2008, the Raju family diverted cash from Satyam to create a network of up to 327 secret companies, including the Maytas entities, which were used to fund the acquisition of roughly 8,000 acres of land in India for the personal benefit of the family. (FACC ¶¶ 105-14; SAC ¶ 273-74.)

These activities created a serious cash shortage at Satyam, even though the Company reported an abundance of cash reserves. (FACC ¶ 115.) To cover up the land acquisition activities, Ramalinga Raju, Rama Raju, and other family members arranged secret loans to the Company, using their stock as collateral, from third party financial sources controlled by the Rajus. (FACC ¶ 115; SAC ¶ 277.) Between November 2006 and October 2008, 37 of the secret companies transferred approximately $307 million to Satyam's bank accounts, of which approximately $42 million was returned to 15 of the 37 companies. (FACC ¶ 268.) These off-the-books loans, which were backed by artificially-inflated Satyam securities, left the Company with roughly $265 million in unpaid loan obligations. (SAC ¶ 279.) At the direction of the Officer Defendants, these related-party loans were never disclosed to investors and were instead recorded as proceeds from the previously entered fraudulent sales. (FACC ¶¶ 115-17; SAC ¶ 278.)

Ramalinga Raju, Rama Raju, and Maytas Infra, in addition to other unspecified Raju family members, reaped the benefit of the

15

falsified invoices, bank document forgeries, secret related party loans, and fake salaries by selling Satyam stock at prices that were artificially inflated as a result of their fraudulent conduct. (FACC ¶¶ 118-23; SAC ¶ 282.) In addition, the Officer Defendants diverted a portion of the Company's foreign earnings to tax havens, which funds were then transferred to Maytas Infra and other companies owned or controlled by Ramalinga Raju and his sons. (SAC ¶ 275.) To avoid detection of these ill-gotten gains, they and other family members sold their common stock by transferring shares to family members and trusted employees (straw men) who then sold the shares through five family-owned companies, which remitted the proceeds back to the straw men, who transferred the money back to the Rajus. (FACC ¶ 120; SAC ¶¶ 281, 284-86.) Plaintiffs allege that Ramalinga Raju, Rama Raju, and Maytas Infra took approximately $68 million from these insider transactions. (FACC ¶ 119-21; SAC ¶ 282.)

## B. False and Misleading Statements

Lead Plaintiffs allege that, as a result of the extensive fraudulent conduct described above, the Company's cash position, bank deposits, and receivables were significantly overstated, and its debt levels were significantly understated, making virtually all of the financial statements and related disclosures issued by Satyam during the Class Period false and misleading in all material respects. (FACC ¶ 244.) In

16

addition, the gross exaggeration of the number of employees in the Company and their utilization rate, made in numerous press releases, conference calls, SEC filings, and other public disclosures furthered the false illusion that the Company was growing and overstated the level of demand for Satyam's services.  (FACC ¶¶ 245-47.)

### i. SEC Filings

Lead Plaintiffs also allege that all of the false and misleading statements alleged in the FACC were contained in or incorporated by reference into the Company's annual reports (Form 20-Fs) and quarterly reports (Form 6-Ks) during the Class Period, all of which were signed by Rama Raju as CEO and Srinivas as CFO.  (FACC ¶ 248.)  Specifically, the Form 20-Fs filed for fiscal years 2004-2008 and the Form 6-Ks filed for 2005-2008 and the first half of 2009 were allegedly false and misleading in several ways.  (FACC ¶¶ 251-52.)

First, the statements materially overstated the Company's revenues, which resulted in the overstatement of gross profits and caused the Company to overstate its earnings per share and its cash flows.  (FACC ¶¶ 254-58.)

Second, the Company's balance sheets reflected assets which were really the false proceeds from the non-existent business that had been fraudulently recorded on the books.  (FACC ¶ 259.)  Thus, the Company's balance sheet disclosures of cash and

17

investments in bank deposits were false and misleading, the
Company reported sham interest income that was purportedly
earned on the false bank deposits, and the Company overstated
its accounts receivables, retained earnings, and shareholder
equity. (FACC ¶¶ 259-65.)

Third, the undisclosed related party loans resulted in
material understatements of the Company's debt liabilities,
including an outstanding undisclosed liability of approximately
$265 million resulting from loan activity between November 2006
and October 2008. (FACC ¶ 268.)

Fourth, the annual reports disclosed much exaggerated
employee numbers and utilization rates. For instance, the
Company's 2004 Form 20-F reported 14,456 employees and the 2008
Form 20-F reported 50,570 employees, representing a 250% growth
in numbers in a span of four years. (FACC ¶ 271.) Plaintiffs
allege that as many as 13,000 of the more than 50,000 reported
employees did not actually exist. (FACC ¶ 271.) Beginning in
at least 2007, the reported utilization rates were also inflated
by as much as 20% during the Class Period to reflect the
productivity levels of the ghost employees. (FACC ¶¶ 272-73.)

Finally, the Company's certifications pursuant to Section
906 of the Sarbanes-Oxley Act of 2002, which were attached to
each annual report filed during the Class Period, falsely
certified that the Form 20-Fs fully complied with Exchange Act

requirements and "fairly present[ed], in all material respects, the financial condition and results of operations of the Company." (FACC ¶¶ 274-76.)

The SAC alleges similarly that all of Satyam's Form 6-Ks and Form 20-Fs between April 30, 2004, and October 24, 2008, misreported the Company's revenue from sales, cash and bank balances, and accrued interest. (SAC ¶¶ 121-243.)

### ii. Public Statements

In addition to false SEC filings, Lead Plaintiffs' allege that the Company made numerous false statements to the public, which artificially inflated the trading prices of Satyam ordinary shares. (FACC ¶ 277.) The FACC alleges that Ramalinga Raju boasted about the Company's revenue growth in several conference calls with analysts, on April 22, 2004, April 21, 2005, April 21, 2006, April 20, 2007, and April 21, 2008. (FACC ¶¶ 278, 280, 282, 284-85, 287.) The participants on these calls consistently communicated to the investing public, based on Ramalinga Raju's statements, that the Company was strong throughout the entire Class Period. (FACC ¶¶ 279, 281, 283, 286, 288.)

Aberdeen also alleges that the press releases and public remarks accompanying many of Satyam's SEC filings misrepresented the strength of the Company and likewise were used to create a false impression among the investing public about Satyam's

financial health. (SAC ¶¶ 134-136, 139-41, 144-46, 159-61, 164-66, 169-71, 185-87, 191-92, 195-97, 201-03, 210-12, 215-17, 220-22, 226-28, 231-33, 240-42.)

**C. Red Flags**

Lead Plaintiffs claim that the AC Defendants' "reckless discharge of their responsibilities directly caused Satyam to issue the false and misleading statements . . . and was a direct and proximate cause of the harm suffered by Class members." (FACC ¶ 238.) The Audit Committee is charged with the following responsibilities:

- Oversight of Satyam's financial reporting process and ensuring that the financial statements are correct, sufficient and credible;

- Review of the quarterly financial statements with management before submission to entire Board;

- Review of adequacy of internal audit processes, including structure and staffing of auditing department, the reporting structure coverage, and the frequency of internal audits:

- Provide recommendations regarding the retention and payment of an independent auditor;

- Approve retention and payments to the independent auditor for any non-audit services rendered; and

- Review, with management, of the performance of the independent and internal auditors, as well as the adequacy of Satyam's internal controls.

(FACC ¶ 240.) According to Lead Plaintiffs, the AC Defendants were the "watchdogs" of the Company and recklessly disregarded their responsibilities in the face of "extensive information"

20

that should have caused them to discover and prevent the fraud. (FACC ¶¶ 70, 241.) Lead Plaintiffs allege that there were certain "red flags" that should have alerted the AC Defendants to the fraud, including the magnitude of the fraud, the excessive auditor fees paid to PwC (the independent auditor), knowledge of deficient internal auditing controls, and the Maytas Acquisition proposal. (FACC ¶ 242.)

### i. Magnitude and Duration of the Fraud

Lead Plaintiffs contend that the "sheer materiality" of the false statements which allegedly overstated the Company's revenues by roughly $190 million annually and overstated the Company's assets by over $1 billion should have tipped off the AC Defendants to the existence of the fraud. (FACC ¶ 242a.) The FACC alleges that "[i]t is not plausible that a pervasive fraud of the magnitude carried out by the Officer Defendants and PwC could have been achieved in the absence of, at a minimum, an extreme and reckless departure by the Audit Committee Defendants from any applicable standard of care." (FACC ¶ 242a.) In addition, Lead Plaintiffs assert that the AC Defendants were highly educated and sophisticated people who, but for their recklessness, should have and would have detected the fraud. (FACC ¶ 242a.)

## ii. **Excessive Fees Paid to PwC India[8]**

The FACC alleges that PwC participated actively in the perpetration of the fraud designed by the Officer Defendants. In exchange for this participation, Lead Plaintiffs allege, the Company paid PwC grossly excessive fees for their auditing services, at times more than 14 times greater than the auditing market would dictate. (FACC ¶ 189.) In addition, Satyam paid PwC approximately $300,000 in both 2007 and 2008 for "other related services." (FACC ¶¶ 191, 242b.) Certain AC Defendants were aware of the abnormally high level of fees being paid to PwC and the "sudden increase in the audit fee" for 2007 and 2008. (FACC ¶ 242b.) When these individuals asked senior management about the fees, they were told that "the auditors were required to do a lot of work" and that the auditors' workload had "increased two fold," and the AC members took the issue no farther. (FACC ¶ 242b.) Lead Plaintiffs contend that the AC Defendants were negligent in not investigating sufficiently the apparently exorbitant auditing fees paid to PwC. (FACC ¶ 242b.)

### iii. **Deficiency of Internal Audit Controls**

---

[8] A considerable portion of the FACC is devoted to allegations regarding the PwC Defendants' role in the fraud. (See FACC ¶¶ 124-237.) Because the PwC Defendants settled the Class action, the Court will include only those facts pertaining to PwC which relate to the allegations against the moving defendants.

Lead Plaintiffs also assert that on May 10, 2007, and

August 8, 2008, PwC sent "Management Letters" addressed "to the

Company", which included hundreds of internal control

deficiencies identified by PwC. (FACC ¶ 242c.) In addition,

the FACC refers to an internal PwC email containing comments

from a PwC employee regarding "suggested text for a presentation

to the Audit Committee." (FACC ¶ 242c.) The email contained

the following language:

> Slide 7: Control deficiencies We have identified
> deficiencies in internal control over financial
> reporting that we consider to be control deficiencies
> and significant deficiencies. We have presented
> management a list of control deficiencies and Slides
> 16 to 19 of this presentation include the reporting to
> the audit committee of the significant deficiencies.

(FACC ¶ 242c.) Based on the Slide, Lead Plaintiffs allege that

the AC Defendants were aware of the numerous internal financial

reporting control deficiencies and were reckless in not taking

steps to investigate and correct them. (FACC ¶ 242c.)

### iv. Proposed Maytas Acquisition

On December 16, 2008, roughly three weeks before Ramalinga

Raju confessed to the fraud, the Company announced that it was

going to acquire 51% of Maytas Infra and 100% of Maytas

Properties in a $1.6 billion deal (the "Maytas Acquisition").

(FACC ¶ 38.) In response to the "immediate outrage from the

global investment community," Satyam withdrew the proposal only

a few hours after the announcement. (FACC ¶¶ 8, 39.) In his

confession letter, Ramalinga Raju described the Maytas
Acquisition deal as "a last ditch attempt by the Raju family to
cover up the fraud by allowing Satyam to acquire real assets for
its non-existent cash." (FACC ¶ 38.)

Lead Plaintiffs alleges that "Satyam's supposedly
independent Board members voted **unanimously** to approve the
transaction." (FACC ¶ 39 (emphasis in original).) Neither of
the Maytas entities' business models was related to Satyam's,
and the Maytas Acquisition allegedly overvalued the Maytas
entities considerably. (FACC ¶ 242d.) In addition, the
proposed deal would have depleted all of Satyam's reported cash
and bank balances. (FACC ¶ 242d.) According to Lead
Plaintiffs, the AC Defendants acted as a "rubber stamp" for
management's plans and approved the Maytas Acquisition without
inquiring about the justifications for it, despite the fact that
it reflected an irrational business decision and would have
benefitted the Raju family directly. (FACC ¶ 242d.)

### v. Improper Remuneration of Defendant Palepu

The FACC also alleges that the payment to Defendant Palepu
for consulting services he provided at the time he was serving
on the Board, for which he was compensated separately, was
another red flag that the AC Defendants recklessly ignored.
(FACC ¶ 242e.) According to Lead Plaintiffs, this "improper

24

remuneration" compromised Palepu's independence as a Board member. (FACC ¶ 242e.)

### D. Disclosure of the Fraud

On September 15, 2008, Satyam announced that it was downsizing by 4,500 employees, which signaled that the Company's services were less in demand than the Company had previously reported. (FACC ¶ 297.) As a result of this partial disclosure, the public trading price of Satyam ordinary shares declined by roughly 10% and the price of its ADSs declined by roughly 14%. (FACC ¶ 298.)

Subsequently, the Company announced the Maytas Acquisition on December 16, 2008, and quickly canceled the deal in response to investors' negative response, resulting in severe damage to investors' confidence in management's credibility. (FACC ¶¶ 299-301.) This damage led to an immediate decrease in ordinary share price by roughly 30% and a roughly 31.8% decline in the ADS price. (FACC ¶ 302.)

Ramalinga Raju submitted to the Board and released to the public simultaneously his confession letter on January 7, 2009, in which he admitted to the massive fraudulent enterprise and implicated his brother in the fraud. (FACC ¶ 303; SAC ¶ 290-92, 297.) At the time, there were roughly 670 million shares of outstanding Satyam securities. (SAC ¶ 300.) Ordinary share prices fell 77.6% on that day, and another 40% on the next day,

totaling a two-day decline of 87%. (FACC ¶ 303; SAC ¶ 301.) Trading in Satyam ADS on the NYSE halted before the markets opened in the U.S., and resumed again only on January 12, 2009, at which time the ADS price had dropped roughly 87%. (FACC ¶ 303; SAC ¶ 302.)

In September 2010, the Company filed with its Form 6-K a Statement of Unaudited Standalone and Consolidated Financial Results for 2009-10, as well as the results of the Company's forensic investigation into the fraud. (FACC ¶ 304; SAC ¶ 244-45.) This filing also admitted the financial irregularities and internal financial reporting control deficiencies during the Class Period. (FACC ¶ 304; SAC ¶ 244-46.) The total impact on Satyam's financial controls was reported to be $1.5 billion. (FACC ¶ 305a.) The September 2010 filing provided additional metrics of the fraud's tremendous impact and reported that the internal controls over financial reporting were not effective at a reasonable assurance level. (FACC ¶¶ 305b-c, 306-11.)

The Company also announced that it and several of its officers, directors, and auditors were being investigated and/or prosecuted by a number of Indian and U.S. government agencies. (FACC ¶ 313; SAC ¶ 294.)

**IV.   Claims**

   **A. FACC**

26

Based on the foregoing factual allegations, the FACC charges the AC Defendants with two counts of civil securities fraud. In Count II of the FACC, Lead Plaintiffs allege that the AC Defendants violated section 10(b) of the Exchange Act and Rule 10b-5 by recklessly failing to prevent the fraudulent inflation of the Company's reported assets and earnings as well as the fraudulent reduction of Satyam's liabilities. (FACC ¶ 367.) Lead Plaintiffs attribute all of the Company's allegedly false and misleading statements to the AC Defendants because they had "extensive control of and role in the Company's financial reporting systems[.]" (FACC ¶ 366.) Count V of the FACC alleges that the AC Defendants violated section 20(a) of the Exchange Act as control persons of the Company who had and exercised the power to influence the Company's decision-making. (FACC ¶ 387.)

Count IV alleges that the Maytas Defendants were control persons subject to liability under section 20(a) because of their "practical operational control of the Company, their representation within the management and Board of Directors through the Officer Defendants, and/or stock ownership[.]" (FACC ¶ 381.)

In Counts X and XI, the employee stock option sub-class charges the SA Defendants with violations of sections 11 and 12(a)(2) of the Securities Act in connection with the RSU-ADS

Plan and the RSU-Ordinary Plan, which were attached to the 2007 Registration Statement and the April 30, 2007 Form 20-F, respectively. (FACC ¶¶ 420, 437.) Count XII alleges strict liability under section 15 of the Securities Act against the SA Defendants because they "had the requisite power to directly or indirectly control or influence the specific corporate policies which resulted in the unlawful acts and conduct" alleged by the sub-class. (FACC ¶ 449.)

## B. SAC

In Count II, Aberdeen charges the Maytas Defendants, among others, with violating section 20(a) of the Exchange Act as controlling persons who had and exercised the power to influence and control the decision-making and actions of Satyam. (SAC ¶ 338.) Counts VI, VII, and VIII assert common law claims of fraud, negligence, and negligent misrepresentation against the Maytas Defendants for their alleged role in the fraud. (SAC ¶¶ 365-69, 372-76, 378-83.)

## C. Motions

The AC Defendants and SA Defendants (together, "Director Defendants") filed two motions to dismiss. One seeks dismissal of the FACC pursuant to the Supreme Court's decision in Morrison. (Dkt. No. 266.) The other was filed contemporaneously and seeks dismissal under Federal Rules of Civil Procedure 12(b)(6) and 9(b) and the Private securities

Litigation Reform Act of 1995 ("PSLRA"). (Dkt. No. 269.) SA
Defendant Dham joined in the Director Defendants' motions to
dismiss, and also filed his own motion to dismiss.[9] (Dkt. No.
264.)

Maytas Infra and Maytas Properties filed two sets of
virtually identical motions to dismiss the FACC and the SAC for
lack of personal jurisdiction, for forum non conveniens, and
pursuant to Federal Rules 12(b)(6) and 9(b), the PSLRA, and the
Securities Litigation Uniform Standards Act ("SLUSA"). (Dkt.
Nos. 279, 281, 283, 289, 291, 293.) Teja Raju and Rama Raju Jr.
joined all six Maytas motions to dismiss.

## LEGAL STANDARD

"In deciding a motion to dismiss, a court ordinarily
accepts as true all well pleaded factual allegations and draws
all reasonable inferences in the plaintiff's favor." In re
Lehman Bros. Sec. & ERISA Litig., 683 F. Supp. 2d 294, 298
(S.D.N.Y. 2010) (citation omitted). To survive a Rule 12(b)(6)
motion to dismiss, a complaint must articulate sufficient
factual allegations "to raise a right to relief above the
speculative level, on the assumption that all the allegations in
the complaint are true (even if doubtful in fact.)" Bell Atl.
Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citations omitted).
A plaintiff must state "enough facts to state a claim to relief

---

[9] AC and SA Defendant Palepu filed a separate reply memorandum in
support of the motions to dismiss. (Dkt. No. 334).

that is plausible on its face." Id. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (citation omitted). A court may "consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." Sgalambo v. McKenzie, 739 F. Supp. 2d 453, 470 (S.D.N.Y. 2010) (quoting ATSI Commc'ns v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007)).

Securities fraud claims are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Although intent may be alleged generally, a plaintiff must still "allege facts that give rise to a strong inference of fraudulent intent." Acito v. IMCERA Grp., Inc., 47 F.3d 47, 52 (2d Cir. 1995) (citations omitted). A complaint alleging securities fraud will survive a motion to dismiss "only if a reasonable

person would deem the inference of scienter cogent and at least as compelling as any opposing inference [of non-fraudulent intent] one could draw from the facts alleged." Tellabs, Inc. v. Major Issues & Rights, Ltd., 551 U.S. 308, 324 (2007) (citations omitted).

## DISCUSSION

## I. Claims Against the Director Defendants

### A. Standing

Article III of the Constitution requires a plaintiff to have standing before the plaintiff may maintain a lawsuit. To establish standing, a plaintiff must allege (1) personal injury, (2) that is fairly traceable to the defendant's allegedly unlawful conduct, and (3) is likely to be redressed by the requested relief. Allen v. Wright, 468 U.S. 737, 751 (1984). In addition, a plaintiff seeking to represent a class must be a member of the class he purports to represent. See e.g., Bailey v. Patterson, 369 U.S. 31, 32-33 (1962) (citing McCabe v. Atchison, T. & S.F.R. Co., 235 U.S. 151, 162-63 (1914)); Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch., 660 F.2d 9, 17 (2d Cir. 1981). "Because a plaintiff cannot claim a personal injury in connection with a security he did not purchase, he 'lacks standing to sue on claims arising from . . . offerings which he did not purchase.'" In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d 326, 368 (S.D.N.Y. 2011) (quoting N.J. Carpenters

Health Fund v. DLJ Mortg. Capital, Inc., No 08 Civ. 5653 (PAC),
2010 WL 1473288, at *3 (S.D.N.Y. Mar. 29, 2010)); see In re
Lehman Bros., 683 F. Supp. 2d at 490.

The cardinal rule of section 10(b) standing is that a
plaintiff seeking to assert such a claim must be either a
purchaser or seller of the securities at issue.[10] Blue Chip
Stamps v. Manor Drug Stores, 421 U.S. 723, 749 (1975). The
purpose of this rule is to "limit[] the class of plaintiffs to
those who have at least dealt in the security to which the
prospectus, representation, or omission relates." Id. at 747.
Moreover, a plaintiff who asserts Securities Act claims must
have purchased securities that are traceable to the allegedly
misleading registration statement. See Barnes v. Osofsky, 373
F.2d 269, 273 (2d Cir. 1967) ("[A]n action under § 11 may be
maintained only by one who comes within a narrow class of
persons, i.e. those who purchase securities that are the direct
subject of the prospectus and registration statement.")
(quotation marks and citation omitted).

Section 3(a)(1) of the Exchange Act and section 2(1) of the
Securities Act both define a "security" to include, among other
things, "any note, stock, . . . investment contract, . . . any
put, call, straddle, option, or privilege on any security[.]"
15 U.S.C. §§ 77b(a)(1), 78c(a)(10). Although the federal

---

[10] All plaintiffs in this action assert claims as purchasers of Satyam
securities.

32

securities laws generally consider an option to purchase a
security to be the equivalent of a security, see Caiola v.
Citibank, N.A., N.Y., 295 F.3d 312, 327 (2d Cir. 2002), employee
stock options are acquired as part of a contract between
employer and employee, and must be considered an "investment
contract" in order to constitute a security. The anti-fraud
provisions of both the Securities Act and the Exchange Act
require that any allegedly fraudulent statement must occur in
connection with a "sale", "offer to sell", or "purchase" of a
"security." Dubin v. E.F. Hutton Grp. Inc., 695 F. Supp. 138,
142 (S.D.N.Y. 1988). Accordingly, the Supreme Court has held
that the Securities and Exchange Acts do not apply to pension
plans to which employees do not contribute and in which employee
participation is compulsory. See Int'l Brotherhood of
Teamsters, Chauffeurs, Warehousemen and Helpers of Am. v.
Daniel, 439 U.S. 551, 559 (1979). This is because such a
pension plan does not require the employee to "give up a
specific consideration in return for a separable financial
interest with the characteristics of a security." Id.
(citations omitted). Inducements to continue employment-as
opposed to inducements to accept employment-do not satisfy this
test. See Fishoff v. Coty Inc., No. 09 Civ. 628 (SAS), 2009 WL
1585769, at *6 (S.D.N.Y. June 8, 2009) (holding that a
plaintiff's mere "continued employment is not a cognizable

contribution" sufficient to constitute a security for purposes of securities fraud).

Adams purports to assert Exchange Act claims on behalf of the sub-class arising from the acquisition and/or exercise of options to purchase Satyam ordinary shares and ADSs under each of the five employee stock option plans as well as Securities Act claims arising from the acquisition and/or exercise of options to purchase Satyam ordinary shares and ADSs under the RSU-Ordinary and RSU-ADS plans. According to the FACC, Adams acquired options under the ASOP-ADS and RSU-Ordinary plans, but exercised options to purchase Satyam securities under only the ASOP-ADS plan. Adams does not plead that he acquired any stock options as part of his acceptance of employment at Satyam, and stock option plan documents submitted to the Court by the Director Defendants show that he acquired options as incentive to continue his employment at the Company.[11] Thus, Adams lacks standing to bring claims under the Securities Act or the Exchange Act based on the mere acquisition of options under any plan.

---

[11] The Director Defendants submitted to the Court various stock option plan documents, including Notices of Stock Option Grants that refer to the ASOP-ADS plan as an "Equity Incentive" program and to the class of options under that plan as "Incentive Stock Option." (Decl. of Evert J. Christensen in Support of Dir. Defs.' Mot. to Dismiss Pursuant to Morrison, Apr. 18, 2011, Exs. A-E at 1 ("Christensen Morrison Decl.").) The Court may consider these stock plan documents without converting the motion to one for summary judgment because these documents must have been known to (and likely possessed by) Adams and constitute part of the basis for his claims. See Sgalambo, 739 F. Supp. 2d at 470.

34

Because Adams alleges that he purchased Satyam securities
by exercising options pursuant to only one plan, the question of
whether Adams has standing to represent purchasers of securities
pursuant to the other four plans becomes one of personal injury.
See Hoffman v. UBS-AG, 591 F. Supp. 2d 522, 532 (S.D.N.Y. 2008)
("If a party, such as Plaintiffs in this case, is not personally
injured by the alleged action of a defendant then he is not
entitled to come into court and litigate that action, regardless
of whether the disposition of his case necessarily requires the
same result as the case of another.").

Adams appears to argue that because the various offering
documents affiliated with the ASOP-Ordinary, RSU-Ordinary, and
RSU-ADS plans were incorporated by reference into the allegedly
misleading registration statements, he has standing to represent
exercisers of all such options. (See Lead Pls.' Mem. in Opp. to
Dir. Defs.' Mot. to Dismiss, June 2, 2011, 34-35 ("Lead Pls.'
Opp. Mem.").) Furthermore, he argues that the dates on which he
exercised his various ASOP-ADS options demonstrate that he must
have acquired securities pursuant to every annual report during
the Class Period, which makes his injury the same as all
purchasers of any securities during that period of time. (Id.
at 35.)

Several courts in this District have considered and
rejected the argument that a purchaser of securities pursuant to

one filing suffers the same injury as a different purchaser who acquires securities pursuant to another filing merely because the two offerings derive from or are incorporated into a common registration statement. This argument fails because enlarging the field of potential misstatements "does not thereby enlarge the field of possible plaintiffs beyond the ranks of those who purchased or acquired the securities at issue." In re Wachovia Equity, 753 F. Supp. 2d at 370 (citing In re Lehman Bros., 684 F. Supp. 2d at 491) (emphasis added); see also In re Morgan Stanley Mortg. Pass-Through Certificates Litig., No. 09 Civ. 2137(LTS)(MHD), 2010 WL 3239430, at *5 n.6 (S.D.N.Y. Aug. 17, 2010) (finding that plaintiff who purchased one type of certificate derived from the same shelf registration statements as other certificates lacks standing to represent purchasers of the other certificates); New Jersey Carpenters Health Fund v. NovaStar Mortg., Inc., No. 08 Civ. 5310(DAB), 2011 WL 1338195, at *6 (S.D.N.Y. Mar. 31, 2011) (finding plaintiff had standing to represent only purchasers of certificates from one of six offerings under the same registration statement).

Ultimately, the issue boils down to the cardinal rule. Because Adams did not exercise options under the ASOP-Ordinary, RSU-ADS, or RSU-Ordinary plans, he does not have standing to represent class members who did. See Hoffman, 591 F. Supp. 2d at 531 ("Plaintiffs lack standing for claims relating to funds

in which they did not personally invest."); In re Smith Barney
Transfer Agent Litig., 765 F. Supp. 2d 391, 399 (S.D.N.Y. 2011);
King Cty., Wash. v. IKB Deutsche Industriebank AG, Nos. 09 Civ.
8387(SAS), 09 Civ. 8822(SAS), 2010 WL 2010943, at *2 (S.D.N.Y.
May 18, 2010). There is, however, an exception to this rule.
The ASOP-B plan was attached to the same Form 20-F filing as the
ASOP-ADS plan, and securities issued under both plans were
subject to the same Form F-3 filing. The fact that the plans
offer options to purchase different types of security is not
enough to preclude Adams from representing participants in the
ASOP-B plan, as the operative documents for both plans are
identical. See In re WorldCom, Inc., Nos. 02 Civ. 3288(DLC), et
al., 2004 WL 555697, at *7 (S.D.N.Y. Mar. 19, 2004).
Accordingly, Adams has standing to represent sub-class members
who exercised options under the ASOP-B and ASOP-ADS plans.
Adams has no standing to represent purchasers of securities
under either RSU plan, which are the only plans implicated in
the Securities Act claims. The claims against the SA Defendants
are therefore dismissed.[12]

## B. Effects of Morrison

### i. Evolution of the transactional test

---

[12] The Sub-class brought the only Securities Act claims alleged in the FACC.
Dismissal of those claims dismisses the entire case against Vinod Dham and
Ram Mynampati, who were not charged with any other violation.

37

The Director Defendants seek dismissal of MPERS' claims and the sub-class's claims pursuant to the Supreme Court's decision in Morrison v. National Australian Bank, Limited, 130 S. Ct. 2869 (2010), which clarified the distinction between domestic and foreign transactions to better define the territorial reach of section 10(b). In Morrison, the Supreme Court repudiated the Second Circuit's "conduct" and "effects" tests, opting instead to announce a new bright line rule defining the reach of section 10(b). By choosing to "apply the presumption [of extraterritoriality] in all cases," the Court held that section 10(b) applies only to "transactions in securities listed on domestic exchanges[] and domestic transactions in other securities[.]"[13] Morrison, 130 S. Ct. at 2884.

The Court went on to define the contours of this new transactional test. It noted that there exists a level of activities and conduct occurring within the United States that would not be sufficient to trigger section 10(b) liability. Id. ("[I]t is a rare case . . . that lacks all contact with the territory of the United States[, and] the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever some domestic activity is involved in the case.") (emphasis in original). The focus of

_____

[13] Since Rule 10b-5 extends no further than section 10(b), the Supreme Court also held, "if § 10(b) is not extraterritorial, neither is Rule 10b-5." Morrison, 130 S. Ct. at 2881.

the Exchange Act, the Supreme Court added, is on the purchases
and sales of securities in the United States, and "not upon the
place where the deception originated[.]"[14] Id.

Because Morrison dealt with securities traded only on
foreign exchanges, the Supreme Court provided little guidance
about how to determine whether a "purchase or sale is made in
the United States." Id. at 2886. The Exchange Act defines a
"purchase" to "include any contract to buy, purchase, or
otherwise acquire," and it defines a sale to "include any
contract to sell or otherwise dispose of." 15 U.S.C. §§
78c(a)(13)-(14). In the wake of Morrison, many courts in this
District have struggled to determine what exactly makes a
transaction domestic. See, e.g., Valentini v. Citigroup, Inc.,
No. 11 Civ. 1355(LBS), 2011 WL 6780915 (S.D.N.Y. Dec. 27, 2011);
In re UBS Sec. Litig., No. 07 Civ. 11225(RJS), 2011 WL 4059356
(S.D.N.Y. Sept. 13 2011); S.E.C. v. Goldman Sachs & Co., 790 F.
Supp. 2d 147 (S.D.N.Y. 2011); In re Vivendi Universal, S.A. Sec.
Litig., 765 F. Supp. 2d 512 (S.D.N.Y. 2011); In re Royal Bank of
Scot. Grp. PLC Sec. Litig., 765 F. Supp. 2d 327 (S.D.N.Y. 2011);
Plumbers' Union Local No. 12 Pension Fund v. Swiss Reins. Co.,
No. 08 Civ. 1958 (JGK), 2010 WL 3860397 (S.D.N.Y. Oct. 4, 2010);
In re Société Generale Sec. Litig., No. 08 Civ 2495 (RMB), 2010

---

[14] Though presented only with an alleged violation of the Exchange Act, the
Morrison court stated expressly that the Securities Act and the Exchange Act
share "[t]he same focus on domestic transactions." Morrison, 130 S. Ct. at
2885 (citation omitted).

WL 3910286 (S.D.N.Y. Sept. 29, 2010). And, most recently, the
Second Circuit decided its first post-Morrison case and held
that "to sufficiently allege the existence of a 'domestic
transaction in other securities,' plaintiffs must allege facts
indicating that irrevocable liability was incurred or that title
was transferred within the United States." Absolute Activitist
Value Master Fund Ltd. v. Ficeto, No. 11 Civ. 0221, 2012 WL
1232700, at *1 (2d Cir. Apr. 13, 2012).

The Director Defendants have moved to dismiss under
Morrison two categories of claims: (1) MPERS' section 10(b)
claims resulting allegedly from the purchase of Satyam ordinary
shares on Indian exchanges, and (2) the sub-class's Exchange Act
and Securities Act claims related to the acquisition and/or
exercise of options to purchase Satyam ADSs and ordinary shares
pursuant to the employee stock option plans. The Director
Defendants do not seek dismissal under Morrison of the remaining
Lead Plaintiffs' Exchange Act claims because the FACC alleges
that those plaintiffs purchased Satyam ADSs on the NYSE. (Dir.
Defs. Mem. in Support of Mot. to Dismiss Pursuant to Morrison,
Apr. 18, 2011, 1 n.2 ("Defs.' Morrison Mem.").)

## ii. MPERS' Claims

MPERS argues principally that its purchases of foreign
shares on foreign exchanges constitute domestic transactions
within section 10(b)'s reach because the buy orders were placed

40

from the United States and the injuries were suffered in the United States. (Lead Pls.' Opp. Mem. at 59-64.) This argument is predicated on precisely the approach the Supreme Court rejected in Morrison. Cf. Morrison, 130 S. Ct. at 2884 ("[T]he focus of the Exchange Act is not upon the place where the deception originated."); see In re Societe Generale, 2010 WL 3910286, at *6 ("By asking the Court to look to the location of 'the act of placing a buy order,' and to . . . 'the place of the wrong,' Plaintiffs are asking the Court to apply the conduct test specifically rejected in Morrison.") (citations omitted); Cornwell v. Credit Suisse Grp., No. 08 Civ. 3758(VM), 2010 WL 3069597, at *3 (S.D.N.Y. July 27, 2010) ("[T]o carve out of the new rule [Plaintiffs'] purchase . . . of securities on a foreign exchange because some acts that ultimately result in the execution of the transaction abroad take place in the United States amounts to nothing more than the reinstatement of the conduct test."); In re UBS, 2011 WL 4059356, at *7 ("[T]here is nothing in the text of Morrison to suggest that the Court intended the location of an investor placing a buy order to be determinative of whether such a transaction is 'domestic' for purposes of § 10(b)."). That "Plaintiffs respectfully disagree with the district courts' holdings" in Cornwell and In re Societe Generale, (Lead Pls.' Opp. Mem. at 62), does not persuade this Court to do so.

41

MPERS attempts to distinguish the facts in Morrison by pointing out that that case dealt with "foreign-cubed" transactions that did not involve investors making investment decisions in the United States, as this case does.[15] (Lead Pls.' Opp. Mem. at 57-58.) This argument merely reprises the unsuccessful argument that this Court has already rejected. An investor's location in the United States does not transform an otherwise foreign transaction into a domestic one. See In re Vivendi Universal, 765 F. Supp. 2d at 532 ("[T]he Supreme Court [in Morrison] clearly sought to bar claims based on purchases and sales of foreign securities on foreign exchanges, even though the purchasers were American.").

Lead Plaintiffs have failed to establish that MPERS' off-exchange purchases of foreign stock constitutes a domestic transaction subject to section 10(b) liability, and the Director Defendants' motion to dismiss MPERS' claims is therefore granted.

### iii. **Sub-class's Claims**

The remaining sub-class claims are the Exchange Act claims related to the exercise of options under the ASOP-B and ASOP-ADS

---

[15] MPERS states, in a footnote and without argument, that "Morrison did not consider whether ordinary shares underlying ADSs listed on the NYSE must themselves be listed" in order to constitute a domestic transaction. (Lead Pls.' Opp. Mem. at 58, n.47.) The Court sees no reason that such distinction should remove the transactions at issue here from the scope of the Morrison decision.

plans to purchase Satyam ordinary shares and Satyam ADSs, respectively.

As the plaintiff, Adams bears the burden of alleging adequately that each type of transaction occurred in the United States. See Goldman Sachs, 790 F. Supp. 2d at 159. Nowhere in the FACC does Adams allege that any of the relevant transactions took place in the United States. Regarding the exercise of options to purchase ordinary shares, Adams echoes the arguments asserted unsuccessfully by MPERS. (Lead Pls.' Opp. Mem. at 66.) For the same reasons as articulated above, the Court dismisses the claims of sub-class members who exercised options to purchase ordinary shares under the ASOP-B plan. See supra Part. 2.A.ii.

The exercise of options to purchase ADSs requires a more nuanced analysis under Morrison. To defeat Defendants' motion, Adams must show that either irrevocable liability was incurred by the parties in the United States or that title to the ADSs was transferred in the United States. See Absolute Activist, 2012 WL 1232700, at *1. According to the Director Defendants, the stock option plan documents demonstrate that the exercise of options to purchase Satyam ADSs occurred in India and therefore fall outside the scope of section 10(b). (Defs.' Morrison Mem. at 3-5.) In response, Adams argues that his ADS transactions are the same as Lead Plaintiffs' purchases of ADSs on the NYSE,

43

which the Director Defendants have not challenged under

Morrison. (Lead Pls.' Opp. Mem. at 66.) In reliance on

Morrison's first prong, Adams contends that "[Morrison] clearly

provides that the fact that a security is listed on a U.S.

exchange is the determining factor." (Id. at 67 (citing

Morrison, 130 S. Ct. at 2888).) Adams thus advocates for an

interpretation of Morrison under which every purchase of a

Satyam ADS is covered under section 10(b), regardless of where

the transaction itself occurs, simply because Satyam ADSs are

listed on the NYSE.

This argument has been rejected by several courts in this

District as incongruous with Morrison's transactional test. See

In re Royal Bank of Scotland, 765 F. Supp. 2d at 336 ("The idea

that a foreign company is subject to U.S. Securities laws

everywhere it conducts foreign transactions merely because it

has listed some securities in the United States is simply

contrary to the spirit of Morrison." (quotation marks omitted);

In re Vivendi Universal, 765 F. Supp. 2d at 531 (finding there

is "no indication that the Morrison majority read Section 10(b)

as applying to securities that may be crosslisted . . . where

the purchase and sale does not arise from the domestic

listing"); In re Alstom SA Sec. Litig., 741 F. Supp. 2d 469, 472

(S.D.N.Y. 2010) ("That the transactions themselves must occur on

a domestic exchange to trigger application of § 10(b) reflects

the most natural and elementary reading of Morrison."). For
instance, in Sgalambo v. McKenzie, the court dismissed claims
based on the purchase of Canadian Superior common stock on the
Toronto Stock exchange, even though Canadian Superior common
stock was also listed on the NYSE. 739 F. Supp. 2d 453, 487
(S.D.N.Y. 2010).

The same reasoning applies to the exercise of Adams'
options to purchase Satyam ADSs, as the relevant transaction is
the actual exercise of Adams' options to purchase ADSs, which
occurred in India. According to the option exercise documents,
Adams' options were not deemed to be "exercised" until the
Company received the Exercise Notice and payment in India.
(Decl. of Evert J. Christensen in Support of Dir. Defs.' Mot. to
Dismiss Pursuant to Morrison, Ex. A, at 2 ("Christensen Morrison
Decl.") ("This option shall be deemed to be exercised upon
receipt by SATYAM of such [Exercise] Notice accompanied by the
Exercise Price and payment of any applicable withholding
tax.").) After that, and assuming the option exercise documents
comply with the relevant law, title in Satyam securities is
transferred upon completion of the option exercise, i.e. once
the Company has received the Exercise Notice and accompanying
payment. (Christensen Morrison Decl., Ex. A at 2 ("[T]he ADSs
shall be considered transferred to the Optionee on the date on
which the Option is exercised with respect to such ADSs.").)

Transfer of the ADSs occurs directly from Satyam in India to the exercising plan participant. (Christensen Morrison Decl., Ex. F, at 2 ("On receipt of the Exercise Notice from the Optionee, SATYAM shall take necessary steps as per the applicable provisions of law on the date of exercise for the allotment of the ADSs to the Optionee by the appropriate authority[.]").) This series of steps demonstrates that Satyam incurs irrevocable liability and title is transferred in India. That Satyam ADSs were also listed on the NYSE is irrelevant because Adams acquired his ADSs directly from Satyam.

Adams has alleged no facts to establish that the option exercise transactions occurred in the United States. He asserts in passing that he "has clearly pleaded that his transactions occurred in the United States," and cites to Paragraph 344 in the FACC. Paragraph 344 in the FACC, however, does not include any facts about the location of the transactions at issue. (FACC ¶ 344.) Conclusory arguments not supported by any factual allegations in a complaint are insufficient to establish that the option exercise transactions were domestic. Accordingly, all of the sub-class's remaining Exchange Act claims are dismissed.

Adams has requested an opportunity to conduct additional discovery regarding when and where irrevocable liability was incurred and title to the ADSs was passed. (Letter dated March

26, 2012, at 3.) Adams appears to argue that the Director

Defendants have created the false impression that the documents

they submitted to the Court are the entire universe of relevant

documents. (Id.) While there are no doubt other documents that

might give color to the facts surrounding Adams' exercise of

options, Defendants have provided the Court with documentation

for every exercise of options Adams claims to have made.

(Compare Decl. of Brian F. Adams in Support of Pls.' Opp. to

Dir. Defs.' Mot. to Dismiss Consolidated Class Action Complaint,

Jan. 22, 2010, 2, and Christensen Morrison Decl., Exs. A-E.)

Adams has not specified what he hopes to find in the event he is

afforded discovery at this juncture. His request to partially

lift the stay of discovery for purposes of exploring the facts

surrounding the location of the relevant transactions is

therefore denied.

### C. Section 10(b) and Rule 10b-5

Section 10(b) of the Exchange Act makes it unlawful:

for any person, directly or indirectly, by the use of
any means or instrumentality of interstate commerce or
of the mails, or of any facility of any national
securities exchange . . . [t]o use or employ, in
connection with the purchase or sale of any security
registered on a national securities exchange or any
security not so registered, or any securities-based
swap agreement[,] any manipulative or deceptive device
or contrivance[.]

15 U.S.C. § 78j(b). Rule 10b-5, which was promulgated
under section 10(b), makes it unlawful:

47

for any person, directly or indirectly, by the use of
any means or instrumentality of interstate commerce,
or of the mails or of any facility of any national
securities exchange,
(a)  To employ any device, scheme, or artifice to
     defraud,
(b)  To make any untrue statement of a material fact
     or to omit to state a material fact necessary in
     order to make the statements made, in light of the
     circumstances under which they were made, not
     misleading, or
(c)  To engage in any act, practice, or course of
     business which operates or would operate as a fraud
     or deceit upon any person, in connection with the
     purchase or sale of any security.

17 C.F.R. § 240.10b-5.

The AC Defendants have moved to dismiss the remaining Lead
Plaintiffs' section 10(b) and Rule 10b-5 claims on the grounds
that the FACC fails to plead with particularity and fails to
plead scienter.

## i. The FACC Pleads Fraud with Sufficient
## Particularity

To state a claim for misrepresentation under section 10(b)
of the Exchange Act, Lead Plaintiffs' must allege that each of
the AC Defendants (1) made misstatements or omissions of
material fact, (2) with scienter, (3) in connection with the
purchase or sale of securities, (4) upon which Plaintiffs'
relied, and (5) that Plaintiffs' reliance was the proximate
cause of its injury. ATSI, 493 F.3d at 105. Generally, these
allegations must satisfy the heightened pleading standards of
Rule 9(b) and the PSLRA, which require a plaintiff to "specify
the statements that the plaintiff contends were fraudulent,

identify the speaker, state where and when the statements were made, and explain why the statements were fraudulent." In re BISYS Sec. Litig., 397 F. Supp. 2d 430, 436-37 (S.D.N.Y. 2005) (citations omitted).

Lead Plaintiffs here have employed the group pleading doctrine, which allows a plaintiff to "rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company."[16] Id. at 438. In order to invoke the group pleading doctrine, "the complaint must allege facts indicating that the defendant was a corporate insider, with direct involvement in day-to-day affairs[.]" In re Alstom SA, 406 F. Supp. 2d 443, 449 (S.D.N.Y. 2005); see also In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 641 (S.D.N.Y. 2007).

Defendants contend that "[n]o such facts are pled here" and that therefore the section 10(b) and Rule 10b-5 claims against the AC Defendants should be dismissed. (Defs.' Reply Mem. in

---

[16] Defendants argue that the group pleading doctrine does not survive the Supreme Court's recent decision in Janus Capital Group, Inc. v. First Derivative Traders, 131 S. Ct. 2296 (2011). In Janus Capital, the Court limited the scope of liability for false statements to those who had ultimate authority for the content of the statement. Id. at 2299 (holding investment advisor not liable for prospectuses of separate entity clients where he drafted the actionable statements but did not "make" them for purposes of section 10(b)). Janus Capital addressed whether one corporate entity could be held liable for the false statements of another corporate entity, and thus is distinguishable on the facts from this case, as the AC Defendants here are charged with responsibility for false statements made by the Company itself.

49

Support of Mot. to Dismiss FACC, July 6, 2011, 7 ("Defs.' Reply Mem.").) The Court disagrees. The FACC alleges that the Audit Committee was responsible for overseeing the Company's financial reporting process, ensuring the accuracy of Satyam's financial statements, and reviewing the performance of the outside auditors. (FACC ¶ 240.) In addition, the Audit Committee was charged with reviewing the quarterly financial statements with management, and reviewing the Company's internal controls for financial reporting. (FACC ¶ 240.) These allegations of everyday involvement with the Company are sufficient to invoke the group pleading doctrine. See In re Livent, Inc. Sec. Litig., 78 F. Supp. 2d 194, 219 (S.D.N.Y. 1999). These allegations are also sufficiently pleaded to establish a connection between the AC Defendants and the allegedly false SEC filings.[17]

## ii. The FACC Does Not Plead Scienter Adequately

The group pleading doctrine may not be used to allege the state of mind of the AC Defendants at the time the alleged misstatements were made. In re Citigroup, Inc. Sec. Litig., 330 F. Supp. 2d 367, 381 (S.D.N.Y. 2004) ("Although the group pleading doctrine may be sufficient to link the individual

---

[17] The Court notes that each individual AC Defendant may only be held liable for statements made during the time he or she served on the Audit Committee. Lead Plaintiffs have pleaded sufficiently that each of the AC Defendants served on the Audit Committee when at least one of the allegedly false Form 20-Fs or Form 6-Ks was filed. (FACC ¶¶ 50-55.)

50

defendants to the allegedly false statements, Plaintiff must also allege facts sufficient to show that the Defendants had knowledge that the statements were false at the time they were made.") (citation omitted). Rather, Lead Plaintiffs must "state with particularity facts giving rise to a strong inference that [the AC Defendants] acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

The required state of mind is an "intent to deceive, manipulate, or defraud." Tellabs, 551 U.S. at 318 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n.12 (1976)). In this Circuit, recklessness is a sufficiently culpable state of mind for securities fraud claims. Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 194 (2d Cir. 2008) (citing Novak v. Kasaks, 216 F.3d 300, 308-09 (2d Cir. 2000)). Pleading recklessness requires factual allegations sufficient to establish "a state of mind approximating actual intent, and not merely a heightened form of negligence." Novak, 216 F.3d at 312 (quotation marks and citation omitted).

In determining whether a "strong inference" has been adequately alleged, the court must ask, "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" Tellabs, 551 U.S. at 326; see also S. Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 110-11 (2d

51

Cir. 2009) ("[I]t is not sufficient to set out 'facts from which, if true, a reasonable person could infer that the defendant acted with the required intent,' for that gauge 'does not capture the stricter demand Congress sought to convey in [the PSLRA.]'") (quoting Tellabs, 551 U.S. at 314) (emphasis in original). A complaint can establish a strong inference of the requisite scienter in one of two ways: (1) alleging particularized facts showing that the "defendants had the motive and opportunity to commit fraud," or (2) alleging "strong circumstantial evidence of conscious misbehavior or recklessness" on the part of the defendants. ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009) (citations omitted). Lead Plaintiffs must plead for each that the AC Defendant that his or her conduct represents such "an extreme departure from the standards of ordinary care . . . that the danger was either known to the defendant or so obvious that the defendant must have been aware of it. Rothman v. Gregor, 220 F.3d 81, 90 (2d Cir. 2000) (quoting Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 47 (2d Cir. 1978)).

To establish motive and opportunity, Lead Plaintiffs must allege that the AC Defendants "benefitted in some concrete and personal way from the purported fraud." Novak, 216 F.3d at 307-08. The FACC contains no facts suggesting that the AC

52

Defendants benefitted personally from the Satyam fraud, and
therefore Lead Plaintiffs have failed to establish motive.
Instead, they must raise a strong inference of scienter under
the second prong, although "the strength of the circumstantial
allegations must be correspondingly greater" if there is no
motive. Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001)
(quotation marks and citation omitted). Lead Plaintiffs assert
several arguments in support of a strong inference of scienter
on the part of the AC Defendants, but these efforts fail for the
following reasons.

## 1. Magnitude of the Fraud

Lead Plaintiffs contend that the sheer magnitude of the
fraud should have alerted the AC Defendants to the existence of
the fraud.  (FACC ¶ 242a.)  However, the magnitude of a fraud,
standing alone, cannot support a strong inference of scienter.
See In re WorldCom, Inc. Sec. Litig., 294 F. Supp. 2d 392, 418
(S.D.N.Y. 2003); Livent, 78 F. Supp. 2d at 217 (finding it
unreasonable to infer scienter on the part of outside auditors
despite failure to detect large scale fraud in performing
auditing duties).

## 2. Audit Committee's Responsibilities

The FACC relies heavily on the Audit Committee's general
oversight responsibilities and the commitment stated in the SEC
filings that it would review the Company's financial statements

and internal auditing controls to show that the AC Defendants
were reckless in the disposal of their duties. Lead Plaintiffs
fail to identify, however, what information, which the AC
Defendants had a duty to monitor and which they failed to
monitor, would have led them to discover the fraud. See e.g.,
Steinberg v. Ericsson LM Tel. Co., No. 07 Civ. 9615(RPP), 2008
WL 5170640, at *12 (S.D.N.Y. Dec. 10, 2008) ("An allegation that
a defendant merely ought to have known is not sufficient to
allege recklessness.") (quotation marks and citations omitted);
In re WorldCom, Inc. Sec. Litig., No. 02 Civ. 3288(DLC), 2003 WL
23174761, at *5 (S.D.N.Y. Dec. 3, 2003) (finding no inference of
scienter where complaint only "describe[d] what the Audit
Committee Defendants might have learned if they had done a
better job or if they had been more aggressive or diligent.").

### 3. Proceedings in India

        Lead Plaintiffs also argue that the initiation by Indian
authorities of proceedings against the AC Defendants raises an
inference of scienter. (Lead Pls.' Opp. Mem. at 20-21.) One of
the seven complaints filed by the SFIO charges Srinivasan, Rao,
V. Raju, and Prasad in connection with Satyam's violation of an
Indian statutory requirement that annual reports must list
employees drawing remuneration above a certain amount as well as
their familial relation to other directors or officers. (Decl.
of Evert J. Christensen in Support of Dir. Defs.' Mot. to

Dismiss FACC, Apr. 18, 2011, Ex. 7.) The FACC also alleges that
the SFIO charged Palepu in connection with the improper payment
of consultant fees to him during his paid service on the Board
absent the required government approval. (FACC ¶ 242e.)
Neither of these charges relates to the underlying fraud at
issue here, and they do not contribute to an inference of
fraudulent intent.

In arguing that the Court can infer scienter from these
other proceedings, Lead Plaintiffs rely on two non-controlling
cases. In particular, the Eighth Circuit decision Lead
Plaintiffs cite to reinforces the requirements that government
investigations and charges may contribute to a strong inference
of scienter, only if accompanied by facts supporting such an
inference. See In re Ceridian Corp. Sec. Litig., 542 F. 3d 240,
248-49 (8th Cir. 2008); see also Rosky ex rel. Wellcare Health
Plans, Inc. v. Farha, No. 07 Civ. 1952(RAL), 2009 WL 3853592, at
*7 (M.D. Fla. Mar. 30, 2009). The proceedings in India do not
themselves raise an inference of the requisite scienter.

#### 4. Red Flags

Lead Plaintiffs contend that at least four "red flags" put
the AC Defendants on notice: (1) the excessive fees paid to PwC;
(2) the 2007 and 2008 Management Letters indicating numerous
internal control deficiencies; (3) the PwC email containing text
for a presentation; and (4) the Maytas Acquisition proposal. At

best, these purported warning signs suggest that the AC Defendants were negligent, but they do not reach the level of recklessness required to establish scienter. See In re Livent, 78 F. Supp. 2d at 220; see also In re JP Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 624 (S.D.N.Y. 2005) ("Recklessness in the scienter context cannot be merely enhanced negligence.") (citation omitted).

## PwC Fees

The FACC alleges that the purportedly excessive fees paid to PwC for "related non-audit services" should have alerted the Audit Committee to the fraud. Lead Plaintiffs also allege that Audit Committee members inquired with management about the seemingly abnormal fees paid to PwC in 2007 and 2008, but were negligent in not investigating the situation more diligently once management responded that PwC had completed a significant amount of extra work. (FACC ¶ 242b.) Even if the AC Defendants had a duty to investigate further, failure to investigate constitutes negligence at most.

## Internal Control Deficiencies

The FACC alleges that the Management Letters contained information that might have alerted the AC Defendants to internal control deficiencies. However, there is nothing in the FACC to suggest that the AC Defendants actually saw the letters, as they were addressed "to the Company," and Lead Plaintiffs do

56

not allege that the Audit Committee received the letters.
Allegations concerning Slide 7 of the PwC presentation suffer
the same deficiency, as the FACC does not allege that PwC ever
presented Slides 16-19 to the Audit Committee, as Slide 7
suggests.  Notably, the comments on Slide 19 indicate that PwC
"evaluated the significance of the deficiencies" and the result
was that "there were no material weaknesses" and that "the
Company's internal control over financial reporting is
effective."  (Reply Decl. of Evert J. Christensen in Support of
Dir. Defs.' Mot. to Dismiss FACC, July 6, 2011, Ex 8 at 5.)[18]
Slide 19 thus contradicts Lead Plaintiffs' argument on this
point.

Nonetheless, even if the AC Defendants had read the letters
and heard a presentation which communicated internal control
deficiencies, Lead Plaintiffs offer no facts regarding the
specific deficiencies referenced or about how more thorough
investigation into these deficiencies would have led the AC
Defendants to discover the fraud based.  Moreover, given the
quantity and nature of the allegations in the FACC concerning
PwC's active participation in the fraud, it strains logic to
conclude that PwC would reveal to Satyam's Audit Committee
information that would itself have led to the discovery of the
fraud.

---

[18] The FACC quotes directly from an email which Defendants attached to their
reply papers, and the Court therefore considers it on this motion to dismiss.

Maytas Acquisition

Finally, Lead Plaintiffs provide no facts about the information supplied to the AC Defendants about the Maytas Acquisition, which they had a duty to monitor and ignored. In fact, the minutes from the Board meeting at which the Maytas Acquisition was proposed, which Lead Plaintiffs attached to their opposition papers, demonstrate that the Directors asked informed questions, received reasonable responses from management, and approved the transaction with several caveats, including the power to revoke approval if an independent valuation of the transaction proved unsatisfactory. (Decl. of Barry Michael in Support of Lead Pls.' Opp. Mem., June 2, 2011, Ex. 2.) Even more detrimental to Lead Plaintiffs' argument is that the Maytas Acquisition was proposed a mere seven days before Ramalinga Raju's confession, and the FACC does not allege that any misstatements were made after they received this purported warning. See In re Worldcom, 294 F. Supp. 2d at 418.

Lead Plaintiffs urge the Court not to "scrutinize each allegation in isolation," but to consider the allegations in their totality. (Lead Pls.' Opp. Mem. at 16-17 (quoting Tellabs, 551 U.S. at 322-23).) However, combining the handful of fruitless propositions asserted by Lead Plaintiffs does not raise a strong inference of fraudulent intent. Nor is the Court persuaded that any plausible inference of scienter is at least

as compelling as the opposite inference. Tellabs, 551 U.S. at
314. The majority of the allegations in the FACC concern an
intricate and well-concealed fraud perpetrated by a very small
group of insiders and only reinforce the inference that the AC
Defendants were themselves victims of the fraud. The strength
of this competing inference outweighs the inference of scienter
asserted by Lead Plaintiffs. Other courts have reached the same
conclusion. See e.g., W. Va. Inv. Mgmt. Bd. v. Doral Fin.
Corp., 344 F. App'x 717, 720 (2d Cir. 2009) ("[T]he opposing
inference-that Doral concealed its fraud from Pricewaterhouse,
just as it concealed its fraud from investors-is objectively
more compelling than plaintiffs' allegations of recklessness.");
S.E.C. v. Cohmad Sec. Corp., No. 09 Civ. 5680(LLS), 2010 WL
363844, at *2 (S.D.N.Y. Feb. 2, 2010) (dismissing section 10(b)
claims for lack of scienter where complaint alleged "reasonable
inference that Madoff fooled the defendants as he did individual
investors, financial institutions, and regulators"); In re Gen.
Elec. Co. Sec. Litig., No. 94 Civ. 4024(JFK), 1995 WL 590639, at
*4 (S.D.N.Y. Oct. 4, 1995) (finding that carefully-pleaded
allegations of fraudulent conduct and efforts to conceal same
refute the assertion that the scheme was so obvious as to raise
strong inference of scienter against non-perpetrators), aff'd
sub nom., Chill v. Gen. Elec. Co., 101 F.3d 263 (2d Cir. 1996).

Having considered the FACC in its entirety, the Court finds
that Lead Plaintiffs have failed to plead sufficient facts to
raise a strong inference of recklessness on the part of the AC
Defendants that is at least as compelling as the non-fraudulent
inference reasonably drawn from the allegations.  Accordingly,
the section 10(b) and Rule 10b-5 claim against the AC Defendants
is dismissed.

### D. Section 20(a) Control Person Liability

Section 20(a) of the Exchange Act provides that:

Every person who, directly or indirectly, controls any
person liable under any provision of this chapter or
of any rule or regulation thereunder shall also be
liable jointly and severally with and to the same
extent as such controlled person to any person to whom
such controlled person is liable[.]

15 U.S.C. § 78t(a).  To state a claim for control person
liability under section 20(a), "a plaintiff must show (1) a
primary violation by the controlled person, (2) control of the
primary violator by the defendant, and (3) that the defendant
was, in some meaningful sense, a culpable participant in the
controlled person's fraud." ATSI, 493 F.3d at 108 (citing
S.E.C. v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir.
1996) cert. denied, 128 S. Ct. 57 (1997)); see also In re
Citigroup Inc. Sec. Litig., 753 F. Supp. 2d 206, 248 (S.D.N.Y.
2010) (citing cases).  Pleading section 20(a) liability
"requires an individualized determination of a defendant's
control of the primary violator as well as a defendant's

60

particular culpability." Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998).

### i. Primary Violation

Defendants do not dispute that the FACC alleges sufficient facts to establish a primary violation of section 10(b) by the Officer Defendants. (Defs.' Mem. at 35-38.) Lead Plaintiffs have satisfied the first element.

### ii. Control Over Primary Violator

"Control" is defined in 17 C.F.R. § 240.12b-2 as "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." See also First Jersey, 101 F.3d at 1472-73 (adopting same standard for section 20(a) claim). To plead control adequately, a plaintiff must plead "actual control, not merely control person status." In re Scottish Re Sec. Litig., 524 F. Supp. 2d 370, 386 (S.D.N.Y. 2007) (quotation marks and citation omitted).

Generally, signing a financial statement filed by the company is enough to establish control over those who wrote the statement, as well as the content of the statement. In re Alstom, 406 F. Supp. 2d at 433 ("It comports with common sense to presume that a person who signs his name to a report has some measure of control over those who write the report.") (quoting Jacobs v. Coopers & Lybrand, LLP, No. 97 Civ. 3374(RPP), 1999

WL 101772, at *18 (S.D.N.Y. Mar. 1, 1999) (alteration and
additional citation omitted). Defendants Srinivasan, Palepu,
and Rao are all alleged to have signed the 2007 Registration
Statement. Whether signing the 2007 Registration Statement
establishes control over the allegedly false and misleading 20-
Fs and 6-Ks which were incorporated into the 2007 Registration
Statement is less clear. The Court need not decide this issue,
however, because the FACC alleges sufficiently another basis to
find that all five AC Defendants had control over the Company in
creating and issuing the fraudulent financial statements.

    Neither director status nor mere membership on an audit
committee, standing alone, is sufficient to demonstrate actual
control over a company or an allegedly fraudulent transaction.
See In re Livent, Inc. Notholders Sec. Litig., 151 F. Supp. 2d
371, 436 (S.D.N.Y. 2001) (citations omitted). The Court has
already concluded, however, that the AC Defendants'
responsibility to oversee the Company's financial reporting,
accounting, and internal controls evidences sufficient day-to-
day involvement in Satyam's operations to allow group pleading.
See supra at I.C.i. It follows that the AC Defendants'
oversight role is also sufficient to establish control for
purposes of a section 20(a) claim. See In re Refco, 503 F.
Supp. 2d at 639.

### iii. Culpable Participation

A plaintiff asserting a section 20(a) claim must allege at least "particularized facts of the controlling person's conscious misbehavior or recklessness." In re CIT Grp. Inc. Sec. Litig., No. 08 Civ. 6613(BSJ), 2010 WL 2365846, at *5 (S.D.N.Y. June 10, 2010) (citing In re UBS Auction Rate Sec. Litig., Nos. 08 Civ. 2967, 08 Civ. 3082, 08 Civ. 4352, 08 Civ. 5251, 2009 WL 860812, at *3 (S.D.N.Y. Mar. 30, 2009) (requiring plaintiffs to allege "some level of culpable participation at least approximating recklessness") (quotation marks omitted)); Steed Fin. LDC v. Nomura Sec. Int'l, Inc., No. 00 Civ. 8058, 2001 WL 1111508, at * 10 (S.D.N.Y. Sept. 20, 2001) ("A plaintiff may plead either conscious misbehavior or recklessness to satisfy the state of mind portion of the culpable participation element."). Just as Lead Plaintiffs have failed to allege sufficient facts supporting the AC Defendants' scienter, the FACC fails to allege particularized facts regarding the AC Defendants' culpable participation. See Harrison v. Rubenstein, No. 02 Civ. 9356(DAB), 2007 WL 582955, at *19 (S.D.N.Y. Feb. 26, 2007); Mishkin v. Ageloff, No. 97 Civ. 2690(LAP), 1998 WL 651065, at *26 (S.D.N.Y. Sept. 23, 1998) ("[T]he Complaint must provide some detail about what [the defendant] is alleged to have done, and when he did it, in order for me to hold that the Complaint provides 'particularized facts' of [the defendant's]

culpable participation."). The section 20(a) claim against the
AC Defendants is therefore dismissed.

## II. Claims Against the Maytas Defendants

The Maytas Defendants have moved to dismiss the section
20(a) claims in the FACC and the SAC, and the common law claims
for fraud, negligence, and negligent misrepresentation asserted
in the SAC on several grounds: (1) lack of personal jurisdiction
under Rule 12(b)(2); (2) forum non conveniens; (3) failure to
state a claim under Rule 12(b)(6) and the PSLRA; and (4)
preemption of the state law claims by the Securities Litigation
Reform Act.

### A. Personal Jurisdiction[19]

In order to be subject to personal jurisdiction in the
United States, the Maytas Defendants must have "certain minimum
contacts with [the United States] such that the maintenance of
the suit does not offend traditional notions of fair play and
substantial justice." Int'l Shoe Co. v. Washington, 326 U.S.
310, 316 (1945) (quotation marks and citations omitted). This
minimum contacts standard may be satisfied if the defendant has
purposefully directed his activities to the forum and the
litigation arises from or relates to those activities.

---

[19] The FACC and the SAC allege similar jurisdictional facts, and Aberdeen
relies completely on Lead Plaintiffs' jurisdictional arguments. (Aberdeen
Omnibus Mem. in Opp. to Mots. to Dismiss, June 17, 2011, 67 ("Aberdeen Opp.
Mem.").) For this reason, the Court will consider Lead Plaintiffs' and
Aberdeen's allegations and arguments together.

64

Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408,
414 (1984). Section 27 of the Exchange Act provides that
federal courts have national jurisdiction over claims arising
under the Act. 15 U.S.C. § 77v(a). Thus, Plaintiffs must
establish (1) that the Maytas Defendants caused effects within
the United States by an act performed outside the country, and
(2) that such effects are the "direct and foreseeable result of
the conduct outside the territory." Bersch v. Drexel Firestone,
Inc., 519 F.2d 974, 998-1000 (2d Cir. 1975) (citation omitted),
abrogated on other grounds by, Morrison v. Nat'l Australian
Bank, Ltd., 130 S. Ct. 2869 (2010).

Two types of personal jurisdiction are available to the
Court: (1) general jurisdiction based on the defendant's regular
business activities in the United States; and (2) specific
jurisdiction, which exists when the defendant has sufficient
minimum contacts with the forum and the litigation arises out of
or is related to the defendant's contact with the forum. See
Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 567-
68 (2d Cir. 1996) (emphasis added)., cert. denied, 117 S. Ct.
508 (1996). Plaintiffs assert only specific jurisdiction over
the Maytas Defendants, as is it not disputed that the Maytas
Defendants have no general business contacts with the United
States.

Plaintiffs contend that there is specific jurisdiction over the Maytas Defendants by virtue of "their participation in a conspiracy with Satyam, through the actions of the Officer Defendants, to defraud Satyam investors residing in the United States and/or who purchased Satyam ADSs on an Exchange operating in this District." (Lead Pls.' Opp. Mem. at 51.) Courts in this Circuit have recognized this conspiracy theory of personal jurisdiction, which allows "the acts of a co-conspirator [to] be attributed to a defendant for the purpose of obtaining personal jurisdiction over the defendant." Singer v. Bell, 585 F. Supp. 300, 302 (S.D.N.Y. 1984) (quotation marks and citations omitted); see also Allstate Life Ins. Co. v. Linter Grp. Ltd., 782 F. Supp. 215, 221 (S.D.N.Y. 1992) (collecting Second Circuit cases applying conspiracy theory of personal jurisdiction in Exchange Act context).[20]

Under this theory, a plaintiff must (1) make a prima facie factual showing of a conspiracy, (2) allege specific facts warranting the inference that the defendant was a member of the

---

[20] The Maytas Defendants contend that the conspiracy theory of personal jurisdiction is barred as a matter of law pursuant to post-Linter decisions by the Supreme Court and the Second Circuit confirming that there is no private right of action for aiding and abetting or conspiracy to violate section 10(b). (Maytas Reply Mem. at 6-7 (citing Janus Capital Grp., Inc. v. First Derivative Traders, No. 09-525, 2011 WL 2297762 (U.S. 2011); Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin, 135 F. 3d 837 (2d Cir. 1998); Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 191 (1994)).) The Court need not decide whether Linter and its progeny remain good law, as Plaintiffs have failed to allege sufficient facts to establish co-conspirator jurisdiction, and it is evident that this Court otherwise lacks personal jurisdiction over the Maytas Defendants.

66

conspiracy, and (3) set forth evidentiary facts to connect the
defendants with transactions occurring in the United States.
Linter, 782 F. Supp. at 221 (citing Chrysler Capital Corp. v.
Century Power Corp., 778 F. Supp. 1260, 1268-69 (S.D.N.Y.
1991)); see Huang v. Sentinel Gov't Sec., 657 F. Supp. 485, 492
(S.D.N.Y. 1987); Singer, 585 F. Supp. at 303.  Bland and
conclusory assertions of conspiracy are insufficient.  Linter,
782 F. Supp. at 221 (citing Lehigh Valley Indus., Inc. v.
Birenbaum, 527 F.2d 87, 93-94 (2d Cir. 1975)).

    Defendants make much of the fact that neither the FACC nor
the SAC asserts overtly that the Maytas Defendants participated
in a conspiracy, and that neither complaint uses the words
"conspiracy" or "co-conspirator."  (Maytas Reply Mem. in Support
of Mot. to Dismiss, July 8, 2011, 8 ("Maytas Reply Mem.").)
Defendants can point to only one controlling case where the
court dismissed claims for lack of personal jurisdiction in part
because the plaintiff asserted co-conspirator jurisdiction but
had not alleged an actual conspiracy in the complaint.  See Bank
Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779,
793 (2d Cir. 1999) (agreeing with district court that theories
of co-conspiracy jurisdiction and aiding and abetting
jurisdiction "are not pertinent because the complaint does not
allege that defendant conspired with, or aided and abetted,
anyone[.]") (quotation marks and citation omitted).

While neither complaint officially charges the Officer
Defendants and the Maytas Defendants with participation in a
conspiracy, the FACC and the SAC both allege sufficient facts to
support an inference that the Maytas Defendants participated in
a conspiracy to violate section 10(b), which was primarily
carried out by and among the Officer Defendants.  The complaints
allege that the Maytas Defendants were instrumentalities that
helped effectuate the Officer Defendants' fraudulent scheme by,
among other things, funneling stolen Satyam funds into real
estate purchases in India; engaging in straw man sales of Satyam
common stock; participating in the proposed cover-up Maytas
Acquisition; and reaping substantial profits from the scheme.
(FACC ¶¶ 34, 38, 113, 118-23; SAC ¶¶ 9, 273-76, 281-82, 284,
287-88.)  These allegations are enough to make a prima facie
showing of a de facto conspiracy in which the Maytas Defendants
participated and from which they benefitted.

Plaintiffs allege no facts, however, which connect any of
the Maytas Defendants with transactions occurring in the United
States, and thus they have not alleged sufficient minimum
contacts to exercise personal jurisdiction over this group of
defendants.  See Del Ponte v. Universal City Dev. Partners,
Ltd., No. 07 Civ. 2360(KMK)(LMS), 2008 WL 169358, at *8 n.6
(S.D.N.Y. Jan. 16, 2008) ("Supreme Court and Second Circuit
authority is quite clear on this matter: specific jurisdiction

requires a showing that Plaintiffs' claim 'arises out of or relates to' [Defendant's] contacts with the forum."). The factual allegations that the Maytas Defendants participated in a de facto conspiracy do not demonstrate any link between the Maytas Defendants and the false and misleading statements at issue here. Plaintiffs assert only conclusorily that the Maytas Defendants "had the ability to prevent the issuance of the false and misleading statements or cause the statements to be corrected." (SAC ¶ 339.) Such bare assertions are insufficient to allege that the Maytas Defendants purposefully directed their activities to the United States such that they "should reasonably anticipate being haled into court" here. See Worldwide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980) (citations omitted). Absent any link between the Maytas Defendants' allegedly fraudulent conduct and the minimum contacts necessary to exercise personal jurisdiction over them, all claims asserted against the Maytas Defendants are dismissed.

Plaintiffs have requested that in the event the Court finds the jurisdictional allegations to be insufficient, they have an opportunity to conduct limited jurisdictional discovery. (Aberdeen Opp. Mem. at 67 n.52.) However, Plaintiffs "did not provide an outline of how their showing of minimum contacts might be enhanced by jurisdictional discovery." In re Terrorist Attacks on September 11, 2001, 349 F. Supp. 2d 765, 813

(S.D.N.Y. 2005) (quotation marks and citation omitted). The Court therefore denies Plaintiffs' request for jurisdictional discovery.

Because the Court has dismissed the claims against the Maytas Defendants for lack of personal jurisdiction, it need not address the additional asserted bases for dismissal.

## CONCLUSION

For the foregoing reasons, the Director Defendants' motions to dismiss the FACC are GRANTED. Co-Lead Plaintiff MPERS' Exchange Act claims are dismissed pursuant to Morrison. The Exchange Act and Securities Act claims brought on behalf of the employee stock option plan sub-class are dismissed either for lack of standing or under Morrison. The claims brought by MPS, SKAGEN, Sampension, and IBEW against the AC Defendants are dismissed for failure to state a claim under Rule 12(b)(6).

The Maytas Defendants' motions to dismiss the FACC and the SAC for lack of personal jurisdiction under Rule 12(b)(2) are GRANTED. The Clerk of the Court is directed to terminate the motions located at Dkt. Nos. 264, 266, 269, 279, 281, 283, 289, 291, and 293.

SO ORDERED:

BARBARA S. JONES
UNITED STATES DISTRICT JUDGE

Dated:     New York, New York
           January 2, 2013